IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

---

SELAM SELAH,

Plaintiff,

v.

Civil Action No.
9:09-CV-1363 (GLS/DEP)

BRIAN FISCHER, Commissioner; JUSTIN TAYLOR, Superintendent; KAREN BELLAMY, Director of DOCCS Inmate Grievance Program; T. KILLIAN, Senior Chaplain; MARK LEONARD, Director of Ministerial and Family Services; ABUNA FOXE, DOCCS Rastafarian Religious Advisor; CHERYL MORRIS, Director of Ministerial Services; FR. E. MANTZOURIS, Greek Orthodox Christian Chaplain; and New York DOCCS,

Defendants.

---

APPEARANCES:

FOR PLAINTIFF: OF COUNSEL:

SELAM SELAH, *Pro Se*
08-B-2266
Clinton Correctional Facility
P.O. Box 2002
Dannemora, NY 12929

FOR DEFENDANTS:

HON. ERIC SCHNEIDERMAN
Office of the Attorney General
State of New York
Department of Law
The Capitol
Albany, New York 12224

MEGAN M. BROWN, ESQ.
Assistant Attorney General

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

REPORT AND RECOMMENDATION

*Pro se* plaintiff Selam Selah, a New York State prison inmate, has commenced this action against the New York State Department of Corrections and Community Supervision ("DOCCS"), the agency's Commissioner, and eight other DOCCS employees, pursuant to 42 U.S.C. § 1983, alleging deprivation of his civil rights. In his complaint plaintiff asserts that the defendants have violated his constitutional rights to equal protection and free religious exercise, as well as those guaranteed under the Religious Land Use and Institutionalized Person Acts ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.,* by failing to accommodate his religious beliefs and permit him to practice his chosen religion, while members of other religious sects, including Rastifarians, are treated more favorably.

Currently pending before the court in connection with this action is a motion brought by the defendants seeking dismissal of plaintiff's complaint for failure to state a cause of action upon which relief may be granted. In their motion defendants argue that plaintiff's complaint fails to comply with governing pleading requirements and that certain of the claims set forth are not legally cognizable. In addition, defendants assert that they are

entitled to qualified immunity from suit. For the reasons set forth below, I recommend that plaintiff's claims against the DOCCS be dismissed, but that defendants' motion otherwise be DENIED.

## I. BACKGROUND[1]

Plaintiff is a prison inmate entrusted to the custody of the DOCCS. *See generally* Amended Complaint (Dkt. No. 84). While at the time this action was commenced plaintiff was confined within the Gouverneur Correctional Facility ("Gouverneur"), located in Gouverneur, New York, *see* Complaint (Dkt. No. 1) ¶ 2, he was later transferred into the Orleans Correctional Facility, located in Albion, New York, Amended Complaint (Dkt. No. 84) ¶ 34. He is currently incarcerated at the Clinton Correctional Facility, located in Dannemora, New York. *See* Dkt. entry of 1/19/12. Plaintiff's inter-facility transfers, however, do not appear to impact upon

---

[1] In light of the procedural posture of the case, the following recitation of facts has been drawn principally from plaintiff's amended complaint, Dkt, No. 84, as well as the materials submitted by the plaintiff in opposition to the defendants' motion, Dkt. No. 113, to the extent they are consistent with the allegations set forth in his complaint. *See Tejada v. Mance,* No. 9:07-CV-0830, 2008 WL 4384460, at *4 n.27 (N.D.N.Y. Sep. 22, 2008) (Mordue, C.J.) (citing, *inter alia*, *Donhauser v. Goord*, 314 F. Supp. 2d 119, 121 (N.D.N.Y. 2004), *vacated in part on other grounds*, 317 F. Supp. 2d 160 (N.D.N.Y. 2004)). Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

his claims, which address agency-wide DOCCS policies and practices.[2]
*Id.*

Plaintiff subscribes to the religious tenets of the Ethiopian Orthodox
Christian Faith, which is also known as Ethiopian-Egyptian Coptic
Orthodox Christianity.  Amended Complaint (Dkt. No. 84) ¶ 21; *see also*
Complaint (Dkt. No. 1) p. 20.  Plaintiff's religion has many similarities to
Rastafarianism with the exception that its teachings acknowledge Jesus
Christ as the Messiah, whereas Rastafarians do not.  Amended Complaint
(Dkt. No. 84) ¶ 21.

Plaintiff's complaint in this action centers upon defendants' alleged
failure to recognize and accommodate his religion.  Plaintiff maintains that
this failure is manifested through defendants' 1) refusal to permit plaintiff
and others of his religious persuasion to possess and display head gear, a
prayer shawl, a prayer girdle, a prayer rug, and other appropriate religious
attire and artifacts consistent with their beliefs; 2) refusal to allow

---

[2]     It appears that plaintiff has filed at least one prior action relating to the
failure of the DOCCS or its predecessor, the Department of Correctional Services, to
recognize his religion and provide him with accommodation including, *inter alia,* a
kosher diet, and that at least at one point the agency entered into an agreement with
the plaintiff to recognize his religion and permit him to receive a kosher diet.  *Selah v.
Goord,* No. 00-CV-0644, 2002 WL 73231, at * 1 (N.D.N.Y. Jan. 2, 2002).

members of plaintiff's sect to observe and commemorate seven specified major holy days and nine minor holy days; 3) denial of the opportunity to participate in congregate religious services and education; 4) failure to provide meals consistent with old testament dietary laws; 5) failure to permit the plaintiff and his fellow Ethiopian Orthodox Christians to wear beards and dreadlocks or braids; and 6) refusal to exempt him from work on Saturdays and Sundays. Plaintiff maintains that despite his complaints to various prison officials within the DOCCS hierarchy, his requests for accommodation have not been honored, while Rastafarians are provided all or most of the accommodations now sought.

## II. PROCEDURAL HISTORY

Plaintiff commenced this action on December 7, 2009. Dkt. No. 1. Since inception of the action the court has been besieged with numerous and oftentimes repetitive serial filings by the plaintiff requesting various forms of relief, resulting in a procedural history which, to date, includes some 124 docket entries spanning over the two years during which the case has been pending, despite the fact that issue has not yet been joined by the filing of an answer. In addition to the standard motion for leave to proceed *in forma pauperis*, Dkt. No. 2, that history includes the filing of six

motions for a temporary restraining order and/or preliminary injunction, three requests for the appointment of *pro bono* counsel, and an application for certification of the matter as a class action. *See* Dkt. No. 5, 6, 69, 74, 86, 89, 109, 115, and 122.

On September 14, 2011, with leave of court, plaintiff filed an amended complaint – the currently operative pleading in the case.[3] Dkt. No. 84. Plaintiff's complaint, as amended, names as defendants DOCCS Commissioner Brian Fischer; DOCCS Rastafarian Religious Advisor Abuna Foxe; the agency's Greek Orthodox Christian Chaplain, Fr. E. Mantzouris; Cheryl Morris, the DOCCS Director of Ministerial Services; Karen Bellamy, the Director of the DOCCS Inmate Grievance Program; Justin Taylor, the Superintendent at Gouverneur; T. Killian, the Senior Chaplain at Gouverneur; and Mark Leonard, the DOCCS Director of Ministerial and Family Services, all of whom are sued in both their individual and official capacities, as well as the DOCCS itself. *Id.* Plaintiff's complaint alleges violation of his right to freely exercise his

---

[3] Both the signed version of the plaintiff's amended complaint and the proposed pleading proffered by Selah in support of his motion for leave to file that amended complaint appear to be lacking pages 2 and 3 and corresponding allegations of paragraphs 3 through a portion of paragraph 7. *See* Dkt. Nos. 68-1, 84.

chosen religion, as guaranteed under the First Amendment to the United States Constitution, the denial of equal protection, in violation of the Fourteenth Amendment, and infringement of his statutory rights under the RLUIPA, and seeks various forms of monetary, declaratory, and injunctive relief.[4] *Id.*

In response to plaintiff's complaint defendants have moved seeking its dismissal pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Dkt. No. 111. In support of that motion, defendants argue that 1) plaintiff's amended complaint fails to meet the governing pleading requirements of Rules 8 and 10 of the Federal Rules of Civil Procedure; 2) plaintiff has failed to demonstrate the existence of a plausible claim under any of the constitutional or statutory provisions cited; 3) plaintiff's claims against the DOCCS are subject to dismissal on the basis of sovereign immunity and the Eleventh Amendment; and 4) in any event the individual defendants are entitled to qualified immunity from suit. *Id.* Plaintiff has since submitted papers in opposition to defendants' motion. Dkt. No. 113.

---

[4] In his complaint plaintiff purports to assert claims on behalf of himself and other similarly situated inmates. His request for class certification, however, has been denied by the court. *See* Memorandum-Decision and Order dated May 19, 2010 (Dkt. No. 9) pp. 3-5.

Defendants' motion, which is now been fully briefed and ripe for determination, has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

## III. DISCUSSION

### A. Dismissal Motion Standard

A motion to dismiss a complaint, brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading, utilizing as a backdrop a pleading standard which, though unexacting in its requirements, "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555, 127 S. Ct. 1955, 1964-65 (2007)). Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *see also id.* While modest in its requirements, that rule commands that a complaint contain more than mere legal conclusions; "[w]hile legal conclusions can provide the framework of a complaint, they

must be supported by factual allegations." *Iqbal*, 556 U.S. 679, 129 S. Ct. at 1950.

In deciding a Rule 12(b)(6) dismissal motion, though the court must accept the material facts alleged in the complaint as true and draw all inferences in favor of the non-moving party, *Hudson v. Palmer*, 468 U.S. 517, 541 n.1, 104 S. Ct. 3194, 3208 n.1 (1984) (citing cases); *Miller v. Wolpoff & Abramson, LLP*, 321 F.3d 292, 300 (2d Cir. 2003), *cert. denied*, 540 U.S. 823, 124 S. Ct. 153 (2003); *Burke v. Gregory*, 356 F. Supp. 2d 179, 182 (N.D.N.Y. 2005) (Kahn, J.), it is "'not bound to accept as true a legal conclusion couched as a factual allegation'", *Iqbal*, 129 S. Ct. at 1950 (quoting *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1965). To withstand a motion to dismiss, a complaint must plead sufficient facts which, when accepted as true, state a claim that is plausible on its face. *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008) (citing *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974). As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.'" *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 570, 127 S. Ct.

at 1974) (alteration in original).

When assessing the sufficiency of a complaint against this backdrop, particular deference should be afforded to a *pro se* litigant, whose complaint merits a generous construction by the court when determining whether it states a cognizable cause of action. *Erickson v. Pardus*, 551 U.S. 89, 94, 127 S. Ct. 2197, 2200 (2007) ("[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.") (quoting *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S. Ct. 285, 292 (1976) (internal quotations omitted)); *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008) (citations omitted); *Kaminski v. Comm'r of Oneida Cnty. Dep't of Social Servs.*, 804 F. Supp. 2d 100, 104 (N.D.N.Y. 2011).

B. The DOCCS as a Named Defendant

In their motion defendants argue that plaintiff's claims against the DOCCS are in reality brought against the State and are therefore subject to dismissal on the basis of sovereign immunity.[5]

The Eleventh Amendment protects a state against suits brought in

---

[5] In its decision rendered on September 7, 2011 the court noted that the DOCCS was not amenable to suit and ordered plaintiff's damage claims against that agency dismissed. *See* Memorandum-Decision and Order, dated September 7, 2011 (Dkt. No. 82) p. 7.

federal court by citizens of that state, regardless of the nature of the relief sought.[6] *Alabama v. Pugh*, 438 U.S. 781, 782, 98 S. Ct. 3057, 3057-58 (1978). This absolute immunity which states enjoy under the Eleventh Amendment extends to state agencies such as the DOCCS. *Salvodon v. New York*, No. 11 Civ. 2190(PAC)(KNF), 2012 WL 1694613, at *3 (S.D.N.Y. May 14, 2012); *Bloom v. Fischer*, No. 11–CV–6237L, 2012 WL 45470, at *3 (W.D.N.Y. Jan. 3, 2012) (citing *Whitfield v. O'Connell*, 09 Civ.1925, 2010 WL 1010060, at *4 (S.D.N.Y. Mar. 18, 2010) ("[B]ecause Section 1983 does not abrogate a state's sovereign immunity and the State of New York has not waived its immunity, claims against DOCS for both monetary and injunctive relief are barred under the Eleventh Amendment") (citations omitted), *aff'd,* 402 Fed. App'x 563 (2d Cir. 2010), *cert. denied*, — U.S. —, 131 S. Ct. 2132 (2011)) (other citation omitted); *see also Richards v. State of New York Appellate Div., Second Dep't*, 597 F. Supp. 689, 691 (E.D.N.Y. 1984) (citing *Pugh* and *Cory v. White*, 457 U.S. 85, 89-91, 102 S. Ct. 2325, 2328-29 (1982)). Accordingly, plaintiff's

---

[6] In a broader sense, this portion of defendants' motion implicates the sovereign immunity enjoyed by the State. As the Supreme Court has reaffirmed the sovereign immunity enjoyed by the states is deeply rooted, having been recognized in this country even prior to ratification of the Constitution, and is neither dependent upon nor defined by the Eleventh Amendment. *Northern Ins. Co. of New York v. Chatham County*, 547 U.S. 189, 193, 126 S. Ct. 1689, 1693 (2006).

claims against the DOCCS are subject to dismissal.[7]

C.    Compliance with Rules 8 and 10

Defendants next argue that plaintiff's amended complaint fails to comply with the requirements of Rules 8 and 10 of the Federal Rules of Civil Procedure.[8]  As was previously noted, Rule 8 of the Federal Rules of Civil Procedure, which sets forth the general pleading requirements applicable to most complaints filed in the federal courts, requires that such a pleading include "a short and plain statement of the claim showing that the pleader is entitled to relief[.]"  Fed. R. Civ. P. 8(a); *see In re*

---

[7]       In addition to damages, plaintiff's amended complaint seeks declaratory and injunctive relief, which would not necessarily be barred by sovereign immunity or the Eleventh Amendment. *See United States v. Georgia*, 546 U.S. 151, 160, 126 S. Ct. 877, 882 (2006).  "[A]ctions involving claims for prospective declaratory or injunctive relief are permissible provided the official against whom the action is brought has a direct connection to, or responsibility for, the alleged illegal action." *Davidson v. Scully*, 148 F. Supp. 2d 249, 254 (S.D.N.Y. 2001) (quotation and citations omitted); *see also Koehl v. Dalsheim*, 85 F.3d 86, 89 (2d Cir. 1996) (finding that it was error for district court to dismiss claim for injunctive relief against superintendent where plaintiff had sufficiently alleged a claim for medical indifference, noting superintendent had overall responsibility to ensure that prisoners' basic needs were met and that if plaintiff can prove his contentions, he may well be entitled to injunctive relief.).  Because the Commissioner of the DOCCS is named as a defendant, both individually and in his official capacity, and thus the agency would be subject to any declaratory and injunctive relief entered against him in his official capacity, I find it unnecessary to also include the DOCCS as an additional named defendant in the action and will therefore recommend dismissal of all claims against that agency.

[8]       As was previously observed, when opposing plaintiff's motion for leave to file his amended complaint defendants did not object to the sufficiency of the proposed pleading under Rules 8 and 10.  *See* Memorandum-Decision and Order, dated September 7, 2011 (Dkt. No. 82) at p. 6.

*WorldCom, Inc.*, 263 F. Supp. 2d 745, 756 (S.D.N.Y. 2003). The purpose of Rule 8 "'is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a responsive answer [and] prepare an adequate defense.'" *Hudson v. Artuz*, 1998 WL 832708, *1 (quoting *Powell v. Marine Midland Bank*, 162 F.R.D. 15, 16 (N.D.N.Y.1995) (quoting *Brown v. Califano*, 75 F.R.D. 497, 498 (D.D.C.1977))) (other citation omitted). A complaint asserting only bare legal conclusions is insufficient. *Iqbal*, 556 U. S. at 678, 129 S. Ct. at 1950 (quoting *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1965). Instead, the complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974. A claim will have "facial plausibility when the plaintiff pleads [sufficient] factual content [to] allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949.

In the end, Rule 8 contemplates only notice pleading; under the rule's mandates, a complaint must sufficiently apprise a defendant as to the nature of plaintiff's claims with sufficient clarity to allow that defendant to answer and prepare for trial. *Salahuddin v. Cuomo*, 861 F.2d 40, 42

(2d Cir. 1988). To the extent that greater detail is required in order to effectively defend against such claims, "it is the role of the litigation tools of discovery and summary judgment to weed out unmeritorious suits." *In re Natural Gas Commodity Litig.*, 337 F. Supp. 2d 498, 506 (S.D.N.Y. 2004) (citation omitted).

To be sure, a complaint lodged by a *pro se* plaintiff can properly be dismissed under appropriate circumstances for failing to comply with the applicable pleading requirement that it be "short and plain." *Philips*, 408 F.3d at 130; *Pickering-George v. Cuomo*, No. 1:10-CV-771, 2010 WL 5094629, at * 4 n.8 (N.D.N.Y. Dec. 8, 2010) (Suddaby, J.) (citing cases). "Dismissal, however, is 'usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised.'" *Hudson*, 1998 WL 832708, *2 (citation omitted).

Turning to Federal Rule of Civil Procedure 10, I note that this provision imposes a requirement whose intent is largely pragmatic, requiring, among other things, that a pleading consist of separately numbered paragraphs "each of which shall be limited as far as practicable to a statement of a single set of circumstances[.]" Fed. R. Civ. P. 10(b).

Rule 10(b) is designed to assist litigants and the court by allowing the interposition of a responsive pleading and the corresponding framing of issues with sufficient clarity to allow an orderly and meaningful presentation of a plaintiff's claims and any corresponding defenses, either on motion or at trial. *See Flores v. Graphtex*, 189 F.R.D. 54, 55 (N.D.N.Y. 1999).

Analysis of plaintiff's amended complaint, in the face of defendants' motion, is informed not only by the salutary purposes to be served by these pleading requirements, but additionally by two equally important principles. First, it is a well-established requirement that a complaint prepared by a *pro se* litigant is entitled to liberal construction in his or her favor. *Salahuddin v. Cuomo*, 861 F.2d at 42-43. Additionally, courts generally favor adjudication of cases on their merits, rather than on the basis of a technicalities or procedural niceties. *Id.* at 42; *see also Zdziebloski v. Town of East Greenbush, New York*, 101 F. Supp. 2d 70, 72 (N.D.N.Y. 2000)(citing *Salahuddin*); *Upper Hudson Planned Parenthood, Inc. v. Doe*, 836 F.Supp. 939, 943 n.9 (N.D.N.Y. 1993).

A counterweight to these considerations, which militate in favor of lenity toward a plaintiff, is the challenge presented by plaintiff's lengthy

and verbose complaint, particularly to the defendants who must frame a proper responsive pleading, as well as to the court in discerning the contours of the plaintiff's claims.  "[U]nnecessary prolixity in a pleading places an unjustified burden on the court and the party who must respond to it because they are forced to select the relevant material from a mass of verbiage."  *Salahuddin v. Cuomo,* 861 F.2d at 42; *see also Ceparano v. Suffolk Cnty.,* No. 10-CV-2030 (SJF) (ATK), 2010 WL 5437212, at *3 (E.D.N.Y. Dec. 15, 2010).

In this instance, while plaintiff's original complaint suffered from his failure to include numbered paragraphs, as demanded by Rule 10, this deficiency has been cured, and plaintiff's amended complaint, as defendants acknowledge, does contain allegations that are separately numbered.  Though many of the paragraphs contained in plaintiff's amended complaint are prolix and contain more than the "single set of circumstances" contemplated under Rule 10(b), in the court's view the amended complaint is sufficiently parsed out to permit formulation of proper answer.

The court has also reviewed the allegations set forth in plaintiff's complaint to determine whether they adequately apprise the defendants of

the nature of his claims. Though plaintiff's amended complaint is indeed unnecessarily lengthy, laced with unnecessary verbiage, and accompanied by random and seemingly unorganized attachments, it provides fair notice to defendants of the claims being asserted. Distilled to its core, the complaint discloses the existence of cognizable claims that defendants have interfered with plaintiff's free exercise of his religious beliefs in violation of the First Amendment and RLUIPA, and additionally that he has been denied equal protection based upon the differences between the treatment afforded to members of his religion and others within the DOCCS system. Where, as here, a complaint, though burdened with irrelevant detail, does articulate, recognizable, alleged unconstitutional behavior, dismissal is not warranted. *See Prezzi v. Schelter*, 469 F.2d 691, 692 (2d Cir. 1972) (per curiam), *cert. denied*, 411 U.S. 935, 93 S. Ct. 1911 (1973) with these guiding principles as a backdrop. I have concluded that plaintiff's complaint, though by no means a model of clarity, gives fair notice of the claims being asserted in the action and therefore satisfies the minimal pleading requirements of Rule 8 of the Federal Rules of Civil Procedure. *Shomo v. State of New York,* 374 Fed. App'x 180, 2010 WL 1628771 (2d Cir. 2010) (cited in accordance

with Fed. R. App. P. 32.1) (citing *Phillips*, 408 F.3d at 130).

The bases for plaintiff's claims are sufficiently delineated in his pleading, in which he asserts violations of the First Amendment's Free Exercise Clause, the Equal Protection Clause of the Fourteenth Amendment, and the RLUIPA. The facts forming the underpinnings of those claims are also set forth, including the religious accommodations plaintiff has requested but has been denied. In sum, when read with the requisite deference owed to the plaintiff as a *pro se* inmate, albeit a somewhat seasoned litigator, I conclude that plaintiff's amended complaint meets the requirements of Rules 8 and 10, and therefore recommend denial of the portion of defendants' motion asserting his failure to comply with those rules.

D. Legal Sufficiency of Plaintiff's Religious Exercise Claims

In their motion, citing *Iqbal* and *Twombly*, defendants argue that plaintiff's amended complaint, with its conclusory allegations, fails to state a claim upon which relief may be granted. That argument is only half-heartedly stated, and does not include any analysis of plaintiff's constitutional and statutory claims. The court has nonetheless reviewed the allegations of plaintiff's complaint with an eye toward determining

whether his claims pass muster under the governing Rule 12(b)(6) standard, discussed above.

As a starting point, I note that it is well-established that prison inmates do not shed all rights upon entry into the prison system.  While inmates confined within prison facilities are by no means entitled to the full panoply of rights guaranteed under the United States Constitution, including its First Amendment, the Free Exercise Clause of that amendment does afford them at least some measure of constitutional protection, including of their right to participate in congregate religious services.  *See Pell v. Procunier,* 417 U.S. 817, 822, 94 S. Ct. 2800, 2804 (1974) ("In the First Amendment context . . . a prison inmate retains those First Amendment rights that are not inconsistent with his [or her] status as a prisoner or with the legitimate penological objectives of the corrections system."); *see also Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir. 1993) ("It is well established that prisoners have a constitutional right to participate in congregate religious services.") (citing cases).  That right extends under certain circumstances beyond mere attendance at congregate religious services, and also prohibits adoption of polices or practices that burden an inmate's sincerely held religious beliefs unless

they are reasonably related to legitimate penological interests. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349, 107 S. Ct. 2400 (1987). Courts must analyze free exercise claims asserted by prison inmates by evaluating "1) whether the practice asserted is religious in the person's scheme of beliefs, and whether the belief is sincerely held; 2) whether the challenged practice of the prison officials infringes upon the religious belief;[9] and 3) whether the challenged practice of the prison officials furthers some legitimate penological objective." *Farid v. Smith*, 850 F.2d 917, 926 (2d Cir.1988) (citations omitted).

Similar protections are accorded to inmates under the RLUIPA, a statutory enactment forming the basis for some of plaintiff's claims. That statute provides, in pertinent part, that

> [n]o government shall impose a substantial burden on the religious exercise of a person residing in or

---

[9] "In *Salahuddin*, the Second Circuit left open the question of whether a plaintiff bringing a free exercise claim under the First Amendment must make a threshold showing that his sincerely held religious beliefs have been 'substantially burdened.'" *DeBlasio v. Rock*, No. 9:09-CV-1077, 2011 WL 4478515, at *21 n.21 (N.D.N.Y. Sep. 26, 2011) (McAvoy, S.J.); *Pilgrim v. Artus*, No. 9:07-CV-1001, 2010 WL 3724883, at * 13 n.10 (N.D.N.Y. 2010) (Treece, M.J.) (citing *Salahuddin v. Goord*, 467 F.3d 263, 274-75 n.5 (2d Cir. 2006) and *Pugh v. Goord*, 571 F. Supp. 2d 477, 497 n.10 (S.D.N.Y. 2008) (noting that the Second Circuit has twice declined to answer the question)), *report and recommendation adopted*, 2010 WL 3724881 (N.D.N.Y. Sep 17, 2010) (Sharpe, J.).

> confined to an institution . . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of a burden on that person – 1) is in furtherance of a compelling governmental interest; and 2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a). The familiar principles informing the analysis of plaintiff's free exercise claim under the First Amendment are similar to those applicable to his RLUIPA cause of action, although the two claims are analyzed under slightly different frameworks. *See Salahuddin v. Goord*, 467 F.3d at 264.

Plaintiff's complaint also asserts an equal protection claim, arguing that he and other members of his designated religion are treated differently by the defendants than Rastafarian inmates despite the similarity of their religious beliefs. The Equal Protection Clause directs state actors to treat similarly situated persons alike. *See City of Cleburne, Texas v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 3254 (1985). To prove a violation of the Equal Protection Clause, a plaintiff must demonstrate that he or she was treated differently than others similarly situated as a result of intentional or purposeful discrimination directed at an identifiable or suspect class. *See Giano v. Senkowski*, 54

F.3d 1050, 1057 (2d Cir.1995) (citing, *inter alia*, *McCleskey v. Kemp*, 481

U.S. 279, 292, 107 S. Ct. 1756, 1767 (1987)).  The plaintiff must also

show that the disparity in treatment "cannot survive the appropriate level

of scrutiny which, in the prison setting, means that he must demonstrate

that his treatment was not reasonably related to [any] legitimate

penological interests."  *Phillips*, 408 F.3d at 129 (quoting *Shaw v. Murphy*,

532 U.S. 223, 225, 121 S. Ct. 1475 (2001) (internal quotation marks

omitted)).

Plaintiff's claims of interference with his free religious exercise rights

under the First Amendment and the RLUIPA, and an alleged Equal

Protection violation based upon the difference between defendants'

treatment of members of his religion and Rastafarians, are plausibly

stated in his amended complaint.  Plaintiff has alleged the existence of

specific policies and practices within the prison facilities in which he has

been housed prohibiting the growing of beards and wearing of dreadlocks

or braids, the refusal to permit possession and wearing religious head

coverings, the failure to permit the possession of prayer rugs, religious

shawls and religious girdles, the failure to provide a kosher diet mandated

by the tenets of his religion, the failure to permit the observance of

specified religious holidays, and the failure to excuse the plaintiff from working on Saturdays and Sundays.[10] While in response defendants undoubtedly will either deny those allegations or assert that those policies or practices are justified by legitimate penological concerns, and in the end may well prevail in defending against those claims, the allegations contained within plaintiff's complaint assert sufficient facts to permit the court to conclude that plausible claims have been stated under the First Amendment, the RLUIPA, and the Equal Protection Clause of the Fourteenth Amendment. I therefore recommend the defendants' motion seeking dismissal plaintiff's claims as insufficiently stated on the merits be denied.

E. Qualified Immunity

In their motion defendants also assert their entitlement to qualified immunity from suit.

Qualified immunity shields government officials performing

[10] Denial of the right of inmates to wear religious head gear, for example, can rise to a level sufficient to establish a constitutional violation absent a showing that the policy relates to legitimate penological concerns. *Excell v. Burge*, No. 9:05-CV-1231, 2008 WL 4426647, at *7 (N.D.N.Y. Sept. 25, 2008) (Kahn, J. and DiBianco, M.J.) (citing *Benjamin v. Coughlin*, 905 F.2d 571, 578-79 (2d Cir.), *cert. denied*, 498 U.S. 951 (1990)).

discretionary functions from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982) (citations omitted).  "In assessing an officer's eligibility for the shield, 'the appropriate question is the objective inquiry whether a reasonable officer could have believed that [his or her actions were] lawful, in light of clearly established law and the information the officer[ ] possessed."  *Kelsey v. Cnty. of Schoharie*, 567 F.3d 54, 61 (2d Cir. 2009) (quoting *Wilson v. Layne*, 526 U.S. 603, 615, 119 S.Ct. 1692 (1999)).  The law of qualified immunity seeks to strike a balance between the need to hold government officials accountable for irresponsible conduct and the need to protect them from "harassment, distraction, and liability when they perform their duties reasonably."  *Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 815 (2009) .

     In *Saucier v. Katz*, 533 U.S. 194, 121 S. Ct. 2151 (2001), the Supreme Court "mandated a two-step sequence for resolving government official's qualified immunity claims."  *Pearson*, 555 U.S. at 232, 129 S. Ct. at 815-16.  The first step requires the court to consider whether, taken in the light most favorable to the party asserting immunity, the facts alleged

show that the conduct at issue violated a constitutional right,[11] *Kelsey*, 567 F.3d at 61, with "the second step being whether the right is clearly established", *Okin v. Village of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 430 n.9 (citing *Saucier*).[12] Expressly recognizing that the purpose of the qualified immunity doctrine is to ensure that insubstantial claims are resolved prior to discovery, the Supreme Court retreated from the prior *Saucier* two-step mandate in its later decision, in *Pearson* concluding that because "[t]he judges of the district courts and courts of appeals are in the best position to determine the order of decisionmaking [that] will best facilitate the fair and efficient disposition of each case", those decision makers "should be permitted to exercise their sound discretion in deciding which of the . . . prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the

[11] In making the threshold inquiry, "[i]f no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. *Saucier,* 533 U.S. at 201, 121 S. Ct. 2151.

[12] In *Okin*, the Second Circuit clarified that the "'objectively reasonable' inquiry is part of the 'clearly established' inquiry", also noting that "once a court has found that the law was clearly established at the time of the challenged conduct and for the particular context in which it occurred, it is no defense for the [government] officer who violated the clearly established law to respond that he held an objectively reasonable belief that his conduct was lawful." *Okin*, 577 F.3d at 433, n.11 (citation omitted).

particular case at hand."[13]  *Pearson*, 555 U.S. at 236, 242, 129 S. Ct. at

818, 821.  In other words, as recently emphasized by the Second Circuit,

the courts "are no longer *required* to make a 'threshold inquiry' as to the

violation of a constitutional right in a qualified immunity context, but we are

free to do so."  *Kelsey*, 567 F.3d at 61(citing *Pearson*, 129 S. Ct. at 821)

(emphasis in original).

For courts engaging in a qualified immunity analysis, "the question

after *Pearson* is 'which of the two prongs . . . should be addressed in light

of the circumstances in the particular case at hand.'" *Okin*, 577 F.3d 430

n.9 (quoting *Pearson*).  "The [*Saucier* two-step] inquiry is said to be

appropriate in those cases where 'discussion of why the relevant facts do

not violate clearly established law may make it apparent that in fact the

relevant facts do not make out a constitutional violation at all.'" *Kelsey*,

567 F.3d at 61 (quoting *Pearson*, 129 S. Ct. at 818).

Qualified immunity is a defense not often particularly well-suited for

a disposition in a motion to dismiss under Rule 12(b)(6).  Undeniably, the

---

[13]     Indeed, because qualified immunity is "an immunity from suit rather than a mere defense to liability. . .", *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806 (1985), the Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in the litigation." *Pearson*, 555 U.S. at 231, 129 S. Ct. at 815 (quoting *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S. Ct. 524 (1991) (per curiam)).

legal rights asserted in plaintiff's complaint are and were well-known and established at the relevant times. *Salahuddin v. Goord*, 467 F.2d at 277; *see also Amaker v. Goord*, No. 06–CV–490A(Sr), 2010 WL 2595286, at * 10 (W.D..Y. Mar. 25, 2010), *report and recommendation adopted*, 2010 WL 2572972 (W.D.N.Y. Jun. 23, 2010). Unfortunately, the question of whether prison officials in the positions of the defendants would reasonably have known that their actions toward the plaintiff, as alleged in his complaint, abridged those rights is inextricably intertwined with the merits of plaintiff's claims such that, at least at this early procedural juncture, it cannot be said that the defendants are entitled to qualified immunity. *See Amaker*, 2010 WL 2595286, at * 10; *Dicks v. Binding Together, Inc.*, No. 03 Civ. 7411, 2007 WL 1462217, at * 10 (S.D.N.Y. May 18 2007), *aff'd in part*, 382 Fed. App'x 28 (2d Cir. 2010) (summary order).

## IV. SUMMARY AND RECOMMENDATION

With the passage of more than two years since the filing of this action and many procedural stops along the way, plaintiff has now filed an amended complaint which, though unquestionably verbose, is separated into paragraphs, sets forth allegations placing the defendants on notice of

the claims being asserted, and contains sufficient facts demonstrating that at least plausible claims under the First and the Fourteenth Amendments to the Constitution and the RLUIPA have been stated.  With the exception of his claims against the DOCCS, an agency of the state entitled to sovereign immunity and the protections of the Eleventh Amendment, I recommend a finding that plaintiff's claims are plausibly stated and thus not subject to dismissal at this early procedural juncture.  Additionally, I recommend a finding that defendants' claim of entitlement to qualified immunity cannot be determined at this juncture.  Based upon the foregoing, it is hereby respectfully

RECOMMENDED that defendants' motion to dismiss plaintiff's complaint (Dkt. No. 111) be GRANTED, in part, and that his claims against the DOCCS be DISMISSED, but that the motion be DENIED in all other respects.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report.  FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a), 6(d),

72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report, recommendation, and order upon the parties in accordance with this court's local rules.

David E. Peebles
U.S. Magistrate Judge

Dated: July 3, 2012
Syracuse, NY



C

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Juan TEJADA, Plaintiff,
v.
Mr. MANCE, Superintendent, Marcy C.F.; Souza, Correctional Officer, Marcy C.F.; and Zurawski, Correctional Officer, Marcy C.F., Defendants.
No. 9:07-CV-0830.

Sept. 22, 2008.

Juan Tejada, Beacon, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Roger W. Kinsey, Esq., of Counsel, New York, NY, for Defendants.

*ORDER*

NORMAN A. MORDUE, Chief Judge.

***1** The above matter comes to me following a Report-Recommendation by Magistrate Judge George H. Lowe, duly filed on the 12th day of September 2008. Following ten days from the service thereof, the Clerk has sent me the file, including any and all objections filed by the parties herein.

Such Report-Recommendation, which was mailed to plaintiff's last known residence, was returned to the Court as undeliverable to plaintiff at such address. *See* Dkt. No. 18.

Additionally, plaintiff was previously advised by the Court that plaintiff was required to promptly notify the Clerk's Office of any change in his address, and that failure to keep such office apprised of his current address would result in the dismissal of the instant action. *See* Dkt. No. 6, at page 3.

After careful review of all of the papers herein, including the Magistrate Judge's Report-Recommendation, and no objections submitted thereto, it is

ORDERED, that:

1. The Report-Recommendation is hereby adopted in its entirety.

2. The defendants' motion to dismiss for failure to state a claim (Dkt. No. 12) is granted, and plaintiff's complaint is dismissed in its entirety.

3. The Clerk of the Court shall serve a copy of this Order upon all parties and the Magistrate Judge assigned to this case.

IT IS SO ORDERED.

***REPORT-RECOMMENDATION***

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me by the Honorable Norman A. Mordue, Chief United States District Judge, for Report and Recommendation with regard to any dispositive motions filed, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Generally, in his Complaint, Juan Tejada ("Plaintiff") alleges that three employees of the New York State Department of Correctional Services ("DOCS") violated his rights under the First, Eighth and Fourteenth Amendments when they denied Plaintiff (and other inmates) an opportunity to exercise outdoors for one hour per day on approximately four days between the period of May 5, 2007, and July 15, 2007, at Marcy Correctional Facility ("Marcy C.F."). (*See generally* Dkt. No. 1 [Plf.'s Compl.].) Currently pending before the Court is Defendants' motion to dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). (Dkt. No. 12.) For the reasons set forth below, I recommend that Defendants' motion be granted.

**I. BACKGROUND**

**A. Summary of Plaintiff's Complaint**

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Construed with the special leniency normally afforded to the pleadings of *pro se* civil rights litigants, Plaintiff's Complaint and the attachments thereto (which are incorporated by reference into the Complaint) allege as follows:

1. On May 5, 2007, DOCS Correctional Officer Souza ("Defendant Souza") and Correctional Officer Zurawski ("Defendant Zurawski") wrongfully deprived Plaintiff, and other inmates in the Marcy C.F. Special Housing Unit ("S.H.U."), of the one hour of outdoor exercise that they were permitted by DOCS Directive 4933; [FN1]

FN1. (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 1, at 7 [Ex. A to Plf.'s Compl., attaching letter from Plaintiff dated May 5, 2007].)

***2** 2. In addition, at unidentified times before May 10, 2007, Defendants Souza and Zurawski wrongfully deprived Plaintiff, and other inmates in the Marcy C.F. S.H.U., of unspecified "supplies" and their radios; [FN2]

FN2. (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 1, at 20-21 [Ex. B to Plf.'s Compl., attaching two versions of letter from Plaintiff dated May 10, 2007].)

3. On May 23, 2007, Defendants Souza and Zurawski wrongfully deprived Plaintiff, and other inmates in the Marcy C.F. S.H.U., of the one hour of outdoor exercise that they were permitted by DOCS Directive 4933; [FN3]

FN3. (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 1, at 26 [Ex. B to Plf.'s Compl., attaching letter from Plaintiff dated May 23, 2007].)

4. That same day, two unidentified inmates were "bitten [sic] ... for standing up [to] this abuse [of the inmates' right to one hour of outdoor exercise per day];" [FN4]

FN4. (Dkt. No. 1, ¶ 6 [Plf.'s Compl.].)

5. Also on that day, Plaintiff brought the deprivation of outdoor exercise to the attention of Superintendent Mance ("Defendant Mance"), who subsequently did nothing; [FN5]

FN5. (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 1, at 26 [Ex. B to Plf.'s Compl., attaching letter from Plaintiff dated May 23, 2007]; Dkt. No. 1, at 14-19 [Ex. B to Plf.'s Compl., attaching three different versions of letter from Plaintiff dated June 24, 2007].)

6. At unidentified times before May 26, 2007, Correctional Officers at Marcy C.F. were, in some way, "being racist towards the Spanish [inmates in the Marcy C.F. S.H.U.]"; [FN6]

FN6. (Dkt. No. 1, at 23 [Ex. B to Plf.'s Compl., attaching letter from Plaintiff dated May 26, 2007].)

7. On July 5, 2007, Defendant Souza threatened to file a false misbehavior report against Plaintiff and his cellmate (who spoke only Spanish); [FN7]

FN7. (Dkt. No. 1, at 32-35 [Ex. B to Plf.'s Compl., attaching letter from Plaintiff dated July 5, 2007].)

8. On July 9, 2007, Defendant Zurawaski deprived Plaintiff of the one hour of outdoor exercise that he was permitted by DOCS Directive 4933, in retaliation against him for having filed a grievance against Defendant Zurawaski; [FN8] and

FN8. (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 1, at 30 [Ex. B to Plf.'s Compl., attaching letter from Plaintiff dated July 9, 2007].)

9. On July 15, 2007, Defendants Souza and Zurawski wrongfully deprived Plaintiff, and other inmates in the Marcy C.F. S.H.U., of the one hour of outdoor exercise that they were permitted by DOCS Directive 4933.[FN9]

FN9. (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 1, at 31 [Ex. B to Plf.'s Compl., attaching letter from Plaintiff dated July 15, 2007].)

As a result of these deprivations, Plaintiff requests

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

both injunctive and monetary relief.[FN10]

FN10. (Dkt. No. 1, ¶¶ 7, 9 [Plf.'s Compl.].)

Based on these factual allegations, I liberally construe Plaintiff's Complaint and its attachments as asserting the following four legal claims against Defendants: (1) a claim of inadequate prison conditions and/or harassment under the Eighth Amendment; (2) a procedural due process claim under the Fourteenth Amendment; (3) an equal protection claim under the Fourteenth Amendment; and (4) a retaliation claim (against Defendant Souza) under the First Amendment. [FN11]

FN11. Due to the special solicitude normally afforded to the pleadings of *pro se* civil rights litigants, when a district court is determining what legal claims a *pro se* civil litigant has raised, "the court's imagination should be limited only by [the plaintiff's] factual allegations, not by the legal claims set out in his pleadings." *Phillips v. Girdich,* 408 F.3d 124, 130 (2d Cir.2005) [citations omitted].

**B. Summary of Grounds in Support of Defendants' Motion to Dismiss**

Generally, Defendants' motion to dismiss is premised on the following seven grounds: (1) Plaintiff's Complaint fails to allege facts plausibly suggesting a deprivation that was sufficiently serious to constitute a violation of the Eighth Amendment; (2) Plaintiff's Complaint fails to allege facts plausibly suggesting the personal involvement of Defendant Mance (a supervisor) in the constitutional violations alleged; (4) Plaintiff's Complaint fails to state a procedural due process claim under the Fourteenth Amendment because a violation of DOCS Directive 4933 does not constitute a violation of the Fourteenth Amendment; (5) Plaintiff lacks standing to assert any claims on behalf of other inmates; (6) the Eleventh Amendment bars Plaintiff's claims against Defendants in their official capacities; and (7) based on Plaintiff's factual allegations, Defendants are protected from liability as a matter of law by the doctrine of qualified immunity. (Dkt. No. 12, Part 2, 1-9 [Defs.' Memo. of Law].)

**II. LEGAL STANDARD GOVERNING MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM**

***3** Under Fed.R.Civ.P. 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). It has long been understood that a defendant may base such a motion on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed.R.Civ.P. 8(a)(2); [FN12] or (2) a challenge to the legal cognizability of the claim.[FN13]

FN12. *See* 5C Wright & Miller, *Federal Practice and Procedure* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a)(2).") [citations omitted]; *Princeton Indus., Inc. v. Rem,* 39 B.R. 140, 143 (Bankr.S.D.N.Y.1984) ("The motion under F.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint as to whether the plaintiff has conformed to F.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement' that the pleader is entitled to relief."); *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972) ("This motion under Fed.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement that the pleader is entitled to relief.' ").

FN13. *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ("These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest.... In addition, they state claims upon which relief could be granted under Title VII and the ADEA."); *Wynder v. McMahon,* 360 F.3d 73, 80 (2d Cir.2004) ("There is a critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas,* 308 F.3d 180, 187 (2d Cir.2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation ... fails as a matter of law.") [citation omitted]; *Kittay v. Kornstein,*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

230 F.3d 531, 541 (2d Cir.2000) (distinguishing between a failure to meet Rule 12[b][6]'s requirement of stating a cognizable claim and Rule 8[a]'s requirement of disclosing sufficient information to put defendant on fair notice); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 379 F.Supp.2d 348, 370 (S.D.N.Y.2005) ( "Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim [under Rule 12(b)(6) ].") [citation omitted]; *Util. Metal Research & Generac Power Sys.,* 02-CV-6205, 2004 U.S. Dist. LEXIS 23314, at *4-5 (E.D.N.Y. Nov. 18, 2004) (distinguishing between the legal sufficiency of the cause of action under Rule 12[b][6] and the sufficiency of the complaint under Rule 8[a] ); *accord, Straker v. Metro Trans. Auth.,* 331 F.Supp.2d 91, 101-102 (E.D.N.Y.2004); *Tangorre v. Mako's, Inc.,* 01-CV-4430, 2002 U.S. Dist. LEXIS 1658, at *6-7 (S.D.N.Y. Jan. 30, 2002) (identifying two sorts of arguments made on a Rule 12[b][6] motion-one aimed at the sufficiency of the pleadings under Rule 8[a], and the other aimed at the legal sufficiency of the claims).

Rule 8(a)(2) requires that a pleading contain "a short and plain statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) [emphasis added]. By requiring this "showing," Fed.R.Civ.P. 8(a)(2) requires that the pleading contain a short and plain statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." [FN14] The main purpose of this rule is to "facilitate a proper decision on the merits." [FN15] A complaint that fails to comply with this rule "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." [FN16]

FN14. *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 1634, 161 L.Ed.2d 577 (2005) (holding that the complaint failed to meet this test) [citation omitted; emphasis added]; *see also* *Swierkiewicz,* 534 U.S. at 512 [citation omitted]; *Leathernman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) [citation omitted].

FN15. *Swierkiewicz,* 534 U.S. at 514 (quoting *Conley,* 355 U.S. at 48); *see also* *Simmons v. Abruzzo,* 49 F.3d 83, 86 (2d Cir.1995) ("Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial.") [citation omitted]; *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988) ("[T]he principle function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial.") [citations omitted].

FN16. *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion); *accord,* *Hudson v. Artuz,* 95-CV-4768, 1998 WL 832708, at *2 (S.D.N.Y. Nov.30, 1998), *Flores v. Bessereau,* 98-CV-0293, 1998 WL 315087, at *1 (N.D.N.Y. June 8, 1998) (Pooler, J.). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g.,* *Photopaint Technol., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 [2d Cir.1996] ).

The Supreme Court has long characterized this pleading requirement under Fed.R.Civ.P. 8(a)(2) as "simplified" and "liberal," and has repeatedly rejected judicially established pleading requirements that exceed this liberal requirement.[FN17] However, it is well established that even this liberal notice pleading standard "has its limits." [FN18] As a result, several Supreme Court and Second Circuit decisions exist, holding that a pleading has

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

failed to meet this liberal notice pleading standard.[FN19]

FN17. *See, e.g., Swierkiewicz,* 534 U.S. at 513-514 (noting that "Rule 8(a)(2)'s simplified pleading standard applies to all civil actions, with limited exceptions [including] averments of fraud or mistake.").

FN18. 2 *Moore's Federal Practice* § 12.34[1][b] at 12-61 (3d ed.2003).

FN19. *See, e.g., Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, ---- - ----, 127 S.Ct. 1955, 1964-1974, 167 L.Ed.2d 929 (2007) (pleading did not meet Rule 8[a][2]'s liberal requirement); *accord, Dura Pharm.,* 125 S.Ct. at 1634-1635, *Christopher v. Harbury,* 536 U.S. 403, 416-422, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002), *Freedom Holdings, Inc. v. Spitzer,* 357 F.3d 205, 234-235 (2d Cir.2004), *Gmurzynska v. Hutton,* 355 F.3d 206, 208-209 (2d Cir.2004). Several unpublished decisions exist from the Second Circuit affirming the Rule 8(a)(2) dismissal of a complaint after *Swierkiewicz. See, e.g., Salvador v. Adirondack Park Agency of the State of N.Y.,* No. 01-7539, 2002 WL 741835, at *5 (2d Cir. Apr.26, 2002) (affirming pre-*Swierkiewicz* decision from Northern District of New York interpreting Rule 8[a][2] ). Although these decisions are not themselves precedential authority, *see* Rules of the U.S. Court of Appeals for the Second Circuit, § 0.23, they appear to acknowledge the continued precedential effect, after *Swierkiewicz,* of certain cases from within the Second Circuit interpreting Rule 8(a)(2). *See Khan v. Ashcroft,* 352 F.3d 521, 525 (2d Cir.2003) (relying on summary affirmances because "they clearly acknowledge the continued precedential effect" of *Domond v. INS,* 244 F.3d 81 [2d Cir.2001], after that case was "implicitly overruled by the Supreme Court" in *INS v. St. Cyr,* 533 U.S. 289 [2001] ).

Most notably, in the recent decision of *Bell Atlantic Corporation v. Twombly,* the Supreme Court, in reversing an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1, "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 550 U.S. 544, ---- - ----, 127 S.Ct. 1955, 1968-69, 167 L.Ed.2d 929 (2007).[FN20] Rather than turning on the *conceivability* of an actionable claim, the Court clarified, the Fed.R.Civ.P. 8 "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965-74.

FN20. The Court in *Twombly* further explained: "The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been adequately stated, it may be supported by showing any set of facts consistent with the allegations in the complaint.... *Conley,* then, described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival." *Twombly,* 127 S.Ct. at 1969.

More specifically, the Court reasoned that, by requiring that a pleading "show [ ] that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2) requires that the pleading give the defendant "fair notice" of (1) the nature of the claim and (2) the "grounds" on which the claim rests. *Id.* at 1965, n. 3 [citation omitted]. While this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id.* [citations omitted]. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.* at 1965 [citations omitted]. What this means, on a practical level, is that there must be "plausible grounds to infer [actionable conduct]," or, in other words, "enough fact to raise a reasonable expectation that discovery will reveal evidence of [actionable conduct]." *Id.*

***4** As have other Circuits, the Second Circuit has repeatedly recognized that the clarified plausibility

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

standard that was articulated by the Supreme Court in *Twombly* governs *all* claims, not merely antitrust claims brought under 15 U.S.C. § 1 (as were the claims in *Twombly* ).[FN21] The Second Circuit has also recognized that this *plausibility* standard governs claims brought even by *pro se* litigants (although the plausibility of those claims is be assessed generously, in light of the special solicitude normally afforded *pro se* litigants).[FN22]

FN21. *See, e.g., Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) (in civil rights action, stating that "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim up relief that is plausible on its face.' ") [citation omitted]; *Goldstein v. Pataki,* 07-CV-2537, 2008 U.S.App. LEXIS 2241, at *14 (2d Cir. Feb. 1, 2008) (in civil rights action, stating that "*Twombly* requires ... that the complaint's '[f]actual allegations be enough to raise a right to relief above the speculative level ....' ") [internal citation omitted]; *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98, n. 2 (2d Cir.2007) ( "We have declined to read Twombly's flexible 'plausibility standard' as relating only to antitrust cases.") [citation omitted]; *Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007) (in prisoner civil rights action, stating, "[W]e believe the [Supreme] Court [in *Bell Atlantic Corp. v. Twombly* ] is ... requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible."* ) [emphasis in original].

FN22. *See, e.g., Jacobs v. Mostow,* 281 F. App'x 85, 87 (2d Cir. March 27, 2008) (in pro se action, stating, "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim up relief that is plausible on its face.' ") [citation omitted] (summary order, cited in accordance with Local Rule 32.1[c][1] ); *Boykin v. KeyCorp.,* 521 F.3d 202, 215-16 (2d Cir.2008) (finding that borrower's *pro se* complaint sufficiently presented a *"plausible* claim of disparate treatment," under Fair Housing Act, to give lenders fair notice of her discrimination claim based on lenders' denial of her home equity loan application) [emphasis added].

It should be emphasized that Fed.R.Civ.P. 8's plausibly standard, explained in *Twombly,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which the Court stated, "Specific facts are not necessary" to successfully state a claim under Fed.R.Civ.P. 8(a)(2). *Erickson v. Pardus,* 551 U.S. 89, ----, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) [citation omitted]. That statement was merely an abbreviation of the often-repeated point of law-first offered in *Conley* and repeated in *Twombly*-that a pleading need not "set out in detail the facts upon which [the claim is based]" in order to successfully state a claim. *Twombly,* 127 S.Ct. 1965, n. 3 (citing *Conley v. Gibson,* 355 U.S. 41, 47 [1957] ). That statement in no way meant that all pleadings may achieve the requirement of giving a defendant "fair notice" of the nature of the claim and the "grounds" on which the claim rests without ever having to allege any facts whatsoever.[FN23] There must still be enough facts alleged to raise a right to relief above the speculative level to a plausible level, so that the defendant may know what the claims are and the grounds on which they rest (in order to shape a defense).

FN23. For example, in *Erickson,* a district court had dismissed a *pro se* prisoner's civil rights complaint because, although the complaint was otherwise factually specific as to how the prisoner's hepatis C medication had been wrongfully terminated by prison officials for a period of approximately 18 months, the complaint (according to the district court) failed to allege facts plausibly suggesting that the termination caused the prisoner "substantial harm." 127 S.Ct. at 2199. The Supreme Court vacated and remanded the case because (1) under Fed.R.Civ.P. 8 and *Twombly,* all that is required is a "a short and plain statement of the claim" sufficient to "give the defendant fair notice" of the claim and "the grounds upon which it rests," and (2) the plaintiff had alleged that the termination of his hepatitis C medication for 18

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 7

Not Reported in F.Supp.2d, 2008 WL 4384460 (N.D.N.Y.)

(Cite as: 2008 WL 4384460 (N.D.N.Y.))

months was "endangering [his] life" and that he was "still in need of treatment for [the] disease." *Id.* at 2200. While *Erickson* does not elaborate much further on its rationale, a careful reading of the decision (and the dissent by Justice Thomas) reveals a point that is perhaps so obvious that it did not need mentioning in the short decision: a claim of deliberate indifference to a serious medical need under the Eighth Amendment involves two elements, i.e., the existence of a sufficiently serious medical need possessed by the plaintiff, and the existence of a deliberately indifferent mental state possessed by prison officials with regard to that sufficiently serious medical need. The *Erickson* decision had to do with only the first element, not the second element. *Id.* at 2199-2200. In particular, the decision was merely recognizing that an allegation by a plaintiff that, during the relevant time period, he suffered from hepatis C is, in and of itself, a factual allegation plausibly suggesting that he possessed a sufficiently serious medical need; the plaintiff need not *also* allege that he suffered an independent and "substantial injury" as a result of the termination of his hepatis C medication. *Id.* This point of law is hardly a novel one. For example, numerous decisions, from district courts within the Second Circuit alone, have found that suffering from hepatitis C constitutes having a serious medical need for purposes of the Eighth Amendment. *See, e.g., Rose v. Alvees,* 01-CV-0648, 2004 WL 2026481, at *6 (W.D.N.Y. Sept.9, 2004); *Verley v. Goord,* 02-CV-1182, 2004 WL 526740, at *10 n. 11 (S.D.N.Y. Jan.23, 2004); *Johnson v. Wright,* 234 F.Supp.2d 352, 360 (S.D.N.Y.2002); *McKenna v. Wright,* 01-CV-6571, 2002 WL 338375, at *6 (S.D.N.Y. March 4, 2002); *Carbonell v. Goord,* 99-CV-3208, 2000 WL 760751, at *9 (S.D.N.Y. June 13, 2000).

Having said all of that, it should also be emphasized that, "[i]n reviewing a complaint for dismissal under Fed.R.Civ.P. 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." [FN24] "This standard is applied with even greater force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se.*" [FN25] In other words, as stated above in Part I.A. of this Report-Recommendation, while all pleadings are to be construed liberally under Fed.R.Civ.P. 8(e), *pro se* civil rights pleadings are to be construed with an *extra* degree of liberality.[FN26]

FN24. *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) [citation omitted]; *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

FN25. *Hernandez,* 18 F.3d at 136 [citation omitted]; *Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003) [citations omitted]; *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d Cir.1999) [citation omitted].

FN26. *See, supra,* note 1 of this Report-Recommendation.

For example, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint.[FN27] Moreover, "courts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest." [FN28] Furthermore, when addressing a *pro se* complaint, *generally* a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." [FN29] Of course, an opportunity to amend is not required where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it." [FN30]

FN27. "Generally, a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum." *Gadson v. Goord,* 96-CV-7544, 1997 WL

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

714878, at *1, n. 2 (S.D.N.Y. Nov.17, 1997) (citing, *inter alia, Gil v. Mooney,* 824 F.2d 192, 195 [2d Cir.1987] [considering plaintiff's response affidavit on motion to dismiss] ). Stated another way, "in cases where a pro se plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they 'are consistent with the allegations in the complaint.' " *Donhauser v. Goord,* 314 F.Supp.2d 119, 212 (N.D.N.Y.2004) (considering factual allegations contained in plaintiff's opposition papers) [citations omitted], *vacated in part on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004). This authority is premised, not only on case law, but on Rule 15 of the Federal Rules of Civil Procedure, which permits a plaintiff, as a matter of right, to amend his complaint once at any time before the service of a responsive pleading-which a motion to dismiss is not. *See Washington v. James,* 782 F.2d 1134, 1138-39 (2d Cir.1986) (considering subsequent affidavit as amending *pro se* complaint, on motion to dismiss) [citations omitted].

FN28. *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (finding that plaintiff's conclusory allegations of a due process violation were insufficient) [internal quotation and citation omitted].

FN29. *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) [internal quotation and citation omitted]; *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

FN30. *Cuoco,* 222 F.3d at 112 (finding that repleading would be futile) [citation omitted]; *see also Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) [citation omitted].

***5** However, while this special leniency may somewhat loosen the procedural rules governing the form of pleadings (as the Second Circuit very recently observed),[FN31] it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Fed.R.Civ.P. 8, 10 and 12.[FN32] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Fed.R.Civ.P. 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow.[FN33] Stated more plainly, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." [FN34]

FN31. *Sealed Plaintiff v. Sealed Defendant # 1,* No. 06-1590, 2008 WL 3294864, at *5 (2d Cir. Aug.12, 2008) ("[The obligation to construe the pleadings of *pro se* litigants liberally] entails, at the very least, a permissive application of the rules governing the form of pleadings.") [internal quotation marks and citation omitted]; *see also Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) ("[R]easonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training ... should not be impaired by harsh application of technical rules.") [citation omitted].

FN32. *See Prezzi v. Schelter,* 469 F.2d 691, 692 (2d Cir.1972) (extra liberal pleading standard set forth in *Haines v. Kerner,* 404 U.S. 519 [1972], did not save *pro se* complaint from dismissal for failing to comply with Fed.R.Civ.P. 8] ); *accord, Shoemaker v. State of Cal.,* 101 F.3d 108 (2d Cir.1996) (citing *Prezzi v. Schelter,* 469 F.2d 691) [unpublished disposition cited only to acknowledge the continued precedential effect of *Prezzi v. Schelter,* 469 F.2d 691, within the Second Circuit]; *accord, Praseuth v. Werbe,* 99 F.3d 402 (2d Cir.1995).

FN33. *See McNeil v. U.S.,* 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Faretta v. California,* 422 U.S. 806, 834, n. 46, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *cf.* *Phillips v. Girdich,* 408 F.3d 124, 128, 130 (2d Cir.2005) (acknowledging that *pro se* plaintiff's complaint could be dismissed for failing to comply with Rules 8 and 10 if his mistakes either "undermine the purpose of notice pleading [ ]or prejudice the adverse party").

FN34. *Stinson v. Sheriff's Dep't of Sullivan Cty.,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980); *accord,* *Standley v. Dennison,* 05-CV-1033, 2007 WL 2406909, at *6, n. 27 (N.D.N.Y. Aug.21, 2007) (Sharpe, J., adopting report-recommendation of Lowe, M.J.); *Muniz v. Goord,* 04-CV-0479, 2007 WL 2027912, at *2 (N.D.Y.Y. July 11, 2007) (McAvoy, J., adopting report-recommendation of Lowe, M.J.); *DiProjetto v. Morris Protective Serv.,* 489 F.Supp.2d 305, 307 (W.D.N.Y.2007); *Cosby v. City of White Plains,* 04-CV-5829, 2007 WL 853203, at *3 (S.D.N.Y. Feb.9, 2007); *Lopez v. Wright,* 05-CV-1568, 2007 WL 388919, at *3, n. 11 (N.D.N.Y. Jan.31, 2007) (Mordue, C.J., adopting report-recommendation of Lowe, M.J.); *Richards v. Goord,* 04-CV-1433, 2007 WL 201109, at *5 (N.D.N.Y. Jan.23, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Ariola v. Onondaga County Sheriff's Dept.,* 04-CV-1262, 2007 WL 119453, at *2, n. 13 (N.D.N.Y. Jan.10, 2007) (Hurd, J., adopting report-recommendation of Lowe, M.J.); *Collins v. Fed. Bur. of Prisons,* 05-CV-0904, 2007 WL 37404, at *4 (N.D.N.Y. Jan.4, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.).

## III. ANALYSIS

### A. First Basis for Dismissal: Facial Merit of Defendants' Unopposed Motion

"Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as required by this Rule shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause be shown." N.D.N.Y. L.R. 7.1(b)(3).

Here, Defendants' motion to dismiss is properly filed, Plaintiff has failed to oppose it (despite being warned of the possible consequences of that failure), [FN35] and Plaintiff has failed to show good cause why his failure to oppose Defendants' motion should not be deemed as consent to the granting of the motion. Therefore, I must determine whether Defendants have met their burden to "demonstrate entitlement to dismissal" under Rule 12(b)(6). [FN36]

FN35. (Dkt. No. 12, Part 1 [Defs.' Notice of Motion].)

FN36. *See also* Fed.R.Civ.P. 7(b)(1) (requiring motions to, *inter alia,* "state with particularity the grounds therefor").

An inquiry into whether a movant has met its "burden to demonstrate entitlement" to dismissal under Local Rule 7.1(b)(3) is a more limited endeavor than a review of a contested motion to dismiss. Specifically, under such an analysis, the movant's burden has appropriately been characterized as "modest." [FN37] This is because, as a practical matter, the burden requires only that the movant present an argument that is "facially meritorious." [FN38]

FN37. *See, e.g.,* *Ciaprazi v. Goord,* 02-CV-0915, 2005 WL 3531464, at *8 (N.D.N.Y. Dec.22, 2005) (Sharpe, J.; Peebles, M.J.) (characterizing defendants' threshold burden on a motion for summary judgment as "modest") [citing *Celotex*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Corp. v. Catrett,* 477 U.S. 317, 323-324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ]; *accord, Saunders v. Ricks,* 03-CV-0598, 2006 WL 3051792, at *9 & n. 60 (N.D.N.Y. Oct.18, 2006) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.), *Smith v. Woods,* 03-CV-0480, 2006 WL 1133247, at *17 & n. 109 (N.D.N.Y. Apr.24, 2006) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.); *see also Race Safe Sys. v. Indy Racing League,* 251 F.Supp.2d 1106, 1109-1110 (N.D.N.Y.2003) (Munson, J.) (reviewing merely whether record contradicted defendant's arguments, and whether record supported plaintiff's claims, in deciding unopposed motion to dismiss, under Local Rule 7.1[b][3] ); *Wilmer v. Torian,* 96-CV-1269, 1997 U.S. Dist. LEXIS 16345, at *2 (N.D.N.Y. Aug. 29, 1997) (Hurd, M.J.) (applying prior version of Rule 7.1[b][3], but recommending dismissal because of plaintiff's failure to respond to motion to dismiss *and* the reasons set forth in defendants' motion papers), *adopted by* 1997 U.S. Dist. LEXIS 16340, at *2 (N.D.N.Y. Oct. 14, 1997) (Pooler, J.); *accord, Carter v. Superintendent Montello,* 95-CV-989, 1996 U.S. Dist. LEXIS 15072, at *3 (N.D.N.Y. Aug. 27, 1996) (Hurd, M.J.), *adopted by* 983 F.Supp. 595 (N.D.N.Y.1996) (Pooler, J.).

FN38. *See, e.g., Hernandez v. Nash,* 00-CV-1564, 2003 U.S. Dist. LEXIS 16258, at *7-8 (N.D.N.Y. Sept. 10, 2003) (Sharpe, M.J.) (before a motion to dismiss may be granted under Local Rule 7.1[b] [3], "the court must review the motion to determine whether it is *facially meritorious"* ) [emphasis added; citations omitted]; *accord, Topliff v. Wal-Mart Stores East LP,* 04-CV-0297, 2007 U.S. Dist. LEXIS 20533, at *28 & n. 43 (N.D.N.Y. March 22, 2007) (Lowe, M.J.); *Hynes v. Kirkpatrick,* 05-CV-0380, 2007 U.S. Dist. LEXIS 24356, at *5-6 & n. 2 (N.D.N.Y. March 21, 2007) (Lowe, M.J.); *Sledge v. Kooi,* 04-CV-1311, 2007 U.S. Dist. LEXIS 26583, at *28-29 & n. 40 (N.D.N.Y. Feb. 12, 2007) (Lowe, M.J.), *adopted by* 2007 U.S. Dist. LEXIS 22458 (N.D.N.Y. March 28, 2007) (McAvoy, J.); *Kele v. Pelkey,* 03-CV-0170, 2006 U.S. Dist. LEXIS 95065, at *5 & n. 2 (N.D.N.Y. Dec. 19, 2006) (Lowe, M.J.), *adopted by* 2007 U.S. Dist. LEXIS 4336 (N.D.N.Y. Jan. 22, 2007) (Kahn, J.).

Here, I find that Defendants have met their lightened burden on their unopposed motion given Defendants' cogent, and legally supported, legal arguments set forth in their memoranda of law. (Dkt. No. 12, Part 2, 1-9 [Defs.' Memo. of Law].) I note that this Court has, on numerous occasions, granted motions to dismiss based on a similar facial analysis of a defendant's legal arguments (and a plaintiff's claims).[FN39]

FN39. *See, e.g., Wilmer v. Torian,* 96-CV-1269, 1997 U.S. Dist. LEXIS 16345, at *2 (N.D.N.Y. Aug. 29, 1997) (Hurd, M.J.) (applying prior version of Local Rule 7.1[b][3], but recommending dismissal because of plaintiff's failure to respond to motion to dismiss *and* the reasons set forth in defendants' motion papers), *adopted by* 96-CV-1269, 1997 U.S. Dist. LEXIS 16340, at *2 (N.D.N.Y. Oct. 14, 1997) (Pooler, J.); *accord, Carter v. Superintendent Montello,* 95-CV-0989, 1996 U.S. Dist. LEXIS 15072, at *3 (N.D.N.Y. Aug. 27, 1996) (Hurd, M.J.), *adopted by* 983 F.Supp. 595 (N.D.N.Y.1996) (Pooler, J.); *Munoz v. Coombe,* 95-CV-1191, 1996 U.S. Dist. LEXIS 15107, at *3 (N.D.N.Y. Aug. 21, 1996) (Hurd, M.J.), *adopted by* 95-CV-1191, 1996 U.S. Dist. LEXIS 15108, at *2 (N.D.N.Y. Oct. 11, 1996) (Pooler, J.) (rejecting plaintiff's objections, explaining that "Local Rule 7.1(b) permits the court to grant an unopposed motion"); *Owens v. Long,* 95-CV-0604, 1996 U.S. Dist. LEXIS 6520, at *2 (N.D.N.Y. March 11, 1996) (Hurd, M.J.), *adopted by* 95-CV-0604, 1996 U.S. Dist. LEXIS 4807 (N.D.N.Y. Apr. 10, 1996) (Pooler, J.).

Even if I were to subject Defendants' legal arguments to the detailed scrutiny that would be appropriate on a *conteste* d motion to dismiss, I would be persuaded by those legal arguments. For the sake of brevity, I will not repeat in detail all of Defendants arguments but only make

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 11

Not Reported in F.Supp.2d, 2008 WL 4384460 (N.D.N.Y.)

(Cite as: 2008 WL 4384460 (N.D.N.Y.))

two points.

First, I agree with Defendants that, even when construed with the utmost of special leniency, Plaintiff's Complaint and its attachments fail to allege facts plausibly suggesting a deprivation that was sufficiently serious to constitute a violation of the Eighth Amendment. Generally, to prevail on a claim of inadequate prison conditions, a plaintiff must show two things: (1) that the conditions of his confinement resulted in deprivation that was *sufficiently serious;* and (2) that the defendant acted with *deliberate indifference* to the plaintiff's health or safety. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Davidson v. Murray,* 371 F.Supp.2d 361, 370 (W.D.N.Y.2005). The denial of one hour of outdoor exercise (and radios and "supplies") on four days during a seventy-one (71) day period of time is not a deprivation that is sufficiently serious for purposes of the Eighth Amendment.[FN40]

FN40. *Arce v. Walker,* 907 F.Supp. 658, 662-63 (W.D.N.Y.1995) (holding, *inter alia,* that denying inmate one hour of daily exercise outside his cell, as required by state regulation, for 18 out of 19 days did not violate inmate's Eighth Amendment rights, as a matter of law), *affirmed in pertinent part,* 139 F.3d 329, 337-38 (2d Cir.1998); *Ochoa v. Connell,* 05-CV-1068, 2007 WL 3049889, at *12 (N.D.N.Y. Oct.18, 2007) (Sharpe, J.) (holding that denial of exercise on 11 out of 33 days did not violate Eighth Amendment) [citations omitted]; *Ford v. Phillips,* 05-CV-6646, 2007 WL 946703, at *9 (S.D.N.Y. March 27, 2007) (holding that denial of exercise on 5 days did not violate Eighth Amendment); *Gibson v. City of New York,* 96-CV-3409, 1998 WL 146688, at *3 (S.D.N.Y. Mar.25, 1998) (holding that denying inmate exercise for 8 days in a 60 day period did not violate Eighth Amendment) [citations omitted]; *Davidson v. Coughlin,* 968 F.Supp. 121, 131 (S.D.N.Y.1997) (holding that denying inmate exercise for 14 days did not violate Eighth Amendment) [citations omitted]; *see also May v. Baldwin,* 109 F.3d 557, 565 (9th Cir.1997) (deprivation of outdoor exercise for 21 days while in Disciplinary Segregation Unit did not demonstrate a serious deprivation under the Eighth Amendment); *Green v. Ferrell,* 801 F.2d 765, 771-72 (5th Cir.1986) (holding that Eighth Amendment was not violated by policy denying inmates out-of-cell exercise for first 15 days of punitive confinement).

***6** Second, I agree with Defendants that, even when construed with the utmost of special leniency, Plaintiff's Complaint fails to state a due process claim under the Fourteenth Amendment because a violation of DOCS Directive 4933 does not constitute a violation of the Fourteenth Amendment. Section 1983 provides, in pertinent part, "Every person who ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by *the Constitution and laws,* shall be liable to the party injured ...." 42 U.S.C. § 1983 [emphasis added]. The term "the Constitution and laws" refers to the United States Constitution and *federal* laws.[FN41] A violation of a state law or regulation, *in and of itself,* does not give rise to liability under 42 U.S.C. § 1983.[FN42] Furthermore, the violation of a DOCS Directive, alone, is not even a violation of New York State law or regulation.[FN43] This is because a DOCS Directive is "merely a system the [DOCS] Commissioner has established to assist him in exercising his discretion," which he retains, despite any violation of that Directive. [FN44]

FN41. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 150, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) ("The terms of § 1983 make plain two elements that are necessary for recovery. First, the plaintiff must prove that the defendant has deprived him of a right secured by the 'Constitution and laws' *of the United States."* ) (emphasis added); *Patterson v. Coughlin,* 761 F.2d 886, 890 (2d Cir.1985) ("Recovery under 42 U.S.C. § 1983 ... is premised upon a showing, first, that the defendant has denied the plaintiff a constitutional or *federal* statutory right ....") (citation omitted; emphasis added); *Fluent v. Salamanca Indian Lease Auth.,* 847 F.Supp. 1046, 1056 (W.D.N.Y.1994) ("The initial inquiry in a §

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

1983 action is whether the Plaintiff has been deprived of a right 'secured by the Constitution and laws' *of the United States.*" ) [emphasis added].

FN42. *See Doe v. Conn. Dept. of Child & Youth Servs.,* 911 F.2d 868, 869 (2d Cir.1990) ("[A] violation of state law neither gives [plaintiff] a § 1983 claim nor deprives defendants of the defense of qualified immunity to a proper § 1983 claim."); *Patterson,* 761 F.2d at 891 ("[A] state employee's failure to conform to state law does not in itself violate the Constitution and is not alone actionable under § 1983 ....") (citation omitted); *Murray v. Michael,* 03-CV-1434, 2005 WL 2204985, at *10 (N.D.N.Y. Sept.7, 2005) (DiBianco, M.J.) ("[A]ny violations of state regulations governing the procedures for disciplinary hearings ... do not rise to the level of constitutional violations.") (citation omitted); *Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) ( "[V]iolations of state law procedural requirements do not alone constitute a deprivation of due process since '[f]ederal constitutional standards rather than state law define the requirements of procedural due process.' ") (citing *Russell v. Coughlin,* 910 F.2d 75, 78 n. 1 [2d Cir.1990] ).

FN43. *See Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) (citation omitted); *Lopez v. Reynolds,* 998 F.Supp. 252, 259 (W.D.N.Y.1997).

FN44. *See Farinaro v. Coughlin,* 642 F.Supp. 276, 280 (S.D.N.Y.1986).

Finally, a few words are necessary about Plaintiff's Fourteenth Amendment equal protection claim and his First Amendment retaliation claim. Even though Defendants do not specifically address these claims in their motion, the Court is not precluded from analyzing these claims because, in a *pro se* prisoner civil rights case, a district court may (and, indeed, has a duty to) *sua sponte* address whether the pleading in such a case has successfully stated a claim upon which relief may be granted.[FN45]

FN45. The authority to conduct this *sua sponte* analysis is derived from two sources: (1) 28 U.S.C. § 1915(e)(2)(B)(ii), which provides that "the court shall dismiss [a] case [brought by a prisoner proceeding *in forma pauperis* ] at any time if the court determines that ... the action ... is frivolous or malicious[,] ... fails to state a claim on which relief may be granted[,] ... or ... seeks monetary relief against a defendant who is immune from such relief"; and (2) 28 U.S.C. § 1915A(b), which provides that, "[o]n review, the court shall ... dismiss the [prisoner's] complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted ...."

With regard to Plaintiff's Fourteenth equal protection claim (i.e., his claim that Defendants Souza and Zurawski discriminated against inmates based on their Hispanic national origin), to prove a violation of the Equal Protection Clause, a plaintiff must demonstrate that he was intentionally treated differently from others similarly situated as a result of intentional or purposeful discrimination directed at an identifiable or suspect class.[FN46] Here, Plaintiff has not alleged facts plausibly suggesting that the deprivations that allegedly occurred on May 5, May 23, July 9, and July 15, 2007, were caused by some sort of racial animus on the part of Defendants. *See, supra,* Part I.A. of this Report-Recommendation.[FN47] Rather, the only allegations of racial animus that Plaintiff offers are vague as to how, when and by whom the discrimination was committed. *Id.* More importantly, Plaintiff's allegations are devoid of any indication as to *why* he believed the offending officers were acting with racial animus, rendering his allegation of discrimination wholly conclusory. *Id.* Similarly, Plaintiff's allegation that Defendant Souza threatened to file a false misbehavior report against him and his cellmate (who spoke only Spanish) fails to allege any facts plausibly suggesting that Defendant Souza made that threat because of racial animus (or even that he carried out the threat). *Id.*

FN46. *Travis v. N.Y. State Div. of Parole,* 96-CV-0759, 1998 U.S. Dist. LEXIS 23417, at

*11 (N.D.N.Y. Aug. 26, 1998) (Sharpe, M.J.), *adopted,* 96-CV-0759, Decision and Order (N.D.N.Y. filed Nov. 2, 1998) (McAvoy, C.J.).

FN47. Indeed, to the contrary, he has alleged the deprivation that occurred on July 7, 2007, occurred because he had filed a grievance against Defendant Souza. *See, supra,* Part I.A. of this Report-Recommendation.

***7** With regard to Plaintiff's First Amendment retaliation claim (i.e., his claim against Defendant Zurawaski for depriving him of the one hour of outdoor exercise that he was permitted on July 9, 2007, by DOCS Directive 4933, in retaliation against him for having filed a grievance against Defendant Zurawaski), to prevail on a First Amendment claim under 42 U.S.C. § 1983, a plaintiff must prove by the preponderance of the evidence that: (1) the speech or conduct at issue was "protected"; (2) the defendants took "adverse action" against the plaintiff-namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff.[FN48] Here, Plaintiff has alleged facts plausibly suggesting that he engaged in protected activity and that Defendant Zurawaski took action against him because of that activity. *See, supra,* Part I.A. of this Report-Recommendation. However, he has failed to allege facts plausibly suggesting that the action taken by Defendant Zurawaski-denying him one hour of outdoor exercise while he was confined in the S.H.U.-was sufficiently adverse for purposes of the First Amendment. *Id.* It is noteworthy that Plaintiff has alleged that, following this denial (on July 9, 2007), he continued to engage in the protected activity of filing complaints about Defendant Zurawaski.[FN49] Under the circumstances alleged, I find that depriving Plaintiff one hour of exercise was *de minimis* adverse action, in that it was insufficient to "deter a similarly situated prisoner of ordinary firmness from exercising his constitutional rights." *Davis v. Goord,* 320 F.3d 246, 353 (2d Cir.2003) [internal quotation marks and citation omitted]. [FN50]

FN48. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Gill,* 389 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d 489, 492 [2d. Cir.2001] ).

FN49. (Dkt. No. 1, at 30-31 [Ex. B to Plf.'s Compl., attaching letters of complaint from Plaintiff dated July 9 and 15, 2007].)

FN50. *Lunney v. Brureton,* 04-CV-2438, 2007 U.S. Dist. LEXIS 38660, at *65-66 (S.D.N.Y. May 25, 2007) ("Case law suggests that the isolated or sporadic denial of privileges [such as recreation] do not suffice to state a claim of actionable retaliation.") [citations omitted]; *cf. Snyder v. McGinnis,* 03-CV-0902, 2004 WL 1949472, at *11 (W.D.N.Y. Sept.2, 2004) (deprivation of one meal on two occasions was *de minimis,* and did not state a claim for retaliation); *Bartley v. Collins,* 95-CV-10161, 2006 U.S. Dist. LEXIS 28285, at *21 (S.D.N.Y. May 12, 2006) ("Bates' misbehavior report against plaintiff and Collins's first report, which both resulted in plaintiff's temporary loss of various privileges such as permission to visit the commissary, likewise do not constitute adverse action because they were *de minimis:* they do not constitute penalties that would deter a similarly situated prisoner of ordinary firmness from exercising his constitutional rights.") [citations omitted].

For these reasons, I recommend that the Court grant Defendants' motion and dismiss Plaintiff's Complaint in its entirety.

**B. Alternative Basis for Dismissal: Fed.R.Civ.P. 41**

Rule 41 of the Federal Rules of Civil Procedure provides, "If the plaintiff fails to prosecute or to comply with these rules or a court order, a defendant may move to dismiss the action or any claim against it." Fed.R.Civ.P. 41(b). Even though Fed.R.Civ.P. 41(b) speaks only of a dismissal *on a motion by a defendant,* courts have recognized that the rule does nothing to abrogate a district court's inherent power to dismiss a plaintiff's complaint,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

*sua sponte,* for failure to prosecute.[FN51] Moreover, the term "these rules" in Fed.R.Civ.P. 41(b) is construed to mean not only the Federal Rules of Civil Procedure, but also the local rules of practice for a district court (since Fed.R.Civ.P. 83[a][1] expressly authorizes district courts to adopt local rules of practice).[FN52] As a result, Fed.R.Civ.P. 41(b) may be fairly characterized as providing for two independent grounds for dismissal on motion or on the Court's own initiative: (1) a failure to prosecute the action, and (2) a failure to comply with the procedural rules, or any Order, of the Court. *Id.*

FN51. *Saylor v. Bastedo,* 623 F.2d 230, 238-239 (2d Cir.1980) (recognizing that, under the language of Rule 41[b], a district court retains the inherent power to dismiss a plaintiff's complaint, *sua sponte,* for failure to prosecute) [citations omitted]; *see also* N.D.N.Y. L.R. 41.2(a) ("Whenever it appears that the plaintiff has failed to prosecute an action or proceeding diligently, the assigned judge shall order it dismissed.").

FN52. *See, e.g., Tylicki v. Ryan,* 244 F.R.D. 146, 147 (N.D.N.Y.2006) (Kahn, J.) (dismissing complaint pursuant to Fed.R.Civ.P. 41[b] for failing to comply with, *inter alia,* the district court's Local Rule 10.1[b][2] ); *In re Interbank Funding Corp.,* 310 B.R. 238, 254 (Bankr.S.D.N.Y.2004) (dismissing complaint pursuant to Fed.R.Civ.P. 41 [b] for failing to comply with, *inter alia,* the district court's local rules); *see also Abdullah v. Acands, Inc.,* 30 F.3d 264, 269-70 (1st Cir.1994) (affirming district court dismissal pursuant to Fed.R.Civ.P. 41[b] for failing to comply with, *inter alia,* the district court's local rule governing joinder); *Kilgo v. Ricks,* 983 F.2d 189, 192 (11th Cir.1993) ("A district court has authority under Federal Rule of Civil Procedure 41(b) to dismiss actions for failure to comply with local rules."); *Hewitt v. Romeo-Rim, Inc.,* 05-CV-40236, 2006 U.S. Dist. LEXIS 90803, at *2 (E.D.Mich. Nov. 14, 2006) (dismissing complaint pursuant to Fed.R.Civ.P. 41[b] for failing to comply with, *inter alia,* the district court's local rule requiring response to motion); *Chillis v. U.S. Postal Off.,* 01-CV-0913, 2001 U.S. Dist. LEXIS 18133, at *3 (N.D.Tex. Nov. 5, 2001) (dismissing complaint pursuant to Fed.R.Civ.P. 41[b] for failing to comply with the district court's Local Rule 83.13); *Shough v. Coyle,* 00-CV-0237, 2000 U.S. Dist. LEXIS 21796, at *4 (D.Colo. Aug. 10, 2000) dismissing complaint pursuant to Fed.R.Civ.P. 41[b] for failing to comply with the district court's Local Rule 5.1[L] ).

***8** With regard to the second ground for dismissal (a failure to comply with an Order of the Court), the legal standard governing such a dismissal is very similar to the legal standard governing a dismissal for failure to prosecute. "Dismissal pursuant to Fed. R. Civ.P. 41(b) for failure to comply with an order of the court is a matter committed to the discretion of the district court." [FN53] The correctness of a Rule 41(b) dismissal for failure to comply with an order of the court is determined in light of five factors:

FN53. *Alvarez v. Simmons Market Research Bureau, Inc.,* 839 F.2d 930, 932 (2d Cir.1988) [citations omitted].

(1) the duration of the plaintiff's failure to comply with the court order, whether plaintiff was on notice that failure to comply would result in dismissal, (3) whether the defendants are likely to be prejudiced by further delay in the proceedings, (4) a balancing of the court's interest in managing its docket with the plaintiff's interest in receiving a fair chance to be heard, and (5) whether the judge has adequately considered a sanction less drastic than dismissal.[FN54]

FN54. *Lucas v. Miles,* 84 F.3d 532, 535 (2d Cir.1996) [citations omitted].

Here, on September 17, 2007, the Court ordered Plaintiff, *inter alia,* to keep the Clerk's Office apprised of his current address. (Dkt. No. 6, at 3 [Order filed Sept. 17, 2007].) Specifically, the Court advised Plaintiff that he is ***"required to promptly notify the Clerk's Office and all parties or their counsel of any change in [his] address; his failure to do same will result in the dismissal of this action."*** (*Id.*) As of that date, Plaintiff's address of record had been Marcy C.F. (Dkt. No. 1, ¶ 2 [Plf.'s Compl.].) On

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

November 10, 2007, Plaintiff notified the Court of his change in address to Fishkill C.F. (Dkt. No. 14.) However, on November 24, 2007, Plaintiff was released from the custody of the Department of Correctional Services. (*Id.*) *See also* N.Y. S. D.O.C.S. Inmate Locator System Report Regarding Plaintiff http:// nysdocslookup.docs.state.ny.us/GCA00P00/WIQ3/WIN Q130 (last visited Sept. 11, 2008). Since his release, Plaintiff has not notified the Court of his change of address.

I have weighed the five factors listed above, and I have concluded that they weigh decidedly in favor of dismissal.[FN55] With regard to the first factor, I find that the duration of Plaintiff's failure to provide his current address has been nearly *nine and a half months.* With regard to the second factor, I find that Plaintiff has received adequate notice that the sort of delay that he has caused in this action (due to his failure to provide his current address) would result in dismissal.[FN56] With regard to the third factor, I find that Defendants are likely to be prejudiced by a further delay. [FN57] With regard to the fourth factor, I have taken care to strike an appropriate balance between alleviating Court calendar congestion and protecting a party's right to due process and a fair chance to be heard, and I find that the need to alleviate congestion on the Court's docket outweighs Plaintiff's right to receive a further chance to be heard in this matter. [FN58] With regard to the fifth factors, I have considered all less-drastic sanctions and rejected them under the circumstances.[FN59]

FN55. *See, e.g., Robinson v. Middaugh,* 95-CV-0836, 1997 U.S. Dist. LEXIS 13929, at *2-3 (N.D.N.Y. Sept. 11, 1997) (Pooler, J.) (dismissing action under Fed.R.Civ.P. 41[b] where plaintiff failed to inform the Clerk of his change of address despite having been previously ordered by Court to keep the Clerk advised of such a change).

FN56. This notice was provided by the Court's Order of September 17, 2007. (Dkt. No. 6, at 3 [Order filed Sept. 17, 2007].) It was provided also by the Local Rules of Practice for this Court, which the Clerk's Office has provided to all correctional facilities in New York State, and which contains similar notifications. N.D.N.Y. L.R. 10.1(b)(2), 41.2(a), (b). Clearly, Plaintiff received this notice, since in his Notice of Change of Address, filed on November 15, 2007, he promised the Court that "as soon [as][I] know the address [of the] shelter or program [I'm] going to I will write the [C]ourt with the address." (Dkt. No. 14.)

FN57. For example, further delay by Plaintiff may very well result in the fading of memories, the discarding of relevant documents, and the retirement or transfer of witnesses. *See* *Geordiadis v. First Boston Corp.,* 167 F.R.D. 24, 25 (S.D.N.Y.1996) ("The passage of time always threatens difficulty as memories fade. Given the age of this case, that problem probably is severe already. The additional delay that plaintiff has caused here can only make matters worse.").

FN58. I note that it is cases like this one that delay the resolution of other cases, and that contribute to the Second Circuit's dubious distinction as having (among the twelve circuits, including the D.C. Circuit) the longest median time to disposition for prisoner civil rights cases, between 2000 and 2005 (9.8 months, as compared to a national average of 5.7 months).

FN59. For example, I am persuaded that issuing an Order chastising Plaintiff for his conduct would be futile, given the fact that such an Order will almost certainly never reach Plaintiff, due to his failure to provide a current address. I am also persuaded that simply waiting another month or so for Plaintiff to contact the Court would also be futile, given the fact that he has failed to contact the Court for nearly ten months now.

***9** For these reasons, I recommend that, in the alternative, the Court *sua sponte* dismiss Plaintiff's Complaint with prejudice for failure to diligently prosecute this action.

**ACCORDINGLY,** it is

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

**RECOMMENDED** that Defendants' motion to dismiss for failure to state a claim (Dkt. No. 12) be ***GRANTED,*** and that Plaintiff's Complaint be ***DISMISSED*** in its entirety.

**ANY OBJECTIONS to this Report-Recommendation must be filed with the Clerk of this Court within TEN (10) WORKING DAYS, PLUS THREE (3) CALENDAR DAYS from the date of this Report-Recommendation (unless the third calendar day is a legal holiday, in which case add a fourth calendar day).** *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b); N.D.N.Y. L.R. 72.1(c); Fed.R.Civ.P. 6(a)(2), (d).

**BE ADVISED that the District Court, on *de novo* review, will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but were not, presented to the Magistrate Judge in the first instance.** [FN60]

FN60. *See, e.g., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137-38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40 n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *Alexander v. Evans,* 88-CV-5309, 1993 WL 427409, at *18 n. 8 (S.D.N.Y. Sept.30, 1993) (declining to consider affidavit of expert witness that was not before magistrate) [citation omitted]; *see also Murr v. U.S.,* 200 F.3d 895, 902, n. 1 (6th Cir.2000) ("Petitioner's failure to raise this claim before the magistrate constitutes waiver."); *Marshall v. Chater,* 75 F.3d 1421, 1426 (10th Cir.1996) ("Issues raised for the first time in objections to the magistrate judge's recommendations are deemed waived.") [citations omitted]; *Cupit v. Whitley,* 28 F.3d 532, 535 (5th Cir.1994) ("By waiting until after the magistrate judge had issued its findings and recommendations [to raise its procedural default argument] ... Respondent has waived procedural default ... objection [ ].") [citations omitted]; *Greenhow v. Sec'y of Health & Human Servs.,* 863 F.2d 633, 638-39 (9th Cir.1988) ("[A]llowing parties to litigate fully their case before the magistrate and, if unsuccessful, to change their strategy and present a different theory to the district court would frustrate the purpose of the Magistrates Act."), *overruled on other grounds by U.S. v. Hardesty,* 977 F.2d 1347 (9th Cir.1992); *Patterson-Leitch Co. Inc. v. Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985, 990-91 (1st Cir.1988) ("[A]n unsuccessful party is not entitled as of right to de novo review by the judge of an argument never seasonably raised before the magistrate.") [citation omitted].

**BE ALSO ADVISED that the failure to file timely objections to this Report-Recommendation will PRECLUDE LATER APPELLATE REVIEW of any Order of judgment that will be entered.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of H.H.S.,* 892 F.2d 15 [2d Cir.1989] ).

N.D.N.Y.,2008.

Tejada v. Mance
Not Reported in F.Supp.2d, 2008 WL 4384460 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Selam SELAH, Plaintiff,
v.
Glenn GOORD, Commissioner of Docs, et al, Defendants.
No. 00-CV-0644.

Jan. 2, 2002.

Elmer Robert Keach, III, Albany NY, Appointed for Plaintiff, of counsel.

Attorney General of New York, The Capitol, Albany, NY, for the Defendants.

Deborah A. Ferro, Assistant Attorney General, of counsel.

Decision and Order

MCAVOY, J.

***1** Plaintiff, who is incarcerated, brought this action pursuant to 42 U.S.C. § 1983 claiming that the current New York State Department of Corrections policy of mandatory administration of a purified protein derivative (PPD) skin test to inmates in order to detect latent Tuberculosis (TB) violates his First Amendment right to free expression of his religion. Plaintiff originally brought this action *pro se,* but following the Southern District's decision in *Reynolds v. Goord,* 103 F.Supp.2d 316 (S.D.N.Y.2000), this Court appointed counsel for Mr. Selah.

Mr. Selah had filed a motion seeking a preliminary injunction preventing the Department of Corrections (DOCs) from administering the PPD test during the pendency of this action. That motion was supplemented by his appointed counsel. The Attorney General responded to both the initial motion and the supplemental papers. Following oral argument on November 13, 2001, this Court ruled in an oral decision that there were evidentiary issues necessitating a hearing.

A full hearing was initially scheduled for December 11, 2001. After conferencing with the parties, the Court determined that it would be prudent to proceed with a bifurcated hearing limited to the issues of whether Mr. Selah sincerely holds his beliefs and whether those beliefs are religious in nature. *See Jolly v. Coughlin,* 76 F.3d 468, 476 (2d Cir.1996).

A hearing on those issues took place on December 11, 2001. Mr. Selah testified as did Nurse Christine Coyne, a correctional facility nursing supervisor; Director of the Inmate Grievance Program Thomas G. Eagen; and Dr. Lester N. Wright, Deputy Commissioner and Chief Medical Officer of DOCs. The Court now issues the following decision.

I. FACTUAL FINDINGS

A. Plaintiff's Religious Beliefs

The Court found that Plaintiff testified credibly regarding his religious beliefs and the basis for those beliefs. Thus, the Court will summarize the relevant portions of those beliefs here.

Plaintiff is an Ethiopian Orthodox Christian. He was raised in this faith and continues to adhere to this faith today. Plaintiff has filed numerous grievances with DOCs alleging denials of his religious expression. These include grievances requesting that he be allowed to have a kosher diet, requesting that his religion be properly recognized on his inmate housing form, requesting that he be allowed a prayer shawl, and requesting that he be allowed a prayer cap. Plaintiff additionally spent some time on a hunger strike, refusing to eat when DOCs would not supply him with a kosher diet. He has filed two previous lawsuits against DOCs regarding the official recognition of his religion and his right to a kosher diet. These resulted in agreements by DOCs to recognize Plaintiff's religion and allow him to have a kosher diet.

Plaintiff testified that his religion is similar to

Judaism, except that his religion recognizes Jesus Christ as the Messiah. Thus, he consults with the prison Rabbi when he has questions about how he should follow his religion. Plaintiff believes in a literal interpretation of the Bible. It is from this literal interpretation that his objections to the PPD test stem. In particular, Plaintiff has provided the Court with two passages of the Bible that he believes are violated by the PPD test. These verses are as follows.

***2** Ye shall not make any cuttings in your flesh for the dead, nor print any marks upon you: I am the LORD.

*Leviticus* 19:28 (King James).

They shall not make baldness upon their head, neither shall they shave off the corner of their beard, nor make any cuttings in their flesh.

*Leviticus* 21:5 (King James).[FN1] Based upon these passages, Plaintiff believes that he should not pierce his flesh, should not be tatooed, and should not mar his skin in any way. When questioned about other provisions of the Bible, such as the prohibition in Leviticus against cutting one's hair and beard, Plaintiff was articulate in clarifying his beliefs and in providing support for his actions taken in accordance with his interpretation of his religious obligations.[FN2]

FN1. The Court has used the King James Version of the Bible as that is what was used by Plaintiff at the hearing.

FN2. For example, Plaintiff was asked specifically about the prohibition against cutting the hair and beard. It was obvious from Plaintiff's appearance that Plaintiff does, in fact, cut his hair and trim his beard. Plaintiff stated that he had discussed this with the Rabbi and religious leaders in the Ethiopian Orthodox Church and believed that this meant he was not to shave his hair or beard completely off.

B. DOCs Response

The Court initially agreed to a bifurcated hearing because of several inconsistencies in Plaintiff's prior complaints with regard to the TB testing that were pointed out by DOCs. The Court will address those here.

*Prior PPD Tests*

The first item addressed by DOCs is that Plaintiff took the PPD test from 1993 until 1999 without refusal. Plaintiff explained this by stating that it was his belief that refusal of the PPD test constituted disobedience of a direct order, and that such reports would harm his chances for parole. Plaintiff also indicated that he had objected to the tests during this time, but had not refused them because of his desire not to be on TB hold or to harm his chances of parole.

The Court also notes that Plaintiff had his legal name changed, as required by his religion, on May 4, 1998. Additionally, it is around this time in 1998 that Plaintiff began to file numerous grievances regarding his religious rights. It is not unimaginable that Plaintiff, for whatever reason, began to take his religion more seriously around this time.

DOCs next points out that the records of Plaintiff's grievances and objections to the PPD test do not consistently relate to his religious beliefs. The Court will discuss these records here.

*Medical Records*

DOCs points to the numerous medical records in which there is no mention of Plaintiff's religious objection. The Court notes that no reason for Plaintiff's refusal is stated in any of these records. They simply state that he refused PPD testing. The one exception to this is a note by Nurse Androsko on December 16, 1999, which states: “per Inmate ‘sick and tired of being stuck, wants alternate testing as [sic] breathing test or x-rays.” ’

On January 26, 2000, there is a medical notation that Plaintiff “refuses for religious reasons” to take the PPD test. That note is signed by Nurse Joyce Carson. The Court notes that Nurse Carson was not the nurse who regularly wrote Plaintiff's records. There are other records in which Plaintiff requests alternative treatments to the PPD test, but again, no reason for his objection is given.

The Court finds the medical records to be inconclusive as to Plaintiff's intent. The records often

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

consist of no more than the phrase "refused PPD test." Without more consistent records regarding what about the PPD test he objected to, they do not clarify whether Plaintiff objected for religious reasons.

*Inmate Grievances*

***3** The Plaintiff initiated a grievance on December 20, 1999. (Plaintiff's Ex. "1"). That grievance refers to numerous reasons for Plaintiff's desire not to take the PPD test. These include religious deprivation, that the substance did not look like the substance given to other patients, and that he had a fear of needles and HIV. Notably, the Inmate Grievance Committee recommended that Plaintiff be given alternative means of TB testing "which are the standards set by the federal courts." Although the Inmate Grievance Committee found that Plaintiff had stated a recognizable objection, the medical staff at Auburn and the Superintendent on his direct appeal rejected that recommendation. Plaintiff then appealed to the Central Office Review Committee (CORC). Clearly, that appeal by Plaintiff lays out his religious objections to the TB testing. He references the biblical statements on which he relies and the prior settlement with DOCs in which DOCs agreed to recognize Plaintiff's religion.

The remainder of the inmate grievances address issues other than the PPD Test.

*February 19, 2000 PPD test*

On February 19, 2000, Plaintiff agreed to take the PPD test after several months of refusing. It is undisputed that Plaintiff took the test in order to attend his father's funeral. DOCs makes much of the fact that Plaintiff did not enter the funeral home; however, it is clear from Plaintiff's testimony that he did not enter the funeral home because he was fully shackled. He states that when he attended his mother's funeral, no such shackles were in place. Plaintiff's father was a well-known member of the community, and Plaintiff believed that television cameras would likely be covering his father's funeral. Thus, the Court finds it entirely reasonable for Plaintiff to have made the decision, as he asserts he did, not to embarrass his family by attending his father's funeral in shackles. It is also clear that Plaintiff took this PPD test solely for the purpose of attending the funeral.

*Other Tests Involving Needles*

More problematic are other instances of Plaintiff allowing needle tests to be done on him. In particular, DOCs put forward evidence that Plaintiff received a tetanus shots in 1991 and consented to an electromyography and nerve conduction test in 1997 and again in 1999 .[FN3] While the tetanus shot is prior to the apparent religious awakening of Plaintiff, the second electromyography is not. Plaintiff did not testify regarding his reasons for consenting to this test. The second test was a follow-up exam to test the changes that had occurred in the intervening time. Plaintiff's lack of objection to this test does cast some doubt on the strictness of his religious beliefs.

FN3. These tests involve electrodes being placed on the body and having electric currents sent through to test the reaction of the nerves. The second part of the test involves having needles actually stuck into the skin of the patient and electric current delivered through those needles.

II LEGAL CONCLUSIONS

In determining whether Plaintiff has established that his First Amendment right to exercise his religion has been infringed, the Court's analysis is limited to two issues-whether Selah sincerely holds his beliefs, and whether these beliefs are, "according to the claimant's own scheme of things," religious. *Leitzsey v. Coombe,* 998 F.Supp. 282, 288 (W.D.N.Y.1998) (citing *United States v. Seeger,* 380 U.S. 163, 185, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965)). "[The] judiciary has but a limited function ... in determining whether beliefs are to be accorded free exercise protection. Our scrutiny extends only to whether a claimant sincerely holds a belief and whether the belief is religious in nature." *Jolly v. Coughlin,* 76 F.3d 468, 476 (2d Cir.1996); *Breeland v. Goord,* 1997 WL 139533, at *4 (S.D.N.Y. March 27, 1997). The propriety of a religious belief is not to be considered. *Hernandez v. C.I.R.,* 490 U.S. 680, 699 (1989). Thus, the Court will examine these two factors in reverse order.

*Whether the Beliefs are Religious*

***4** The Second Circuit has approved of the following definition of religion: "the feelings, acts, and experiences

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

of individual men in their solitude, so far as they apprehend themselves to stand in relation to whatever they may consider the divine." *See* *Patrick v. LeFevre,* 745 F.2d 153, 157 (2d Cir.1984) and *United States v. Moon,* 718 F.2d 1210, 1227 (2d Cir.1983) (both quoting WILLIAM JAMES, THE VARIETIES OF RELIGIOUS EXPERIENCE 31 (1910)). Whether a belief is religious as opposed to simply a personal fear is a credibility determination for the factfinder to make. *See Galinsky v. Board of Education,* 213 F.3d 262, 262 (2d Cir.2000) (trial court's finding that desire to avoid immunization stemmed from personal fears rather than religious beliefs would not be disturbed as it was a credibility determination). The accuracy or acceptability of the beliefs are not to be considered in this analysis. *Patrick,* 745 F.2d at 157. Nor must the plaintiff show that his beliefs are generally practiced in the religion he claims. *See* *Campos v. Coughlin,* 854 F.Supp. 194, 210 (S.D.N.Y.1994). "The freedom to exercise religious beliefs cannot be made contingent on the objective truth of such beliefs." *Patrick,* 745 F.2d at 157 (quoting *United States v. Ballard,* 322 U.S. 78, 86, 64 S.Ct. 882, 886, 88 L.Ed. 1148 (1944)).

The Court concludes that Plaintiff's beliefs are religious in nature. Plaintiff testified to the nature of his beliefs and the authority on which he bases those beliefs. Plaintiff also testified to consultation with religious leaders regarding the appropriate way to implement his beliefs. Plaintiff supported his belief that the skin should not be lacerated with historical reasons for the rule, stemming from religious origins, and provided ample interpretation for the various provisions of the Bible he claims support his view. Thus, Plaintiff has established the first prong of the test.

*Whether the Beliefs are Sincere*

In analyzing the sincerity of Plaintiff's religious beliefs, this Court starts with the proposition that "[a] claimant need not be a member of a particular organized religious denomination to show sincerity of beliefs." *Jackson v. Mann,* 169 F.3d 316, 319 (2d Cir.1999). When analyzing the sincerity of petitioner's religious beliefs, the Court should "seek[ ] to determine an adherent's good faith in the expression of his religious belief." *Patrick,* 745 F.2d at 157 (citing *International Society for Krishna Consciousness v. Barber,* 650 F.2d 430, 441 (2d Cir.1981)). The Court must attempt to differentiate between "those beliefs that are held as a matter of conscience and those that are animated by motives of deception and fraud." *Patrick* 749 F.2d at 157. The Second Circuit has called this analysis "exceedingly amorphous." *Id.* It "requir[es] the factfinder to delve into the claimant's most veiled motivations and vigilantly separate the issue of sincerity from the factfinder's perception of the religious nature of the claimant's beliefs." *Id.*

***5** The Court notes that judicial entities are particularly ill suited for determining matters of essentially personal conscience. Recognizing this inherent limitation, the Court must base its decision on the credibility of the Plaintiff and the circumstances surrounding his objection to the PPD test. In examining these items, the Court concludes that the Plaintiff sincerely holds his religious beliefs.

First, the Plaintiff testified credibly regarding his religious objections to the PPD test. Further, Plaintiff's actions, at least since 1998, have shown him to consistently object to the PPD test. Although Plaintiff did submit to the test in order to attend his father's funeral, the Court notes that a Plaintiff may show sincerity even when he submits to a test after coercion. *See Jolly* 75 F.3d at 477 (Inmate did not need to show lengthy resistance to test to prove sincerity); *Reynolds,* 103 F.Supp.2d at 334-335 (inmate who took PPD test after objecting still sincere in his beliefs). Further, the Court does not find Plaintiff's prior submission to PPD tests to be a bar to his current objections, particularly in light of the other circumstances in Plaintiff's religious life.

The Court is mindful that Plaintiff did submit to the electromyography involving needles in April of 1999. Despite this anomaly, the Court finds that Plaintiff is sincere in his desire to follow his faith as he sees it-including the prohibition on piercing the skin or lacerating the flesh. The Court cannot truly know Plaintiff's heart and conscience, but determines that to the extent it can judge Plaintiff's sincerity, that Plaintiff has made a "good faith" expression of his religious beliefs.

III. CONCLUSION

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 5

Not Reported in F.Supp.2d, 2002 WL 73231 (N.D.N.Y.)

(Cite as: 2002 WL 73231 (N.D.N.Y.))

Inasmuch as the Court finds that Mr. Selam Selah sincerely holds his beliefs and that these beliefs are religious, and that the Plaintiff's religious beliefs are burdened by DOCs' policy (*see* previous oral decision-if Plaintiff's beliefs are sincere and religious, then they are burdened by DOCs policy), the parties are ordered to proceed with a hearing on the issue of whether the burden placed on the Plaintiff by DOCs policy is justified.

IT IS SO ORDERED

N.D.N.Y.,2002.

Selah v. Goord
Not Reported in F.Supp.2d, 2002 WL 73231 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Only the Westlaw citation is currently available.

United States District Court,

W.D. New York.
Leon C. BLOOM, Jr., Plaintiff,
v.
Brian FISCHER in his capacity as Commissioner of the New York State Department of Correctional Services (DOCS) and in his individual capacity, et al., Defendants.
No. 11–CV–6237L.

Jan. 3, 2012.

**Background:** State inmate brought § 1983 action against Department of Correctional Services (DOCS) employees or officials, alleging they violated his constitutional rights by administratively imposing a period of post-release supervision (PRS) on him to follow his judicially-imposed sentence of imprisonment. Defendants moved to dismiss for failure to state a claim.

**Holdings:** The District Court, David G. Larimer, J., held that:

(1) two of inmate's claims were untimely, and
(2) defendants, in their personal capacities, were entitled to qualified immunity.

Motion granted.

West Headnotes

**[1] Federal Civil Procedure 170A 1825**

170A Federal Civil Procedure

170AXI Dismissal
170AXI(B) Involuntary Dismissal
170AXI(B)5 Proceedings
170Ak1825 k. Motion and proceedings thereon. Most Cited Cases

If a complaint is sufficient to state a claim on which relief can be granted, the plaintiff's failure to respond to a motion to dismiss for failure to state a claim does not warrant dismissal. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[2] Limitation of Actions 241 58(1)**

241 Limitation of Actions

241II Computation of Period of Limitation
241II(A) Accrual of Right of Action or Defense
241k58 Liabilities Created by Statute
241k58(1) k. In general. Most Cited Cases

State inmate's causes of action for damages under § 1983 against Department of Correctional Services (DOCS) employees or officials, alleging they violated his constitutional rights by administratively imposing a period of post-release supervision (PRS) on him to follow his judicially-imposed sentence of imprisonment accrued, and three-year limitations period began to run, at point when state inmate's petition for writ of habeas corpus was granted. 42 U.S.C.A. § 1983.

**[3] Civil Rights 78 1376(7)**

78 Civil Rights

78III Federal Remedies in General
78k1372 Privilege or Immunity; Good Faith and Probable Cause
78k1376 Government Agencies and Officers
78k1376(7) k. Prisons, jails, and their officers; parole and probation officers. Most Cited Cases

Department of Correctional Services (DOCS) employees or officials, in their personal capacities, were entitled to qualified immunity from state inmate's § 1983 claims, alleging defendants violated inmate's constitutional rights by administratively imposing a period of post-release supervision (PRS) on him to follow his judicially-imposed sentence of imprisonment; although unconstitutionality and unlawfulness of practice of administratively mandating PRS was presently clear, it

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 2

--- F.Supp.2d ----, 2012 WL 45470 (W.D.N.Y.)

(Cite as: 2012 WL 45470 (W.D.N.Y.))

was not so prior to when state Court of Appeals held that state law barred DOCS from adding term of PRS onto sentence in absence of pronouncement of such by sentencing judge. 42 U.S.C.A. § 1983.

**[4] Constitutional Law 92 4838**

92 Constitutional Law

92XXVII Due Process
92XXVII(H) Criminal Law
92XXVII(H)12 Other Particular Issues and Applications
92k4838 k. Parole. Most Cited Cases

**Pardon and Parole 284 46**

284 Pardon and Parole

284II Parole
284k45 Authority or Duty to Grant Parole or Parole Consideration
284k46 k. Parole as right or privilege. Most Cited Cases

New York's parole scheme is not one that creates in any prisoner a legitimate expectancy of release, and thus plaintiffs have no liberty interest in parole, and the protections of the Due Process Clause are inapplicable. U.S.C.A. Const.Amend. 14.

Leon C. Bloom, Jr., Altona, NY, pro se.

J. Richard Benitez, NYS Attorney General's Office, Rochester, NY, for Defendant.

*DECISION AND ORDER*

DAVID G. LARIMER, District Judge.

***1** Plaintiff, Leon C. Bloom, appearing *pro se,* commenced this action under 42 U.S.C. § 1983. Plaintiff, an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), alleges that the defendants, all of whom at all relevant times, were DOCS employees or officials, have violated his constitutional rights by administratively imposing a period of post-release supervision ("PRS") on plaintiff to follow his judicially-imposed sentence of imprisonment.

Defendants have moved to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Plaintiff has not responded to the motion.[FN1]

**DISCUSSION**

[1] Plaintiff's failure to oppose the motion to dismiss does not relieve the Court of its obligation to consider the merits of plaintiff's claims. "If a complaint is sufficient to state a claim on which relief can be granted, the plaintiff's failure to respond to a Rule 12(b)(6) motion does not warrant dismissal." *McCall v. Pataki,* 232 F.3d 321, 322 (2d Cir.2000). Plaintiff's failure to respond to the motion notwithstanding, then, the Court must determine whether, "accept[ing] the allegations contained in the complaint as true, and draw[ing] all reasonable inferences in favor of the non-movant," plaintiff has stated a facially valid claim. *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994). In undertaking that analysis, the Court employs the now well-known standards set forth in *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), and *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), under which "a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955.

Plaintiff alleges that he was released from prison in October 2006, having at that point "served 6/7ths of his nine years sentence." Complaint ¶ 10. He further alleges that his maximum determinate sentence expired in October 2007, but that in January 2008, DOCS re-imprisoned him for violating the conditions of his PRS.

Plaintiff sought relief in state court by means of a petition for a writ of habeas corpus. In April 2008, a state court judge granted plaintiff's application, ordered that the PRS imposed on plaintiff by DOCS be vacated, and that plaintiff be released from custody. Plaintiff was released on April 3, 2008, and DOCS vacated the remaining portion of his five-year term of PRS.

In June 2010, plaintiff was convicted at trial of grand larceny in the fourth degree. He alleges that his indeterminate sentence of two to four years was based in part on his alleged 2008 PRS violation, and that he was denied early release because of the PRS violation. Plaintiff alleges that DOCS has since removed the information

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 3

--- F.Supp.2d ----, 2012 WL 45470 (W.D.N.Y.)

(Cite as: 2012 WL 45470 (W.D.N.Y.))

concerning the PRS violation from his file, although his sentence on the grand larceny charge remains in place, and at the time that he filed the complaint in this action in May 2011, plaintiff was still incarcerated pursuant to that larceny sentence.

***2** Based on these allegations, plaintiff asserts three causes of action. The first alleges that by imposing a term of PRS, defendants violated plaintiff's constitutional rights. In support of that claim, plaintiff cites *Earley v. Murray,* 451 F.3d 71 (2d Cir.2006), *cert. denied,* 551 U.S. 1159, 127 S.Ct. 3014, 168 L.Ed.2d 752 (2007), in which the Second Circuit held that a term of PRS was not enforceable unless it had been pronounced by the sentencing judge on the record.

In his second cause of action, plaintiff alleges that his "unlawful re-imprisonment ... past the maximum expiration date of his determinate sentence" violated his constitutional rights. Plaintiff's third cause of action asserts that defendants violated his rights "[b]y failing to remove alleged PRS violations from [his] record" after the state court granted plaintiff's habeas corpus application in April 2008.

[2] Plaintiff's first two causes of action must be dismissed as time-barred. "[C]ourts in this circuit have uniformly held that pursuant to *Heck v. Humphrey* [, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994),] the claims of plaintiffs [arising out of the administrative imposition of PRS] do not accrue until the underlying sentence is invalidated, or, in this case, until [plaintiff's] petition for writ of habeas corpus was granted." *Albergottie v. New York City,* No. 08 Civ. 8331, 2011 WL 519296, at *4 (S.D.N.Y. Feb. 15, 2011) (citing cases). *See Heck,* 512 U.S. at 489–90, 114 S.Ct. 2364 ("[A] § 1983 cause of action for damages attributable to an unconstitutional conviction or sentence does not accrue until the conviction or sentence has been invalidated"). Since plaintiff's habeas petition was granted in April 2008, his complaint, which was filed in this Court in May 2011, is untimely under the three-year statute of limitations applicable to § 1983 claims. *See Palmer v. Stuart,* 274 Fed.Appx. 58, 58 (2d Cir.2008); *McKithen v. Brown,* 481 F.3d 89, 100 n. 12 (2d Cir.2007), *cert. denied,* 552 U.S. 1179, 128 S.Ct. 1218, 170 L.Ed.2d 59 (2008).

[3] In addition, to the extent that plaintiff's claims are brought against defendants in their individual capacities, defendants are entitled to qualified immunity. In a similar case, this Court has held that "[a]lthough the unconstitutionality and/or unlawfulness of defendants' practice of administratively mandating PRS may be clear today, it was manifestly not so prior to April 2008," when the New York Court of Appeals held in *Garner v. New York State DOCS,* 10 N.Y.3d 358, 859 N.Y.S.2d 590, 889 N.E.2d 467 (2008), and in *People v. Sparber,* 10 N.Y.3d 457, 859 N.Y.S.2d 582, 889 N.E.2d 459 (2008), that state law barred DOCS from adding a term of PRS onto a defendant's sentence in the absence of a pronouncement for such by the sentencing judge. "It is these decisions—and not *Earley*—which courts in the Second Circuit have consistently understood to have effected the change in the law, and established the temporal boundary of qualified immunity for DOCS officials alleged to have administratively imposed PRS." *Vincent v. Yelich,* 812 F.Supp.2d 276, 281 (W.D.N.Y.2011). Since plaintiff's term of PRS was imposed prior to the issuance of those 2008 decisions by the Court of Appeals, defendants are protected by qualified immunity.

***3** [4] Plaintiff's third cause of action, which arises out of denial of his application for early release with respect to the sentence imposed on him in 2010 for his grand larceny conviction, fails to state a cognizable claim. "New York's parole scheme 'is not one that creates in any prisoner a legitimate expectancy of release,' and thus 'plaintiffs have no liberty interest in parole, and the protections of the Due Process Clause are inapplicable.' " *Duemmel v. Fischer,* 368 Fed.Appx. 180, 182 (2d Cir.2010) (quoting *Barna v. Travis,* 239 F.3d 169, 171 (2d Cir.2001)). *See also Fifield v. Eaton,* 669 F.Supp.2d 294, 296–98 (W.D.N.Y.2009) (granting motion to dismiss inmate's claim that he was denied parole opportunities due to his refusal to participate in SOP because inmate had no liberty interest in parole, conditional release, discretionary good time credits, or choosing his programming); *see also Kneitel v. Goord,* No. 9:05–cv–30, 2008 WL 2485061, at *5 (N.D.N.Y. June 18, 2008) ("As per any potential liberty interest created by statute or regulations in the State of New York, the governing statute clearly states that '[p]articipation in a temporary release program shall be a

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

privilege. Nothing contained in this article may be construed to confer upon any inmate the right to participate ... in a temporary release program' ") (quoting N.Y. Correct. L. § 855(9)). *Cf. Friedl v. City of New York,* 210 F.3d 79, 84 (2d Cir.2000) ("Prisoners *on work release* have a liberty interest in *continued* participation in such programs") (emphases added).

Finally, to the extent that plaintiff sues defendants in their official capacities, his claims are barred by sovereign immunity. *See Whitfield v. O'Connell,* 09 Civ.1925, 2010 WL 1010060, at *4 (S.D.N.Y. Mar. 18, 2010) ("[B]ecause Section 1983 does not abrogate a state's sovereign immunity and the State of New York has not waived its immunity, claims against DOCS for both monetary and injunctive relief are barred under the Eleventh Amendment") (citations omitted), *aff'd,* 402 Fed.Appx. 563 (2d Cir.2010), *cert. denied,* ––– U.S. ––––, 131 S.Ct. 2132, 179 L.Ed.2d 920 (2011); *Smith v. Paterson,* No. 08 Civ. 3313, 2010 WL 4359225, at *3 (S.D.N.Y. Nov. 3, 2010) ("Neither the fact that individuals and not the state are named as defendants in this action, nor the fact plaintiffs characterize the relief sought as equitable, overcomes the Eleventh Amendment bar") (citing *Edelman v. Jordan,* 415 U.S. 651, 666–668, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974)).

**CONCLUSION**

Defendants' motion to dismiss the complaint (Dkt. # 6) is granted, and the complaint is dismissed.

IT IS SO ORDERED.

FN1. The New York State Department of Correctional Services internet Inmate Lookup website, http://nysdocslookup.docs.state.ny.us, indicates that plaintiff was released from DOCS custody, to the custody of the New York State Division of Parole, on November 14, 2011.

W.D.N.Y.,2012.

Bloom v. Fischer
--- F.Supp.2d ----, 2012 WL 45470 (W.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Page 1

Not Reported in F.Supp.2d, 2010 WL 1010060 (S.D.N.Y.)

(Cite as: 2010 WL 1010060 (S.D.N.Y.))

H

Only the Westlaw citation is currently available.
**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,

S.D. New York.
John WHITFIELD, Plaintiff,
v.
Dr. David O'CONNELL, et al., Defendants.
No. 09 Civ.1925(WHP).

March 18, 2010.
Mr. John Whitfield, Woodbourne, NY, pro se.

Christina Chinwe Okereke, Esq., New York State Office of the Attorney General, New York, NY, for State Defendants.

Joseph T. Pareres, Esq., Rachel Hilary Poritz, Esq., Silverson, Pareres & Lombardi, L.L.P., New York, NY, for Bio-Reference Defendants.

*MEMORANDUM & ORDER*

WILLIAM H. PAULEY III, District Judge.

***1** Plaintiff *pro se* John Whitfield ("Whitfield") brings this federal civil rights action against the New York State Department of Correctional Services ("DOCS"), various named and unnamed DOCS officials and medical professionals at six New York State prisons in their individual and official capacities, Bio-Reference Laboratories s/h/a Medilabs Laboratory ("Bio-Reference"), Robert L. Rush, Ph.D. ("Dr.Rush"), and unnamed Bio-Reference technologists. Defendants Dr. N. Muthra ("Dr.Muthra"), Dr. Khee Tint Maw ("Dr.Maw"), Philip Williams ("Williams"), Brian Fischer ("Fischer"),[FN1] and DOCS (collectively the "State Defendants") move to dismiss the Amended Complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. Defendants Dr. Rush and Bio-Reference (collectively the "Bio-Reference Defendants") move to dismiss the Amended Complaint pursuant to Rules 12(b)(1) and 12(b)(6) and, in the alternative, they move for summary judgment. For the following reasons, the State Defendants' and the Bio-Reference Defendants' motions to dismiss the Amended Complaint are granted.

FN1. Numerous other individual State Defendants named and unnamed in the Amended Complaint have not been served. Those named Defendants are: DOCS Inmate Grievance Program Director Thomas G. Eagen, Drs. David O'Connell, J, Perilli, Lester Wright, Jerome Fein, "Everett," Gerald Ginsberg, Heidi L. Fine, M.A. Halko, Andrew Shapiro, and F. Lancellotti; and Registered Nurses Philip Erickson, Michael Michener, Colleen Bennett, Margaret Coloni, Ruth Gilligan, James McMahon, Robert Magee, Cathie Turta-Yohe, Carol Kunes, Baib Koziarski, Leacy Miller, D. Rick, Mana Jones, Joyce Gutowski, Suzette Cainper, Elizabeth Hamawy, Roberta Jahn-Sissoko, and Valerie Jane Monroe.

*BACKGROUND*

For purposes of these motions, this Court accepts the following allegations of the Amended Complaint as true.[FN2] Whitfield has been in DOCS custody since June 1988. At that time, he entered Downstate Correctional Facility ("Downstate") and has been housed over the last twenty years in at least six DOCS facilities around New York State. (Amended Verified Complaint dated Sept. 27, 2009 ("Compl.") ¶ 59.)

FN2. In his Complaint, Whitfield references grievances # SS-39628-04, # WB-14349-08 and # WB14427-08, and five laboratory reports dated June 2, 1988, September 23, 1993, March 22, 1995, August 30, 2001, and July 29, 2006. These documents, which Whitfield submitted with his opposition papers, are incorporated by reference and properly considered on a motion to dismiss. *See, e.g., Sanchez v. Velez,* No. 08 Civ.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

1519(NRB), 2009 WL 2252319, at *1 & n. 1 (S.D.N.Y. July 24, 2009) (considering *pro se* plaintiff's grievances referenced in the complaint on motion to dismiss).

Whitfield has complained to DOCS medical staff about lower back, kidney, chest and lung pain for years. (Compl.¶¶ 58, 94, 101.) He asserts DOCS employees omitted many of his complaints from his Ambulatory Health Records. (Compl.¶ 97.) On November 6, 2000, Whitfield received treatment for bacterial pneumonia from Williams, a physician's assistant at Sing Sing Correctional Facility ("Sing Sing"). (Compl.¶¶ 6, 74.) Whitfield alleges that although he experienced a severe allergic reaction to the prescribed antibiotic, Williams forced him to continue taking the medication and refused to prescribe another. (Compl.¶ 100.)

On October 5, 2004, Whitfield filed grievance # SS-39628-04 (the "Chest Pain Grievance") at Sing Sing with the Inmate Grievance Resolution Committee (the "IGRC") complaining that the Medical Department's treatment of his ongoing chest pain was inadequate and requesting to see an outside physician. (Compl. ¶ 54; Plaintiff's Affidavit in Support of Opposition to Defendants' Motion to Dismiss and Motion for Summary Judgment dated Aug. 4, 2009 ("Pl.Aff.") Ex. A: Inmate Grievance Complaint dated Oct. 5, 2004.) On November 3, 2004, Fischer, the Superintendent of Sing Sing, denied Whitfield's appeal from the IGRC's adverse decision. (Compl. ¶¶ 8, 78; Pl. Aff. Ex. A: Superintendent decision on appeal dated Nov. 3, 2004.) Whitfield then appealed to the Central Office Review Committee (the "CORC"), which denied his grievance on December 1, 2004. (Compl.¶ 54.)

***2** In June 2008, Whitfield was transferred from Sing Sing to Woodbourne Correctional Facility ("Woodbourne"). (Compl.¶¶ 1, 55.) On arrival, Whitfield received a series of medical examinations, including blood and urine tests. (Compl.¶ 55.) On July 28, 2008, Woodbourne medical staff informed Whitfield that he had a urinary tract infection and prescribed a seven-day antibiotic regimen. (Compl.¶ 55.) Whitfield alleges that while taking the prescribed antibiotic, his "long-standing chest and lung pain flared up substantially." (Compl.¶ 56.) When the pain persisted after completing the antibiotic treatment, he attended sick call and asked to see a doctor. (Compl.¶ 56.)

On August 13, 2008 Whitfield received copies of his DOCS medical records that he had requested. (Compl.¶ 56.) Whitfield claims they showed that "as far back as March 1995 there was clear documentary evidence of bacteria in his urine." (Compl.¶ 56.) Specifically, a laboratory report from Attica Correctional Facility ("Attica") dated March 22, 1995 indicated a "few" bacteria in his urine (Pl. Aff. Ex. B: Laboratory report dated Mar. 22, 1995 ("Attica Lab Report")), yet according to Whitfield he did not receive antibiotics for that condition at Attica (Compl.¶ 56). Further, two laboratory reports from Sing Sing dated August 30, 2001 and July 29, 2006 recorded "moderate" bacteria in his urine and abnormal hematology results such as low white blood cell and platelet counts. (Compl. ¶ 57; Pl. Aff. Ex. B: Laboratory reports dated Aug. 30, 2001 and July 29, 2006 ("Sing Sing Lab Reports").) The Sing Sing Lab Reports were ordered by Drs. Muthra and Maw, physicians in Sing Sing's Medical Department. (Compl. ¶¶ 4-5, 73; Sing Sing Lab Reports.)

The Attica Lab Report and the Sing Sing Lab Reports were issued by Bio-Reference, an independent laboratory that performed the testing of samples sent by requesting DOCS physicians who treated Whitfield. (Compl.¶ 10.) Dr. Rush is, and was at all relevant times, the Director of Bio-Reference. (Compl.¶ 11.) Whitfield alleges that Bio-Reference did not identify the specific bacteria found in his urine or conduct antibiotic sensitivity tests after urinalyses showed the presence of bacteria on March 22, 1995, August 20, 2001, and July 29, 2006. (Compl.¶¶ 79-80.) He further claims that the Bio-Reference Defendants instituted a policy discouraging Bio-Reference employees from using costly techniques like bacteria identification and sensitivity tests on inmate samples. (Compl.¶ 81.)

On August 18, 2008, Whitfield met with Dr. F. Lancellotti ("Dr.Lancellotti"), a physician in the Woodbourne Medical Department, to inquire about his abnormal test results. (Compl.¶¶ 39, 58.) Dr. Lancellotti conducted additional blood and urine tests to confirm the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

antibiotic treatment removed all bacteria, as well as an x-ray and an EKG. (Compl.¶ 58.) Whitfield alleges that despite his requests, Dr. Lancellotti refused to conduct other tests to determine whether the bacterial infection damaged any organs. (Compl.¶ 58.) Whitfield was subsequently informed that the blood and urine tests were negative for the presence of bacteria. (Compl.¶ 58.)

***3** Whitfield then ordered a copy of his entire DOCS medical file. (Compl.¶ 59.) In reviewing that file on September 8, 2008, Whitfield learned that the first urinalysis conducted when he entered DOCS custody at Downstate in June 1988 indicated the presence of bacteria in his urine. (Compl. ¶ 59; Pl. Aff. Ex. B: Laboratory report dated June 2, 1988 ("Downstate Lab Report")) He also discovered a laboratory report from Attica dated September 23, 1993 reporting a "marked decrease" in platelet count. Whitfield claims that report "confirm [ed] the presence of a spreading bacterial infection." (Compl. ¶ 73; Affidavit of John Whitfield dated Nov. 5, 2009 Ex. B: Laboratory report dated Sept. 23, 1993 ("Attica Lab Report").) Both lab reports were issued by Bio-Reference. On September 12, 2008, Whitfield again met with Dr. Lancellotti and requested to see a specialist. (Compl.¶ 60.) Dr. Lancellotti denied Whitfield's request for an ultrasound or an MRI of his kidneys but ordered an x-ray. (Compl.¶ 60.)

Whitfield alleges that Defendants "[a]t all times relevant ... acted pursuant to the policies ... promulgated by [DOCS] ." (Compl.¶ 47.) Based on the laboratory reports in his medical file and Defendants' inactions, Whitfield claims that Defendants "entered into an agreement to ignore [his] urinary tract infection" of twenty years duration "to bring about his death." (Compl.¶¶ 91-94.) Whitfield also claims that in furtherance of the conspiracy, employees at the Greenhaven Correctional Facility ("Greenhaven") removed laboratory reports from his file in October 1991 and January 1993, and that Dr. Heidi L. Fine destroyed an x-ray taken November 6, 2000. (Compl.¶¶ 59, 95, 99.) He further alleges that Defendants' actions prevented him from discovering his true medical condition until July 28, 2008. (Compl.¶ 106.)

On September 13, 2008, Whitfield filed grievance # WB-14349-08 (the "Infection Grievance") at Woodbourne requesting treatment "by an outside physician" and the removal of "the doctors who ignored [his] urinary tract infection." (Compl. ¶ 61; Pl. Aff. Ex. D: Inmate Grievance Complaint dated Sept. 13, 2008.) Dr. Lancellotti responded on September 25, 2008 by stating that "there was nothing currently wrong with [Whitfield's] health." (Compl.¶ 123.) The CORC denied Whitfield's grievance on appeal on November 19, 2008. (Compl. ¶ 54; Pl. Aff. Ex. D: CORC Grievance Decision dated Nov. 19, 2008.)

On November 17, 2008, Dr. Lancellotti performed a laser surgical removal of a wart on Whitfield's tricep. (Compl.¶ 63.) Whitfield alleges that Dr. Lancellotti treated him roughly during the procedure, left a deep gash and portions of the wart behind, and failed to prescribe pain killers. (Compl.¶ 63.) Whitfield filed grievance # WB-14427-08 (the "Retaliation Grievance") on November 26, 2008 alleging Dr. Lancellotti acted in retaliation for the Infection Grievance. (Compl.¶¶ 63, 125.) The CORC denied the Retaliation Grievance on January 28, 2009. (Compl.¶ 54.)

*DISCUSSION*

I. *Legal Standard*

***4** "A court faced with a motion to dismiss pursuant to both Rule 12(b)(1) and 12(b)(6) must decide the jurisdictional question first because a disposition of a Rule 12(b)(6) motion is a decision on the merits and, therefore, an exercise of jurisdiction." *Magee v. Nassau Cty. Med. Ctr.,* 27 F.Supp.2d 154, 158 (E.D.N.Y.1998). When considering a motion to dismiss under either Rule 12(b)(1) or 12(b)(6), the Court accepts the material facts alleged in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Jaghory v. N.Y. State Dep't of Educ.,* 131 F.3d 326, 329 (2d Cir.1997).

Nonetheless, "factual allegations must be enough to raise a right of relief above the speculative level, on the assumption that all of the allegations in the complaint are true." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (requiring plaintiff to plead "enough fact [s] to raise a reasonable expectation that discovery will reveal evidence of [his claim]"). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- U.S. ----, ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Twombly,* 550 U.S. at 570). A court's "consideration [on a motion to dismiss] is limited to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Allen v. WestPoint-Pepperell, Inc.,* 945 F.2d 40, 44 (2d Cir.1991).

A *pro se* litigant's submissions are held to "less stringent standards than [those] drafted by lawyers." *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972). Courts must "liberally construe pleadings and briefs submitted by *pro se* litigants, reading such submissions 'to raise the strongest arguments they suggest.' " *Bertin v. United States,* 478 F.3d 489, 491 (2d Cir.2007) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). "These liberal pleading rules apply with particular stringency to complaints of civil rights violations." *Phillip v. Univ. of Rochester,* 316 F.2d 291, 293-94 (2d Cir.2003). Nevertheless, the court need not accept as true "conclusions of law or unwarranted deductions of fact." *First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 771 (2d Cir.1994) (citations omitted).

II. *Eleventh Amendment and Sovereign Immunity*

"Neither a state nor one of its agencies nor an official of that agency sued in his or her official capacity is a 'person' under § 1983." *Spencer v. Doe,* 139 F.3d 107, 111 (2d Cir.1998); *see also Will v. Mich. Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). "Therefore, state officials cannot be sued in their official capacities for retrospective relief under section 1983." *Huminski v. Corsones,* 386 F.3d 116, 133 (2d Cir.2004) (citing *Will,* 491 U.S. at 71). Moreover, because Section 1983 does not abrogate a state's sovereign immunity, *Quern v. Jordan,* 440 U.S. 332, 341, 345, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979), and the State of New York has not waived its immunity, claims against DOCS for both monetary and injunctive relief are barred under the Eleventh Amendment. *Santiago v. N.Y. State Dep't of Corr. Servs.,* 945 F.2d 25, 31-32 (2d Cir.1991). Accordingly, Whitfield's § 1983 claims against the individual State Defendants in their official capacities and against DOCS for monetary and injunctive relief are dismissed.

III. *Statute of Limitations: Defendants Williams & Fischer*

A. *In General*

***5** "In section 1983 actions, the applicable limitations period is found in the 'general or residual [state] statute [of limitations] for personal injury actions.' " *Pearl v. City of Long Beach,* 296 F.3d 76, 79 (2d Cir.2002) (quoting *Owens v. Okure,* 488 U.S. 235, 249-50, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989)) (alterations in original). In New York, the applicable statute of limitations is three years. N.Y. C.P.L.R. § 214(5); *see also Pearl,* 296 F.3d at 79. "For statute of limitations purposes, a pro se prisoner's complaint is deemed filed on the date that the prisoner turn[s] his complaint over to prison officials for transmittal to the court, not when the court actually receives it." *Abbas v. Dixon,* 480 F.3d 636, 638 & n. 1 (2d Cir.2007) (internal quotation marks omitted). Because Whitfield delivered his original complaint to Woodbourne prison authorities on September 23, 2008, his only actionable claims are those that accrued on or after September 23, 2005.

"Federal law determines when a section 1983 cause of action accrues ... [which occurs] ... when the plaintiff knows or has reason to know of the injury which is the basis of his action." *Pearl,* 296 F.3d at 80 (internal quotation and citations omitted). "The cause of action accrues even though the full extent of the injury is not then known or predictable." *Wallace v. Kato,* 549 U.S. 384, 391, 127 S.Ct. 1091, 166 L.Ed.2d 973 (2007). Likewise, "[d]elay in discovering the cause of the injury does not prevent the claim from accruing" because it is ' "discovery of the injury, not discovery of the other elements of the claim, [that] starts the clock.' " *Gonzalez v. Wright,* 665 F.Supp.2d 334, 348-49 (S.D.N.Y.2009) (quoting *Rotella v. Wood,* 528 U.S. 549, 555, 120 S.Ct. 1075, 145 L.Ed.2d 1047 (2000)). Moreover, "[t]he existence of a conspiracy does not postpone the accrual of causes of action arising out of the conspirators' separate wrongs." *Pinaud v. Cty. of Suffolk,* 52 F.3d 1139, 1156 (2d Cir.1995).

Whitfield alleges that Williams deliberately refused to treat his underlying urinary tract infection or prescribe

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 5

Not Reported in F.Supp.2d, 2010 WL 1010060 (S.D.N.Y.)

(Cite as: 2010 WL 1010060 (S.D.N.Y.))

an alternative antibiotic when treating his bacterial pneumonia on November 6, 2000. Whitfield claims Fischer denied his Chest Pain Grievance on November 3, 2004. Even if Whitfield could not have discovered the cause of his alleged injuries or the existence of the alleged conspiracy until July 28, 2008, his claims against Williams and Fischer both accrued well before September 23, 2005.

B. *Tolling: Continuing Violation and Fraudulent Concealment*

"To assert a continuing violation for statute of limitations purposes," the plaintiff must allege (1) "an ongoing policy of deliberate indifference to his or her serious medical needs"; and (2) for each defendant, "some acts in furtherance of the policy within the relevant statute of limitations period." *Shomo v. City of N.Y.,* 579 F.3d 176, 179, 182-84 (2d Cir.2009). To rely on the fraudulent concealment doctrine, a plaintiff must make non-conclusory allegations of "a conspiracy or other fraudulent wrong which precluded his possible discovery of the harms that he suffered." *Pinaud,* 52 F.3d at 1157; *see also Shomo,* 579 F.3d at 85 (plaintiff must allege "it would have been *impossible* for a reasonably prudent person to learn about his or her cause of action" (emphasis in original)).

***6** Whitfield does not claim that Williams or Fischer participated in his treatment during the three years preceding the filing of this lawsuit. As for fraudulent concealment, the allegations in the Amended Complaint acknowledge the possibility that Whitfield could have discovered his chronic urinary tract infection before July 28, 2008. First, Whitfield complained about his health problems as far back as 2004. (Compl ¶ 54.) Moreover, when he requested access to his medical records, he received them promptly. (*See* Compl ¶¶ 56, 59.) Whitfield does not claim that any Defendant refused him access to his medical file at any time. Accordingly, the claims against Williams and Fischer are time-barred and dismissed.

IV. *Failure to State a Claim*[FN3]

FN3. Although Defendants also move to dismiss on the ground that Whitfield failed to exhaust his administrative remedies, "the court may dismiss the underlying claim without first requiring the exhaustion of administrative remedies" where "a claim ... [*inter alia* ] ... fails to state a claim upon which relief can be granted." 42 U.S.C. § 1997e(c)(2); *see also McCoy v. Goord,* 255 F.Supp.2d 233, 252 (S.D.N.Y.2003).

A. *Deliberate Indifference to Serious Medical Needs*

To state a claim of inadequate medical treatment in violation of the Eighth Amendment, "a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The Eighth Amendment standard includes objective and subjective criteria: (1) "the deprivation alleged must be, objectively, sufficiently serious"; and (2) "a prison official must have a sufficiently culpable state of mind[:] deliberate indifference to inmate health or safety." *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

Under the objective element, an inmate must allege his medical needs were "sufficiently serious," a standard that "contemplates a condition of urgency, one that may produce death, degeneration, or extreme pain." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (internal quotations and citations omitted). However, a prisoner is not required to allege that he "experiences pain that is at the limit of human ability to bear, nor [must he allege] that [his] condition will degenerate into a life-threatening one." *Brock v. Wright,* 315 F.3d 158, 163 (2d Cir.2003).

The subjective element requires the prisoner to allege "something more than mere negligence" yet "something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer,* 511 U.S. at 835; *Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996). The defendant prison official must "know [ ] of and disregard [ ] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Farmer,* 511 U.S. at 837. "[M]ere medical malpractice is not tantamount to deliberate indifference," unless "the malpractice involves culpable recklessness, i.e., ... a conscious disregard of a substantial risk of serious harm."

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998) (quoting *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996)). "Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation." *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003).

1. *Urinary Tract Infection*

***7** The gravamen of the Amended Complaint is that numerous named and unnamed medical personnel at six different prison facilities and at Bio-Reference ignored the five laboratory reports indicating the presence of bacteria in his urine and therefore failed to diagnose or treat his alleged urinary tract infection.[FN4] This Court need not decide whether Whitfield's alleged chronic urinary tract infection constituted a serious medical need because the acts and omissions Whitfield alleges fail to rise to the level of deliberate indifference.

> FN4. A district court has the power to *sua sponte* dismiss claims against nonmoving defendants for failure to state a claim, as long as the plaintiff has been given an opportunity to be heard. *See Thomas v. Scully,* 943 F.2d 259, 260 (2d Cir.1991). In this case, Whitfield has been heard both in his Amended Complaint-which this Court in its discretion permitted him to file *after* the motions under consideration were filed-and in his papers in opposition to those motions.

"[A]lthough the provision of medical care by prison officials is not discretionary, the type and amount of medical treatment is discretionary." *Perez v. Hawk,* 302 F.Supp.2d 9, 21 (E.D.N.Y.2004). "[D]isagreements over medications, diagnostic techniques ..., forms of treatment, or the need for specialists or the timing of their intervention, are not adequate grounds for a Section 1983 claim. These issues implicate medical judgments and, at worst, negligence amounting to medical malpractice, but not the Eighth Amendment." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001); *see also Estelle,* 429 U.S. at 106 ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.").

Whitfield's claims that Drs. O'Connell, Muthra and Maw-who each ordered a single laboratory report-ignored the presence of bacteria in his urine and failed to treat his alleged urinary tract infection are at most "isolated omission[s] to act" which do "not support a claim under section 1983 absent special circumstances indicating an evil intent, recklessness, or at least deliberate indifference ..." *Ayers v. Coughlin,* 780 F.2d 205, 209 (2d Cir.1985) (*per curiam* ). Even if, as Whitfield alleges, basic medical procedure required these Defendants to "take appropriate additional steps" to determine the nature of the bacteria found, this is at most negligence, not deliberate indifference. *See Chance,* 143 F.3d at 703.

Whitfield further alleges that Drs. Fein, Everett, Ginsberg, Fine and Halko, and no fewer than eighteen registered nurses ignored the laboratory reports when treating him between January 1990 and July 2008. Whitfield does not allege at what point in that mostly time-barred eighteen-year period he was examined or treated by any of these Defendants, under what circumstances, or for what medical conditions. Because Whitfield does not "identif[y] the particular events giving rise to [his] claim[s]" against these Defendants, his Amended Complaint fails to give them "fair notice of what the claim is and the grounds upon which it rests." *Boykin v. KeyCorp.,* 521 F.3d 202, 214-15 (2d Cir.2008).

Whitfield's claims against Dr. Lancellotti concerning treatment for his urinary tract infection also fail as "mere disagreement[s] over [ ] proper treatment [which] do [ ] not create a constitutional claim." *Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998); *see also Joyner v. Greiner,* 195 F.Supp.2d 500, 505 (S.D.N.Y.2002) (physician's refusal to order an MRI not actionable under the Eighth Amendment). "So long as the treatment given is adequate," as Dr. Lancellotti's was here, "the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance,* 143 F.3d at 703.

***8** Finally, Whitfield fails to state a claim against the Bio-Reference Defendants. A laboratory's choice not to

perform bacteria identification and antibiotic sensitivity tests on blood and urine samples are medical judgments of the kind that cannot give rise to a constitutional claim. *See Estelle,* 429 U.S. at 107.

Accordingly, this Court grants Defendants' motions to dismiss Whitfield's deliberate indifference to serious medical needs claims arising from the treatment of his urinary tract infection.

2. *Wart Removal*

Whitfield alleges that Dr. Lancellotti inadequately performed a laser surgical removal of a wart and refused to prescribe pain killers during post-operative recovery. Warts do not constitute a serious medical need under the Eighth Amendment. *See Page v. Scott,* No. 07 Civ. 287(BES)(VPC), 2009 WL 604922, at *6 (D.Nev. Feb. 17, 2009) (plantar warts are not a serious medical need). Moreover, the allegedly hostile and incomplete performance of a laser surgical wart removal and refusal to prescribe pain medication thereafter does not constitute deliberate indifference. *See White v. Corrs. Med. Servs.,* No. 06 Civ. 680(SNL), 2006 WL 1391298, at *2 (E.D.Mo. May 19, 2006) (prisoner's allegations of "failure to remove [his] warts entirely" and resulting pain "may be cognizable as a negligence or medical malpractice claim under state law, [but] they are insufficient to sustain a constitutional violation"). Not surprisingly, this Court could not find any decisions by courts in the Second Circuit concerning deliberate indifference claims as applied to non-venereal warts. Accordingly, this Court dismisses Whitfield's deliberate indifference to serious medical needs claim concerning the wart removal with prejudice pursuant to Rule 12(b) (6).

B. *Conspiracy*

To state a claim for "a § 1983 conspiracy, a plaintiff must [allege]:(1) an agreement between two or more state actors ... (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999).[FN5] Because "Section 1983 is only a grant of a right of action [,] the substantive right giving rise to the action must come from another source." *Singer v. Fulton Cty. Sheriff,* 63 F.3d 110, 119 (2d Cir.1995). Therefore, a § 1983 conspiracy claim "will stand only insofar as the plaintiff can prove the *sine qua non* of a § 1983 action: the violation of a federal right." *Singer,* 63 F.3d at 119 (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 150, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) (one of the necessary elements of a § 1983 action is "that the defendant has deprived [the plaintiff] of a right secured by the 'Constitution and laws' of the United States")). Since Whitfield's deliberate indifference to serious medical needs claims fail, his claim of a conspiracy also falls.

> FN5. "[A] § 1985(3) claim generally describes a conspiracy of two or more persons for the purpose of depriving of another of equal protection of the laws or equal privileges and immunities under the laws." *Dixon v. City of Lawton, Okla.,* 898 F.2d 1443, 1447 (10th Cir.1990). However, " § 1985(3) requires proof that a conspirator's action was motivated by a class-based, invidiously discriminatory animus; there is no such requirement under § 1983." *Dixon,* 898 F.2d at 1447 (citing *Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971)).

C. *Retaliation*

"[T]o survive a motion to dismiss a complaint, a plaintiff asserting First Amendment retaliation claims must allege (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (internal quotation marks and citation omitted). It is well established that the filing of prison grievances is constitutionally protected conduct. *See Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996) ("retaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments"). Nonetheless, "[c]ourts properly approach prisoner retaliation claims with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

act." *Davis,* 320 F.3d at 352; *see also* *Williams v. Fisher,* No. 02 Civ. 4558(LMM), 2003 WL 22170610, at *10 (S.D.N.Y. Sept.18, 2003) ("because of the ease of fabricating a claim of retaliation, the Second Circuit requires the court to handle such claims with care").

***9** "[I]n the prison context [the Second Circuit has] defined 'adverse action' *objectively,* as retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d 379, 381 (2d Cir.2004) (emphasis in original and citation omitted). In considering a prisoner retaliation claim, courts must bear in mind that "prisoners may be required to tolerate more ... than average citizens, before a [retaliatory] action taken against them is considered adverse." *Davis,* 320 F.3d at 353 (internal quotation marks omitted); *Young v. Strack,* No. 05 Civ. 9764(WHP), 2007 WL 1575256, at *7 (S.D.N.Y. May 29, 2007).

Although courts in this district have recognized that a prison physician's retaliatory treatment may well constitute "adverse action," these cases involve the revocation of "necessary medical rehabilitative treatment," *Williams,* 2003 WL 22170610, at *11, or the denial of medical treatment for injuries later requiring surgery, *Burton v. Lynch,* --- F.Supp.2d ----, No. 08 Civ. 8791(LBS), 2009 WL 3286020, at *9, 11 (S.D.N.Y. Oct. 13, 2009). That Dr. Lancellotti may have performed a laser wart removal without the most pleasant of bedside manners, or that he may have left part of the wart behind and declined to prescribe pain killers falls far short of "adverse action" which would chill the speech of a similarly situated individual of ordinary firmness. Dr. Lancellotti's alleged actions are "simply *de minimis* and therefore outside the ambit of constitutional protection." *Davis,* 320 F.3d at 353. Accordingly, this Court dismisses Whitfield's retaliation claim concerning Dr. Lancellotti's laser removal of a wart from Plaintiff's arm.

V. *State Law Claims*

Having dismissed all of Whitfield's federal claims, this Court declines to exercise supplemental jurisdiction over his pendant state law claims. *See* 28 U.S.C. § 1367; *Marcus v. AT & T Corp.,* 138 F.3d 46, 57 (2d Cir.1998) ("In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well.").

*CONCLUSION*

For the foregoing reasons, the State Defendants' and the Bio-Reference Defendants' motions to dismiss the Amended Complaint are granted. The Clerk of the Court shall terminate all pending motions and mark this case as closed.

SO ORDERED.

S.D.N.Y.,2010.

Whitfield v. O'Connell
Not Reported in F.Supp.2d, 2010 WL 1010060 (S.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



C

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

Theodore HUDSON, Plaintiff,
v.
Christopher ARTUZ, Warden Philip Coombe, Commissioner Sergeant Ambrosino Doctor Manion Defendants.
No. 95 CIV. 4768(JSR).

Nov. 30, 1998.

Mr. Theodore Hudson, Great Meadow Correctional Facility, Comstock.

Alfred A. Delicata, Esq., Assistant Attorney General, New York.

MEMORANDUM AND ORDER

BUCHWALD, Magistrate J.

***1** Plaintiff Theodore Hudson filed this *pro se* action pursuant to 42 U.S.C. § 1983 on April 26, 1995. Plaintiff's complaint alleges defendants violated his constitutional rights while he was an inmate at Green Haven Correctional Facility.[FN1] Plaintiff's complaint was dismissed *sua sponte* by Judge Thomas P. Griesa on June 26, 1995 pursuant to 28 U.S.C. § 1915(d). On September 26, 1995, the Second Circuit Court of Appeals vacated the judgment and remanded the case to the district court for further proceedings.

FN1. Plaintiff is presently incarcerated at Sullivan Correctional Facility.

The case was reassigned to Judge Barbara S. Jones on January 31, 1996. Defendants moved to dismiss the complaint pursuant to Fed.R.Civ.P. 12(c) on November 25, 1996. Thereafter, the case was reassigned to Judge Jed S. Rakoff on February 26, 1997. On February 26, 1998, Judge Rakoff granted defendants' motion to dismiss, but vacated the judgment on April 10, 1998 in response to plaintiff's motion for reconsideration in which plaintiff claimed that he never received defendants' motion to dismiss.

By Judge Rakoff's Order dated April 14, 1998, this case was referred to me for general pretrial purposes and for a Report and Recommendation on any dispositive motion. Presently pending is defendants' renewed motion to dismiss. Plaintiff filed a reply on July 6, 1998. For the reasons discussed below, plaintiff's complaint is dismissed without prejudice, and plaintiff is granted leave to replead within thirty (30) days of the date of the entry of this order.

FACTS

Plaintiff alleges that he was assaulted by four inmates in the Green Haven Correctional Facility mess hall on March 14, 1995. (Complaint at 4.) He alleges that he was struck with a pipe and a fork while in the “pop room” between 6:00 p.m. and 6:30 p.m. (Complaint at 4–5.) Plaintiff contends that the attack left him with 11 stitches in his head, chronic headaches, nightmares, and pain in his arm, shoulder, and back. (*Id.*) Plaintiff also states that Sergeant Ambrosino “failed to secure [the] area and separate” him from his attackers. (Reply at 5.) Plaintiff's claim against Warden Artuz is that he “fail [sic] to qualify as warden.” (Complaint at 4.) Plaintiff names Commissioner Coombes as a defendant, alleging Coombes “fail [sic] to appoint a qualified warden over security.” (Amended Complaint at 5.) Plaintiff further alleges that Dr. Manion refused to give him pain medication. (Complaint at 5.) Plaintiff seeks to “prevent violent crimes” and demands $6,000,000 in damages. (Amended Complaint at 5.)

Defendants moved to dismiss the complaint, arguing that: (1) the Eleventh Amendment bars suit against state defendants for money damages; (2) the plaintiff's allegations fail to state a claim for a constitutional violation; (3) the defendants are qualifiedly immune from damages; and (4) plaintiff must exhaust his administrative remedies before bringing this suit.

DISCUSSION

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

I find that plaintiff's complaint runs afoul of Rules 8 and 10 of the Federal Rules of Civil Procedure and dismiss the complaint without prejudice and with leave to amend. Federal Rule 8 requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The purpose of this Rule "is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a responsive answer [and] prepare an adequate defense." *Powell v. Marine Midland Bank,* 162 F.R.D. 15, 16 (N.D.N.Y.1995) (quoting *Brown v. Califano,* 75 F.R.D. 497, 498 (D.D.C.1977)); *see Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988) (stating that the "principal function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial").

***2** Rule 10 of the Federal Rules of Civil Procedure requires, *inter alia,* that the allegations in a plaintiff's complaint be made in numbered paragraphs, each of which should recite, as far as practicable, only a single set of circumstances. *Moore's Federal Practice,* Vol. 2A, ¶ 10.03 (1996). Rule 10 also requires that each claim upon which plaintiff seeks relief be founded upon a separate transaction or occurrence. *Id.*[FN2] The purpose of Rule 10 is to "provide an easy mode of identification for referring to a particular paragraph in a prior pleading." *Sandler v. Capanna,* 92 Civ. 4838, 1992 WL 392597, *3 (E.D.Pa. Dec.17, 1992) (citing 5 C. Wright & A. Miller, *Federal Practice and Procedure,* § 1323 at 735 (1990)).

FN2. Rule 10 states:

(b) Paragraphs; Separate Statements. All averments of claim or defense shall be made in numbered paragraphs, the contents of each of which shall be limited as far as practicable to a statement of a single set of circumstances; and a paragraph may be referred to by number in all succeeding pleadings. Each claim founded upon a separate transaction or occurrence and each defense other than denials shall be stated in a separate count or defense whenever a separation facilitates the clear presentation of the matters set forth.

A complaint that fails to comply with these pleading rules "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of" a plaintiff's claims. *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996). It may therefore be dismissed by the court. *Id.; see also Salahuddin v. Cuomo,* 861 F.2d at 42 ("When a complaint does not comply with the requirement that it be short and plain, the court has the power to, on its own initiative, ... dismiss the complaint"). Dismissal, however, is "usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." *Id.* In those cases in which the court dismisses a *pro se* complaint for failure to comply with Rule 8, it should give the plaintiff leave to amend when the complaint states a claim that is on its face nonfrivolous. *Simmons v. Abruzzo,* 49 F.3d 83, 87 (2d Cir.1995).

In determining whether a nonfrivolous claim is stated, the complaint's allegations are taken as true, and the "complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v.. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The complaint of a *pro se* litigant is to be liberally construed in his favor when determining whether he has stated a meritorious claim. *See Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972). Even if it is difficult to determine the actual substance of the plaintiff's complaint, outright dismissal without leave to amend the complaint is generally disfavored as an abuse of discretion. *See Salahuddin,* 861 F.2d at 42–42; *see also Doe v. City of New York,* No. 97 Civ. 420, 1997 WL 124214, at *2 (E.D.N.Y. Mar.12, 1997).

Here, plaintiff's *pro se* complaint fails to satisfy the requirements of Federal Rules 8 and 10. The complaint is often illegible and largely incomprehensible, scattering what appear to be allegations specific to plaintiff within a forest of headnotes copied from prior opinions. Defendants have answered with a boilerplate brief, which is perhaps all a defendant can do when faced with such a complaint. The Court is left with an insurmountable burden in attempting to make a reasoned ruling on such

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

muddled pleadings.

***3** Although plaintiff's complaint is substantially incomprehensible, it appears to plead at least some claims that cannot be termed frivolous on their face. For example, plaintiff clearly alleges that inmates assaulted him and that Dr. Manion refused to provide him medical attention. He also appears to assert that Sergeant Ambrosino failed to protect him from the attack or take steps to prevent future attacks. (Plaintiff's Reply at 5). It is well established that an inmate's constitutional rights are violated when prison officials act with deliberate indifference to his safety or with intent to cause him harm. *Hendricks v. Coughlin,* 942 F.2d 109 (2d Cir.1991). It is similarly well established that an inmate's constitutional rights are violated when a prison doctor denies his request for medical care with deliberate indifference to the inmate's serious medical needs. *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Hathaway v. Coughlin,* 37 F.3d 63 (2d Cir.1994), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). Although plaintiff provides few facts to support his allegations, I disagree with defendants' assertion that outright dismissal is appropriate because it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Defendant's Memorandum at 5 (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

Because plaintiff's complaint does not comply with Rules 8 and 10, it is hereby dismissed without prejudice, and plaintiff is granted leave to replead within thirty (30) days of the date of the entry of this Order. In drafting his second amended complaint, plaintiff is directed to number each paragraph and order the paragraphs chronologically, so that each incident in which he alleges a constitutional violation is described in the order that it occurred. Plaintiff is also directed to specifically describe the actions of each defendant that caused plaintiff harm, and to do so in separate paragraphs for each defendant. Plaintiff's complaint shall contain the facts specific to the incidents plaintiff alleges occurred, and not any facts relating to any case that has been decided previously by a court of law. Plaintiff's complaint shall also contain a clear statement of the relief he seeks in addition to monetary damages.

CONCLUSION

For the reasons set forth above, plaintiff's complaint is dismissed without prejudice, and plaintiff is granted leave to replead within thirty (30) days of the date of the entry of this Order.

IT IS SO ORDERED.

S.D.N.Y.,1998.

Hudson v. Artuz
Not Reported in F.Supp.2d, 1998 WL 832708 (S.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

John T. PICKERING–GEORGE, a/k/a John R. Daley, Jr., Plaintiff,

v.

Andrew M. CUOMO, Attorney General of New York State; Andrea Oser, Deputy Solicitor General of New York State; District Attorneys, a/k/a District Attorney Offices; and Prosecuting Attorneys, Defendants.

No. 1:10–CV–0771 (GTS/DEP).

Dec. 8, 2010.

John T. Pickering–George, Bronx, NY, pro se.

***DECISION and ORDER***

Hon. GLENN T. SUDDABY, District Judge.

***1** Currently before the Court in this *pro se* civil rights action, filed by John T. Pickering–George ("Plaintiff"), is Plaintiff's motion to proceed *in forma pauperis* and motion for various other relief. (Dkt.Nos.2, 3.) For the reasons discussed below, Plaintiff's motion to proceed *in forma pauperis* is granted, and his motion for various other relief is denied. In addition, Plaintiff's Complaint is *sua sponte* dismissed for failure to state a claim upon which relief can be granted and frivolousness, pursuant to 28 U.S.C. §§ 1915(e)(2)(B), unless, within thirty (30) days of the date of this Decision and Order, he files an Amended Complaint that complies with the terms of this Decision and Order.

**I. PLAINTIFF'S MOTION TO PROCEED *IN FORMA PAUPERIS***

After carefully reviewing Plaintiff's papers, the Court finds that he qualifies for *in forma pauperis* status. (Dkt. No. 2.) Plaintiff's motion to proceed *in forma pauperis* in this action is, therefore, granted. However, the Court reserves the right to conduct an analysis of any "strikes" acquired by Plaintiff, for purposes of 28 U.S.C. § 1915(g), should the Court obtain, at a later time, reason to believe that he had acquired at least three such "strikes" before he filed this action. In addition, Plaintiff should note that, although his motion to proceed *in forma pauperis* has been granted, he still will be required to pay other fees that he might incur in this action, including copying and/or witness fees.

**II. PLAINTIFF'S MOTION FOR VARIOUS OTHER RELIEF**

Approximately three months after filing his Complaint in this action, Plaintiff filed an 26–page document described as a "motion." (Dkt. No. 3.) Included within that filing is another motion to proceed *in forma pauperis.* (Dkt. No. 3, Attach.1.) Like Plaintiff's original filing, this motion is indecipherable. (*Compare* Dkt. No. 1 *with* Dkt. No. 3.) For example, the first page of the document states as follows:

> RE: PETITIONER *"MOTION"* FOR *DOCKET NUMBER ALSO STATUS AND MOTION FOR ATTORNEY FEE'S, COSTS FOR FAILURE TO RESPOND IN ACCORDANCE WITH,* 5 U.S.C.S. § 552(a)(4)(E) & (F) (FOIA), *FREEDOM OF INFORMATION ACT, AND, "ENCLOSED JURISDICTIONS", OF [A], SUBPOENA, CONTEMPT, MANDAMUS, MANDATORY, GENERAL ORDER, MANDATED PROCESS, GENERAL PROVISIONS GOVERNING DUTIES, OBTAINING DOCUMENTS, FORMS, AND APPLICATIONS IMMUNITIES CLAUSE FROM PROSECUTION OR PUNISHMENT, RELEASE–DISMISSAL DOCUMENT FORM, EXEMPT FROM INVESTIGATIONS, INDICTMENT, PROSECUTIONS, PUNISHMENT, PENALTY OR FORFEITURE, SUITS OR OTHER PROCEEDING BEFORE ANY JUDGE OR JUSTICE, COURT OR OTHER TRIBUNAL, CONDUCTING AND INQUIRY FOR LEGAL PROCEEDING RELATING TO THE ACTS OF SAID "AUTHORITIES" WRITTEN ORDER IN THE NAME OF THE CITY, COUNTIES STATE OF NEW YORK.*

(Dkt. No. 3 at 1.) The second page lists the attorney whom the motion apparently concerns or perhaps to whom

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 2

Not Reported in F.Supp.2d, 2010 WL 5094629 (N.D.N.Y.)

(Cite as: 2010 WL 5094629 (N.D.N.Y.))

it has been sent. (*Id.* at 2.) For the next 18 pages, Plaintiff lists—as purported relevant authorities—various legal terms and phrases (as well as statutes, rules, and cases). (*Id.* at 3–21.) On the next page, labeled page "3," Plaintiff begins what appears to be his legal argument in the form of paragraphs, and continues to do so until the end of the document. (*Id.* at 22–25.) However, the contents of the paragraphs still mostly consist of legal citations, lack any allegations of fact, and simply make no sense.

***2** For all of these reasons, Plaintiff's "motion" is denied based on its non-compliance with the requirements of Fed.R.Civ.P. 7(b) (1)(B),(C) (which requires the movant to "state with particularity the grounds for seeking the order" and "state the relief sought") and Local Rule 7.1(a)(1),(2) of the Local Rules of Practice for this Court (which, depending on the relief sought, requires the movant to accompany the motion with a memorandum of law and affidavit). *See Link v. Taylor,* 07–CV–338, 2009 WL 127660, at *3 (N.D.Ind. Jan. 20, 2009) (denying *pro se* plaintiff's motion to compel response to a production request where the request was incomprehensible); *Wright v. Goord,* 04–CV–6003, 2008 WL 2788287, at *3 (W.D.N.Y. July 15, 2008) (denying *pro se* prisoner's motion to compel based on its incomprehensibility).[FN1]

FN1. The Court notes that Plaintiff's recently filed motion to proceed *in forma pauperis* (Dkt. No. 3, Attach.1) is duplicative of his original motion accompanying his Complaint, which is granted herein. Plaintiff is advised that, because the Court is granting his motion to proceed *in forma pauperis,* which was filed on July 8, 2010, it is not necessary that he file any further motions seeking that relief in this action. Plaintiff's second motion to proceed *in forma pauperis* (Dkt. No. 3, Attach.1) will therefore be denied as duplicative of Dkt. No. 2 and as moot.

Moreover, to the extent that Plaintiff's motion can somehow be construed as a request for entry of a default judgment with regard to his original filing, [FN2] Plaintiff is advised that Fed.R.Civ.P. 55 provides for entry of default judgement "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend...." Fed. Rule Civ. Proc. 55(a). Here, Plaintiff's motion was served before the Court determined the sufficiency of his Complaint and thus before Defendants were served. As a result, there can be no default in answering or defending. As a result, to the extent that Plaintiff's motion is one for default judgment, it is denied on this alternative ground.

FN2. The Court notes that the first page of Plaintiff's motion refers to a failure to respond and the twenty-first page of Plaintiff's motion refers to a default judgment.

## III. *SUA SPONTE* REVIEW OF PLAINTIFF'S COMPLAINT

Having reviewed Plaintiff's motion to proceed *in forma pauperis,* the Court must now consider the sufficiency of the allegations set forth in his Complaint in light of 28 U.S.C. § 1915. This is because Section 1915(e)(2)(B) directs that, when a plaintiff seeks to proceed *in forma pauperis,* "the court shall dismiss the case at any time if the court determines that ... the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B).

### A. Governing Legal Standards

It has long been understood that a dismissal for failure to state a claim, pursuant to Fed.R.Civ.P. 12(b)(6), may be based on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed.R.Civ.P. 8(a)(2); or (2) a challenge to the legal cognizability of the claim. *Jackson v. Onondaga County,* 549 F.Supp.2d 204, 211, nn. 15–16 (N.D.N.Y.2008) (McAvoy, J. adopting Report–Recommendation on *de novo* review) [citations omitted].

With regard to the first ground, Fed.R.Civ.P. 8(a)(2) requires that a pleading contain a "short and plain statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) [emphasis added]. By requiring this "showing," Fed.R.Civ.P. 8(a)(2) requires that the pleading contain a short and plain statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." *Jackson,* 549 F.Supp.2d at 212, n. 17 [citations omitted]. The main purpose of this rule is to "facilitate a proper decision on

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 3

Not Reported in F.Supp.2d, 2010 WL 5094629 (N.D.N.Y.)

(Cite as: 2010 WL 5094629 (N.D.N.Y.))

the merits." *Id.* at 212, n. 18 [citations omitted].[FN3]

FN3. *See also* *Simmons v. Abruzzo,* 49 F.3d 83, 86 (2d Cir.1995) ( "Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial.") [citation omitted]; *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988) ("[T]he principal function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial.") [citations omitted].

***3** The Supreme Court has long characterized this pleading requirement under Fed.R.Civ.P. 8(a)(2) as "simplified" and "liberal," and has repeatedly rejected judicially established pleading requirements that exceed this liberal requirement. *Id.* at 212, n. 20 [citations omitted]. However, even this liberal notice pleading standard "has its limits." *Id.* at 212, n. 21 [citations omitted]. As a result, numerous Supreme Court and Second Circuit decisions exist holding that a pleading has failed to meet this liberal notice pleading standard. *Id.* at 213, n. 22 [citations omitted].

Most notably, in *Bell Atlantic Corp. v. Twombly,* the Supreme Court reversed an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007). In doing so, the Court "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45–46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly,* 550 U.S. at 560–563. Rather than turning on the *conceivability* of an actionable claim, the Court clarified, the "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 555–572. The Court explained that, while this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation [s]." *Id.* at 555 [citations omitted]. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.* at 555 [citations omitted].[FN4]

FN4. *See also* *Ashcroft v. Iqbal,* 129 S.Ct. 1937 (2009).

This clarified plausibility standard governs *all* claims, including claims brought by *pro se* litigants (although the plausibility of those claims is to be assessed generously, in light of the special solicitude normally afforded *pro se* litigants).[FN5] It should be emphasized the Fed.R.Civ.P. 8's plausibility standard, explained in *Twombly,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which (when reviewing a *pro se* pleading) the Court stated, *"Specific* facts are not necessary" to successfully state a claim under Fed.R.Civ.P. 8(a) (2). *Erickson v. Pardus,* 127 S.Ct. 2197, 2200 (2007) [citation omitted; emphasis added]. That statement was merely an abbreviation of the often-repeated point of law—first offered in *Conley,* and repeated in *Twombly*—that a pleading need not "set out in *detail* the facts upon which [the claim is based]" in order to successfully state a claim. *Twombly,* 550 U.S. at 556, n. 3 (citing *Conley,* 355 U.S. at 47) [emphasis added]. The statement did not mean that all pleadings may achieve the requirement of "fair notice" without ever alleging any facts whatsoever. Clearly, there must still be enough fact set out (however set out, whether in detail or in a generalized fashion) to raise a right to relief above the speculative level to a plausible level. [FN6] Indeed, the Supreme Court recently reaffirmed this pleading requirement, as well as the continued vitality of *Twombly* in *Ashcroft v. Iqbal,* 129 S.Ct. 1937 (2009), noting that while the *Twombly* "plausibility standard is not akin to a 'probability requirement,' ... it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 1949 (quoting *Twombly* ). What remains clear after *Iqbal* is that "legal conclusions can provide the framework of a complaint," but when unsupported by factual allegations they fail to meet the minimal requirements of Fed.R.Civ.P. 8. *Id.* at 1950.

FN5. *Iqbal,* 129 S.Ct. at 1953 ("Our decision in *Twombly* expounded the pleading standard for all

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

civil action, ... and it applies to antitrust and discrimination suits alike."); *see, e.g., Jacobs v. Mostow,* 271 F. App'x 85, 87 (2d Cir. Mar. 27, 2008 (in *pro se* action, stating "[t]o survive a motion to dismiss, a complaint must plead 'enough facts to state a claim to relief that is plausible on its face' ") [citation omitted] (summary order, cited in accordance with Rule 32.1[c][1] of the Local Rules of the Second Circuit); *Boykin v. KeyCorp.,* 521 F.3d 202, 215–16 (2d Cir.2008) (finding that borrower's *pro se* compliant sufficiently presented a *"plausible* claim of disparate treatment," under Fair Housing Act, to give lenders fair notice of her discrimination claim based on lenders' denial of her home equity loan application) [emphasis added].

FN6. For example, in *Erickson,* the Supreme Court held that, because the plaintiff-prisoner had alleged that, during the relevant time period, he suffered from hepatitis C, he had alleged facts plausibly suggesting that he possessed a sufficiently serious medical need for purposes of an Eighth Amendment claim of inadequate medical care. *Erickson,* 127 S.Ct. at 2199–2200. Expressed differently, the Court held that such a plaintiff need not also allege that he suffered an independent and "substantial injury" as a result of the termination of his hepatitis C medication (a requirement that had been imposed by the district court). This point of law is hardly a novel one, which is presumably why the *Erickson* decision was relatively brief. Prior to the Supreme Court's decision, numerous decisions, including from district courts within the Second Circuit alone, had found that suffering from hepatitis C constitutes a serious medical need for purposes of the Eighth Amendment. *See, e.g., Rose v. Alvees,* 01–CV–0648, 2004 WL 2026481, at *6 (W.D.N.Y. Sept. 9, 2004); *Johnson v. Wright,* 234 F.Supp.2d 352, 360 (S.D.N.Y.2002); *McKenna v. Wright,* 01–CV–6571, 2002 WL 338375, at *6 (S.D.N.Y. March 4, 2002); *Carbonell v. Goord,* 99–CV–3208, 2000 WL 760751, at *9 (S.D.N.Y. June 13, 2000). The important thing is that, in *Erickson,* even the *pro se* plaintiff was required to allege some sort of fact.

***4** Finally, in reviewing a complaint for dismissal under Fed.R.Civ.P. 12(b)(6), the Court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor. This standard is applied with even greater force where the plaintiff alleges civil rights violations and/or where the complaint is submitted *pro se.* However, while the special leniency afforded to *pro se* civil rights litigants somewhat loosens the procedural rules governing the form of pleadings (as the Second Circuit has observed),[FN7] it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards in Fed.R.Civ.P. 8, 10 and 12.[FN8] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Fed.R.Civ.P. 8, 10, and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow.[FN9] Stated more plainly, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." *Jackson,* 549 F.Supp.2d at 214, n. 28 [citations omitted].

FN7. *Sealed Plaintif v. Sealed Defendant # 1,* 537 F.3d 185, 191 (2d Cir.2008); *see also Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983).

FN8. *See Prezzi v. Schelter,* 469 F.2d 691, 692 (2d Cir.1972), *cert. denied,* 411 U.S. 935, 93 S.Ct. 1911 (1973) (finding that extra liberal pleading standard set forth in *Haines v. Kerner,* 404 U.S. 519, 92 S.Ct. 594 [1972], did not save *pro se* complaint from dismissal for failing to comply with Fed.R.Civ.P. 8); *accord, Shoemaker v. State of Cal.,* 101 F.3d 108 (2d Cir.1996) (citing *Prezzi,* 469 F.2d at 692) [unpublished disposition cited only to acknowledge the continued precedential effect of *Prezzi* within the Second Circuit]; *accord, Praseuth v. Werbe,* 99 F.3d 402 (2d Cir.1995); *accord Wachtler v. Herkimer County,* 35 F.3d 77, 82 (2d Cir.1994).

FN9. *See McNeil v. U.S.,* 508 U.S. 106, 113

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

(1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel"); *Faretta v. California,* 422 U.S. 806, 834, n. 46 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (*"[P]ro se* status does not exempt a party from compliance with relevant rules of procedural and substantive law.") [citation omitted]; *accord, Traguth,* 710 F.2d at 95; *cf. Phillips v. Girdich,* 408 F.3d 124, 128, 130 (2d Cir.2005) (acknowledging that *pro se* plaintiff's complaint could be dismissed for failing to comply with Rules 8 and 10 if his mistakes either "undermine the purpose of notice pleading [ ]or prejudice the adverse party").

**B. Summary of Plaintiff's Complaint**

On July 8, 2010, Plaintiff filed a handwritten Complaint, labeled "Complaint Mandamus–General Form" consisting of 28 pages, plus three handwritten attachments, for a total of 154 pages. The first attachment to Plaintiff's Complaint is identified as "New York State Arraignment Charges and Motions" (*see* Dkt. No. 1, Attach. 1), and the second attachment is identified as "Table of Authorities, Federal Rules of Criminal Procedure Amended *Mandated Process of Criminal Federal Rules Digest* " (*see* Dkt. No. 1, Attach. 2). The third attachment to Plaintiff's Complaint is addressed to the Court Clerk, stating:

> RE: RELEASE–DISMISSAL OF ANY CONVICTION, VINDICTIVE PROSECUTION FOR CIVIL RIGHTS ACTIONS, *"MOTIONS"* FOR DISMISSAL OF INDICTMENTS BOTH FEDERAL AND STATE ATTORNEY GENERAL, AND DISTRICT AND PROSECUTING ATTORNEYS PURSUANT TO, U.S. FEDERAL CONST. AMEND*TS* . 1, 5, 8, *14.1,5*

(Dkt. No. 1, Attach.3) [emphasis in original]. The first 21 pages of the Complaint consist of a list of legal terms and phrases with sporadic references to the Federal Rules of Civil Procedure, followed by a listing of numerous federal constitutional provisions, federal statutes, New York State statutes, and rules of appellate procedure, including rules of the United States Supreme Court. The last three pages of the Complaint consist of unnumbered paragraphs largely containing, once again, listings of legal authorities with some apparent quotation therefrom. Plaintiff's "Statement of Claim" states,

> [N]OW HERE COMES PETITIONER *PRO SE "WITH MOTION",* PURSUANT TO U.S. FEDERAL CONST. AMENDT*S.* 1, 4, 5, *14.1,5* DUE PROCESS, GARUNTEED [sic] DUE PROCESS, FRCP. RULE. 1 ...,
>
> *[T]HE, MOTION IN REGARDS TO [A] *SUBPOENA, CONTEMPT, MANDATORY MANDAMUS,"* GENERAL ORDER, MANDATED PROCESS GENERAL PROVISIONS GOVERNING DUTIES IN RESPONDING TO SUBPOENA FORM AND INJUNCTION PROCESS FOR DISBURSEMENT OF *"DOCUMENTS, FORMS, AND APPLICATIONS–IMMUNITIES CLAUSE FROM PROSECUTION OR PUNISHMENT, RELEASE–DISMISSAL DOCUMENT FORM, EXEMPT FROM INVESTIGATIONS, INDICTMENT, PROSECUTIONS, PUNISHMENT, PENALTY OR FORFEITURE, SUITS OR OTHER PROCEEDING BEFORE ANY JUDGE OR JUSTICE, COURT OR OTHER TRIBUNAL, CONDUCTING ANY INQUIRY FOR LEGAL PROCEEDING RELATING TO ACTS OF SAID "AUTHORITIES" WRITTEN ORDER IN THE NAME OF THE CITY, COUNTIES, STATE OF NEW YORK.*

***5** (Dkt. No. 1, at 25 [emphasis in original].) As relief for his asserted injuries, the Complaint demands "to have all documents released to petitioner in accordance with applications, process, registration requirements of obtaing [sic], immunities from prosecution or punishment release-dismissal document form...." (*Id.* at 27.) In addition, Plaintiff seeks $75,000 plus attorney's fees, and costs "for failure to respond within (60) sixty days, *FRCP. Rule. 55(a)(e),* 28 U.S.C.S *or* within (90) days, (F.O.I.A) Freedom of Information Act, 5 U.S.C.S § 552(a)(4) (E) & (F)." (*Id.*) Plaintiff's lengthy attachments to the Complaint

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

are similar in form, containing lists of hundreds of statutory provisions and rules and unnumbered paragraphs apparently quoting various legal authorities; these attachments also include citation to and quotation of case law. But for reference to four lawsuits previously filed by Plaintiff in other jurisdictions, all of which have been dismissed, the Complaint and attachments are devoid of any allegations of fact, even when construed with the utmost of special leniency.[FN10]

FN10. Plaintiff references the following four cases: (1) *Pickering–George v. City of New York,* 08–CV–5112, filed in the Southern District of New York on June 4, 2008, and dismissed as frivolous on August 25, 2008, with an order enjoining Plaintiff from filing further actions in that court without prior permission; (2) *Daley v. Commissioner of OMH,* 09–CV–0146, filed in the Northern District of New York on February 5, 2009, and dismissed on April 28, 2009, with Plaintiff's appeal to the Second Circuit dismissed on September 24, 2009, as lacking an arguable basis in law or fact; (3) *Pickering–George v. Court Report Records,* 10–CV–0313, filed in the District of Delaware on April 15, 2010, and dismissed on July 1, 2010, for failure comply with an order of the court; and (4) *Pickering–George v. Court Reporter Records,* 10–CV–5576, filed in the Southern District of New York on July 22, 2010, and dismissed by order of July 22, 2010, wherein the court denied Plaintiff's motion for *in forma pauperis* status for the purpose of an appeal, finding any appeal would not be taken in good faith. As will be discussed in greater detail below in this Decision and Order, Plaintiff is a prolific litigant in federal court, having filed fifteen separate federal court lawsuits since 2006 and seven appeals.

**C. Analysis of Complaint**

As stated above in Part II.A. of this Decision and Order, although courts are generally bound to construe the allegations of a *pro se* complaint with special leniency, they must do so within the confines of the requirements of Fed.R.Civ.P. 8. For example, "some facts must be included in the complaint that would support the court's exercise of subject matter jurisdiction and a complaint that falls too far short of this requirement may properly be dismissed." *Rahl v. New York Telephone Co.,* 09–CV–1165, 2010 WL 3338832, at * (N.D.N.Y. Aug. 24, 2010) (Sharpe, J.) (dismissing *pro se* complaint for failure to plead facts sufficient to survive a Rule 12(b)(6) motion). Though "usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible ...," the Court retains the power to dismiss a complaint that is "prolix" or has the "surfeit of detail," notwithstanding the deference given to *pro se* litigants. *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988).

This is one of those cases. While prolix and excessive in its citation and quotation of legal authorities, Plaintiff's Complaint is so lacking in factual allegations that the Court simply is unable to discern any plausible claim within the Court's jurisdiction. Indeed, not only is the Court at a complete loss as to the basis for Plaintiff's Complaint, but it is unable to decipher what relief Plaintiff seeks. To the extent that Plaintiff's attempted claims arise out of Defendants' criminal prosecution of him, three points bear making.

First, Plaintiff appears to have previously asserted similar, if not identical, claims in other courts, which have dismissed those claims with prejudice, raising possible issues of collateral estoppel, res judicata, and/or statute of limitations. (Some of those cases are described below, in Part III.D. of this Decision and Order.) Second, some or all of the Defendants against whom Plaintiff is attempting to assert claims appear to be protected from liability as a matter of law by the doctrine of absolute immunity, due to their status as prosecutors. Third, in the event that the criminal charges brought against Plaintiff are still pending, Plaintiff's claims against these Defendants would not be ripe. Moreover, as made clear by the Supreme Court in *Heck v. Humphrey,* "a plaintiff whose criminal conviction has not been 'reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus,' may not seek damages under 42 U.S.C. § 1983 for alleged violations of his constitutional rights." *Brady v. Marks,* 7 F.Supp.2d 247, 252–53 (W.D.N.Y.1998) (citing *Heck v. Humphrey,* 512 U.S. 477, 486–87 [1994]

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

). "[T]o permit a convicted criminal to proceed with a malicious prosecution claim would permit a collateral attack on the conviction through the vehicle of a civil suit." *Marks,* 7 F.Supp.2d at 253 (internal quotation marks and citations omitted).

***6** For each of these many reasons, Plaintiff's Complaint must be, and is, dismissed based on the condition described below in Part II. of this Decision and Order. The Court notes that, in reaching this conclusion, it does not in any way deprive Plaintiff of the special solicitude normally afforded to *pro se* civil rights litigants. However, the Court notes that limiting the special solicitude with which Plaintiff's Complaint is construed, in this circumstance, would be appropriate, given Plaintiff's extraordinary experience as a *pro se* civil rights litigant in federal court, described below in Part II.C. of this Decision and Order.

**D. Nature of Dismissal**

Generally, when a district court dismisses a *pro se* action *sua sponte,* the plaintiff will be allowed to amend his or her action. *See* *Gomez v. USAA Fed. Savings Bank,* 171 F.3d 794, 796 (2d Cir.1999). However, an opportunity to amend is not required where the defects in the plaintiff's claims are substantive rather than merely formal, such that any amendment would be futile.

As the Second Circuit has explained, "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993) [citations omitted]; *accord* *Brown v. Peters,* 95–CV–1641, 1997 WL 599355, at *1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.) ("[T]he court need not grant leave to amend where it appears that amendment would prove to be unproductive or futile.") [citation omitted]; *see also* *Foman v.. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230 (1962) (denial not abuse of discretion where amendment would be futile); *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) ("The problem with Cuoco's causes of action is substantive; better pleading will not cure it. Repleading would thus be futile. Such a futile request to replead should be denied.") [citation omitted]; *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 28 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") [citation omitted]; *Health–Chem Corp. v. Baker,* 915 F.2d 805, 810 (2d Cir.1990) ("[W]here ... there is no merit in the proposed amendments, leave to amend should be denied") .[FN11]

FN11. The Court notes two Second Circuit cases exist reciting the standard as being that the Court should grant leave to amend "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would succeed in stating a claim ." *Gomez v. USAA Federal Sav. Bank,* 171 F.3d at 796; *Abbas v. Dixon,* 480 F.3d 636, 639 (2d Cir.2007). The problem with these cases is that their "rule out any possibility, however likely it might be" standard is rooted in the "unless it appears beyond doubt" standard set forth in *Conley v. Gibson,* 355 U.S. at 45–46, which was "retire[d]" by the Supreme Court in *Twombly,* 127 S.Ct. 1955. *See* *Gomez,* 171 F.3d at 796 (relying on *Branum v. Clark,* 927 F.2d 698, 705 [2d Cir.1991], which relied on *Conley,* 355 U.S. at 45–46). Thus, this standard does not appear to be an accurate recitation of the governing law.

This rule applies even to *pro se* plaintiffs. *See, e.g.,* *Cuoco,* 222 F.3d at 103; *Brown,* 1997 WL 599355, at *1. As explained above in Part II.A. of this Decision and Order, while the special leniency afforded *pro se* civil rights litigants somewhat loosens the procedural rules governing the form of pleadings (as the Second Circuit has observed), it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Fed.R.Civ.P. 8, 10, and 12; rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Fed.R.Civ.P. 8, 10, and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow.

***7** Here, Plaintiff's obvious familiarity with these requirements is evidenced by his extensive litigation history, which raises serious concerns as to Plaintiff's vexatious nature (and his right to amend his current Complaint). More specifically, the Court's research has revealed that Plaintiff has amassed a significant record of

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

civil actions filed in just the past four years. According to the Federal Judiciary's Public Access to Court Electronic Records ("PACER"), since November of 2006, he has filed fifteen complaints in various districts throughout the country, including one in this district, as well as seven circuit court appeals.[FN12] All but one of his actions have been dismissed, and Plaintiff has previously been warned of the requirements of Fed.R.Civ.P. 8 and of the consequences of filing frivolous lawsuits.

FN12. Plaintiff also apparently attempted to make various submissions with the United States Supreme Court, which, on April 27, 2009, directed the Clerk of the Court not to accept any further petitions in noncriminal matters from Plaintiff unless he paid the docketing fee and complied with the Court's rules. *Pickering–George v. Holder,* 129 S.Ct. 2061 (2009).

For example, on November 30, 2006, Plaintiff filed an action in the District of Colombia, *Pickering–George v. U.S. Attorney General,* 06–CV–2061, which was dismissed for failure to comply with the requirements of Fed.R.Civ.P. 8(a); the district court's dismissal was affirmed on appeal. *See Pickering–George v. U.S. Attorney General,* No. 06–5418 (D.C.Cir. Nov. 19, 2007).

In June of 2008, the Eastern District of New York dismissed a complaint that Plaintiff filed in that district, *Pickering–George v. City of New York,* 08–CV–0512, noting that Plaintiff had filed numerous frivolous actions in several federal courts under at least five aliases in the previous three years (including "John R. Daly, Jr.," "John T. Piquin–George," and "John T. George"); after issuing an order to show cause, to which Plaintiff failed to respond, on August 5, 2008, the Eastern District of New York issued an order prohibiting Plaintiff from filing future actions in that district without first obtaining leave of court. *See Pickering–George v. City of New York,* Eastern District of New York, 08–CV–0512, Dkt. Nos. 3, 10. Notwithstanding the court's order, on November 19, 2009, plaintiff filed another action in that district, *Pickering–George v. Gonzalez,* 09–CV–9638, which was dismissed on the day it was filed due to Plaintiff's failure to obtain prior permission of the court.

On February 5, 2009, Plaintiff filed *Daley v. Commissioner of OMH,* 09–CV–0146, in this District. The handwritten complaint consisted of 55 pages, plus nearly 200 pages of exhibits. *See Daley v. Commissioner of OMH,* Northern District of New York, 09–CV–0146, Dkt. No. 1. In addition, Plaintiff filed a 65–page document containing hundreds of citations and apparently some "argument." *See id.* at Dkt. No. 3. Expressly stating its concern that Plaintiff's filing may have been an attempt to circumvent the filing injunction issued by Chief Judge Kimba Wood in the Southern District of New York, the Court characterized Plaintiff's complaint as "plainly frivolous" and dismissed it without leave to amend. *See id.* at Dkt. No. 4. On Plaintiff's appeal, the Second Circuit denied his motion to proceed *in forma pauperis* and dismissed the appeal as lacking an arguable basis in law or in fact. *See id.* at Dkt. No. 10.

***8** On March 31, 2009, Plaintiff filed another action, in the District of Delaware on March 31, 2009, *Daley v. U.S. District Court of Delaware,* 09–CV–0218, which was dismissed on June 24, 2009, as frivolous and malicious, pursuant to 28 U.S.C. § 1915(e) (2)(B).

Recently, on March 30, 2010, Plaintiff filed a complaint against Brookhaven (N.Y.) Center, among others, in the Eastern District of New York. *Pickering–George v. Brookhaven (N.Y.) Center,* 10–CV–1103, 2010 WL 1740439 (E.D.N.Y. Apr. 30, 2010). In dismissing the complaint for failure to comply with Fed.R.Civ.P. 8, the court characterized Plaintiff's twelve-page handwritten complaint as "incomprehensible," and noted that "the Complaint is largely comprised of quotations from various federal statutes and case law." *Pickering–George v. Brookhaven (N.Y.) Center,* 2010 WL 1740439, at * 1.

In addition, on August 31, 2010, the District of Colombia dismissed a complaint filed by Plaintiff against the Attorney General of the United States, among others, as a result of Plaintiff's failure to comply with Fed.R.Civ.P. 8. *Pickering–George v. Attorney–General, District of Columbia,* 10–CV–1507, Dkt. Nos. 3, 4.

In view of the foregoing, it seems highly unlikely that

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Plaintiff will be able state a claim upon which relief can be granted. Notwithstanding that fact, the Court is mindful of the fact that it has great difficulty deciphering the claims and factual allegations that Plaintiff is attempting to assert in his Complaint. As a result, at this juncture, the Court has trouble concluding that an amendment by Plaintiff would be futile. For these reasons, Plaintiff shall be afforded an opportunity to file an Amended Complaint, before the dismissal of this action. *Plaintiff is advised that his action will be dismissed unless, within thirty (30) days from the date of the filing of this Decision and Order, he files an Amended Complaint that states a claim upon which relief can be granted.*

In the event that Plaintiff chooses to file an Amended Complaint, he is advised that any such Amended Complaint, *shall supersede and replace in its entirety his original Complaint, and may not incorporate any portion of his original Complaint by reference. See* N.D.N.Y. L.R. 7.1(a)(3); *Harris v. City of N.Y.,* 186 F.3d 243, 249 (2d Cir.1999) (citing *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 [2d Cir.1994] ). In an extension of special solicitude, he is further advised that the body of the Amended Complaint should (1) state the basis for this Court's jurisdiction over his claims, (2) state the reasons that the case is properly venued in this Court, (3) contain sequentially numbered paragraphs founded only one occurrence of misconduct per paragraph, and (4) describe such facts as the alleged acts of misconduct, the dates on which such misconduct occurred, the names of each and every individual who participated in such misconduct, and, where appropriate, the location where the alleged misconduct occurred.

***9 ACCORDINGLY,** it is

**ORDERED** that Plaintiff's motion to proceed *in forma pauperis* (Dkt. No. 2) is ***GRANTED;*** and it is further

**ORDERED** that Plaintiff's motion for various other relief (Dkt. No. 3) is ***DENIED;*** and it is further

**ORDERED** that Plaintiff's Complaint **SHALL BE** *sua sponte* ***DISMISSED*** for failure to state a claim upon which relief can be granted, pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b), ***UNLESS,*** within **THIRTY (30) DAYS** from the date of this Decision and Order, Plaintiff files an **AMENDED COMPLAINT** that states a claim upon which relief can be granted; and it is further

**ORDERED** that any Amended Complaint filed by Plaintiff must be a complete pleading, which will supersede his original Complaint in all respects, and which may not incorporate any portion of his original Complaint by reference; and it is further

**ORDERED** that, upon receipt from Plaintiff of his Amended Complaint, the Clerk shall forward that Amended Complaint to the undersigned for further review; and it is further

**ORDERED** that, in the event Plaintiff fails to file an Amended Complaint that complies with the terms of this Decision and Order as set forth above, the Clerk shall enter Judgment dismissing this action without further Order of this Court.

N.D.N.Y.,2010.

Pickering-George v. Cuomo
Not Reported in F.Supp.2d, 2010 WL 5094629 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



C

Only the Westlaw citation is currently available.
United States District Court,

E.D. New York.
Anthony J. CEPARANO, Plaintiff,
v.
SUFFOLK COUNTY, County Executive Steve Levy, Suffolk County Police Department, Police Commissioner Richard Dormer, Former Police Commissioner (2003), Lt. Michael Fitzpatrick, Lt. James Maher, Lt. Paul Schrieber, Det. Anthony Leto, Det. Behrens, Det. Robert Suppa, Det. William Sheridan, P.O. Christopher Viar, P.O. Walter Hetzel, P.O. Kathleen Focas, P.O. Timothy Kelly, Sgt. Leonard, Sgt. William Wallace, P.O. Eric Guiterman, P.O. William Vasquez, P.O. James Behrens, P.O. Anthony Calato, P.O. Daniel Rella, P.O. Juan Valdez, Sgt. William Scaima, P.O. Anthony Wuria, P.O. Michael Pelcher, P.O. Ernie Ketcham, Sgt. Frank Giuliano, Lt. James Smith, Det. “James Smith's Partner”, Sgt. Ken, P.O. (5TH Precinct), P.O. “John Doe's # 's 1–50”, Lt. Stephen Hernandez, Lt. Daniel Meyer, Capt. John Hanley, Suffolk County Division of Medical Legal Investigations and Forensic Science, Chief of Toxicology Michael Lehrer, Asst. Chief of Toxicology Michael Katz, Toxicologist Lori Arendt, Reconstruction Analyst Robert Genma, Suffolk County District Attorney's Office, District Attorney Thomas J. Spota III, Chief Major Crime Bureau, A.D.A. Bradford S. Magill, A.D.A. Patricia Brosco, “Supervisor of Bradford S. Magill”, “Supervisor of Patricia Brosco”, Suffolk County Unified Courts System, Presiding Judge S.C. District Ct., Judge Gaetan B. Lozito, Presiding Judge Ralph T. Gazzilo, Presiding Judge C. Randall Hinrichs, Court Reporter Dennis P. Brennan, Court Reporter Susan T. Conners, Judge Martin Efman, Judge J.J. Jones, Suffolk County Legal Aid Society, Presiding Attorney Edward Vitale, Attorney Susan Ambro, 18–B Counsel Robert Macedonio, Suffolk County Sheriff's Department, Sheriff Vincent Demarco, Sheriff Alfred Etisch, Warden Ewald, Former Warden (2004–2006), C.O. # 1158, C.O. # 1257, C.O. # 1251, C.O. # 1207, C.O. # 1259, C.O. # 1094, C.O. # 1139, C.O. # 1241, C.O. Violet, C.O. # 962, C.O. # 1131, C.O. “Tom Arnold”, Lt. McClurkin, C.O. Galotti, Sgt. Fischer, C.O. Cathy Ryan (Peeping Pervert), C.O. Kenneth Lawler, C.O. # 668, Co. # 1274, C.O. William Zikis, C.O. # 1324, C.O. # 1275, C.O. Joseph Foti, C.O. # 1220, C.O. # 1276, C.O. Ezekiel, Dep “Brutalitywiolators” # 1–12, C.O. “John Civil Rights Violators” # 1–200, Nurse “Korea”, Nurse Pat, Nurse Julie “Loud”, Nurse “Male, Earring, Glasses”, Nurse “Really Ugly Warts, Always Nasty & Rude”, Suffolk County Probation Department, Senior Supervisor, Senior P.O. Bennedetto, Probation Officer Curtis, Probation Officer “Herman Muenster” (P.O. Curtis' Partner), Probation Officer Soltan, Probation Officer “P.O. Soltan Partner”, Front Desk Clerk, Andrew O'flaherty, West Babylon Fire Department, Supervisor Mina, Emt McClean, Good Samaritan Hospital, Dr. Jeffrey Margulies, Dr. “I.C.U.”, Nurse “Do You Want His Clothes”, Nurse “Interogate [Sic] Him Before He's Sedated”, Donna Venturini, Rob Gannon, Beth Feeney, Jeanne H. Morena, Southside Hospital, Dr. “Julie Crist's E.R. Doctor”, Dr. “Chief [of] Psychiatry”, Newsday, Editor John Mancini, Managing Editor Deborah Henley, Managing Editor Debby Krenek, Reporter Bill Mason, 1010 Wins Radio, 1010 wins.com, Programming Director, Reporter, Cablevision, News 12 Long Island, Programming Director, Reporter, Southern Meadows Apartments, Property Manager Debra Cody, Property Manager, Maintenence [Sic] Supervisor William Florio, Suffolk County Intensive Case Management, Director Douglas Shelters, Case Manager Dana Romano, Bellport Outreach, Director, Supervisor of Julie Crist's Case Mgr Jenny, Julie Crist's Case Mgr Jenny, Global Tel–Link, Ceo, Board of Directors, Executive V.P. Billing and Marketing Margaret Phillips, Julie Dougherty A.K.A. Julie Crist, myspace.com, Mother's Against Drunk Driving (Madd), and Madd President 2007–2009, Defendants.
No. 10–CV–2030 (SJF)(ATK).

Dec. 15, 2010.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Anthony J. Ceparano, Gowanda, NY, pro se.

***ORDER***

FEUERSTEIN, District Judge.

I. Introduction

***1** On May 4, 2010, incarcerated *pro se* plaintiff Anthony J. Ceparano ("plaintiff"), commenced this purported civil rights action pursuant to 28 U.S.C. § 1983 against approximately four hundred and fifteen (415) defendants, one hundred and fifty-three (153) of whom are named: [FN1] Suffolk County, County Executive Steve Levy, Suffolk County Unified Courts System, Suffolk County District Attorney's Office, Suffolk County Legal Aid Society, Suffolk County Police Department, Suffolk County Sheriff's Department, Suffolk County Division of Medical Legal Investigations and Forensic Science, Suffolk County Probation Department, Suffolk County Police Commissioner Richard Dormer, Former Police Commissioner (2003), Captain John Hanley, Lieutenants Michael Fitzpatrick, James Maher, Paul Schrieber, James Smith, Stephen Hernandez, Daniel Meyer, Sergeants William Wallace, William Scaima, Frank Giuliano, Leonard, Ken Detectives Anthony Leto, Behrens, Robert Suppa, William Sheridan, "James Smith's Partner", Police Officers Christopher Viar, Walter Hetzel, Kathleen Focas, Timothy Kelly, Eric Guiterman, William Vasquez, James Behrens, Anthony Calato, Daniel Rella, Juan Valdez, Anthony Wuria, Michael Pelcher, Ernie Ketcham, "(5th Precinct)", Police Officers "John Doe's # 's 1–50", Chief of Toxicology Michael Lehrer, Assistant Chief of Toxicology Michael Katz, Toxicologist Lori Arendt, Reconstruction Analyst Robert Genma, Suffolk County District Attorney Thomas J. Spota III, Chief Major Crime Bureau, Assistant District Attorney Bradford S. Magill, Assistant District Attorneys Patricia Brosco, "Supervisor of Bradford S. Magill", "Supervisor of Patricia Brosco", Suffolk County presiding Judges Gaetan B. Lozito, Ralph T. Gazzilo, C. Randall Hinrichs, Martin Efman, J.J. Jones, Court Reporters Dennis P. Brennan, Susan T. Conners, Suffolk County presiding Legal Aid Attorneys Edward Vitale, Susan Ambro, 18–B Counsel Robert Macedonio, Suffolk County Sheriffs Vincent DeMarco, Alfred Etisch, Warden Ewald, Former Warden (2004–2006), Corrections Officers # 1158, # 1257, # 1251, # 1207, # 1259, # 1094, # 1139, # 1241,# 962, # 1131, # 668, # 1274, # 1324, # 1275, # 1220, # 1276, Violet, "Tom Arnold", Galotti, Ezekiel, "Cathy Ryan (Peeping Pervert)", William Zikis, Kenneth Lawler, Joseph Foti, Lieutenant McClurkin, Sergeant Fischer, "Dep BrutalityWiolators # 1–12", Corrections Officers "John Civil Rights Violators" # 1–200, Corrections Nurses "Korea", Pat, "Julie Loud", "Male, Earring, Glasses", "Really Ugly Warts, Always Nasty & Rude", Suffolk County Senior Probation Supervisor, Senior Probation Officer Bennedetto, Probation Officers Curtis, "Herman Muenster (P.O. Curtis' partner)", Soltan, "P.O. Soltan Partner", Front Desk Clerk, Andrew O'Flaherty, West Babylon Fire Department, Supervisor Mina, Emergency Medical Technician McClean, Good Samaritan Hospital, Doctors. Jeffrey Margulies, "I.C.U.", Nurses "Do you want his clothes", "Interogate [sic] him before he's sedated", Donna Venturini, Rob Gannon, Beth Feeney, Jeanne H. Morena, Southside Hospital, Drs. "Julie Crist's E.R. Doctor", "Chief [of] Psychiatry", Newsday, Editor John Mancini, Managing Editor Deborah Henley, Managing Editor Debby Krenek, Reporter Bill Mason, 1010 WINS Radio, 1010 WINS.com, Programming Director, Reporter, Cablevision, News 12 Long Island, Programming Director, Reporter, Southern Meadows Apartments, Property Manager Debra Cody, Property Manager, Maintenence [sic] Supervisor William Florio, Suffolk County Intensive Case Management, Director Douglas Shelters, Case Manager Dana Romano, Bellport Outreach, Director, Supervisor of Julie Crist's Case Manager Jenny, Julie Crist's Case Manager Jenny, Global Tel–Link, CEO, Board of Directors, Executive Vice President of Billing and Marketing, Margaret Phillips, Julie Dougherty A.K.A. Julie Crist, Myspace.com, Mother's Against Drunk Driving (MADD), and MADD President 2007–2009. Accompanying the complaint is an application to proceed *in forma pauperis.* Upon review of the declaration accompanying plaintiff's application, I find that plaintiff's financial status qualifies him to commence this action without prepayment of the filing fees. *See* 28 U.S.C. § 1915(a)(1). Accordingly, plaintiff's application is granted. However, for the reasons set forth below, the complaint is sua sponte dismissed in part without prejudice and dismissed in part with prejudice.

FN1. Plaintiff's "named" defendants include those he has nicknamed (i.e. "Herman Muenster") or otherwise described (i.e. "Nurse

really ugly warts, always nasty & rude") as opposed to those simply included as "John Doe."

II. The Complaint

***2** Plaintiff's handwritten complaint exceeds two hundred and fifty pages and is comprised of over seven hundred numbered paragraphs purporting to allege a myriad of claims based upon conduct alleged to have occurred between 2003 and 2009. The complaint is largely a collection of diatribes, opinions, conclusions and speculation devoid of underlying facts. For example, the complaint begins:

> I grew up believing in this Country, and the ideals I was taught in school: "All men are created equal. By the people, of the people, for the people. No person shall be deprived of life, liberty or property without due process of the law. The rights of the people to be secure in their persons, houses, and papers ..." Anyone who believes this has never lived in Suffolk County. It is all a lie! The people have no rights. Police, D.A.'s, local government agents, wield unchecked power and abuse whoever they want at will. No one is safe, and god forbid you've ever made a mistake, you are targeted forever ...
>
> It took just *one year* of living in Suffolk County ... to destroy all my faith, and every illusion that I ever had about having civil rights. I thought these things only happened in urban ghettos or the backwoods of the deep south. Never could I have imagined this could ever happen here. It's a sick game. There is no justice ...

Compl. at ¶ IV (emphasis in original). The complaint continues:

> Police brutality in Suffolk County is not the exception. It is the rule. It is page one, standard operating procedure. A badge in Suffolk County is a license to assault, and even kill, placing the holder above the law. I have been arrested seven times in Suffolk County, six of which I was taken into custody. Of the six, *five* (83%) involved police brutality and excessive force.

*Id.* at ¶¶ 8–9 (emphasis in original). Plaintiff then describes each of his arrests in Suffolk County, beginning with his November 8, 2003 arrest wherein Lieutenant James Smith is alleged to have "yanked the phone out of my hand [and] smashed me over the head with it." *Id.* at ¶ 10. According to the complaint, "[i]n Suffolk County, law enforcement is a self-serving, self-sustaining aberation [sic] that exists not for the benefit of and protection of society as much as it does for the enrichment of those who hold badges and law licenses." *Id.* at ¶ 52. Plaintiff alleges:

> law here [in Suffolk County] is about conviction rates, merit raises, and elections. The goals are promotions and raises, and personal advancement and enrichment. Above all, it is about the exercise and abuse of power, without regard to consequence, by those that are above the law. These demons destroy lives, regardless of the irrelevant concepts of truth and innocence, with no more thought than you give to stepping on a bug while walking. Not only do police and district attorneys continue arrests and prosecutions of those they suddenly realize are innocent, they also entrap people they know from the start are innocent. The attitude is "you've been arrested before so you'll do some more time. So what? What difference does a little thing like innocence make? I need an arrest

***3** Rule 8(a) (2) of the Federal Rules of Civil Procedure requires that pleadings present a "short and plain statement of the claim showing that the pleader is entitled to relief," and "[e]ach averment of a pleading shall be simple, concise and direct." Fed.R.Civ.P. 8; *Swierkiewicz v. Sorema, NA.,* 534 U.S. 506, 512, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). Pleadings must give "fair notice of what the plaintiff's claim is and the grounds upon which it rests" in order to enable the opposing party to answer and prepare for trial, and to identify the nature of the case. *Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 346, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005) (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), overruled in part on other grounds by *Bell Atlantic Corporation v. Twombly,* 550 U.S. 554, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

A complaint should be short and clear because "unnecessary prolixity in a pleading places an unjustified burden on the court and the party who must respond to it because they are forced to select the relevant material from a mass of verbiage." *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1998); *see also* *Roberto's Fruit Market,*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Inc. v. Schaffer,* 13 F.Supp.2d 390 (E.D.N.Y., 1998).; *The Homeless Patrol v. Joseph Volpe Family,* 09–CV–3628, 2010 WL 2899076, at *7 (S.D.N.Y. July 22, 2010) (dismissing *sua sponte* a one hundred and forty-eight (148) page *pro se* amended complaint for, *inter alia,* failure to satisfy Rule 8). "Complaints which ramble, which needlessly speculate, accuse, and condemn, and which contain circuitous diatribes far removed from the heart of the claim do not comport with [Rule 8's] goals and this system; such complaints must be dismissed." *Infanti v. Scharpf,* 06 CV 6552, 2008 WL 2397607, at *1 (E.D.N.Y. June 10, 2008) (quoting *Prezzi v. Berzak,* 57 F.R.D. 149, 151, 16 Fed.R.Serv.2d 970 (S.D.N.Y.1972)).

However, "[d]ismissal of a complaint in its entirety should be 'reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any is well disguised.' " *Infanti,* 2008 WL 2397607, at *2, (quoting *Salahuddin,* 861 F.Supp. at 42)). Accordingly, prolix, unintelligible, speculative complaints that are argumentative, disjointed and needlessly ramble have routinely been dismissed in this Circuit. *See, e.g., Jones v. Nat'l Communications and Surveillance Networks,* 266 F.App'x 31, 32 (2d Cir.2008) (affirming dismissal of fifty-eight (58) page, single-spaced *pro se* complaint with eighty-seven (87) additional pages of attachments, alleging over twenty (20) separate causes of action against more than forty (40) defendants for failure to meet the "short and plain statement" requirement of Rule 8); *Bell v. Lasaceli,* 08–CV–0278A, 2009 WL 1032857, at *2 (W.D.N.Y., Apr.15, 2009) (dismissing a two hundred (200) page *pro se* complaint naming forty-two (42) defendants for noncompliance with Rule 8); *Infanti,* 2008 WL 2397607 (dismissing *sua sponte* a ninety (90) page complaint comprised of over five hundred (500) paragraphs for running a foul of Rule 8's requirements); *see also In re Merrill Lynch & Co., Inc.,* 218 F.R.D. 76, 77–78 (S.D.N.Y.2003) (dismissing ninety-eight (98) page complaint comprised of three hundred and sixty-seven (367) paragraphs and explaining that "[w]hen a complaint is not short and plain, or its averments are not concise and direct, 'the district court has the power, on motion or *sua sponte,* to dismiss the complaint ....' ") (quoting *Simmons v. Abruzzo,* 49 F.3d 83, 86 (2d Cir.1995)). However, given the preference that *pro se* cases be adjudicated on the merits and not solely on the ground that the complaint does not constitute a short and plain statement of the facts, leave to amend the complaint should be given at least once. *Salahuddin,* 861 F.Supp. at 42.

3. Habeas Corpus

***4** Section 1983 provides that:

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured....

42 U.S.C. § 1983. To state a claim under Section 1983, a complaint must contain factual allegations plausibly suggesting: (1) that the challenged conduct was attributable at least in part to a person acting under color of state law, and (2) that such conduct deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States. *American Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 49–50, 119 S.Ct. 977 L.Ed.2d 130 (1999); *Velez v. Levy,* 401 F.3d 75, 84 (2d Cir.2005).

B. Application

The complaint in its present form does not fulfill Rule 8(a) (2)'s pleading requirements. The complaint is prolix, confused, ambiguous, speculative, repetitive, argumentative and unintelligible. Neither the defendants nor the court should be required to expend the time, effort and resources necessary to parse through plaintiff's pleading in order to determine what claims, if any, plaintiff has alleged. Given "labyrinthian prolixity of unrelated and vituperative charges that def[y] comprehension," *Shomo v. State of New York,* 374 F.App'x. 180, 183 (2d Cir.2010) (quoting *Prezzi v. Schelter,* 469 F.2d 691, 692 (2d Cir.1972)), the Court *sua sponte* dismisses the complaint for failure to satisfy Rule 8(a)(2). However, plaintiff is afforded an opportunity to file a "short and plain statement of [his] claim" in accordance with this order. Plaintiff is advised that, for the reasons that follow, many of the named defendants are either immune from suit or are outside the scope of

Section 1983. Accordingly, plaintiff's Section 1983 claims against these defendants are not plausible and should be omitted from any amended complaint because such an amendment would be futile.

1. Immunity

a. Eleventh Amendment Immunity

The Eleventh Amendment to the United States Constitution provides:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI. "The reach of the Eleventh Amendment has ... been interpreted to extend beyond the terms of its text to bar suits in federal courts against states, by their own citizens or by foreign sovereigns ...." *State Employees Bargaining Agent Coalition v. Rowland,* 494 F.3d 71, 95 (2d Cir.2007) (quoting *W. Mohegan Tribe & Nation v. Orange C'ty,* 395 F.3d 18, 20 (2d Cir.2004)) (alterations in original). Eleventh Amendment immunity also extends to suits for money damages against state officials in their official capacities. *Will v. Mich. Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself") (internal citation omitted); *McNamara v. Kaye,* No. 06–CV–5169, 2008 WL 3836024, at *8 (E.D.N.Y. Aug.13, 2008) ("[L]awsuits against state officers acting [in] their official capacity and lawsuits against state courts are considered to be lawsuits against the state.").[FN2]

> FN2. A narrow exception to this rule exists for suits injunctive relief against state officers in their official capacity. *See Will,* 491 U.S. at 71, n. 10. To the extent plaintiff seeks prospective injunctive relief against any state defendant in his or her official capacity, plaintiff may include such claim in an amended complaint to be filed in accordance with this order.

***5** Here, plaintiff's Section 1983 claims for money damages against the state defendants in their official capacities are barred by the Eleventh Amendment and therefore are not plausible. Accordingly, such claims are dismissed with prejudice. In so far as the plaintiff names the New York Unified Court System as a defendant, it too is considered an arm of the state and is thus immune from suit by the Eleventh Amendment. *Gollomp v. Spitzer,* 568 F.3d 355, 368 (2d Cir.2009) ("[E]very court to consider the question of whether the New York State Unified Court System is an arm of the State has concluded that it is, and is therefore protected by Eleventh Amendment sovereign immunity."). Thus, plaintiff's claims against the New York State Unified Court System are not plausible and are dismissed with prejudice.

b. Prosecutorial Immunity

Plaintiff also seeks to sue the prosecuting attorneys in the underlying criminal cases against him for civil rights violations pursuant to Section 1983. It is "well established that a state prosecuting attorney who acted within the scope of his duties in initiating and pursuing a criminal prosecution is immune from a civil suit for damages under § 1983.' " *Shmueli v. City of New York,* 424 F.3d 231, 236 (2d Cir.2005) (internal quotations omitted). "Prosecutorial immunity from § 1983 liability is broadly defined, covering 'virtually all acts, regardless of motivation, associated with [the prosecutor's] function as an advocate.' " *Hill v. City of New York,* 45 F.3d 653, 661 (2d Cir.1995) (quoting *Dory v. Ryan,* 25 F.3d 81, 83 (2d Cir.1994)). In *Hill,* an Assistant District Attorney's alleged acts of "conspiring to present falsified evidence to, and to withhold exculpatory evidence from, a grand jury" were "clearly protected by the doctrine of absolute immunity as [being] part of his function as an advocate." *Id.* at 661.

Here, plaintiff alleges, *inter alia,* that Assistant District Attorneys Magill and Brosco withheld evidence from the grand jury and did not provide required disclosures until days before or the day of trial. These allegations fall within the scope of protection defined by the doctrine of prosecutorial immunity and plaintiff has failed to otherwise allege any conduct by these defendants that would fall outside the scope of prosecutorial immunity. Accordingly, plaintiff's claims against these

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 6

Not Reported in F.Supp.2d, 2010 WL 5437212 (E.D.N.Y.)

(Cite as: 2010 WL 5437212 (E.D.N.Y.))

defendants are not plausible and are dismissed with prejudice.

c. Judicial Immunity

Plaintiff seeks to sue several state court judges of the Suffolk District Court, Suffolk County Court and New York State Supreme Court, Suffolk County, who were allegedly involved with his underlying criminal proceedings. Judges Lozito, Gazzilo [FN3], Hinrichs, Efman and Jones are entitled to absolute judicial immunity. It is well settled that judges are entitled to absolute immunity for damages arising out of judicial actions performed in their judicial capacity. *See* *Mireles v. Waco,* 502 U.S. 9, 11–12, 112 S.Ct. 286, 116 L.Ed.2d 9 (1991); *Fields v. Soloff,* 920 F.2d 1114, 1119 (2d Cir.1990). Therefore, "if the relevant action is judicial in nature, the judge is immune so long as it was not taken in the complete absence of jurisdiction." *Huminski v. Corsones,* 396 F.3d 53, 75 (2d Cir.2004).

FN3. Plaintiff alternates the spelling of the defendant's name, spelling it "Gazzillo" and "Gazzilo."

***6** Even liberally construed, plaintiff alleges no acts performed by any of these defendants that fall outside the scope of absolute judicial immunity. To the extent plaintiff even describes the conduct of any of the judges, all acts described were performed in their official capacity as judges. Therefore, plaintiff's claims against these defendants are not plausible and are dismissed with prejudice.

d. Entities that are Immune from Suit

"[U]nder New York law, departments that are merely administrative arms of a municipality do not have a legal identity separate and apart from the municipality and, therefore, cannot sue or be sued." *Davis v. Lynbrook Police Dep't,* 224 F.Supp.2d 463, 477 (E.D.N.Y.2002) (dismissing claim against Lynbrook Police Department); *see also* *Melendez v. Nassau County,* No. 10–CV–2516, 2010 WL 3748743, at *5 (E.D.N.Y. Sept.17, 2010) (dismissing claims against Nassau County Sheriff's Department); *Coleman v. City of New York,* No. 08–CV–5276, 2009 WL 909742, at *2 (E.D.N.Y. Apr. 1, 2009) (dismissing claims against New York City department of probation); *Conte v. County of Nassau,* No. 06–CV–4746, 2008 WL 905879, at *1 n. 2 (E.D.N.Y. Mar. 31, 2008) (dismissing § 1983 claims against Nassau County District Attorney's Office).

Insofar as plaintiff alleges claims against the Suffolk County Police Department, Suffolk County District Attorney's Office, Suffolk County Sheriff's Department and Suffolk County Probation Department, the Court finds these entities to be administrative arms of the municipality and therefore lack the capacity to be sued. The Court construes Suffolk County Division of Medical, Legal Investigations and Forensic Sciences to be an administrative arm of the municipality and thus lacks the capacity to be sued. *S* ee *Bennett v. County of Suffolk,* 30 F.Supp.2d 353 (E.D.N.Y.1998) (Suffolk County acted through its Department of Health Services).[FN4] Therefore, plaintiff's claims against the above named entities are dismissed with prejudice.

FN4. The Court takes judicial notice that the Suffolk County Division of Medical Legal Investigations is a division of the Suffolk County Department of Health Services.

2. Private Defendants Not Amenable to Suit Under § 1983

a. Suffolk County Legal Aid Society, Edward Vitale and Susan Ambro

"[T]he Legal Aid Society ordinarily is not a state actor amenable to suit under § 1983." *Schnabel v. Abramson,* 232 F.3d 83, 86–87 (2d Cir.2000). Furthermore, Legal Aid attorneys are employees of "a private not for profit legal services corporation ... organized under the laws of New York [that] exists independent of any state or local regulatory authority." *Neustein v. Orbach,* 732 F.Supp. 333, 336 n. 3 (E.D.N.Y.1990). "Like the state-action requirement of the Fourteenth Amendment, the under-color-of-state-law element of § 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrongful." *American Mfrs.,* 526 U.S. at 49 (internal quotations omitted). Given that the Suffolk County Legal Aid Society and its attorneys are not state actors, plaintiff's § 1983 claims against the Suffolk County Legal Aid Society and

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

its attorneys, Edward Vitale and Susan Ambro, are not plausible and are thus dismissed with prejudice.

b. Other Private Defendants

***7** As stated above, a defendant must be acting under color of state law to be liable for a § 1983 claim. *Id.* Plaintiff's complaint largely describes alleged civil rights violations pursuant to Section 1983 against a myriad of private actors. Insofar as plaintiff purports to allege Section 1983 claims against private defendants for violations of his civil rights, such claims are not plausible and are dismissed with prejudice. Accordingly, the complaint is dismissed as against E.M.T. McClean, Good Samaritan Hospital, Dr. Jeffrey Margulies, Donna Venturini, Rob Gannon, Beth Feeney, Jeanne H. Morena, Southside Hospital, Newsday, John Mancini, Deborah Henley, Debby Krenek, Bill Mason, 1010 WINS Radio, 1010 WINS.com, South Meadows Apartments, Debra Cody, William Florio, Bellport Outreach, Global Tel–Link, Margaret Phillips, Julie Dougherty A.K.A. Julie Crist, Myspace.com, and Mother's Against Drunk Driving (MADD).

3. Unnamed Correctional Officers

Although it is a general principle of tort law that a tort victim who cannot identify the tortfeasor cannot bring suit, in the case of *pro se* litigants this rule has been relaxed. *Valentin v. Dinkins,* 121 F.3d 72, 75 (2d Cir.1997).

Plaintiff purports to allege claims against various unnamed officers alleged to work at the Suffolk County Police Department's Fifth Precinct and the Suffolk County Sheriff's Department as well as other “John Doe” defendants, whose work places are not identified within the Complaint. The United States Marshal Service will not be able to serve the intended defendants without further information. Accordingly, the Court hereby directs plaintiff to ascertain the full names of the unidentified defendants whom plaintiff seeks to sue.

4. Claims Against State Actors in Their Individual Capacities

“[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.” *Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986) (quoting *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977)). Whether or not there was “personal involvement is a question of fact.” *Williams,* 781 F.2d at 323.

Upon review of the voluminous complaint, the Court finds that the following defendants, though named in the caption, appear nowhere in the body of the complaint: Suffolk County Executive Steve Levy, Police Commissioner Richard Dormer, Police Commissioner Former 2003, Det. Behrens, Det. William Sheridan, P.O. Timothy Kelly, Sgt. Leonard, Sgt. William Wallace, P.O. Eric Guiterman, P.O. James Behrens, P.O Anthony Calato, P.O. Daniel Rella, P.O. Juan Valdez, Sgt. William Scaima, P.O. Anthony Wuria, P.O. Michael Pelcher, P.O. Ernie Ketcham, Sgt. Frank Giuliano, Michael Lehrer, Thomas J. Spota, Supervisor of Bradford S. Magill, Supervisor of Patricia Brosco, Presiding Judge S.C. District Court 6/5/07, Edward Vitale, Sheriff Vincent DeMarco, Sheriff Alfred Etisch, Warden Ewald, Warden Former 8/04–5/06, C.O. # 1158, C.O. # 1257, C.O. # 1207, C.O. # 1259, C.O. # 1094, C.O. # 1139, CO. Violet, C.O. # 962, C.O. “Tom Arnold”, C.O. Galotti, Sgt. Fischer, C.O. Cathy Ryan (Peeping Pervert), C.O. Kenneth Lawler, C.O. # 668, C.O. # 1274, CO. William Zikis, C.O. # 1324, CO. # 1275, C.O. Joseph Foti, C.O. Ezekiel, Dep “Brutality*Violators” # 1–12, C.O. “John Civil Rights Violators” # 1–200, Suffolk County Probation Department, Senior Supervisor, Senior P.O. Bennedetto, Probation Officer Soltan, Probation Officer “P.O. Soltan Partner”, Front Desk Clerk, West Babylon Fire Department, Supervisor Mina, EMT McClean, Dr. Jeffrey Margulies, Dr. “I.C.U.”, Rob Gannon, Beth Feeney, Jeanne H. Morena, Southside Hospital, Dr. “Julie Crist's E.R. Doctor”, Dr. “Chief [of] Psychiatry”, Editor John Mancini, Managing Editor Deborah Henley, Managing Editor Debby Krenek, Reporter Bill Mason, Programming Director, Reporter, Programming Director, Reporter and Director Douglas Shelters.

***8** Plaintiff does not plead factual allegations such that these defendants would have notice of his claims and be able defend against them. Moreover, plaintiff does not allege that any of these defendants were personally involved in any of the alleged wrongdoing. Because personal involvement is a prerequisite to a damages award for an alleged constitutional violation, plaintiff's claims, as

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

plead, are not cognizable as against these defendants.

D. Leave to Amend

Rule 15(a) (2) of the Federal Rules of Civil Procedure provides that a party shall be given leave to amend "when justice so requires." When addressing a *pro se* complaint, a district court should not dismiss without granting leave to amend at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Thompson v. Carter,* 284 F.3d 411, 419 (2d Cir.2002) (citing *Branum v. Clark,* 927 F.2d 698, 705 (2d Cir.1991)). Nevertheless, "[l]eave to amend, though liberally granted, may properly be denied for: 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.' " *Ruotolo v. City of New York,* 514 F.3d 184, 191 (2d Cir.1998) (citing *Forman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)). "If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." *Forman,* 371 U .S. at 182. However, if amendment would be futile, *i.e.,* if it could not withstand a motion to dismiss pursuant to Rule 12(b)(6), leave to amend may be denied. *See Lucente v. International Business Machines Corp.,* 310 F.3d 243, 258 (2d Cir.2002).

Since plaintiff is proceeding *pro se,* he is granted leave to amend his complaint to replead his 1983 claims in accordance with this order. Plaintiff shall comply with Federal Rule of Civil Procedure 8 as set forth above at pages eight to ten (8–10) and file any amended complaint in accordance with this order **within thirty (30) days from the date this order is served with notice of entry upon him,** or plaintiff's complaint will be deemed dismissed with prejudice.

IV. Conclusion

For the foregoing reasons, plaintiff's application to proceed *in forma pauperis* is granted and the complaint is *sua sponte* dismissed with leave to amend within thirty (30) days from the date this order is served with notice of entry upon plaintiff. The Superintendent of the facility in which plaintiff is incarcerated must forward to the Clerk of the Court a certified copy of plaintiff's trust fund account for the six (6) months immediately preceding this order, in accordance with plaintiff's authorization in his *in forma pauperis* application. The agency holding plaintiff in custody must calculate the amounts specified by 28 U.S.C. § 1915(b), deduct those amounts from his prison trust fund account, and disburse them to the Clerk of the United States District Court for the Eastern District of New York. The Warden or Superintendent shall not deduct more than twenty percent (20%) from plaintiff's trust fund account.

***9** The Clerk of the Court is directed to mail a copy of this order, together with plaintiff's authorization, to the Superintendent of the facility in which plaintiff is incarcerated and to serve notice of entry of this Order in accordance with Rule 77(d)(1) of the Federal Rules of Civil Procedure, including mailing a copy of the Order to the *pro se* plaintiff at his last known address, *see* Fed.R.Civ.P. 5(b)(2)(c). The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith and therefore *in forma pauperis* status is denied for the purpose of any appeal. *See Coppedge v. United States,* 369 U.S. 438, 444–45, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962).

**SO ORDERED.**

E.D.N.Y.,2010.

Ceparano v. Suffolk County
Not Reported in F.Supp.2d, 2010 WL 5437212 (E.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Only the Westlaw citation is currently available.
United States District Court,

S.D. New York.
Jose J. SHOMO, Plaintiff,
v.
CITY OF NEW YORK, et al., Defendants.
No. 03 Civ. 10213(AKH).

April 4, 2005.
*OPINION AND ORDER GRANTING MOTION TO DISMISS, WITH PARTIAL LEAVE TO REPLEAD*

HELLERSTEIN, J.

***1** Plaintiff Jose J. Shomo, a *pro se* inmate in the custody of the Department of Correctional Services of the State of New York, brings this suit pursuant to 42 U.S.C. § 1983, seeking compensatory damages in the amount of $100 million relating to alleged violations of the First, Fourth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution by thirteen named defendants and 5 unnamed defendants. Plaintiff bases his claims on alleged deliberate indifference to his serious medical needs relating to his upper body paralysis and nervous system afflictions, assault, and destruction of personal property. Defendants have filed a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) on the grounds that the action is barred by plaintiff's failure (1) to file his claim within the statute of limitations; (2) to file a notice of claim to preserve state law claims; (3) to allege personal involvement on the part of certain defendants; (4) to properly state a deliberate indifference to medical needs claim; (5) to properly state a destruction of property claim; and (6) because of certain defendants' qualified immunity. I address such assertions by defendants as are necessary to resolve this motion.

I. Background

From September 20, 1999 to January 4, 2001, Plaintiff was in the custody of the New York City Department of Corrections (DOC). Plaintiff alleges that during that time various corrections officers and medical care providers were responsible for numerous and continuous incidences of deliberate indifference to his medical needs, assault, and destruction of property. Plaintiff's allegations are summarized below.

A. *The Deliberate Medical Indifference Allegations*

On his first day in custody, September 20, 1999, Shomo received a physical examination from Dr. Christen Pedestu, who found that Shomo suffered from right arm paralysis and limited use of his left arm. *See* Compl., ¶ 30. Dr. Pedestu also noted that "Plaintiff was receiving Health Home Attendants Services while he was on the streets." Compl., ¶ 31. Accordingly, Dr. Pedestu recommended that the DOC admit Shomo to the North Infirmary Command (NIC). *Id.* Over the next five months, Shomo met with a barrage of doctors, including defendants Dr. Shahid Nawaz, ¶¶ 35, 41; Dr. Saroja Singha,[FN1] ¶¶ 39, 40, 78, 80; Dr. Joy Meyers, ¶¶ 40, 44-47, 71; Dr. Marie Francois, ¶ 52; Dr. Rameem Seegobin, ¶¶ 67, 71; and various unnamed doctors.

FN1. Defendant identifies Dr. Singha as "Dr. Saroga Singa" in his complaint. Compl., ¶ 15. I adopt the spelling provided by the defendants, "Saroja Singha."

Plaintiff Shomo's allegations relate that he suffered pain and paralysis in his arms, making it difficult or impossible to perform activities of daily living (ADLs) such as eating, dressing, grooming, toileting, or bathing. *See, e.g.,* Compl., ¶¶ 33, 42-46. Medical and security staff at the DOC refused to provide assistance with those activities, despite Plaintiff's repeated requests. *See e.g.,* Compl., ¶¶ 42-46, 50, 51, 54, 59, 66. Further, Plaintiff alleges that he was improperly housed with the general population of inmates during his stays at various detention facilities, when he should have been admitted to infirmary custody because of his medical condition. *See, e.g.,* Compl., ¶¶ 33, 49, 51, 56, 62-66. As a result of these deprivations and improper treatment, Plaintiff states that he experienced "muscle spasms, migraine headaches, severe back and neck pain, as well as emotional trauma." Compl., ¶ 99. In particular, Shomo alleges that since DOC

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

staff would not assist with him his ADLs, he was forced to pay other inmates to perform those activities for him or "remain dirty, stinking, unbathed, etc." Compl., ¶ 51. *See also* Compl., ¶ 97.

***2** Shomo also alleges that an injury to his foot went untreated by staff for a prolonged period of time, causing unnecessary pain and requiring Plaintiff to hop around on one foot for seven weeks while his foot healed. *See* Compl., ¶¶ 78-81, 101. Because medical staff refused to treat his foot, and because staff refused to provide Plaintiff with a wheelchair, Plaintiff allegedly fell down several times, causing injury to his left shoulder and ribs, as well as emotional trauma. *See* Compl., ¶ 102.

Finally, Plaintiff alleges he suffered injury to his left arm as the result of corrections officers' refusal to obey instructions provided by the medical staff at the DOC. Following a court appearance on October 7, 1999,[FN2] Corrections Officer Pelite indicated that he intended to handcuff Shomo to another inmate for the return trip to Rikers Island detention facility. *See* Compl., ¶ 38. Plaintiff then explained to Pelite that he carried medical instructions describing how to handcuff him. Officer Pelite then notified the area supervisor, "Captain Swartz." [FN3] *Id.* According to the complaint, Captain Swartz said "he didn't give a hoot" what the medical instructions said, that it was too late to call special transportation, NIC or anyone else. *Id.* He then ordered Shomo to be handcuffed to the other inmate. *Id.* While handcuffed to the other inmate, Shomo began to suffer muscle spasms. *Id.* He later slipped while boarding the bus, causing his left arm, which was cuffed to the other inmate, to be wrenched upwards. *Id.* After these incidents, Plaintiff was taken to the NIC where he indicated that he was feeling pain and could not move his left arm. *Id.*

FN2. Plaintiff's complaint states that the events in this paragraph occurred on September 7, 1999, but given the sequence of events he describes, it is clear that he meant October 7, 1999.

FN3. According to Defendant's Motion to Dismiss, Captain Swartz has not been identified by the Department of Corrections. *See* Reply Mem. of Law in Further Support of City Defendant's Mot. to Dismiss at 3.

B. *The Assault Allegation*

On March 11, 2000, Plaintiff alleges that after a brief exchange of words, Corrections Officer Little reached through the bars of his cell, and then "violently pulled him into the bars," Compl., ¶ 91, as well as "scratching and clawing him." Compl., ¶ 135. As a result, Plaintiff suffered severe pain to the left shoulder, lacerations, swelling, and bruises. *See* Compl., ¶ 136.

C. *Destruction of Property*

Shomo states generally that corrections officers destroyed his personal property during searches of his cell and that this occurred at least 100 times between October 8, 1999, and January 4, 2001. *See* Compl., ¶ 95. Plaintiff additionally states that he suffered physical and emotional pain after each cell search because his physical ailments made it painful for him to rearrange his cell and that he was compelled to pay other inmates to assist him. *See* Compl., ¶ 97.

II. Discussion

A. *Standards on a 12(b)(6) Motion to Dismiss*

A Rule 12(b)(6) motion requires the court to determine whether plaintiff has stated a legally sufficient claim. A motion to dismiss under Rule 12(b)(6) may be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Branum v. Clark,* 927 F.2d 698, 705 (2d Cir.1991). The court's function is "not to assay the weight of the evidence which might be offered in support" of the complaint, but "merely to assess the legal feasibility" of the complaint. *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980). In evaluating whether plaintiff may ultimately prevail, the court must take the facts alleged in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.,* 32 F.3d 697, 699-700 (2d Cir.1994). Moreover, a complaint submitted *pro se* must be liberally construed and is held to a less rigorous standard of review than formal pleadings drafted by an attorney. *Hughes v. Rowe,* 449 U.S. 5, 9, 101 S.Ct.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

173, 66 L.Ed.2d 163 (1980); *Salahuddin v. Coughlin,* 781 F.2d 24, 29 (2d Cir.1986).

B. *Service of Process*

***3** Corporate Counsel for the City of New York accepted service of process and represents defendants City of New York, New York City Department of Corrections, William Fraser, Eric Perry, Dr. Saroja Singh, and Dr. Marie Francois. *See* Letter From Jordan M. Smith to Hon. Alvin K. Hellerstein of April 26, 2004. Corporate Counsel provided addresses for defendants Pauline Little, Dr. Joy Myers, St. Barnabas Hospital, Marquita Wright, Dr. Shahid Nawaz, and Dr. Rameeh Seegobin. *Id.* In his Opposition to Defendant Motion to Dismiss ("Plaintiff's Opposition"), Shomo indicates that an attempt to serve defendants Wright, Dr. Nawaz, Dr. Seegobin by United States Marshals did not succeed, presumably because the addresses provided by the City of New York were no longer accurate when the attempt was made. *See* Plaintiff's Opposition ¶ 6.

Under ordinary circumstances, the plaintiff must serve notice on the defendant within 120 days of filing the complaint. *See* Fed. R. Civ. Proc. Rule 4(m). This rule is not strictly enforced in *pro se* prisoner cases. *See Carney v. Davis,* 1991 U.S. Dist. LEXIS 10254, No. 90 Civ. 2591, 1991 WL 150537, at *3 (S.D.N.Y.1991) (declining to dismiss *pro se* prisoner's action despite three and one-half years delay in service). I find that Plaintiff Shomo requested that U.S. Marshals serve notice on Drs. Nawaz and Seegobin within a reasonable period of time and that he was not in a position to monitor whether they succeeded in serving those defendants. I therefore direct Corporate Counsel for the City of New York to investigate and provide Shomo with updated addresses for Drs. Nawaz and Seegobin, and to confirm that Dr. Myers has been served notice, as these are the only three persons against whom Plaintiff has leave to re-plead.

C. *Statute of Limitations*

Plaintiff Shomo states claims under 42 U.S.C. § 1983, the Civil Rights Act of 1964, the Rehabilitation Act of 1973, and the Americans with Disabilities Act of 1990. *See* Compl., ¶¶ 97-136. The defendants argue that the statute of limitations has expired for all claims made by Shomo pursuant to those Acts.

1. *42 U.S.C. § 1983*

Congress did not provide a statute of limitations period for the filing of § 1983 claims. In the absence of congressional specification, the Supreme Court has held that "[w]here state law provides multiple statutes of limitations for personal injury actions, courts considering § 1983 claims should borrow the general or residual statute for personal injury actions." *Owens v. Okure,* 488 U.S. 235, 250 (1989). In New York, the relevant period is three years. *See* N.Y.C.P.L.R. § 214(5) (Consol.2004); *Pearl v. City of Long Beach,* 296 F.3d 76, 79 (2d Cir.2002) (parties stipulated that relevant period for § 1983 claim was three years).

Shomo was in prison at the time he filed this lawsuit. Pursuant to the "mailbox rule" governing *pro se* complaints by incarcerated litigants, Shomo filed his complaint on September 26, 2003, the day he swore his complaint before a Notary Public and conceivably handed it to prison officials. *See Dory v. Ryan,* 999 F.2d 679, 682 (2d Cir.1993) (complaint deemed filed on date prisoner gives the complaint to prison officials). Under the three year statute of limitations, Shomo's complaint reaches back to September 26, 2000. As defendants argue, however, Shomo does not identify any specific conduct by defendants occurring after April 14, 2000, although he does generally allege that defendants were deliberately indifferent to his serious medical needs through his release from prison on January 4, 2001. Shomo's complaint therefore falls under the statute of limitations. Since, however, he also alleges continuing indifference, and therefore it is possible Shomo may allege a § 1983 claim that accrues after September 26, 2000, I allow that possibility, as I discuss later in this opinion.

***4** Federal law governs the question of when the § 1983 claim accrues, even though the statute of limitations is borrowed from state law. *See M.D. v. Southington Bd. of Educ.,* 334 F.3d 217, 221 (2d Cir.2003); *Pearl v. City of Long Beach,* 296 F.3d at 80 n. 2. Under federal law, the statute of limitations begins to run once the plaintiff knows or has reason to know of the injury on which his claim is based. *Cornwell v. Robinson,* 23 F.3d 694, 703 (2d Cir.1994) (citing *Singleton v. New York,* 632 F.2d 185, 191 (2d Cir.1980)).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

For the purposes of determining when Shomo's claim accrued, I must first evaluate whether the doctrine of continuing violation is applicable to his case. The doctrine of continuing violation is available to litigants who bring Title VII employment discrimination suits and tolls the statute of limitation such that it does not begin until the last injurious act. *See, e.g., AMTRAK v. Morgan,* 536 U.S. 101, 116-17 (2002). To date, several decisions have discussed, but refrained from applying, the doctrine of continuing violation to medical indifference claims. *See Pino v. Ryan,* 49 F.3d 51, 54 (2d Cir.1995) ("plaintiff has alleged no facts indicating a continuous or ongoing violation"); *Doe v. Goord,* 2004 U.S. Dist. LEXIS 24808 (D.N.Y.2004) ( "Whether the 'continuing violation doctrine' should apply also need not be determined at this stage"); *Griswold v. Morgan,* 317 F.Supp.2d 226, 232 (D.N.Y.2004) (declining to decide whether continuous violation doctrine applied to deliberate medical indifference claim and dismissing on other grounds); *Thomas v. Wright,* 2002 U.S. Dist. LEXIS 19618 (D.N.Y.2002) (same). However, in *Cole v. Miraflor,* 2001 U.S. Dist. LEXIS 1681 (D.N.Y.2001) (Sweet, J.) ("Second Circuit has recognized that the rule *may* apply in [deliberate medical indifference case]") (citing *Pino v. Ryan, supra* ) (emphasis added), the doctrine of continuing violation in a deliberate medical indifference case was applied. I note that Cole's complaint was later dismissed on administrative exhaustion grounds. *See* 195 F.Supp.2d 496 (S.D.N.Y.2002).

In *AMTRAK v. Morgan, supra,* the United States Supreme Court clarified the doctrine of continuing violation as it applied to Title VII employment discrimination claims, holding that "[h]ostile environment claims are different in kind from discrete acts." 536 U.S. at 115. Discrete acts are those acts that constitute a "separate actionable" violation by the defendant, *id.* at 114, and "are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Id.* at 113. Hostile environment claims, on the other hand, involve acts that "may not be actionable on [their] own." *Id.* at 115. Instead, the "entire hostile work environment encompasses a single unlawful employment practice," *id.* at 117, or in other words the plaintiff's injury has a temporal component-he or she is subjected to discriminatory conditions day after day, and while each day's undeserved humiliations may not independently provide grounds for a lawsuit, in the aggregate the plaintiff has a colorable claim of discrimination.

***5** Shomo's claim more closely resembles the accumulation of acts that create a hostile work environment claim, than allegations of discrete acts of deliberate indifference. This is not to say that all claims of deliberate indifference to serious medical needs should be characterized as hostile work environment claims for the purposes of tolling the statute of limitations. In fact, many such claims allege discrete behavior, as when an inmate suffers a serious injury that demands immediate attention, or when medical care provider acts in such a way that manifests deliberate indifference to the possibility of harm. Here, Shomo allegedly entered prison already suffering from a chronic neurological condition that, unlike a bleeding knife wound, required attention, but not necessarily immediate attention. Moreover, it is difficult to characterize an omission to provide care as a discrete act when the needed care can occur at any point during the day or week with identical effect. When the inmate is paralyzed and unable to perform ADLs, except with great pain and humiliation, as Shomo alleges, the desired assistance is frequently needed, but a single failure to provide it does not, by itself, cause an actionable injury.

I conclude that Shomo's claim is analogous to the hostile work environment described in *AMTRAK, supra,* and that tolling the statute of limitations on the basis of continuing violation in the deliberate medical indifference context has sufficient support in this Circuit, the Supreme Court, and in the rationale underlying the doctrine. Just as the hostile work environment confronts the claimant with daily indignations that rise to the level of a lawsuit only when aggregated, so might the suffering inmate lack a claim on the first day the prison authorities or doctors ignore his medical condition, and on the second day, and the third. But over a stretch of months, the prisoner's suffering at the hands of indifferent corrections officers and medical staff might ripen into a legitimate complaint, and in such a case, it would make sense to consider the entire period of medical neglect, meaning that the unlawful practice would end on the last day prison authorities had a duty to provide medical care to Plaintiff

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Shomo. If this were true, Shomo's claim might accrue later than September 26, 2000, and until January 4, 2001, the day he was released from prison. Shomo's claim thereby might come within the statute of limitations.

Further, the doctrine of continuing violation applies even if the plaintiff became aware of the cause of action before the statute of limitations ran, so long as a related act or omission that forms part of the hostile environment, or in this case, deliberate medical indifference claim, occurred within the statute of limitations. *See AMTRAK v. Morgan,* 536 U.S. at 117-19. Thus even if Shomo were aware of a complete cause of action on April 14, 2000, under the doctrine of continuing violation, he would not be required to file suit within three years of that date *if* related acts or omissions of deliberate medical indifference occurred later. *See id.*

***6** Since I hold that the doctrine of continuing violation applies to deliberate indifference claims, I now must consider whether Plaintiff Shomo alleges facts that enable him to invoke the doctrine. To allege continuing violation, the plaintiff must "allege both the existence of an ongoing policy of discrimination and some non-time-barred acts taken in furtherance of that policy." *Harris v. City of New York,* 186 F.3d 243, 250 (2d Cir.1999). I hold, giving Shomo the pleading benefits of a *pro se* litigant, that Shomo has sufficiently alleged the existence of an ongoing policy of denying him medical treatment, but that he has not sufficiently alleged non-time-barred acts in furtherance of the alleged policy of denying him medical treatment.

Shomo's allegations might amount to deliberate medical indifference taking place between September 20, 1999, and April 14, 2000, but it is not clear. Shomo does not make any specific allegations, after April 14, 2000, that he sought medical assistance or was improperly denied care. His general allegations encompassing the period from January 29, 1999 to January 4, 2001, are insufficient to allege non-time-barred acts or omissions as required by *Harris v. New York, supra.*

Therefore I dismiss the complaint, but in light of the liberality accorded *pro se* litigants, *Boag v. MacDougall,* 454 U.S. 364 (1982), I give Plaintiff leave to re-plead. The re-pleading, which must be served and filed within 30 days after the City makes the report required by this Opinion, must give specific time, place, and circumstances to show that Plaintiff has a real, non-time-barred claim for relief.

2. *Rehabilitation Act of 1973; Americans with Disability Act of 1990*

The Rehabilitation Act of 1973, 29 U.S.C. § 704, and the American with Disability Act of 1990, 42 U.S.C. § 12132, both adopt the state residual personal injury statute of limitations, which in New York is three years. *See Harris v. City of New York,* 186 F.3d at 247-48. I decline to adopt the statute of limitations analysis above for these statutes, however, because Shomo clearly lacks a cause of action under either statute.

3. *Statute of Limitations as it Relates to Corrections Officer Little*

Unlike the provision of medical treatment, the assault allegedly committed by Corrections Officer Little cannot be construed as part of a deliberate medical indifference claim. An assault is independently actionable, and as such the logic that underlies the doctrine of continuing violation is inapplicable. The complaint as it relates to Corrections Officer Little is dismissed with prejudice.

4. *Statute of Limitations as it Relates to Captain Swartz*

Although Shomo might adequately state a claim of deliberate indifference to his medical needs against defendant Captain Swartz, I dismiss the claim against him with prejudice for the same reasons as apply to Corrections Officer Little. Specifically, the single incident that involved Captain Swartz, *see* Compl., ¶ 38, does not fit within the larger pattern of refusal to assist with ADLs that form the basis for Plaintiff's continuing violation theory.

5. *Statute of Limitations as it Relates to Destruction of Property Claims*

***7** The doctrine of continuing violation does not apply to destruction of property claims, and since Shomo does not specify any such acts after September 26, 2000, his claim is dismissed with prejudice to the extent that it alleges destruction of property.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

D. *Lack of Personal Involvement*

I dismiss Plaintiff's complaint as it relates to defendants William Fraser and Eric Perry since Plaintiff has failed to demonstrate the kind of personal involvement required to show constitutional violations. "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citations omitted); *see also Back v. Hastings On Hudson Union Free School Dist.,* 365 F.3d 107, 127 (2d Cir.2004) ("An individual cannot be held liable for damages under § 1983 'merely because he held a high position of authority,' but can be held liable if he was personally involved in the alleged deprivation." (quoting *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996))); *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) ("The rule in this circuit is that when monetary damages are sought under § 1983, the general doctrine of *respondeat superior* does not suffice and a showing of some personal responsibility of the defendant is required.") (citation omitted).

*Colon* instructs that the "personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." 58 F.3d at 873 (citations omitted).

In his complaint, Shomo identifies Commissioner Fraser and Deputy Commissioner Perry as having responsibility for operating and maintaining DOC jails in the City of New York. *See* Compl., ¶¶ 5, 6. Shomo only mentions these defendants again to indicate that he filed a complaint with their respective offices alleging the violations discussed above. *See* Compl., ¶¶ 26, 73. In his Opposition to Defendant's Motion to Dismiss, Shomo adds that although Fraser and Perry were aware of the violations, they did nothing to protect him. Plaintiff's Opp., ¶ 15, and cites *Brown v. Coughlin,* 758 F.Supp. 786 (1991) (finding allegation against Commissioner sufficient to survive summary judgment).

Shomo does not adequately state that Fraser and Perry were aware of the violations he alleges. He does not indicate when he complained to their offices, or what the content of the complaint was. *See* Compl., ¶ 26, 73. Nor does the attempt to explain how defendants Fraser and Perry were responsible, directly or indirectly, for the acts of the other named defendants, or the prevailing conditions that contributed to Plaintiff's injuries. Therefore, Plaintiff fails to state a claim against defendants Fraser and Perry and I order that the complaint against each of them is dismissed, with prejudice.

E. *Municipal Liability and the Department of Corrections*

***8** In order to establish the liability of a municipality in an action under § 1983 for unconstitutional acts by a municipal employee below the policymaking level, a plaintiff must establish that the violation of his constitutional rights resulted from a municipal custom or policy. *Vann v. City of New York,* 72 F.3d 1040, 1049 (2d Cir.1995). To establish the violation, the plaintiff must demonstrate the existence of the policy and show that the policy caused his injuries. *See Vippolis v. Village of Haverstraw,* 768 F.2d 40, 44 (2d Cir.1985) (citing *Oklahoma City v. Tuttle,* 471 U.S. 808, 824 n. 8 (1985)). The municipal policy does not need to be an explicitly stated rule or regulation. A plaintiff may state a claim against a municipality by showing that it repeatedly ignored complaints that would put it on notice of the alleged violations. *See Vann v. City of New York,* 72 F.3d at 1049.

Shomo fails to identify any municipal or DOC policy or custom that caused his injuries and he does not effectively claim that the DOC ignored his complaints. Plaintiff asserts that he was not transferred to Goldwater Hospital because of a DOC policy that restricted intake at the hospital to HIV positive patients. *See* Compl., ¶ 71, 129. This policy could not have caused Shomo's injuries, nor did it prevent the DOC staff from assisting him with ADLs at the NIC or other hospitals under contract with the DOC, like St. Barnabas Hospital.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

The argument that the DOC had a policy of ignoring medical issues in general, or Shomo's medical issues in particular, fails because Shomo was seen by many doctors and received numerous medical tests. Shomo's complaint conveys that between the beginning of his confinement on September 20, 1999 and the end of his detailed allegations on March 11, 2000, he received attention from medical staff on nearly a weekly basis. *See generally* Compl., ¶¶ 29-91. He also received a nerve conduction study, Compl., ¶ 82; a diagnostic MRI, Compl., ¶ 83; and various x-rays, Compl., ¶ 86. Plaintiff also indicates that he received prescribed medication. *See e.g.,* Compl., ¶ 39. A reasonable DOC supervisor or other individual with responsibility for agency policy reviewing this record of treatment could easily conclude that Shomo was receiving adequate care. Plaintiff's claim against the City of New York is dismissed with prejudice.

Plaintiff's claim against the Department of Corrections is dismissed with prejudice as all claims against City agencies shall be construed as claims against the City of New York. *See* N.Y. City Charter, Ch. 17, § 396; *Echevarria v. Dep't of Correctional Servs.,* 48 F.Supp.2d 388, 391 (S.D.N.Y.1999) ("suits against the DOC are suits against a non-suable entity and are properly dismissed on that basis").

F. *Deliberate Medical Indifference*

The government has an obligation "to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble,* 429 U.S. 97, 103 (1976). In order to establish a claim under § 1983 for failure to provide medical attention, the plaintiff must allege not only that he suffered from a serious injury, but also that the injury sustained was caused by "deliberate indifference" on the part of the defendants. *Farmer v. Brennan,* 511 U.S. 825, 832 (1994). Deliberate indifference might be found when an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that substantial risk of serious harm exists, and he must also draw that inference. *Id.* at 834. Though a plaintiff must prove at trial that the defendant had a state of mind "equivalent to criminal recklessness," *Hernandez v. Keane,* 341 F.3d at 144, the subjective element of intent may be pleaded generally. *See* *Phelps v. Kapnolas,* 308 F.3d 180, 186 (2d Cir., 2002).

***9** Plaintiff Shomo does not allege medical malpractice, nor would such a claim be actionable under Eighth Amendment law. *See* *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) ("Eighth Amendment is not a vehicle for bringing medical malpractice claims"). First, he claims that although various doctors ordered that he receive assistance with his ADLs, DOC staff, including nurses and corrections officers, refused to provide that assistance. Second, Shomo alleges that Drs. Myers, Nawaz, and Seegobin transferred him to general population even though they knew, on the basis of other doctors' findings, that he was unfit for general population living.

*Failure of Medical Staff and Security Staff to Assist with ADLs*

As to the first general allegation, Shomo has not named individuals who deliberately ignored medical instructions, with the exception of the aforementioned Captain Swartz, Compl., ¶ 38. Many of his allegations simply state that although he requested assistance with ADLs from medical staff and security staff, none was given, in spite of alleged doctor's orders. *See* Compl., ¶¶ 45, 50, 51, 54, 59, 63, 66, 68, 70, 72, 76, 94 (medical and security staff refused to assist with ADLs). Shomo alleges some of his injuries in the passive voice and these allegations do not name any defendant at all, except by inference. *See e.g.,* Compl., ¶ 56 ("Plaintiff was not transferred to NIC despite Dr. Daniel's expressed orders."); Compl., ¶ 58 ("In spite of Dr. Appel's order the day before, Plaintiff was cleared for housing in general population."); Compl., ¶ 58 ("Plaintiff was to receive assistance with [ADLs]. These orders were not carried out.").

These allegations do no more than provide context to Shomo's complaint. The plaintiff, however, must identify the party responsible for his injuries, and Shomo does not do this with respect to the medical and security staff's alleged failure to assist with ADLs. I evaluate the deliberate indifference to serious medical needs claims as to each of the named individuals who could possibly remain in the suit below.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

*St. Barnabas Hospital*

Plaintiff Shomo identifies St. Barnabas Hospital ("the hospital") in paragraphs 119, 124, 125, 126, and 129, arguing that the hospital had institutional responsibility to ensure that medical staff provided proper care and that the hospital failed to provide that level of care. I assume, without deciding, that the hospital acts under color of state law with respect to DOC inmates and is therefore subject to claims under § 1983.

The hospital is subject to the supervisory defendant analysis of *Colon, supra.* Shomo does not adequately explain how the hospital created a policy or custom under which unconstitutional practices occurred, allowed the continuance of such a policy or custom, was grossly negligent in supervising subordinates who committed the wrongful acts, or exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring. *Colon,* 58 F.3d at 873. It is not apparent from Shomo's complaint that any supervising authority at the hospital was aware that medical staff refused to comply with doctors' instructions, or that the hospital created or fostered a policy that would encourage medical staff to refuse to comply. The complaint is dismissed with respect to St. Barnabas Hospital.

*Dr. Saroja Singh*

***10** Plaintiff Shomo identifies Dr. Saroja Singh in paragraphs 15, 39, 40, 78, 80, 110, and 111, alleging that Dr. Singh refused to examine him, Compl., ¶ 39; and denied his request for a second opinion, Compl., ¶ 39, 110. Shomo's claim against Dr. Singh falls short because he indicates that during his medical appointments Dr. Singh asked him questions about his condition and prescribed him medication. At most, Shomo alleges that Dr. Singh was negligent in giving treatment, and "negligence, even if it constitutes medical malpractice, does not, without more, give rise to a constitutional claim." *Smith v. McGinnis,* 2003 U.S. Dist. LEXIS 25768 (D.N.Y.2003) (citing *Neitzke v. Williams,* 490 U.S. 319, 321-22 (1989)). To rise to the level of medical indifference, however, the defendant must have been aware of the condition and deliberately refused to treat it with conscious disregard of the substantial risk of serious harm. *See Hernandez v. Keane,* 341 F.3d at 144. Although Plaintiff is not required to plead that Dr. Singh acted with the "very purpose of causing harm," *Farmer v. Brennan,* 511 U.S. at 835, he must at least attempt to show that Dr. Singh was aware of the substantial risk of harm to the defendant and chose to ignore it. Shomo concludes that Dr. Singh's failure to provide more extensive treatment resulted in the loss of the use of his left arm, Compl., ¶ 110 but other parts of his complaint undermine this assertion. In particular, Shomo's complaint describes substantial neurological problems affecting his left arm that pre-dated his interaction with Dr. Singh, and indeed, appear to pre-date his incarceration. *See* Compl., ¶ 31 (Plaintiff's medical records showed that he received "Home Health" services); Compl., ¶ 36 (Physician's Assistant Pitchford issued medical instructions ... "to prevent further neurological damage to Plaintiff's left arm."). On the face of Shomo's pleading, therefore, it is clear that Dr. Singh was not the cause of the neurological damage to his left arm, and given the nature of his condition, it seems highly unlikely that Dr. Singh was in a position to make it worse when she treated him on several different occasions. The complaint is dismissed with prejudice as it relates to Dr. Singh.

*Dr. Marie E. Francois*

Plaintiff Shomo identifies Dr. Francois two times in his complaint, in paragraph 20, declaring that she is a physician with responsibility for treating inmates, and in paragraph 52, alleging that Dr. Francois denied him a second opinion following the results of an examination that indicated that he was able to perform ADLs. Shomo clearly fails to state a claim against Dr. Francois, since prisoners are not constitutionally entitled to a second medical opinion. *See Smith v. McGinnis,* 2003 U.S. Dist. LEXIS 25768 *13-14 (doctor's decision not to seek second opinion not deliberate indifference to serious medical needs). The complaint is dismissed with prejudice as it relates to Dr. Francois.

*Physician Assistant Marquita Wright* [FN4]

FN4. Plaintiff identifies defendant Wright as "Dr. Wright;" corporate counsel for the City of New York identifies the defendant as Physician Assistant Marquita Wright. I adopt the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

defendant's title for Ms. Wright.

***11** Plaintiff Shomo identifies Ms. Wright in paragraph 19 and her name does not appear again the complaint. The complaint is dismissed as it relates to Ms. Wright.

*Dr. Joy Myers,*[FN5] *Dr. Shahid Nawaz,*[FN6] *and Dr. Rameeh Seegobin* [FN7]

FN5. Dr. Myers appears in paragraphs 14, 44-47, 71, 113, 121, 125, and 129.

FN6. Dr. Nawaz appears in paragraphs 17, 35, 41, 64, and 120.

FN7. Dr. Seegobin appears in paragraphs 18, 67, 71, 120, 121, and 129.

Plaintiff Shomo is granted leave to re-plead his claim as it relates to Drs. Myers, Nawaz, and Seegobin. The sequence of events he describes fulfills the requirements to state a deliberate indifference to medical needs claim under § 1983. Shomo alleges that these doctors ordered his discharge from the infirmary to the prison general population while fully aware that he was incapable of performing ADLs. *See* Compl., ¶ 113 (Dr. Myers); Compl., ¶ 120 (Drs. Nawaz and Seegobin).

On October 13, 1999, an unnamed neurologist at Bellevue Hospital determined that Shomo was capable of performing ADLs after performing a "non focal exam." *See* Compl., ¶ 48, 113. Following this exam, however, multiple doctors determined that Plaintiff required assistance with ADLs. *See* Compl., ¶ 55 (Dr. Vettigunta on November 2, 1999); Compl., ¶ 56 (Dr. Daniel on November 4, 1999); Compl., ¶ 57 (Dr. Appel on November 4, 1999); Compl., ¶ 62 (Dr. Yeager on November 20, 1999). On February 11, 2000, Dr. Ismaila Adiatu found that Plaintiff was declared fit for general population "due to a medical error." *See* Compl., ¶ 84. Finally, on March 8, 2000, Dr. Adiatu "emphasized that Plaintiff's case should be reviewed [at] the highest level, because Plaintiff was not receiving the proper care." Compl., ¶ 90.

Shomo alleges that each of the named doctors was aware that other doctors had found that he needed assistance with ADLs. *See* Compl ., ¶ 120 ("in spite of having reviewed various medical records from outside hospitals [and] diagnostic test results indicating Plaintiff's need for assistance with ADLs, Dr. Nawaz and Dr. Seegobin ordered Plaintiff discharged from infirmary care"); Compl., ¶ 121 (same allegation repeated for Drs. Myers and Seegobin). As physicians, these individuals would have known of and disregarded "an excessive risk to inmate health or safety," *Farmer v. Brennan,* 511 U.S. at 834, by transferring Shomo to general population where he was unable to eat or bathe because of his upper extremity paralysis. Shomo persistently requested assistance with ADLs, and multiple doctors agreed that his condition necessitated that assistance. Each doctor was aware of these facts from which the inference could be drawn that a substantial risk of serious harm existed.

Shomo alleges that he suffered serious physical pain and emotional trauma as a result of his residence in the general population with medical care. He also alleges that the refusal of medical and security staff to assists with ADLs deprived him of the conditions of basic human decency. *See e.g.,* Compl., ¶ 114 (Plaintiff could not comply with strip searches, forced to eat like a dog, pay other inmates to assist him with toileting, bathing, and washing clothes). Although these consequences "do not inevitably entail pain" they may nevertheless fail to comport with contemporary standards of decency. *See* *Koehl v. Dalsheim,* 85 F.3d 86, 88 (2d Cir.1996) (deprivation of medically-prescribed eyeglasses sufficiently serious to violate the Eighth Amendment).

III. Conclusion

***12** The complaint is dismissed with prejudice as it relates to defendants City of New York, New York City Department of Corrections, Commissioner William Fraser, Deputy Commissioner Eric Perry, Captain Swartz, Corrections Officer Little, St. Barnabas Hospital, Marquita Wright, Dr. Saroja Singh, and Dr. Marie Francois. The complaint is dismissed without prejudice and Shomo is given leave to re-plead as it relates to defendants Dr. Joy Myers, Dr. Shahid Nawaz, and Dr. Rameeh Seegobin.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Corporate Counsel for the City of New York is directed to determine the current addresses of defendants Drs. Myers, Nawaz, and Seegobin, and to ascertain whether they have been served with notice. Corporate Counsel shall file a report with Plaintiff and this Court containing the service of notice status of remaining defendants and their addresses within 30 days.

Plaintiff is advised that although he is granted leave to re-plead against Drs. Myers, Nawaz, and Seegobin, he must allege specific acts causing injuries committed by or at the instruction of one or more of those individuals occurring after September 26, 2000, in order to come within the continuing violation doctrine he seeks to invoke. If he fails to do so on re-pleading, his complaint will be dismissed with prejudice. The re-pleading must be filed within 30 days after the City files its report with the Plaintiff and this Court.

The Clerk of the Court Shall mark this case as closed.

SO ORDERED.

S.D.N.Y.,2005.

Shomo v. City of New York
Not Reported in F.Supp.2d, 2005 WL 756834 (S.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Page 1

Not Reported in F.Supp.2d, 2011 WL 4478515 (N.D.N.Y.)

(Cite as: 2011 WL 4478515 (N.D.N.Y.))

C

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Philip DeBLASIO, Plaintiff,
v.
David ROCK, et al., Defendants.
No. 9:09–CV–1077 (TJM/GHL).

Sept. 26, 2011.
Philip Deblasio, Romulus, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State of New York, Adele M. Taylor–Scott, Esq., of Counsel, Albany, NY, for Defendants.

***MEMORANDUM DECISION AND ORDER***

THOMAS J. McAVOY, Senior District Judge.

***1** In this *pro se* prisoner civil rights action, filed pursuant to 42 U.S.C. § 1983, Plaintiff Philip DeBlasio alleges that twenty-three employees of the New York Department of Corrections and Community Supervision ("DOCCS") violated his constitutional rights by denying him adequate medical care, interfering with his right to exercise his religion, subjecting him to excessive force, and subjecting him to unconstitutional conditions of confinement. (Dkt. No. 1.) Currently pending is Defendants' motion for summary judgment. (Dkt. No. 55.) Plaintiff has not opposed the motion, despite having been advised of the consequences of failing to do so and having been granted four extensions of the deadline by which to do so. (Dkt. No. 55 at 3; Jan. 19, 2011, Text Order; Feb. 16, 2011, Text Order; Mar. 31, 2011 Text Order; June 27, 2011, Text Order.) For the reasons that follow, Defendants' motion for summary judgment is granted in part and denied in part.

**I. BACKGROUND**

Plaintiff, an inmate currently in DOCCS custody at Five Points Correctional Facility, complains in this action of a series of events that occurred at Great Meadow Correctional Facility in 2006 and 2009. (Dkt. No. 1.)

**A. Incidents in 2006**

In his verified complaint, Plaintiff alleges that on December 28, 2006, Defendant Physician Assistant Fisher Nesmith stopped at his cell during sick-call rounds. (Dkt. No. 1 at 11.) Plaintiff told Defendant Nesmith that he needed to see the doctor for his chronic back pain and herniated discs. *Id.* Defendant Nesmith would not allow Plaintiff to see the doctor. *Id.* at 12. This happened "several times" again after December 28, 2006. *Id.*

Plaintiff alleges that on December 28, 2006, Defendant Correction Officer Kevin Holden was assigned to pack Plaintiff's personal belongings because Plaintiff was moving to a new cell. (Dkt. No. 1 at 12.) Thereafter, pages were missing from each of Plaintiff's three copies of the Koran. *Id.* One of the three Korans had to be destroyed because it was missing so many pages. *Id.* Plaintiff alleges that Defendant Holden is "defin[i]tely responsible" for the missing pages because he "was the only person to pack [P]laintiff's property ..." *Id.*

**B. Incident with Extraction Team**

Plaintiff alleges that one night in early August 2009 [FN1], he complained of sharp pains in his left ribcage area and blood in his urine.[FN2] (Dkt. No. 1 at 12.) Defendant Correction Officer Kelsey Lenney told Plaintiff he would call a nurse.[FN3] *Id.* After speaking to Defendant Nurse Della Howley, Defendant Lenney returned twenty minutes later and asked Plaintiff if he had requested a sick call. *Id.* at 12–13. Plaintiff was enraged and started banging the gate and asking to see a sergeant. *Id.* at 13. When Defendant Sergeant John Busse responded to the scene, Plaintiff explained the situation and Defendant Busse said he would take care of it. *Id.* Two hours after Plaintiff had first complained of the pain, Defendant Howley arrived at his cell "with a very negative attitude." *Id.* Plaintiff "was so mad she wouldn't help him [that] he threw water at her and hit [Defendant] Lt. Richard Juckett as well." *Id.*

FN1. Plaintiff's allegations about the precise dates on which the incidents in the complaint

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

occurred are contradictory. Early in the complaint, he alleges that he complained of the pain in his ribcage on "8–7–09." (Dkt. No. 1 at 12.) Later in the complaint, he says that "the next day" after the event was "9–7–09" and refers to it as "Friday morning of the same day." (Dkt. No. 1 at 14.) September 7, 2009, was a Monday. August 7, 2009, was a Friday. These discrepancies need not be resolved because the precise dates are irrelevant to the issues in this case.

FN2. Defendant Lenney declares that Plaintiff complained to him of pain in his side but did not mention anything about blood in his urine. (Dkt. No. 55–9 ¶¶ 4–5.)

FN3. Defendant Lenney declares that he did, indeed, call Defendant Howley about Plaintiff. (Dkt. No. 55–9 ¶ 4.) Defendant Howley declares that she does not recall having a conversation with "the Correction Officer on duty" but that she remembers receiving a telephone call from Defendant Juckett asking her to check on Plaintiff. (Dkt. No. 56 ¶¶ 6–7.)

***2** After Plaintiff threw the water, an extraction team was mobilized to remove him from his cell. (Dkt. No. 1 at 13.) This team included Defendant Juckett, Defendant Busse, Defendant Correction Officer Adam Rivers, Defendant Lenney, Defendant Correction Officer Richard Dempster, and Defendant Correction Officer Richard Buell. *Id.*

According to Plaintiff, Defendant Juckett told Plaintiff that "he was going to OBS [FN4] one way or the other" even if Defendant Juckett "had to drag [P]laintiff out of the cell himself." *Id.* Plaintiff told Defendant Juckett that he was "not suicidal and should be sent to F–Block" as originally scheduled. *Id.* Defendant Juckett "was then just about to spray [P]laintiff in the face when [P]laintiff pleaded with him to take him out without gas[s]ing him ..." *Id.* In the complaint, Plaintiff alleges that the extraction team moved him to an observation room and then beat him with sticks, their fists, and their feet. *Id.* At his deposition, Plaintiff testified that the members of the extraction team beat him with their fists for about a minute. (Dkt. No. 55–16 at 84:17–24, 86:24–87:10.)

FN4. The Residential Crisis Treatment Program, often referred to as "OBS", is a special observation area for inmates who cannot be controlled by security officers or who become unmanageable, suicidal, or homicidal. (Dkt. No. 55–2 ¶¶ 4–5.)

Defendants assert that they did not use any force on Plaintiff. Defendant Dempster declares that the only physical contact that any member of the extraction team had with Plaintiff during the cell extraction was when Defendant Buell placed Plaintiff's wrists and legs in restraints. (Dkt. No. 55–5 ¶ 10; Dkt. No. 55–8 ¶ 18.) Defendant Dempster declares that Plaintiff "voluntarily complied with [a] strip frisk, which is standard procedure for inmates being processed into" the mental health unit. (Dkt. No. 55–5 ¶ 12; Dkt. No. 55–8 ¶¶ 20–21.) After that was done, the team "escorted [P]laintiff to an observation cell," which was "accomplished without incident." (Dkt. No. 55–5 ¶¶ 13–14.) Defendant Juckett declares that "[t]he only physical contact that I or any member of the extraction team had with Inmate DeBlasio that day was to place him in restraints, conduct a pat frisk, and be present when the inmate was subject to strip frisk." (Dkt. No. 55–8 ¶ 25.) Defendant Lenney declares that he "had no physical contact with inmate DeBlasio at all." (Dkt. No. 55–9 ¶ 20.) Defendant Rivers declares that he "had no physical contact with inmate DeBlasio during this engagement." (Dkt. No. 55–11 ¶ 13.)

After Plaintiff was secured in the observation cell, the extraction team members left the area, returned to their regular duties, and did not see Plaintiff again that day. (Dkt. No. 55–5 ¶¶ 15–16; Dkt. No. 55–3 ¶¶ 13–14; Dkt. No. 55–8 ¶ 22; Dkt. No. 55–9 ¶ 21; Dkt. No. 55–1 ¶ 12.) No paperwork was prepared documenting a use of force. (Dkt. No. 55–11 ¶ 14.) It is standard procedure to prepare a Use of Force Report when force is used on an inmate. *Id.*

Plaintiff alleges that after the extraction team left, he remained in the observation cell all night without any medical attention or treatment. (Dkt. No. 1 at 13.) At his deposition he testified that he suffered only from

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

"discomfort [and] bruises" as a result of the incident. (Dkt. No. 55–16 at 83:6–8.) About twenty-four hours after the incident, Plaintiff complained to an officer of chest pains. (Dkt. No. 56 at 2 ¶ 15, 5.) Plaintiff allowed Defendant Howley to examine him. *Id.* Plaintiff told Defendant Howley only that he had indigestion. *Id.* Defendant Howley found that Plaintiff had "no signs of distress." *Id.*

**C. Incident at Conference Room**

***3** The day after the incident with the extraction team, Defendant Correction Officer Scott Hamel escorted Plaintiff to a conference room to be interviewed by Defendant Dr. Battu [FN5] and Defendant Social Worker Sarah Wetherell.[FN6] (Dkt. No. 1 at 14.) Dr. Battu had been asked to see Plaintiff to "possibly prescribe medications to control his behavior or adjust medications that were already prescribed." (Dkt. No. 55–2 ¶ 9.) Dr. Battu often performs such interviews alone, but was accompanied by Defendant Wetherell "[b]ecause of the violent nature of this inmate." *Id.* ¶ 10. Defendant Wetherell had "worked with [P]laintiff for a number of years ... and [was] familiar with his history and patterns of behavior." (Dkt. No. 55–20 ¶ 3.) Defendant Wetherell declares that the RCTP Coordinator was also present. (Dkt. No. 55–20 ¶ 13.)

FN5. The parties spell this defendant's name in a variety of ways. In his declaration, he refers to himself as Kalyana Battu. (Dkt. No. 55–2 at 1.) Therefore, I have used that spelling.

FN6. The parties spell this defendant's name in a variety of ways. In her declaration, she refers to herself as Sarah Wetherell. (Dkt. No. 55–20 at 1.) Therefore, I have used that spelling.

Defendant Sergeant Crispin Murray declares that he supervised Defendant Hamel as he escorted Plaintiff to the appointment. (Dkt. No. 55–10 ¶ 5.) Once Plaintiff was in the conference room, Defendant Murray moved to a desk several feet away from the door to the room. (*Id.* ¶ 6; Dkt. No. 55–2 ¶ 11.)

Plaintiff alleges that he told Defendants Battu and Wetherell about the incident with the extraction team. (Dkt. No. 1 at 14.) He alleges that Defendant Battu said that it was none of his concern because he was just "there to handle medications and suicide prevention" and that because Plaintiff threw water at Defendant Howley he "may have deserved" what happened. *Id.* Plaintiff alleges that Defendant Wetherell "refused to comment or help [Plaintiff] in any way at all." *Id.* Plaintiff alleges that he called Defendant Wetherell "a snake sellout C.O. bitch" and she stormed out of the room and talked to Defendant Correction Officer Scott Hamel. *Id.* Dr. Battu declares that Plaintiff "became verbally abusive to Sarah Wetherell, nearly bringing her to tears, and when I tried to calm him down, [P]laintiff became abusive toward me." (Dkt. No. 55–2 ¶ 14.) Dr. Battu declares that Plaintiff's behavior "brought the interview to an end. The officer waiting outside moved in and escorted [P]laintiff out." (Dkt. No. 55–2 ¶ 15.) Defendant Wetherell declares that when "the session started to get hostile, the RCTP Coordinator stood up, and in doing so triggered a prearranged signal to security personnel to move in." (Dkt. No. 55–20 ¶ 19.)

Plaintiff alleges that Defendant Hamel entered the conference room and rushed Plaintiff into a cell. (Dkt. No. 1 at 14.) Defendant Hamel declares that he entered the conference room because "I believe I observed [Plaintiff] stand up during the interview in disobedience of my direct order to him not to do so. When the inmate stood up, I automatically moved in, took control of the restraints, and escorted him out of the room and back to his observation cell." (Dkt. No. 55–7 ¶ 9.) Defendant Murray declares that when a "problem occurred in the interview room," he supervised Defendant Hamel as Defendant Hamel escorted Plaintiff back to his cell and Defendant Stemp joined them "to provide additional security coverage." (Dkt. No. 55–10 ¶¶ 7–9.)

***4** The parties dispute what happened next. Defendant Hamel declares that before he placed Plaintiff in his cell, he asked him if he wanted to take a shower because inmates in the observation unit generally take showers on Mondays, Wednesdays, and Fridays. (Dkt. No. 55–7 ¶ 10.) Defendant Hamel declares that Plaintiff declined and then turned and head-butted him, hitting Defendant Hamel's forehead just over his left eye and splitting the skin open. *Id.* ¶ 11. Defendants Murray and Stemp also declare that Plaintiff head-butted Defendant Hamel. (Dkt. No. 55–10 ¶ 10; Dkt. No. 55–19 ¶ 6.) Defendant Hamel declares that he "instinctively" pushed Plaintiff "forward

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

and down to the floor with my left hand" and that Plaintiff banged his head on the way down. (Dkt. No. 55–7 ¶ 12.) Defendant Hamel declares that Plaintiff did not stay down and kept kicking and trying to bite Defendant Hamel. *Id.* ¶ 13. Defendant Murray declares that he ordered Defendant Stemp to "go in and pull the inmate out of the cell so they could get control of him." (Dkt. No. 55–10 ¶ 13.) Defendant Hamel declares that he and Defendant Stemp "used the wrist restraints to lift [Plaintiff] out of the cell and onto the floor in the hallway." (Dkt. No. 55–7 ¶ 16.) Defendant Hamel declares that once Plaintiff was on the floor in the hallway, he took control of Plaintiff's legs while Defendant Stemp took control of Plaintiff's upper body. *Id.* ¶ 17. Defendant Stemp declares that he took control of Plaintiff's upper body by putting one knee on his back and the other on his head until he calmed down. (Dkt. No. 55–19 ¶ 10.) Defendant Hamel declares that Plaintiff calmed down and they all remained that way until Defendant Hamel and Defendant Stemp were relieved by other staff. (Dkt. No. 55–7 ¶ 18.)

Defendant Stemp declares that he "used only such force as was necessary to subdue the inmate. Nobody kicked, punched or otherwise asserted unnecessary force against" Plaintiff. (Dkt. No. 55–19 ¶ 13.) Defendant Murray declares that he "personally did not have any physical contact with the inmate." (Dkt. No. 55–10 ¶ 16.) Defendant Murray declares that given Plaintiff's "unprovoked assault on the escorting officer, his attempts to further assault the officer during the course of the take-down, and his refusal to comply with staff direction, I do not believe that ... the actions of the men under my supervision violated any of [P]laintiff's federally protected rights." *Id.* ¶ 21.

Plaintiff's version of this incident is quite different. In his verified complaint, Plaintiff alleges that after Defendant Hamel escorted him to his cell, Defendants Stemp and Murray came into the cell. (Dkt. No. 1 at 14.) Plaintiff alleges that Defendant Murray removed Plaintiff's handcuffs, said "how tough are you now disrespecting Nurse Howley and Wetherell and Dr. Battu," and slapped Plaintiff on the left side of his face with an open hand. *Id.* All of the officers then beat Plaintiff, got him onto his stomach, handcuffed him, and kicked him several more times in the face, head, and body. *Id.* at 14–15. At his deposition, Plaintiff testified that he did not do anything to any of the officers until Defendant Murray removed his handcuffs and punched him in the face. Plaintiff testified that it was only then that "I put my hands up and I started fighting with him." (Dkt. No. 55–16 at 99:12–100:17.)

***5** When the relief officers arrived, Defendants Murray, Stemp, and Hamel escorted Plaintiff to the clinic to be examined for injuries. (Dkt. No. 55–10 ¶ 17.) Plaintiff and the officers were examined and photographed and Defendant Murray completed a Use of Force Report. (Dkt. No. 55–10 ¶ 18.) Medical records show that Plaintiff suffered bruises on his right shoulder, red cheeks, a quarter-sized bump on his scalp, two raised areas on the back of his scalp, and a bruised ear. (Dkt. No. 55–7 at 7.)

**D. Conditions of Confinement**

Plaintiff alleges that after this incident he was subjected to various harsh conditions of confinement. (Dkt. No. 1 at 15.)

1. *Handcuff Incident with Defendant Segovis*

Plaintiff alleges that on August 18, 2009, Defendant Correction Officer Roswell Segovis handcuffed Plaintiff to take him to the shower. (Dkt. No. 1 at 15.) Defendant Segovis noticed that Plaintiff was wearing socks and refused to let him shower. *Id.* He then left Plaintiff handcuffed in his cell for five hours. *Id* . Plaintiff pleaded with Defendant Segovis to remove the handcuffs so that he could use the bathroom. *Id.* Defendant Segovis refused and after several hours Plaintiff "had no choice but to wet his pants and then defecate on himself." *Id.* Defendant Segovis declares that he left Plaintiff handcuffed because Plaintiff "took the handcuffs hostage and refused to put his hands through the feed-up slot so that they could be removed." (Dkt. No. 55–18 ¶ 4.)

Later, Defendant Segovis issued a misbehavior report charging Plaintiff with committing an unhygienic act. (Dkt. No. 1 at 15.) The hearing officer sentenced Plaintiff to seven days of restricted diet. *Id.* Defendant First Deputy Superintendent Jeffrey Tedford "co-signed" the order for restricted diet. *Id.* The punishment "was brought to the attention" of Defendant Sergeant David Winchip, who "was going along with the entire [charade]." *Id.*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

2. *Hot Water*

Plaintiff alleges that he was not able to get hot water because he was not given a bucket. (Dkt. No. 1 at 17.) On August 19, 2009, Plaintiff asked Defendant Sergeant Peter DePalo for hot water. (Dkt. No. 1 at 17.) Defendant DePalo said "Muslims don't deserve hot water. You'll get that when you get to hell." *Id.* On August 24, 2009, Plaintiff told a watch commander, in the presence of Defendant Winchip, that he was not receiving hot water. *Id.* at 18. Defendant Winchip said he would see to it that Plaintiff got a bucket for hot water. *Id.* Later that day, Defendant Winchip came to Plaintiff's cell and said "You won't get that bucket[ ] today you dirty white Muslim wigger." *Id.*

3. *Drinking Water*

Plaintiff alleges that he once went without water for a week. (Dkt. No. 1 at 15.) He alleges that during the week that he went without water, Defendant Correction Officer William Powers was responsible for turning on Plaintiff's water and failed to do so. (Dkt. No. 1 at 6.) At his deposition, Plaintiff testified that Defendant Segovis was also responsible. (Dkt. No. 55–16 at 150: 2–5, 6–9.)

4. *Food*

***6** Plaintiff alleges that on August 18, 2009, Defendant Correction Officer Alan White and Defendant Segovis played with Plaintiff's breakfast tray and Plaintiff had to plead with them in order to get it. (Dkt. No. 1 at 16.) At lunch [FN7] Defendant White gave Plaintiff only a quarter cup of juice to drink and no lunch tray. *Id.* Later, Defendant DePalo came to Plaintiff's cell asking for the empty lunch tray. *Id.* Plaintiff told him that he was never given a lunch tray. *Id.* Defendant DePalo looked under Plaintiff's bed and did not see a tray. *Id.* That night at dinner an officer served Plaintiff a special diet loaf instead of regular food and told him that he would receive it for seven days as punishment for not giving back his lunch tray. *Id.* This punishment was ordered by Defendants White and Segovis and "co-signed" by Defendant DePalo. *Id.* at 17. Plaintiff asserts that Defendants White and Segovis "have a history" with him and "blatantly harass[ed]" Plaintiff "to disturb his Fast of Ramadan." *Id.* at 16–17.

FN7. It is unclear when Plaintiff went to lunch on August 18, 2009, because, as discussed above, he alleges that he was handcuffed in his cell from 8:00 a.m. to 1:00 p.m. (Dkt. No. 1 at 15.)

Plaintiff alleges that on one occasion, Defendant Segovis gave Plaintiff pork instead of the special diet loaf. *Id.* Defendant Segovis said "You know you want to eat some swine." *Id.* at 18.

5. *Recreation and Movement*

Plaintiff alleges that he was not allowed to move outside his cell at all when Defendant Segovis was assigned to his block. (Dkt. No. 1 at 17.)

6. *Showers*

Plaintiff alleges that on one occasion, Defendant Segovis would not allow Plaintiff to shower. *Id.* When Plaintiff reported this to Defendant DePalo, he said "That's life in F-block for Muslims." *Id.*

7. *Bibles*

Plaintiff alleges that on August 31, 2009, a chaplain came to Plaintiff's cell to deliver two Bibles. (Dkt. No. 1 at 16.) Defendants Powers and Segovis told the chaplain to leave the Bibles and that they would give them to Plaintiff when they were not busy. *Id.* Defendant Powers came to Plaintiff's cell and "said [he] was banging all day." *Id.* Plaintiff said it was not him who was banging. *Id.* Defendant Powers said he would investigate and that Plaintiff would not be getting his Bibles. *Id.* On or about September 8, 2009, Defendant Powers came to Plaintiff's cell, told him he had discovered that it was not Plaintiff who was banging, and apologized. *Id.* However, he did not give Plaintiff his Bibles. *Id.* The record shows that Plaintiff received the Bibles on September 12, 2009.[FN8] (Dkt. No. 55–6 at 28.)

FN8. Plaintiff signed the complaint in this action on September 10, 2009. (Dkt. No. 1.) Thus, he had not received the Bibles when he wrote the complaint. Because Plaintiff has not opposed the motion for summary judgment, it is unclear whether he wishes to continue asserting the claim regarding the Bibles.

**E. Restrictions on Religious Practice**

Plaintiff claims that Defendant Superintendent David Rock and Defendant CORC Director Karen Bellamy violated his religious rights in three ways. (Dkt. No. 1 at 18.) First, he alleges that he was not allowed to demonstratively pray in the BHU recreation pen. *Id* . Plaintiff alleges that Defendant Rock allows Christians to pray but "is obviously discriminating against the Muslims" by prohibiting demonstrative prayer. *Id.* at 18–19. Second, he alleges that BHU and SHU inmates are not allowed to have razors, which prevents Muslims from shaving their pubic and armpit hair as required by their faith. *Id.* at 19. Third, Plaintiff alleges that he is not given Halal food. *Id.*

**F. Procedural History**

***7** Plaintiff filed his complaint in this Court on September 23, 2009. (Dkt. No. 1.) Plaintiff's complaint sets forth three causes of action: (1) religious discrimination; (2) "assault and cruel and unusual punishment at the hands of DOCS workers"; and (3) a request that Plaintiff receive "proper medical attention at all times." (Dkt. No. 1 at 20.) Plaintiff requests injunctive relief (being allowed to pray in the recreation pen, being allowed to shave his pubic hair, and given Halal food) and damages. *Id.* at 21.

Defendants now move for summary judgment. (Dkt. No. 55.) Plaintiff has not opposed the motion.

## II. APPLICABLE LEGAL STANDARDS

### A. Legal Standard Governing Unopposed Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted if "the movant shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, a dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining whether a genuine issue of material [FN9] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino,* 542 F.3d 290, 309 (2d Cir.2008).

FN9. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson,* 477 U.S. at 248.

When a plaintiff fails to respond to a defendant's motion for summary judgment, "[t]he fact that there has been no [such] response ... does not ... mean that the motion is to be granted automatically." *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). Rather, the Court must (1) determine whether any facts are disputed in the record presented on the defendants' motion, and (2) determine whether, based on the *undisputed* material facts, the law indeed warrants judgment for the defendants. *See Champion,* 76 F.3d at 486; *Allen v. Comprehensive Analytical Grp., Inc.,* 140 F.Supp.2d 229, 232 (N.D.N.Y.2001); N.D.N.Y. L.R. 7.1(b)(3).

### B. Legal Standard Governing Motions to Dismiss for Failure to State a Claim

To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the allegations of the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnise Gen. Transatlantique,* 405 F.2d 270, 273 (2d Cir.1968) (citations omitted); *accord, Katz v. Molic,* 128 F.R.D. 35, 37–38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties."). Accordingly, it is appropriate to summarize the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

***8** A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia,* "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal,* ––– U.S. ––––, ––––, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)) (emphasis added). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense ... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 1950 (internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949.

## III. ANALYSIS

### A. Failure to Exhaust Administrative Remedies Regarding Claims Against Defendants Nesmith and Holden

Plaintiff alleges that Defendant Nesmith would not allow Plaintiff to see a doctor for back pain and that Defendant Holden ripped pages from Plaintiff's Korans. (Dkt. No. 1 at 11–12.) Defendants argue that these claims should be dismissed because Plaintiff failed to exhaust his administrative remedies. (Dkt. No. 55–23 at 13–14.) Defendants are correct.

Under the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). In order to properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular institution to which they are confined. *Jones v. Bock,* 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007). In New York state prisons, the Department of Corrections and Community Supervision ("DOCCS") has a well-established three-step inmate grievance program. N.Y. Comp.Codes R. & Regs. tit. 7, § 701.7 (2010).

***9** Generally, the DOCCS Inmate Grievance Program ("IGP") involves the following procedure for the filing of grievances. First, an inmate must file a complaint with the facility's IGP clerk within twenty-one calendar days of the alleged occurrence. N.Y. Comp.Codes R. & Regs. tit. 7, § 701.5(a) (2010). A representative of the facility's inmate grievance resolution committee ("IGRC") has sixteen calendar days from receipt of the grievance to informally resolve the issue. *Id.* at (b)(1). If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance, and issues a written decision within two working days of the conclusion of the hearing. *Id.* at (b)(2).

Second, a grievant may appeal the IGRC decision to the facility's superintendent within seven calendar days of receipt of the IGRC's written decision. If the grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the superintendent must issue

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 8

Not Reported in F.Supp.2d, 2011 WL 4478515 (N.D.N.Y.)

(Cite as: 2011 WL 4478515 (N.D.N.Y.))

a written decision within twenty calendar days of receipt of the grievant's appeal. Grievances regarding DOCCS-wide policy issues are forwarded directly to the central office review committee ("CORC") for a decision under the process applicable to the third step. *Id.* at (c).

Third, a grievant may appeal to CORC within seven working days of receipt of the superintendent's written decision. CORC is to render a written decision within thirty calendar days of receipt of the appeal. *Id.* at (d).

If a prisoner has failed to properly follow each of the applicable steps prior to commencing litigation, he has failed to exhaust his administrative remedies. *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006).

Here, Jeffrey Hale, the Assistant Director of the Inmate Grievance Program for DOCCS, declares that there "are no CORC appeal records that correspond to the December 28, 2006, events as alleged in [P]laintiff's complaint regarding back pain or the loss of personal or religious property at the Great Meadow Correctional Facility." (Dkt. No. 55–6 ¶ 7.) CORC records show that Plaintiff did not file any CORC appeals between October 2006 and October 2008. (Dkt. No. 55–6 at 5.) Indeed, Plaintiff admitted at his deposition that he did not properly exhaust his administrative remedies regarding Defendant Holden's alleged desecration of the Korans.[FN10] (Dkt. No. 55–16 at 57:17–58:5.) Therefore, Plaintiff failed to exhaust his administrative remedies regarding his claims against Defendants Nesmith and Holden.

FN10. Plaintiff was not able to recall any of the details about the incident with Defendant Nesmith. (Dkt. No. 55–16 at 37–41.)

Plaintiff's failure to exhaust, however, does not end the inquiry. The Second Circuit has held that a three-part inquiry is appropriate where a prisoner has failed to exhaust his available administrative remedies. *Hemphill v. New York,* 380 F.3d 680, 686, 691 (2d Cir.2004).[FN11] First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* (citations omitted). Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* (citations and internal quotations omitted).

FN11. The Second Circuit has not yet decided whether the *Hemphill* rule has survived the Supreme Court's decision in *Woodford,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368. *Chavis v. Goord,* No. 07–4787–pr, 2009 U.S.App. LEXIS 13681, at *4, 2009 WL 1803454, at *1 (2d Cir. June 25, 2009).

***10** Here, as discussed above, an administrative remedy was available to Plaintiff. Defendants preserved the exhaustion defense by asserting it in their answer to the complaint. (Dkt. No. 39 ¶ 18.) The record before the Court on this unopposed motion for summary judgment indicates neither that Defendants should be estopped from asserting the defense nor any special circumstances justifying Plaintiff's failure to exhaust his administrative remedies. Therefore, the Court grants Defendants' motion for summary judgment dismissing the claims against Defendants Nesmith and Holden.

**B. Claims Regarding Failure to Provide Medical Care**

Plaintiff alleges that Defendants Buell, Busse, Dempster, Howley, Juckett, Lenney, and Rivers [FN12] failed to provide him with adequate medical care. (Dkt. No. 1at 11–14.) Defendants argue that there are "neither objective nor subjective facts to support Plaintiff's conclusory medical indifference claim." (Dkt. No. 55–23 at 14–17.) Defendants are correct.

FN12. Defendants characterize the complaint as asserting Eighth Amendment medical care claims

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

against only Defendants Nesmith, Howley, and Battu. (Dkt. No. 55–23 at 14.)

1. *Defendants Lenney, Busse, and Howley*

Plaintiff alleges that Defendants Lenney, Busse, and Howley failed to adequately respond to his complaints of ribcage pain and blood in his urine. (Dkt. No. 1 at 12–13.)

There are two elements to a prisoner's claim that prison officials violated his Eighth Amendment right to receive medical care: "the plaintiff must show that she or he had a serious medical condition and that it was met with deliberate indifference." *Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir.2009) (citation and punctuation omitted). "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003).

The undisputed facts show that Plaintiff did not suffer from a serious medical condition. A "serious medical condition" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) (citations omitted), *accord, Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1996), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Relevant factors to consider when determining whether an alleged medical condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance,* 143 F.3d at 702–03. Here, Plaintiff alleges that he complained to Defendants Lenney, Busse, and Howley of "sharp pains in his left ribcage area and the pissing of blood." (Dkt. No. 1 at 12.) Defendant Lenney declares that Plaintiff complained to him of pain in his side but did not mention anything about blood in his urine. (Dkt. No. 55–9 ¶¶ 4–5.) When Plaintiff allowed Defendant Howley to examine him the next day, he stated only that he had indigestion. (Dkt. No. 56 at 5.) There is no evidence that Plaintiff's ribcage pain and the blood he reported in his urine significantly affected his daily activities or caused him chronic and substantial pain. The record before the Court, therefore, does not reflect that Plaintiff suffered from "a condition of urgency, one that may produce death, degeneration, or extreme pain."

***11** Even if Plaintiff had raised a triable issue as to the objective prong of his Eighth Amendment medical care claim against Defendants Lenney, Busse, and Howley, the Court would grant summary judgment on this claim because Plaintiff has not raised a triable issue of fact that any of these Defendants were deliberately indifferent to his medical needs. Medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act ... that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance,* 143 F.3d, 698, 703 (quoting *Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

Defendants Lenney and Busse are correction officers, not medical staff members. (Dkt. No. 1 at 8; Dkt. No. 55–9 ¶ 1.) "Non-medical personnel engage in deliberate indifference where they intentionally delayed access to medical care when the inmate was in extreme pain and has made his medical problem known to attendant prison personnel." *Baumann v. Walsh,* 36 F.Supp.2d 508, 512 (N.D.N.Y.1999). Here, as discussed above, there is no evidence that Plaintiff was in "extreme pain." Moreover, the undisputed facts show that neither Defendant Lenney nor Defendant Busse intentionally delayed Plaintiff's access to medical care. Defendant Lenney declares that he called Defendant Howley regarding Plaintiff's complaints of pain. (Dkt. No. 55–9 ¶ 4.) By Plaintiff's own admission, Defendant Howley came to his cell two hours after he first complained of pain. (Dkt. No. 1 at 13.) A two-hour wait for medical care is not the type of delay that indicates deliberate indifference. *See Baumann,* 36 F.Supp.2d at 512 (denying defendants' motion to dismiss where plaintiff alleged that correction officer delayed care for his injured arm for three weeks). Therefore, the Court grants Defendants' motion for summary judgment and dismisses the Eighth Amendment medical care claims against Defendants Lenney and Busse.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Regarding Defendant Howley, to establish deliberate indifference on the part of medical staff, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer,* 511 U.S. at 837; *Chance,* 143 F.3d at 702–703. The inmate then must establish that the provider consciously and intentionally disregarded or ignored that serious medical need. *Farmer,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811; *Ross v. Giambruno,* 112 F.3d 505 (2d Cir.1997). The undisputed facts show that Defendant Howley came to Plaintiff's cell to tend to his pain but that Plaintiff threw toilet water on her before she could examine him. (Dkt. No. 1 at 13; Dkt. No. 56 ¶ 11.) Thus, the undisputed facts show that the failure to provide immediate care to Plaintiff was the result of his own conduct rather than any conscious and intentional disregard on the part of Defendant Howley. Therefore, the Court grants Defendants' motion for summary judgment and dismisses the Eighth Amendment medical care claim against Defendant Howley.

2. *Defendants Buell, Busse, Dempster, Juckett, Lenney, and Rivers*

***12** Plaintiff alleges that the members of the extraction team (Defendants Buell, Busse, Dempster, Juckett, Lenney, and Rivers) violated his Eighth Amendment rights by leaving him in a cell all night without any medical attention or treatment. (Dkt. No. 1 at 13).

The undisputed facts show that Plaintiff did not suffer from any serious medical condition as a result of the incident with the extraction team. Plaintiff testified that he suffered from "discomfort [and] bruises" from the incident. (Dkt. No. 55–16 at 83:6–8.) Superficial injuries such as bruises are not "serious medical conditions." *Tafari v. McCarthy,* 714 F.Supp.2d 317, 354 (N.D.N.Y.2010). Therefore, the Court grants Defendants' motion for summary judgment and dismisses the Eighth Amendment medical care claims against Defendants Buell, Busse, Dempster, Juckett, Lenney, and Rivers.

**C. Excessive Force Claim Against the Extraction Team**

Plaintiff claims that the members of the extraction team (Defendants Buell, Busse, Dempster, Juckett, Lenney, and Rivers) used excessive force. (Dkt. No. 1 at 13.) Defendants do not explicitly address Plaintiff's Eighth Amendment excessive force claim regarding the extraction team, although their memorandum of law requests "that [P]laintiff's complaint be dismissed, *in its entirety,* and without leave to replead" and states, in the section regarding medical care, that "the extraction team did not use any force against [P]laintiff." (Dkt. No. 55–23 at 16 and 30, emphasis added.) The Court finds that Plaintiff has, just barely, raised a triable issue of material fact on this issue.

When prison officials are "accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is ... whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian,* 503 U.S. 1, 6–7, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). The extent of any injury suffered by the inmate "is one factor that may suggest whether the use of force could plausibly have been thought necessary in a particular situation or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Id.* at 7 (citation and quotation marks omitted).

> In determining whether the use of force was wanton and unnecessary, it may also be proper to evaluate the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by responsible officials, and any efforts made to temper the severity of a forceful response. The absence of serious injury is therefore relevant to the Eighth Amendment inquiry, but does not end it.

*Id.* (citation and quotation marks omitted). In other words, not "every malevolent touch by a prison guard gives rise to a federal cause of action. The Eighth Amendment's prohibition of cruel and usual punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Id.* at 9.

***13** Here, Plaintiff's verified complaint alleges that

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

the members of the extraction team beat Plaintiff with sticks, their fists, and their feet. (Dkt. No. 1 at 13.) At his deposition, Plaintiff testified that the members of the extraction team beat him with their fists for about a minute. (Dkt. No. 55–16 at 84:17–24, 86:24–87:10.) If Plaintiff's version of events is credited, Defendants' use of force was more than *de minimis* despite the fact that Plaintiff suffered only bruises and discomfort as a result. *Cf. Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 471 (S.D.N.Y.1998) (kicking an inmate's ankles and feet during a pat frisk is *de minimis* and insufficient to rise to the level of a constitutional violation); *Show v. Patterson,* 955 F.Supp. 182, 192–93 (S.D.N.Y.1997) (pushing inmate against wall with hands and no use of weapons *de minimis* use of force); *Anderson v. Sullivan,* 702 F.Supp. 424, 425–27 (S.D.N.Y.1988) (pushing inmate's face into a bar while applying handcuffs not significantly disproportional to the goal of handcuffing plaintiff).

Defendants flatly contradict Plaintiff's version of events. The members of the extraction team declare that the only physical contact any of them had with Plaintiff was to place him in restraints, pat frisk him, and strip frisk him. (Dkt. No. 55–8 ¶ 25; Dkt. No. 55–9 ¶ 20; Dkt. No. 55–11 ¶ 13.)

Given these conflicting versions of events, the Court is called upon to weigh the parties' credibility. In general, of course, "[c]redibility determinations ... are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). *See also Rule v. Brine, Inc.,* 85 F.3d 1002, 1011 (2d Cir.1996) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."). There is, however, a "narrow exception" to the general rule that credibility determinations are not to be made on summary judgment. *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005); *Blake v. Race,* 487 F.Supp.2d 187, 202 (E.D.N.Y.2007). Under this exception, in the "rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete" and the plaintiff's evidence is contradicted by evidence produced by the defendants, the court may appropriately conclude at the summary judgment stage that no reasonable jury would credit the plaintiff's testimony. *Jeffreys,* 426 F.3d at 554.

Here, although Plaintiff is relying exclusively on his own testimony and his evidence is contradicted by evidence produced by Defendants, the *Jeffreys* exception does not apply because Plaintiff's testimony is not "contradictory and incomplete." The complaint and deposition testimony are moderately contradictory. In the complaint, Plaintiff alleges that the extraction team members beat him with sticks, their fists, and their feet. (Dkt. No. 1 at 13.) However, at his deposition, Plaintiff testified that the team members hit him only with their fists. (Dkt. No. 56–16 at 84:17–19.) However, this is far less contradictory than the plaintiff's statements in *Jeffreys.* There, the plaintiff, who alleged that a group of police officers beat him and threw him out a third-floor window, confessed on at least three occasions that he had jumped rather than having been thrown. *Jeffreys,* 426 F.3d at 552. The plaintiff did not publicly state that he had been thrown out of a window by police officers until *nine months* after the incident. *Id.* The plaintiff could not identify any of the individuals whom he alleged participated in the attack or describe their ethnicities, physical features, facial hair, weight, or clothing on the night in question. *Id.* Plaintiff's deposition and complaint are also far less contradictory than cases in which courts have applied *Jeffreys* to make credibility determinations at the summary judgment stage. *See Butler v. Gonzalez,* No. 09 Civ.1916, 2010 U.S. Dist. LEXIS 108244, at *24–26, 2010 WL 3398156, at *8 (S.D.N.Y. May 18, 2010) (collecting cases).[FN13] Therefore, although this is a very close question, the Court finds that Plaintiff has raised a triable issue of fact that Defendants Buell, Busse, Dempster, Juckett, Lenney, and Rivers used excessive force against him. Accordingly, the Court denies Defendants' motion for summary judgment dismissing this claim.

FN13. The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009). [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

**D. Claims Against Defendants Battu and Wetherell**

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

***14** Plaintiff alleges that he reported the incident with the extraction team to Defendants Battu and Wetherell, that they refused to get involved, and that Defendant Battu told him that he may have deserved the way he was treated. (Dkt. No. 1 at 14.) Defendants move to dismiss these claims, arguing that Plaintiff has failed to allege that Defendants Battu and Wetherell were personally involved in any constitutional violation. (Dkt. No. 55–23 at 11–12.) Plaintiff's allegations against Defendant Battu and Wetherell are properly analyzed as a failure-to-intervene claim. On that claim, summary judgment in favor of Defendants is appropriate.

Law enforcement officials can be held liable under § 1983 for not intervening in a situation where another officer is violating an inmate's constitutional rights. *Jean–Laurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008) (citation omitted). A state actor may be held liable for failing to prevent another state actor from committing a constitutional violation if "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Id.* (citation omitted). Whether an officer can be held liable on a failure to intervene theory is generally a question of fact for the jury to decide. *See Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994) ("Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise.").

Here, a reasonable jury could not conclude that Defendants Battu and Wetherell failed to intervene with an ongoing constitutional violation. The undisputed facts show that Plaintiff did not tell Defendants Battu and Wetherell about the incident with the extraction team until several hours after it was over. (Dkt. No. 1 at 13–14.) Even if one fully credits Plaintiff's version of events, Defendants Battu and Wetherell did not have any realistic opportunity to intervene and prevent the harm. Therefore, Defendants' motion for summary judgment dismissing the claims against Defendants Battu and Wetherell is granted.

**E. Excessive Force Claim Against Defendants Hamel, Murray, and Stemp**

Plaintiff contends that Defendants Hamel, Murray, and Stemp subjected him to excessive force as directed by Defendants Battu and Wetherell. (Dkt. No. 1 at 14–15; Dkt. No. 55–16 at 93:14–95:3.) Defendants' memorandum of law does not address this excessive force claim.

As discussed above in Section I(C), the parties dispute what happened when Plaintiff was removed from the conference room. Plaintiff alleges that Defendants Hamel, Murray, and Stemp beat him and then kicked him while he was handcuffed. (Dkt. No. 1 at 14–15.) Defendants contend that Plaintiff head-butted Defendant Hamel without provocation and that they used only enough force to bring him under control. (Dkt. No. 55–7 ¶ 11; Dkt. No. 55–10 ¶ 10; Dkt. No. 55–19 ¶ 6.) Medical records show that Plaintiff suffered bruises on his right shoulder, red cheeks, a quarter-sized bump on his scalp, two raised areas on the back of his scalp, and a bruised ear. (Dkt. No. 55–7 at 7.)

***15** Given the parties' conflicting versions of events and Defendants' failure to address the claim, the Court finds that the excessive force claim against Hamel, Murray, and Stemp survives summary judgment.

However, there is no competent evidence that Defendants Battu and Wetherell were involved in the incident. Although Plaintiff claims that they ordered the use of force, he does not have any personal knowledge to support that opinion. To be sufficient to create a factual issue for purposes of a summary judgment motion, an affidavit (or verified complaint) must, among other things, be based "on personal knowledge." Fed.R.Civ.P. 56(e) ("A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated."). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Oil,* 196 F.3d 435, 452 (2d Cir.1999) (citations omitted). Therefore, the claim that Defendants Battu and Wetherell ordered Defendants Hamel, Murray, and Stemp to beat Plaintiff is dismissed.

**F. Conditions of Confinement Claims**

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 13

Not Reported in F.Supp.2d, 2011 WL 4478515 (N.D.N.Y.)

(Cite as: 2011 WL 4478515 (N.D.N.Y.))

Plaintiff alleges that Defendants DePalo, Powers, Segovis, Tedford [FN14], White, and Winchip subjected him to cruel and unusual punishment by subjecting him to harsh conditions of confinement.[FN15] (Dkt. No. 1 at 15–18.) Defendants argue that Plaintiff has "failed to allege a plausible Eighth Amendment claim" regarding the conditions of his confinement. (Dkt. No. 55–23 at 17–20.)

FN14. Defendants do not address the claim against Defendant Tedford.

FN15. Plaintiff does not assert that Defendants subjected him to these conditions of confinement in retaliation for any protected conduct. (Dkt. No. 1 at 20.) Therefore, I will address the conditions of confinement claims solely under Eighth Amendment standards.

1. *Handcuff Incident with Defendant Segovis*

Plaintiff alleges that Defendant Segovis violated his Eighth Amendment rights by leaving Plaintiff handcuffed in his cell for five hours while Plaintiff pleaded to be un-handcuffed so he could use the bathroom. (Dkt. No. 1 at 15.) Defendants argue that this claim should be dismissed because there is "neither an objective nor a subjective basis for assigning Eighth Amendment liability. Leaving [P]laintiff in the cell handcuffed behind his back for several hours was a much safer alternative than having to perform a cell extraction to retrieve [the handcuffs]." (Dkt. No. 55–23 at 19.) Defendants are not entitled to summary judgment on this claim because Plaintiff's verified complaint raises a triable issue of fact that Defendant Segovis subjected him to unconstitutional conditions of confinement.

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual" punishments. The word "punishment" refers not only to deprivations imposed as a sanction for criminal wrongdoing, but also to deprivations suffered during imprisonment. *Estelle v. Gamble,* 429 U.S. 97, 102–03, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Punishment is "cruel and unusual" if it involves the unnecessary and wanton infliction of pain or if it is incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle,* 429 U.S. at 102. Thus, the Eighth Amendment imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). In fulfilling this duty, prison officials must "ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.' " *Farmer,* 511 U.S. at 832 (quoting *Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)).

***16** To satisfy the objective component of an Eighth Amendment conditions of confinement claim, "the deprivation alleged must be, objectively, 'sufficiently serious.' " *Farmer,* 511 U.S. at 834 (quoting *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). To prove the objective component of an Eighth Amendment conditions of confinement claim, a prisoner must show that the defendant's "act or omission ... result[ed] in the denial of the minimal civilized measure of life's necessities." *Farmer,* 511 U.S. at 834. Therefore, "extreme deprivations are required to make out a conditions-of-confinement claim." *Hudson v. McMillian,* 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992).

To satisfy the subjective component of an Eighth Amendment conditions of confinement claim, a prisoner must show that the defendant acted with "deliberate indifference." *Wilson v. Seiter,* 501 U.S. 294, 302–03, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). A prison official demonstrates deliberate indifference to inhumane conditions of confinement where he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837.

Defendants' extremely spare argument regarding Plaintiff's claim against Defendant Segovis states, in full:

> Plaintiff alleges that on August 18, 2009, he presented himself for shower in socks and was left locked in the cell with handcuffs on for several hours by Defendant Segovis. The only reason security staff would leave an inmate handcuff[ed] in their cell is if they "kidnapped"

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

> the cuffs, and [P]laintiff refused to put his hand and wrists through the modified feed-up slot to allow the officer Segovis to remove the cuffs. Once again, [P]laintiff's refusal to comply with staff direction and facility procedures resulted in a reasonable and foreseeable deprivation. These facts, moreover, provide neither an objective nor a subjective basis for assigning Eighth Amendment liability. Leaving [P]laintiff in the cell handcuffed behind his back for several hours was a much safer alternative than having to perform[ ] a cell extraction to retrieve them, for both [P]laintiff and staff. Plaintiff was not subjected to a serious risk of harm, and the circumstance was not the result of deliberate indifference to inmate health or safety such as to give rise to an Eighth Amendment cause of action. *Gaston v. Coughlin,* 249 F.2d at 16.

(Dkt. No. 55–23 at 19, citations to record omitted.) Defendants do not address Plaintiff's allegation that he pleaded with Defendant Segovis to release him from his handcuffs so that he could use the bathroom or his allegation that he ultimately urinated and defecated on himself.

Defendants cite only *Gaston v. Coughlin,* 249 F.3d 156 (2d Cir.2001) [FN16] to support their argument. In that case, the Second Circuit held that a triable issue of fact existed on a conditions of confinement claim where the prisoner alleged that, *inter alia,* the area directly in front of his cell was filled with human feces, urine, and sewage water for several days. Although it is not entirely clear, Defendants may be arguing that Plaintiff's claim should be dismissed because his allegations are not as dire as those asserted by the plaintiff in *Gaston.* However, a reasonable juror, if he or she credited Plaintiff's version of events, could find that being handcuffed for five hours while pleading to be released in order to use the bathroom is an extreme deprivation. Similarly, a reasonable juror who credited Plaintiff's version of events could find that Defendant Segovis was deliberately indifferent. Therefore, Defendants' motion for summary judgment dismissing the claim against Defendant Segovis regarding the handcuffing incident is denied.

FN16. As noted in the block citation, Defendants cite this case as "249 F.2d at 16." (Dkt. No. 55–23 at 19.)

2. *Hot Water*

***17** Plaintiff alleges that he was denied hot water on several occasions. (Dkt. No. 1 at 17.) Defendants move for summary judgment, arguing that the claim should be dismissed. (Dkt. No. 55–23 at 20.) Defendants are correct. The denial of hot water in an inmate's cell fails to state an Eighth Amendment claim because it does "not constitute [a] serious deprivation[ ] of basic human needs." *Graham v. Perez,* 121 F.Supp.2d 317, 323 (S.D.N.Y.2000). Therefore, Defendants' motion for summary judgment dismissing Plaintiff's claim that Defendants violated his Eighth Amendment rights by failing to provide him with a bucket for hot water is granted.

3. *Drinking Water*

Plaintiff's complaint alleges that he was denied drinking water in his cell for a week. (Dkt. No. 1 at 15.) In his complaint and at his deposition, Plaintiff alleged that Defendant Powers was responsible for this deprivation because he failed to turn Plaintiff's water on. (Dkt. No. 1 at 16; Dkt. No. 55–16 at 152:18–19.) At his deposition, Plaintiff testified that Defendant Segovis was also responsible. (Dkt. No. 55–16 at 150:3–5, 9–12.) Defendants' memorandum of law does not discuss this claim.

Where a prisoner alleges that he or she was denied drinking water in his or her cell, the resolution of the claim hinges on whether the prisoner received fluids at other times or suffered any adverse effects. *Compare Johnson v. Comm'r of Corr. Servs.,* 669 F.Supp. 1071, 1074 (S.D.N.Y.1988) (prisoner confined for one week in a cell with an inoperable sink did not suffer a constitutional violation because he was provided drinks with meals) *with Atkins v. County of Orange,* 372 F.Supp.2d 377, 406 (S.D.N.Y.2005) (inmate raised triable issue of fact that the defendants subjected her to unconstitutional conditions of confinement by depriving her of water in her cell for almost one month despite fact that they provided her with fluids at meals where medical records showed inmate suffered adverse effects from water deprivation). Here, Plaintiff received juice at meals. (Dkt. No. 55–16 at 152:9–13.) There is no evidence that Plaintiff suffered any adverse effects from water deprivation. Therefore, the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Court *sua sponte* dismisses Plaintiff's claims regarding the deprivation of drinking water.

4. *Food*

Plaintiff alleges that Defendants interfered with his food on several occasions. Specifically, he alleges that (1) Defendants White and Segovis forced Plaintiff to plead with them before they gave him his breakfast tray on August 18, 2009 (Dkt. No. 1 at 16); (2) Defendant White gave Plaintiff only juice for lunch one day (Dkt. No. 1 at 16); Defendants White, Segovis, DePalo, and Tedford punished him by restricting him to a special loaf diet (Dkt. No. 1 at 15, 16–17); and (4) Defendant Segovis gave him pork instead of his special diet on one occasion (Dkt. No. 1 at 18). Defendants move for summary judgment dismissing these claims, arguing that "such deprivations are *de minimis* and do not rise to a level of constitutional significance ..." (Dkt. No. 55–23 at 18.) Defendants are correct.

***18** Plaintiff's allegations that he was denied food at lunch one day, given a diet he did not like as punishment, and given food that his religion does not allow him to eat on one occasion are insufficient to raise a triable issue of fact that Defendants violated his Eighth Amendment rights. *See* *Gill v. Hoadley,* 261 F.Supp.2d 113, 129 (N.D.N.Y.2003) (finding that complaint failed to state Eighth Amendment claim where prisoner alleged he was denied one meal); *Shakur v. Selsky,* 391 F.3d 106 (2d Cir.2004) (prisoner stated *First Amendment* claim where he alleged that he was denied one religiously significant feast). Therefore, the Court dismisses Plaintiff's Eighth Amendment claims regarding the denial of food.

To the extent that Plaintiff claims that the imposition of the loaf diet violated his right to due process, the claim is *sua sponte* dismissed. In order to state a claim for violation of his procedural due process rights, a plaintiff must allege facts plausibly suggesting that he was deprived of a liberty interest without due process of law. *Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir.2000). An inmate has a liberty interest where (1) the state has granted its inmates, by regulation or statute, an interest in remaining free from that particular confinement or restraint; and (2) the confinement or restraint imposes "an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); *Tellier,* 280 F.3d at 80; *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996). The Second Circuit has held that the imposition of a loaf diet does not impose an atypical and significant hardship on inmates, even where the inmate alleges that the diet caused severe stomach pain and weight loss. *McEachin v. McGuinnis,* 357 F.3d 197 (2d Cir.2004). Therefore, any due process claim regarding the loaf diet is dismissed.

5. *Recreation and Movement*

Plaintiff alleges that he was not allowed "any recreation or any movement outside his cell" when Defendant Segovis was assigned to his block. (Dkt. No. 1 at 17.) Defendants do not address this claim in their memorandum of law. [FN17]

> FN17. Although Defendants do not discuss the issue in their memorandum of law, Defendant Segovis declares that inmates in the Special Housing Unit have one recreation period per day, for which they are required to sign up in advance. (Dkt. No. 55–18 ¶ 16.) Defendant Segovis escorts any inmates who sign up to recreation. *Id.* ¶ 17. Defendant Segovis declares that Plaintiff "rarely signed up for recreation" during his shift. *Id.* ¶ 18.

Prisoners have the right under the Eighth Amendment to be allowed "some opportunity for exercise." *Williams v. Greifinger,* 97 F.3d 699, 704 (2d Cir.1996). Plaintiff's complaint, however, does not plausibly allege facts suggesting that this right was violated. Interference with prisoners' recreation must be quite severe in order to state an Eighth Amendment claim. *See* *Branham v. Meachum,* 77 F.3d 626, 630–31 (2d Cir.1996) (officers who denied inmate outdoor exercise for twenty-two days did not violate Eighth Amendment). Therefore, the Court *sua sponte* dismisses Plaintiff's claims regarding the denial of recreation and movement.

6. *Showers*

Plaintiff alleges that Defendant Segovis would not allow him to shower on August 19, 2009. (Dkt. No. 1 at

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

17.) Plaintiff alleges that when he told Defendant DePalo that he had not been allowed to shower, Defendant DePalo said "That's life in F-block for Muslims." *Id.* Defendants do not address this claim in their memorandum of law.[FN18]

> FN18. Although Defendants' memorandum of law does not address this claim, Defendant DePalo declares that at "no time did I derogate [P]laintiff's religion or act in an unprofessional manner toward him ." (Dkt. No. 55–4 ¶ 23.)

***19** The denial of one shower does not violate the Eighth Amendment. *McCoy v. Goord,* 255 F.Supp.2d 233, 260 (S.D.N.Y.2003) ("a two-week suspension of shower privileges does not suffice as a denial of 'basic hygienic needs' "). Therefore, the Court dismisses Plaintiff's claim *sua sponte.*

7. *Bibles*

Plaintiff alleges that Defendants Segovis and Powers refused to give Plaintiff two Bibles that a chaplain delivered for him. (Dkt. No. 1 at 16.) Defendants' memorandum of law does not address this claim.

The allegation about the Bibles fails to state an Eighth Amendment claim because Plaintiff does not plausibly allege that he was denied "the minimal civilized measure of life's necessities" as a result of the deprivation. The Court can find no authority suggesting that even a permanent deprivation of the Bibles would rise to that level. Here, Plaintiff received the Bibles twelve days after the chaplain originally delivered them. (Dkt. No. 55–6 at 28.) Therefore, Plaintiff's Eighth Amendment claim regarding the Bibles is *sua sponte* dismissed.

The allegation about the Bibles also fails to state a procedural due process claim. "[A]n unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available." *Hudson v. Palmer,* 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) (emphasis omitted). This Circuit has held that "confiscation ... [does] not constitute a Fourteenth Amendment violation for loss of property because of the availability of state court post-deprivation remedies" in the New York Court of Claims. *Koehl v. Dalsheim,* 85 F.3d 86, 88 (2d Cir.1996); *Jackson v. Burke,* 256 F.3d 93, 96 (2d Cir.2001); *see also Parratt v. Taylor,* 451 U.S. 527, 544, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) ("Although the state remedies may not provide the respondent with all the relief which may have been available if he could have proceeded under § 1983, that does not mean that the state remedies are not adequate to satisfy the requirements of due process."), *overruled in part on other grounds by Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). Therefore, Plaintiff's claim regarding the deprivation of the two Bibles is dismissed.

8. *Verbal Abuse*

Defendants argue that, to the extent that Plaintiff alleges that his constitutional rights were violated by comments by Defendants DePalo and Winchip regarding Muslims, such claims should be dismissed. (Dkt. No. 55–23 at 20.) Defendants are correct. Verbal harassment, in and of itself, does not rise to the level of a constitutional violation. *Tafari v. McCarthy,* 714 F.Supp.2d 317, 364 (N.D.N.Y.2010); *Ramirez v. Holmes,* 921 F.Supp. 204, 210 (S.D.N.Y.1996) ("Allegations of threats or verbal harassment, without any injury or damage, do not state a claim under 42 U.S.C. § 1983."). Therefore, Defendants' motion for summary judgment dismissing these claims is granted.

**G. Religion Claims**

***20** Plaintiff alleges that Defendants Rock and Bellamy [FN19] violated his right to exercise his religion. (Dkt. No. 1 at 18–19.) Defendants move for summary judgment of these claims. (Dkt. No. 55–23 at 20–28.)

> FN19. Plaintiff alleges that Defendants Rock and Bellamy are responsible for violating his religious rights. (Dkt. No. 1 at 18.) Defendant Rock, who was the Superintendent of Great Meadow when Plaintiff was incarcerated there, was "responsible for the overall administrative functioning of the facility." (Dkt. No. 55–12 ¶ 3 .) He was therefore personally involved in the implementation of the Directive at Great Meadow. The evidence does not show, however, any personal involvement by Defendant Bellamy with implementation of the Directive at Great

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Meadow. Defendant Bellamy is the Director of the Inmate Grievance Program. (Dkt. No. 55–6 ¶ 12.) Therefore, Defendants' motion for summary judgment dismissing the claims against Defendant Bellamy for lack of personal involvement (Dkt. No. 55–23 at 12) is granted. Hereafter, I will refer to Plaintiff's religion claims as being brought solely against Defendant Rock.

1. *Meals*

Plaintiff alleges that Defendant Rock violated his right to exercise his religion because Great Meadow Correctional Facility does not provide a Halal diet. (Dkt. No. 1 at 19.) Defendants move for summary judgment dismissing this claim, arguing that the religious alternative meals provided at Great Meadow meet Plaintiff's religious dietary requirements. (Dkt. No. 55–23.) Defendants are correct.

The Second Circuit has "clearly established that a prisoner has a right to a diet consistent with his or her religious scruples." *Ford,* 352 F.3d at 597. However, "[a]ll that is required for a prison diet not to burden an inmate's free exercise of religion is the provision of a diet sufficient to sustain the prisoner's good health without violating [his religion's] dietary laws." *Muhammad v. Warithu–Deen Umar,* 98 F.Supp.2d 337, 344 (W.D.N.Y.2000) (citing *Abdul–Malik v. Goord,* No. 07 Civ. 4584, 1997 U.S. Dist. LEXIS 2047, 1997 WL 83402, at *6 (S.D.N.Y. Feb. 27, 1997)).[FN20]

FN20. Defendants served a copy of this unpublished decision on Plaintiff with their moving papers. (Dkt. No. 55–23 at 105.)

Defendant Rock declares that DOCCS "has proscribed the use of what is called a [ ] Religious Alternative Meal program to accommodate non[-]Kosher religious dietary requirements." (Dkt. No. 55–12 ¶ 47.) He further declares that the alternative meal "provides a nutritionally adequate diet and meets Islamic requirements regardless of sect." *Id.* ¶ 50. Courts have consistently held that DOCCS' Religious Alternative Meal is sufficient to sustain Muslim prisoners' good health without violating dietary laws and that a strictly Halal diet is not required. *Muhammad,* 98 F.Supp.2d at 343–44 (collecting cases). Therefore, Defendants' motion for summary judgment dismissing Plaintiff's claim regarding the failure to provide Halal meals is granted.

2. *Restrictions on Demonstrative Prayer*

DOCCS Directives limit prisoners' freedom to demonstratively pray. Specifically, DOCCS Directive 4202(k) states that "[i]ndividual demonstrative prayer by inmates will only be allowed in the privacy of their own living quarters and in designated religious areas whenever feasible as determined by the Superintendent." (Dkt. No. 55–12 ¶ 9.) Plaintiff argues that the Directive as implemented at Great Meadow violates his right to practice his religion. (Dkt. No. 1 at 18, 20.) Defendants argue that this claim should be dismissed. (Dkt. No. 55–23 at 25–26.) The Court will address this claim under both the Free Exercise Clause of the First Amendment and the Religious Land Use and Institutionalized Persons Act ("RLUIPA").

a. *First Amendment*

Prisoners retain some measure of the constitutional right to the free exercise of religion guaranteed by the First Amendment. *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003). However, due to the unique concerns of the prison setting, prisoners' free exercise rights must be balanced against the interests of prison officials engaged in the complex duties of administering the penal system. *Id.* Thus, a prison regulation that denies a prisoner the ability to engage in a religious exercise "is judged under a reasonableness test less restrictive than that ordinarily applied [to burdens on fundamental rights]: a regulation that burdens a [prisoner's] protected right passes constitutional muster if it is reasonably related to legitimate penological interests." *Salahuddin v. Goord,* 467 F.3d 263, 274 (2d Cir.2006) (quoting *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) (punctuation omitted).

***21** To establish a free exercise claim, a prisoner "must show at the threshold that the disputed conduct substantially burdens [FN21] his sincerely held religious beliefs." *Salahuddin,* 467 F.3d at 274–75 (citing *Ford,* 352 F.3d at 591). A religious belief is "sincerely held" when the plaintiff subjectively, sincerely holds a particular

belief that is religious in nature [FN22]. *Ford,* 352 F.3d at 590. Here, there is no dispute that Plaintiff sincerely believes that his religion requires him to demonstratively pray several times each day.

> FN21. Although the Second Circuit has applied the "substantial burden" test in its most recent prison free exercise cases, it has done so while explicitly refusing to adopt or endorse the test. "The *Ford* court noted that the Circuits apparently are split over whether prisoners must show a substantial burden on their religious exercise in order to maintain free exercise claims. Nevertheless, the *Ford* court held that since the plaintiff had not challenged the application of the substantial burden requirement, the court would proceed as if the requirement applied. Likewise, the *Salahuddin* court noted that '[r]esolution of this appeal does not require us to address Salahuddin's argument that a prisoner's First Amendment free-exercise claim is not governed by the 'substantial burden' threshold requirement,' because defendants 'never proceed to argue that we should find any particular burdened religious practice to be peripheral or tangential to [plaintiff's] religion.' The court then proceeded as if the substantial burden requirement applied." *Pugh v. Goord,* 571 F.Supp.2d 477, 497 n. 10 (S.D.N.Y.2008) (citations and some punctuation omitted).

> FN22. However, in some cases "an asserted belief might be so bizarre, so clearly nonreligious in motivation, so as not to be entitled to protection." *Frazee v. Illinois Dept. Of Employment Security,* 489 U.S. 829, 834 n. 2, 109 S.Ct. 1514, 103 L.Ed.2d 914 (1989).

A prisoner's sincerely held religious belief is "substantially burdened" "where the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Jolly v. Coughlin,* 76 F.3d 468, 477 (2d Cir.1996) (punctuation omitted) (holding that Rastafarian prisoner's sincerely held religious belief that he was prohibited from submitting to a test for latent tuberculosis was "substantially burdened" where he was forced to choose between "submitting to the test or adhering to [his] beliefs and enduring medical keeplock.").

Defendants argue that the Directive does not substantially burden Plaintiff's sincerely held religious beliefs because Plaintiff "has also admitted that prayer times do not always coincide with recreation times and that he is only forced to choose occasionally." (Dkt. No. 55–23 at 26, citing Dkt. No. 55–16 (Plaintiff's deposition) at 164–65.)

Defendant Rock declares that:

> An inmate housed at Great Meadow who wishes to pray during his recreation period has alternatives to demonstrative prayer in the yard. First, the inmate can make silent, non-demonstrative prayers while in Great Meadow's recreation yard. In addition, an inmate may choose to remain in his cell during the recreation period and, while in his cell, the inmate may pray demonstratively as he wishes. An inmate may choose to go back to his cell during a designated "go back," whereby inmates may return to their cells from the recreation yard under the supervision of staff at a scheduled time. "Go Back" periods, however, are limited, and may not coincide with the exact point in time that an inmate wishes to perform the Salaah, inasmuch as inmates must be escorted while they are transported from the recreation yard to their cells, and vice versa, and [ ] only a finite number of correction officers work at Great Meadow at any time.

(Dkt. No. 55–12 ¶¶ 24–28.)

Defendant Rock asserted the same argument in *Smith v. Artus,* No. 9:07–CV–1150, 2010 U.S. Dist. LEXIS 104660, 2010 WL 3910086 (N.D.N.Y. Sept.30, 2010). [FN23] There, Judge Mordue found that:

> FN23. Defendants served a copy of this unpublished decision on Plaintiff with their moving papers. (Dkt. No. 55–23 at 120.)

> The question therefore becomes whether having to choose between attending recreation ... or fulfilling his obligation to pray Salaah in a demonstrative manner

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

would substantially burden plaintiff's religious rights. Although facts produced at trial may show otherwise, the present record, when viewed in the light most favorable to plaintiff, shows that plaintiff's free exercise rights were substantially burdened by defendants' policy of requiring plaintiff to either forego his Salaah prayer or give up other privileges accorded him as an inmate.

***22** *Smith,* 2010 U.S. Dist. LEXIS 104660, at *36–37, 2010 WL 3910086, at *12. Judge Mordue's analysis is persuasive and thus the Court finds that there is a triable issue of fact that the Directive substantially burdened Plaintiff's sincere religious beliefs.

Once a plaintiff establishes that a sincerely held religious belief has been substantially burdened,"[t]he defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct." *Salahuddin,* 467 F.3d at 275.

Defendant Rock's declaration discusses, at length, the penological interests on which the Directive is based. Specifically, he declares that:

Demonstrative prayer singles individuals out as members of a particular religious group. This is particularly true of Muslim inmates performing the Salaah, which includes, among other things, kneeling down, bending forward, touching the forehead to the ground, and motioning with the hands and arms. When inmates of a particular faith are involved in an incident, other inmates of the same faith are likely to involve themselves in the incident to protect someone from "their group." Identification of inmates' religious affiliation has also been known to lead to conflicts between different faith groups or different sects within a faith group. These conflicts can escalate rapidly placing staff and other inmates at serious risk of physical injury or death, and threaten the facility's overall security. In the recreation yard, where hundreds of inmates are gathered at one time, this easily could lead to large-scale violent incidents. During the confusion created by such incidents, an inmate may attempt to escape from the facility or inmates may attempt to take over the prison.

Demonstrative prayer in the yard also negatively impacts staff's ability to control inmates. When an inmate is engaged in demonstrative prayer in the recreation yard, that inmate is likely to ignore legitimate direct orders from staff. The inmate praying demonstratively may view the interruption as an insult to his or her religion, and the perceived insult may lead to conflict between staff and the inmate. Staff may be hesitant to interrupt an inmate engaged in demonstrative prayer out of respect for the religious significance of the prayer, and thus be impeded in their attempt to communicate necessary information to the inmate or carry out direct orders or tasks associated with that inmate. This, in turn, disrupts the order of the facility and may adversely impact related safety concerns. As noted above, because the inmate's religion has been identified by his demonstrative prayer, when these conflicts occur, other inmates may join in the conflict, rapidly escalating the situation. Whether the inmate ignores a direct order or staff is unwilling to disrupt prayer, the end result is a diminution of staff's control over the recreation yard and an increased risk to the safety and security of the facility.

***23** I am informed by my attorneys that plaintiff is asserting that these security concerns do not apply to inmates housed in the Behavioral Health Unit (BHU) because they are isolated during recreation periods. However, the fact that inmates in BHU and the Special Housing Unit (SHU) [ ] take recreation in isolated recreation yards does not significantly alter these security and staffing concerns. The recreation yards adjacent to the BHU and SHU are small pens designed for use by one inmate at a time. They abut one another, and although solitary, they are not private and may be observed by other members of the inmate population. Thus, the religious preferences of inmates engaging in demonstrative pray[er] in the BHU and SHU recreation yards would still be identifiable by other inmates, and staff would still have diminished control over inmates praying demonstratively. Moreover, from an administrative perspective, it is better to require staff to apply Directive 4202 across the board to all members of the inmate population without exception. In this way, both staff and inmates know exactly what is allowed and what is not allowed. There are no errors of discretion, no favors, no favoritism, and no room for inmates in

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

general population to become disruptive as a result of their belief that inmates in BHU or SHU are receiving special privileges.

(Dkt. No. 55–12 ¶¶ 11–34.)

Judge Mordue concluded in *Smith* that the security concerns identified by Defendant Rock satisfied the burden of showing that legitimate penological interests supported the Directive's ban on demonstrative prayer in the recreation yards at Great Meadow. *Smith,* 2010 U.S. Dist. LEXIS 104660, at *41–42, 2010 WL 3910086, at *14. The undersigned agrees. "Prison security and penological institutional safety goals are indeed a most compelling governmental interest ..." *Campos v. Coughlin,* 854 F.Supp. 194, 207 (S.D.N.Y.1994) (Sotomayor, J.); *see also Orafan v. Goord,* 411 F.Supp.2d 153, 160 (N.D.N.Y.2006), *rev'd on other grounds, Orafan v. Rashid,* 249 Fed. App'x 217 (2d Cir.2007).

Therefore, the burden shifts to Plaintiff to show that the concerns articulated by Defendant Rock are irrational. *Salahuddin,* 467 F.3d at 275. When determining whether the burden imposed by the defendants is reasonable rather than irrational, a court evaluates four factors: (1) whether the action had a valid, rational connection to a legitimate governmental objective; (2) whether the prisoner has an alternative means of exercising the burdened right; (3) the impact on guards, inmates, and prison resources of accommodating the right; and (4) the existence of alternative means of facilitating the plaintiff's exercise of the right that have only a *de minimis* adverse effect on valid penological interests. *Salahuddin,* 467 F.3d at 274–75.

Defendant Rock declares here, as he did in *Smith,* that the Directive's ban on demonstrative prayer in recreation yard at Great Meadow is rational because:

***24** Great Meadow's "big recreation yard is approximately 5 acres, and during a typical recreation period, between 100 and 400 inmates are present in the yard, depending on the weather. In the morning, one sergeant and six correction officers are assigned to the yard to supervise the inmates during recreation. In the afternoon, one sergeant and eight correction officers are assigned to the yard and in the evening, one sergeant and twelve correction officers are assigned to the yard. In these large areas of a facility such as the yard or the mess hall, prisoners substantially outnumber staff, and these are areas of a facility where unusual incidents such as serious fights and assaults will typically occur. BHU and SHU recreation periods run on parallel schedules. Fewer staff are assigned because BHU and SHU inmates are released to the yard individually but must be escorted by at least two officers. BHU and SHU populations, even though isolated from the general population, tend to be more unpredictable and difficult to control. These populations often present greater safety and security risks for staff. When an inmate becomes involved in a conflict situation in one area of the facility, staff must be diverted from other areas of the facility to back up the staff assigned to the location where the incident is occurring. During recreation periods the diversion of staff away from more populated areas or escort responsibilities to address incidents with BHU or SHU inmates can be dangerous, and creates critical security concerns. During such incidents, inmates and staff are placed at risk of sustaining serious physical injury or death. Further, during the confusion created by such incidents, an inmate may attempt to escape from the facility or inmates may attempt to take over the prison. It is imperative, therefore, that rules and regulations designed to minimize the potential for conflict, and the drain on human resources be implemented, across the board, without exception. This is particularly true in the current economic climate as, upon information and belief, there are no resources available to hire additional facility staff, and DOCS is being encouraged to reduce the number of hours that staff may work overtime.

(Dkt. No. 55–12 ¶¶ 36–45.)

In *Smith,* the plaintiff opposed the defendants' motion for summary judgment. In his opposition, the plaintiff argued that the Directive's ban on demonstrative prayer in the recreation yard at Great Meadow was an irrational response to the concerns articulated by Defendant Rock because (1) the Directive contains other provisions explicitly allowing religious behaviors that single out members of particular faith groups, such as wearing

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

distinctive head coverings and facial hair and being served on different colored trays in the mess hall; (2) officers are just as likely to lose control over inmates praying non-demonstratively, which is allowed under the Directive, as they are over inmates praying demonstratively; (3) other activities in the recreation yard—such as sports—also lead to conflict but are permitted; and (4) demonstrative prayer is allowed in the recreation yards at other facilities. *Smith,* 2010 U.S. Dist. LEXIS 104660, at *42–26, 2010 WL 3910086, at * 14–15. Judge Mordue found that the plaintiff had raised a triable issue of fact that the Directive was an irrational response to the facility's legitimate penological interests. *Smith,* 2010 U.S. Dist. LEXIS 104660, at *47–48, 2010 WL 3910086, at *16.

***25** In *Smith,* the plaintiff asserted that the alternatives that the facility offered to praying in the recreation yard—namely, non-demonstrative prayer or staying in his cell at recreation time to pray-were not reasonable. *Smith,* 2010 U.S. Dist. LEXIS 104660, at *48–53, 2010 WL 3910086, at *16–17. Judge Mordue found that the plaintiff had raised a triable issue of fact regarding the reasonableness of the facility's alternatives. *Id.*

In *Smith,* Judge Mordue found that the same issues that raised a triable issue of fact regarding the rationality of the Directive also raised a triable issue regarding the third *Turner* factor, which considers the impact on guards, inmates, and prison resources. *Smith,* 2010 U.S. Dist. LEXIS 104660, at *53–54, 2010 WL 3910086, at *17.

Finally, in *Smith* the plaintiff proposed alternatives to the Directive's ban on demonstrative prayer in the recreation yard-for instances, adding an additional “Go Back” period for Muslim inmates or setting aside an area of the recreation yard for prayer. *Smith,* 2010 U.S. Dist. LEXIS 104660, at *54–56, 2010 WL 3910086, at *18. Judge Mordue found that Plaintiff had raised a triable issue of fact that the facility could accommodate Muslims' need to demonstratively pray by designating an area of the recreation yard for prayer. *Smith,* 2010 U.S. Dist. LEXIS 104660, at *57–58, 2010 WL 3910086, at *19.

Thus, in *Smith,* Judge Mordue found that there was a triable issue of fact that the very policy challenged by Plaintiff in this case-Great Meadow's implementation of DOCCS Directive 4202(k) banning demonstrative prayer in the recreation yard-violated Muslim inmates' free exercise rights.

However, unlike the plaintiff in *Smith,* Plaintiff here has not opposed Defendants' motion for summary judgment. Thus, Plaintiff here has not met his burden of showing that the concerns articulated by Defendant Rock are irrational.

Even if Plaintiff had opposed the motion and met his burden, Defendants would be entitled to summary judgment on Plaintiff's free exercise claim because (1) the doctrine of qualified immunity shields them from liability for damages; and (2) Plaintiff's request for injunctive relief is moot.

The affirmative defense of qualified immunity “shields government officials ‘from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.’ “ *Stephenson v. Doe,* 332 F.3d 68, 76 (2d Cir.2003) (quoting *McCardle v. Haddad,* 131 F.3d 43, 50 (2d Cir.1997)). A qualified immunity inquiry in prisoner civil rights cases generally involves two issues: (1) “whether the facts, viewed in the light most favorable to the plaintiff, establish a constitutional violation”; and (2) “whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted.” *Sira v. Morton,* 380 F.3d 57, 68–69 (2d Cir.2004) (citations omitted); accord, *Higazy v. Templeton,* 505 F.3d 161, 169 n. 8 (2d Cir.2007) (citations omitted). In the context of religion claims, the Supreme Court and the Second Circuit have “expressly cautioned against framing the constitutional right at too broad a level of generality.” *Redd v. Wright,* 597 F.3d 532, 536 (2d Cir.2010) (citing *Wilson v. Layne,* 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)). The Second Circuit imposes a “ ‘reasonable specificity’ requirement on defining the contours of a constitutional right for qualified immunity purposes.” *Id.* Thus, conduct does not violate clearly established rights unless the Supreme Court or the Second Circuit has quite specifically held that conduct is unconstitutional. *Id.*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

***26** Here, neither the Second Circuit nor the Supreme Court has held that the policy against demonstrative prayer in the solitary recreation pen at Great Meadow Correctional Facility violates prisoners' rights under the First Amendment or RLUIPA. Indeed, *Smith* appears to be the only case on the issue. Even if *Smith* was sufficient to create "clearly established statutory or constitutional rights," it would have no effect here because it was decided after Plaintiff filed this action. Moreover, Judge Mordue dismissed the plaintiff's action in *Smith* on the basis of qualified immunity because "it still does not appear well established that an inmate has the right to pray demonstratively in the recreation yard." *Smith,* 2010 U.S. Dist. LEXIS 104660, at *88, 2010 WL 3910086, at *29. Therefore, Defendants are entitled to qualified immunity on Plaintiff's claim for money damages regarding demonstrative prayer.

Defendants argue that Plaintiff's claims for injunctive relief are moot because he is no longer housed at Great Meadow. (Dkt. No. 55–23 at 10–11.) Defendants are correct. "It is settled in this Circuit that a transfer from a prison facility moots an action for injunctive relief against the transferring facility." *Prins v. Coughlin,* 76 F.3d 504, 506 (2d Cir.1996) (per curiam). Plaintiff has not been housed at Great Meadow since October 2009. (Dkt. No. 7.) Therefore, his request for injunctive relief is moot.

Accordingly, Defendants' motion for summary judgment dismissing Plaintiff's First Amendment claim regarding the ban on demonstrative prayer is granted.

b. *RLUIPA*

RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution [FN24] ... unless the government demonstrates that imposition of the burden on that person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc–1(a).

FN24. An "institution" is any facility or institution that is "owned, operated, or managed by, or provides services on behalf of any State" and is, *inter alia,* "for persons who are mentally ill, disabled, or retarded, or chronically ill or handicapped" or "a jail, prison, or other correctional facility." 42 U.S.C. § 1997(1) (2010).

In *Smith,* Judge Mordue found that the plaintiff had raised a triable issue of fact that Great Meadows' ban on demonstrative prayer violated RLUIPA for the same reasons that he articulated regarding the First Amendment. *Smith,* 2010 U.S. Dist. LEXIS 104660, at *58–62, 2010 WL 3910086, at *19–20. However, he found that the defendants were entitled to qualified immunity. *Smith,* 2010 U.S. Dist. LEXIS 104660, at *89, 2010 WL 3910086, at *29.

Here, even if Plaintiff had raised a triable issue of fact, Defendants would be entitled to summary judgment dismissing the RLUIPA claim for two reasons. First, money damages are not available under RLUIPA. *Sossamon v. Texas,* ––U.S. ––––, 131 S.Ct. 1651, 179 L.Ed.2d 700 (2011). Second, as discussed above, Plaintiff's claims for injunctive relief are moot. Therefore, Defendants' motion for summary judgment dismissing Plaintiff's RLUIPA claim regarding the ban on demonstrative prayer is granted.

3. *Access to Personal Razor*

***27** Plaintiff alleges that Defendants violated his religious rights by refusing to allow him a razor or clippers to shave his pubic hair and armpits. (Dkt. No. 1 at 19.) Defendants argue that their refusal to give Plaintiff a personal razor is supported by legitimate health and safety concerns because inmates in the SHU and BHU, where Plaintiff resided at Great Meadow, "are there because they have threatened to ... commit suicide, inflict self harm, or because they have assaulted staff or other inmates." (Dkt. No. 55–23 at 27.) Even if Plaintiff had raised a triable issue of fact regarding the merits of this claim, Defendants are entitled to summary judgment on the basis of qualified immunity. The Court can find no Supreme Court or Second Circuit authority holding that prisoners are entitled to possess a personal razor or clippers to perform grooming mandated by their religion. Additionally, as discussed above, Plaintiff's requests for injunctive relief

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

are moot because he is no longer housed at Great Meadow. Therefore, Defendants' motion for summary judgment dismissing this claim is granted.

**H. Claim Against Defendant Karandy**

Defendants argue that complaint fails to state that Defendant Karandy was personally involved in any of the alleged constitutional violations. (Dkt. No. 52–33 at 11–12.) Defendants are correct.

Under Second Circuit precedent, " 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). In order to prevail on a § 1983 cause of action against an individual, a plaintiff must show some tangible connection between the unlawful conduct and the defendant. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). Here, the complaint includes Defendant Karandy in the list of defendants but does not contain any allegations about any acts or omissions by Defendant Karandy. (Dkt. No. 1 at 9.) Therefore, I grant Defendants' motion for summary judgment and dismiss the claim against Defendant Karandy.

**ACCORDINGLY,** it is

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 55) is ***GRANTED IN PART AND DENIED IN PART.*** All claims are dismissed with the exception of: (1) the excessive force claim against Defendants Buell, Busse, Dempster, Juckett, Lenney, and Rivers; (2) the excessive force claim against Defendants Hamel, Murray, and Stemp; and (3) the claim against Defendant Segovis regarding the handcuffing incident; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy *Butler v. Gonzalez,* No. 09 Civ.1916, 2010 U.S. Dist. LEXIS 108244, 2010 WL 3398156 (S.D.N.Y. May 18, 2010) in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

IT IS SO ORDERED.

N.D.N.Y.,2011.

DeBlasio v. Rock
Not Reported in F.Supp.2d, 2011 WL 4478515 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Prince PILGRIM, Plaintiff,

v.

Dale ARTUS, Superintendent, Clinton Correctional Facility, Defendants.

Civ. No. 9:07-CV-1001 (GLS/RFT).

March 18, 2010.

Prince Pilgrim, Attica, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Aaron M. Baldwin, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendant.

***REPORT-RECOMMENDATION and ORDER***

RANDOLPH F. TREECE, United States Magistrate Judge.

***1** *Pro se* Plaintiff Prince Pilgrim has filed this civil rights action, pursuant to 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1 *et seq.,* alleging that Defendant Dale Artus, Superintendent of Clinton Correctional Facility, violated his constitutional and statutory rights to freely exercise his religious beliefs. Dkt. No. 1, Compl. The crux of Plaintiff's religious expression claim is that he was repeatedly punished for exercising his sincerely held religious beliefs, which require him to wear dreadlocks, because he is a member of the Nation of Islam ("NOI") and Department of Correctional Services' ("DOCS") policy allows only those of the Rastafarian faith to wear dreadlocks. *See generally id.*

In addition, Plaintiff alleges that Artus failed to protect him from unconstitutional retaliation, his due process rights were violated during the course of several disciplinary hearings, and the penalties imposed as a result of his disciplinary convictions constituted "cruel and unusual punishment" in violation of the Eighth Amendment. *Id.*

Presently before the Court for a Report-Recommendation is Defendant's Motion for Summary Judgment. Dkt. No. 36. Since the filing of Defendant's Motion, the Court has granted Plaintiff four separate extensions of time to file a response in opposition to the Motion. *See* Dkt. No. 46, Order, dated Aug. 20, 2009, at p. 1 (cataloguing prior extensions). The final extension granted Plaintiff until September 4, 2009, to file a response, and warned Plaintiff that ***"failure to oppose Defendant's Motion will result in this Court accepting the facts set forth by Defendant as true."*** *Id.* at p. 3 (emphasis in original) (citing N.D.N.Y.L.R. 7.1(a)(3)). Despite this Court's leniency and warnings, Plaintiff's Response [FN1] was not received until September 10, 2009, six days after the deadline passed. Dkt. No. 47, Pl.'s Resp. in Opp'n to Def.'s Mot. Notwithstanding Plaintiff's failure to meet the extended deadline, because he is proceeding *pro se,* we will nonetheless consider his Response and the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Exhibits attached thereto in issuing a recommendation on Defendant's Motion.

FN1. Plaintiff's Response consists of (1) an Affidavit, dated August 31, 2009, which is in sum and substance a concise memorandum of law, and (2) a Declaration, dated August 31, 2009, which is in sum and substance a statement of material facts, with attached Exhibits. *See* Dkt. No. 47.

For the reasons that follow, we recommend that Defendant's Motion be **granted** in part and **denied** in part.

**I. FACTS NOT IN DISPUTE**

The following facts were derived mainly from the Defendant's Statement of Material Facts, submitted in accordance with N.D.N.Y.L.R. 7.1, which were not, in their entirety, specifically countered nor opposed by Plaintiff. *See* N.D.N.Y.L.R. 7.1(a)(3) (*"The Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."* (emphasis in original)). In any event, most, if not all, of the material facts are not in dispute, but rather, the issue is whether those facts give rise to constitutional and statutory violations.

***2** Plaintiff was received into DOCS' custody on or about November 4, 1992. Dkt. No. 36-2, Def.'s 7.1 Statement, at ¶ 1. At all times relevant to the Complaint, and continuing until the present, Defendant Dale Artus has been the Superintendent of Clinton Correctional Facility ("Clinton"), where Plaintiff was confined from April 1, 2005 through February 5, 2009. *Id.* at ¶ 2. Plaintiff is currently incarcerated at Attica Correctional Facility. *Id.*

On November 18, 2006, Plaintiff was given a direct order by Corrections Officer ("C.O.") A. Appleby to remove his dreadlocks as per DOCS' policy, which allows only inmates of the Rastafarian faith to wear dreadlocks. *Id.* at ¶ 18; Dkt. No. 47-1, Prince Pilgrim Decl., dated Aug. 31, 2009 (hereinafter "Pl.'s Decl."), at ¶ 14. DOCS' hair policy is based on DOCS Directive # 4914, entitled "Inmate Grooming Standards," and relevant decisions from the Central Office Review Committee ("CORC"), which is the final appellate body for inmate grievances and whose decisions have the same effect as directives. Dkt. No. 36-6, Mark Leonard Decl., dated Apr. 30, 2009, at ¶ 59. DOCS Directive # 4914 allows inmates to wear long hair [FN2] provided they tie it back in a ponytail at all times, but does not specifically permit nor disallow dreadlocks. *Id.,* Ex. B, DOCS Directive # 4914(III)(B)(2)(a)-(d). However, relevant CORC decisions have made clear that "[o]nly inmates of the Rastafarian faith may have dreadlocks." *Id.,* Ex. C, CORC Decision, dated May 8, 2003.

FN2. DOCS Directive # 4914 defines "long" as "below shoulder length." Leonard Decl., Ex. B, DOCS Directive # 4914(III)(B)(2) (b).

On December 19, 2006, C.O. C. Strong observed Plaintiff, who was on his way to an NOI meeting, with his hair in dreadlocks that extended down to the middle of his back. *Id.* at ¶ 17; Pilgrim Decl. at ¶¶ 17-18. C.O. Strong issued Plaintiff a Misbehavior Report (hereinafter "First MR"), charging him with Refusal to Obey a Direct Order (Rule 106.10). Def.'s 7.1 Statement at ¶ 19. At a Tier II Hearing that concluded on December 27, 2006, Lieutenant ("Lt.") Boyle found Plaintiff guilty of the charge and assessed him a penalty of thirty (30) days keeplock,[FN3] with loss of commissary, package and phone privileges. *Id.* at ¶ 20. During that hearing, Boyle refused Plaintiff's request to call Defendant Superintendent Artus as a witness, reasoning that because Artus was not present nor otherwise involved in the incident, his testimony would not be germane to the charge at issue. *Id.* at ¶¶ 40-41. However, Plaintiff was allowed to call other witnesses

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

including two C.O.'s and another inmate. *Id.* at ¶ 42. Plaintiff's appeal, dated December 27, 2006, was delegated by Defendant Artus to Captain J. Bell, who affirmed Boyle's decision. *Id.* at ¶ 21.

> FN3. Generally speaking, inmates placed on keeplock are restricted to their cells for twenty-three (23) hours a day, given one hour for exercise, and are denied participation in normal prison activities that occur outside of their cells. *Parker v. Peek-Co,* 2009 WL 211371, at *4 n. 6 (N.D.N.Y. Jan. 27, 2009) (citing cases).

On February 20, 2007, Plaintiff was issued another Misbehavior Report (hereinafter "Second MR") by C.O. Appleby for again failing to cut his dreadlocks and thereby refusing to comply with both a direct order and a prior hearing disposition. *Id.* at ¶¶ 22-23; Pl.'s Decl. at ¶ 21. A Tier II Hearing was conducted by Lt. Lucia, who found Plaintiff guilty of Refusal to Obey a Direct Order (Rule 106.10) and Noncompliance with a Hearing Disposition (Rule 181 .10), and assessed Plaintiff thirty (30) days keeplock, with corresponding loss of recreation, commissary, package and phone privileges, and an additional fifteen (15) days keeplock and loss of privileges invoked from a previous disciplinary hearing determination. Def.'s 7.1 Statement at ¶¶ 23-24; Pl.'s Decl. at ¶ 25. Artus referred Plaintiff's appeal of those convictions to Captain Bell, who reviewed and affirmed the hearing officer's decision on March 5, 2007. Def.'s 7.1 Statement at ¶ 25; Pl.'s Decl. at ¶ 26. By letters dated March 14, 2007, and March 21, 2007, Plaintiff requested a discretionary review of the March 1, 2007 Tier II Hearing disposition, raising issues as to whether or not he should have been credited for time spent in pre-hearing confinement. Def.'s 7.1 Statement at ¶ 26. Artus delegated that petition to G. Haponik, First Deputy Superintendent, who denied the requested relief. *Id.* at ¶ 27.

***3** Also on February 20, 2007, Plaintiff filed a grievance with the Inmate Grievance Program ("IGP") at Clinton, alleging harassment and unlawful discrimination on the part of C.O. Appleby, and taking issue with DOCS' policy regarding dreadlocks. *Id.* at ¶¶ 43-44; Pl.'s Decl. at ¶ 22. The Inmate Grievance Review Committee ("IGRC") dismissed the grievance on the grounds that there was a pending misbehavior report against Plaintiff, making the issue non-grievable. Def.'s 7.1 Statement at ¶ 45. Plaintiff's appeal to the Superintendent was referred to the IGP Supervisor, who agreed with the IGRC's determination and issued a memorandum to Plaintiff denying his appeal. *Id.* at ¶¶ 46-47.

On August 1, 2007, Plaintiff was issued another Misbehavior Report (hereinafter "Third MR") by C.O. J. Way for failure to comply with a prior direct order to cut his hair. *Id.* at ¶ 28. Along with Refusal to Obey a Direct Order (Rule 106.10), Plaintiff was charged with Harassment (Rule 107.11) for using obscene language during his confrontation with C.O. Way, and Inmate Grooming (Rule 110.33) for failure to tie back his long hair. *Id.* at ¶ 31. Lt. Miller conducted a Tier II Hearing on August 1, 2007, at which time Plaintiff was found guilty of refusing a direct order and having unfastened long hair, but not guilty of harassment. *Id.* at ¶ 32. Plaintiff was penalized with thirty (30) days keeplock and loss of commissary, package, and phone privileges for the same amount of time. *Id.* at ¶ 33. Artus referred Plaintiff's appeal of those convictions to Captain Bell, who reviewed and affirmed the hearing officer's decision. *Id.* at ¶ 34.

On September 12, 2007, C.O. Edwards issued Plaintiff a fourth Misbehavior Report (hereinafter "Fourth MR") concerning his dreadlocks. *Id.* at ¶¶ 35-36. The Fourth MR charged Plaintiff with Refusal to Obey a Direct Order (Rule 106.10) and making a False Statement (Rule 107.20), the latter charge owing to Plaintiff's alleged statement that he was a Rastafarian when, in fact, he was registered as an NOI member. *Id.* at ¶¶ 36-37; Pl.'s Decl. at ¶ 34. A Tier II Hearing was held on September 17, 2007, before Lt. Miller, who found Plaintiff guilty on both charges and sentenced him to thirty (30) days keeplock

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

with concurrent loss of commissary, package, and phone privileges. Def.'s 7.1 Statement at ¶ 38.

On or about November 26, 2007, Plaintiff filed another grievance with the IGP, dated November 17, 2007, complaining that DOCS' policy regarding dreadlocks did not comply with DOCS Directive # 4914 and violated his First Amendment rights. *Id.* at ¶ 48. That grievance was consolidated with similar grievances filed by other inmates at Clinton who were given similar orders and/or warnings regarding their hair. *Id.* at ¶ 49; Pl.'s Decl. at ¶ 36. After conducting an investigation, First Deputy Superintendent W.F. Hulihan issued a determination, dated December 19, 2007, stating that "DOCS policy is that registered Rastafarian religion inmates are the only inmates allowed to have dreadlock hairstyles .... This issue has been addressed in numerous CORC decisions .... Based on DOCS established policy and CORC decisions, no compelling evidence has been submitted to support a change in policy." Def.'s 7.1 Statement at ¶ 52. Plaintiff and the other grievants appealed Hulihan's determination to CORC, which upheld the decision. *Id.* at ¶ 53.

***4** Plaintiff wrote Defendant Artus many times during his incarceration at Clinton, the issue of his sanctions for wearing dreadlocks being the predominant topic of such correspondences. *Id.* at ¶ 54; Compl. at ¶ 4. On each occasion that he received a letter of complaint, request for an investigation, appeal, etc., from Plaintiff, Artus referred the matter to a deputy superintendent or other staff member for review, response, or other necessary action. Def.'s 7.1 Statement at ¶ 56.

## II. DISCUSSION

### A. Summary Judgment Standard

Pursuant to FED. R. CIV. P. 56(c), summary judgment is appropriate only where "there is no genuine issue as to any material fact and [the moving party] is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through " 'pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any,' " that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

To defeat a motion for summary judgment, the non-movant must "set out specific facts showing [that there is]a genuine issue for trial," and cannot rest "merely on allegations or denials" of the facts submitted by the movant. FED. R. CIV. P. 56(e); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525-26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) and *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), *accord, Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

**B. Personal Involvement**

1. *Due Process, Retaliation, and Cruel and Unusual Punishment*

***5** Plaintiff alleges that Defendant Artus violated his First, Eighth, and Fourteenth Amendment rights by failing to overturn disciplinary sanctions, thereby subjecting him to punishments that were cruel and unusual, and by allowing others to retaliate against him. Defendant asserts he was not personally involved in any of those alleged constitutional violations.

The Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citations omitted). Moreover, "the doctrine of *respondeat superior* cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement." *Kinch v. Artuz,* 1997 WL 576038, at *2 (S.D.N.Y. Sept. 15, 1997) (citing *Colon v. Coughlin,* 58 F.3d 865, 874 (2d Cir.1995) & *Wright v. Smith,* 21 F.3d at 501) (further citations omitted). Thus, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the constitution." *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 1948 (2009).

Nonetheless, if a plaintiff seeks to bring a § 1983 action for supervisory liability, liability on the part of the supervisor may exist

> in one or more of the following ways: 1) actual direct participation in the constitutional violation, 2) failure to remedy a wrong after being informed through a report or appeal, 3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, 4) grossly negligent supervision of subordinates who committed a violation, or 5) failure to act on information indicating that unconstitutional acts were occurring.

*Hernandez v. Keane,* 341 F.3d 137, 145 (2d Cir.2003) (citing *Colon v. Coughlin,* 58 F.3d at 873) (further citations omitted).

In this case, Plaintiff does not allege that Defendant Artus directly participated in any of the alleged harassment, retaliation, due process violations, nor disciplinary actions that were taken against him. Rather, Plaintiff hangs his hat on the second of the five aforementioned ways in which supervisory liability may attach: "failure to remedy a wrong after being informed through a report or appeal." *Id.* at 145. Plaintiff asserts that he sent several grievances, complaint letters, and appeals of his disciplinary convictions to Artus, who was thereby made aware of the allegedly unconstitutional policy regarding dreadlocks and the harassments and retaliatory misbehavior reports that were being filed against Plaintiff, but that Artus nonetheless failed to intervene on Plaintiff's behalf. The record establishes that Plaintiff appealed to Artus at least three of the four Tier II Hearing dispositions that are relevant to this lawsuit, and that he filed several grievances and complaint letters with

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 6

Slip Copy, 2010 WL 3724883 (N.D.N.Y.)

(Cite as: 2010 WL 3724883 (N.D.N.Y.))

Artus.[FN4] *See* Dkt. No. 36-5, Dale Artus Decl., dated Apr. 30, 2009, Exs. A-U, Docs. related to Pl.'s Misbehavior Reps. & Grievances.

FN4. Defendant contends that Plaintiff did not appeal the disposition rendered at the fourth Disciplinary Hearing held on September 17, 2007. As opposed to his appeals on the first three Tier II Disciplinary Hearing dispositions, there is no record evidence of any appeal taken as to the fourth. *See generally,* Dkt. No. 36-5, Dale Artus Decl., dated Apr. 30, 2009, Ex. E, Fourth MR Docs. Plaintiff has not presented any evidence in opposition to Defendant's claim that he did not exhaust the administrative remedies available to him with respect to the fourth hearing. *See also* Compl. at ¶ 1 (stating that Plaintiff filed *"three* appeals to Tier II Disciplinary Hearings to Superintendent Dale Artus" (emphasis added)).

***6** However, while personal involvement may be found where a supervisory official personally reviews and denies a grievance, the mere referral of an inmate's complaint by a supervisory official to the appropriate staff for investigation is not sufficient to establish personal involvement. *See* *Vega v. Artus,* 610 F.Supp.2d 185, 199 (N.D.N.Y.2009) (quoting *Harnett v. Barr,* 538 F.Supp.2d 511, 524-25 (N.D.N.Y.2008)); *cf.* *Charles v. New York State Dep't of Corr. Servs.,* 2009 WL 890548, at *6 (N.D.N.Y. Mar. 31, 2009) (noting that "courts in this circuit have held that when a supervisory official ***receives and acts on*** a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint, a sufficient claim for personal involvement has been stated" (emphasis in original) (citation omitted)). Moreover, "mere linkage in the prison chain of command is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim." *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (internal quotation marks and citation omitted). Even "the fact that an official ignored a letter alleging unconstitutional conduct is not enough to establish personal involvement." *Flemming v. Wurzberger,* 2006 WL 1285627, at *2 (W.D.N.Y. May 10, 2006) (internal quotation marks and citations omitted).

In this case, Artus asserts that he referred each and every one of Plaintiff's appeals and grievances to subordinate staff members for review, investigation, and appropriate action. Artus Decl. at ¶ 13. The documentary record confirms that contention. Artus referred Plaintiff's appeals of his convictions on the First, Second, and Third MRs to Captain Bell, who reviewed and affirmed the dispositions rendered at the corresponding Tier II Hearings. *Id.,* Exs. B-D, Interdep't Comm'ns, dated Jan. 3, 2006, Mar. 5, 2007, & Aug. 16, 2007. In addition, all of the grievances, complaints, and appeals of grievances mentioned in Plaintiff's Response to Defendant's Motion were forwarded by Artus to staff members in order to investigate, render a decision, and take appropriate actions. Artus Decl. at ¶ 13; Dkt. No. 47, Prince Pilgrim Aff., dated Aug. 31, 2009 (hereinafter "Pl.'s Aff.") at p. 5. Namely, Plaintiff's grievances dated November 9, 2006, November 21, 2006, November 28, 2006, February 20, 2007, July 1, 2007, August 1, 2007, and October 5, 2007,[FN5] were all responded to by Artus's subordinate staff members. Pl.'s Aff., Ex. F, Interdep't Mem., dated Nov. 13, 2006; Ex. H, Interdep't Mem., dated Nov. 13, 2006 (referring 11/9/06 grievance to Deputy Sup't for Sec. J. Tedford); Ex. I, Interdep't Mem., dated Nov. 29, 2006 (referring 11/21/06 grievance to Deputy Sup't of Programs L. Turner); Ex. J, Interdep't Mem., dated Nov. 29, 2006 (referring 11/28/06 grievance to Tedford); Ex. N, Interdep't Comm'n, dated Feb. 23, 2007 (forwarding 2/20/07 grievance to Deputy Sup't of Security Servs. S. Racette); Exs. Q-S, Interdep't Comm'ns, dated July 5, Aug. 7 & Oct. 10, 2007 (referring grievances dated 7/1/07, 8/1/07, and 10/5/07 to IGP Supervisor T. Brousseau).

FN5. Plaintiff also mentions complaints/grievances filed on October 22, 2006, and August 30, 2007. Pl.'s Aff. at p. 5. The only correspondences on the record with those corresponding dates are a letter Plaintiff wrote to Assistant Deputy Superintendent S. Garman on

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

October 22, 2006, regarding his self-nomination for Inmate Liaison Committee Representative, and a letter to IGP Supervisor T. Brousseau dated August 30, 2007, in which Plaintiff enclosed two previously filed grievances that allegedly had not been acknowledged at that point. Pl.'s Decl., Ex. E & H, Lts. dated Oct. 22, 2006, & Aug. 30, 2007. Neither of these letters was sent to Artus, nor did they implicate Plaintiff's issues regarding his dreadlocks.

***7** Because Plaintiff has failed to rebut Defendant's documentary case that his involvement was limited to forwarding Plaintiff's disciplinary appeals, complaints, grievances, and appeals of grievances to other staff members, we recommend that all of Plaintiff's claims, with the exception of his RLUIPA and First Amendment religious expression claims,[FN6] be **dismissed** for lack of personal involvement. *See* *Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (holding that the referral of appeals down the chain of command does not create personal involvement on the part of the referee); *see also* *Brown v. Goord,* 2007 WL 607396, at * 10 (N.D.N.Y. Feb. 20, 2007) (citing cases for the proposition that a supervisor may "delegat[e] to high-ranking subordinates the responsibility to read and respond to ... complaints by prisoners" without becoming personally involved); *Cruz v. Edwards,* 1985 WL 467, at *4 (S.D.N.Y. Mar. 25, 1985) (finding defendant superintendent was not personally involved when he referred the appeal to the deputy superintendent).

FN6. We discuss the personal involvement issues related to Plaintiff's RLUIPA and First Amendment religious expression claims below in Part II.C.2.

Moreover, even if we were to look past Plaintiff's failure to demonstrate Artus's personal involvement, we would still find all of his constitutional claims (again with the notable exception of his First Amendment religious expression claim) to be without merit.

a. *Due Process*

In his Complaint, Plaintiff appears to make a due process claim based on "prejudicial" hearings and other unspecified procedural violations that occurred during those Hearings. Compl. at ¶ 10; Pl.'s Aff. at ¶ 15; *see also* Pl.'s Decl. at ¶ 24 (stating that the proceedings were "hollow"). This claim is wholly conclusory. Plaintiff does not identify which of the four Tier II Disciplinary Hearings was conducted in a prejudicial manner, nor does he describe any of the alleged procedural violations that occurred. *See Bell. Atl. Corp. v. Twombly,* 550 U.S. at 545 (stating that a valid claim must have enough factual allegations "to raise a right to relief above the speculative level"). In short, Plaintiff has not stated a plausible due process claim.

Even if we were to look past the conclusory nature of Plaintiff's due process claim, we would still recommend dismissal of such claim. In order to state a procedural due process claim pursuant to the Fourteenth Amendment, an inmate must first establish that he enjoys a protected liberty interest. *Arce v. Walker,* 139 F.3d 329, 333 (2d Cir.1998) (citing *Kentucky Dep't of Corrs. v. Thompson,* 490 U.S. 454, 460 (1989)). The Supreme Court held in *Sandin v. Conner* that state created liberty interests shall be limited to those deprivations which subject a prisoner to "atypical and significant hardship ... in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484 (1995).

Here, Plaintiff alleges that he was sentenced to and served three separate thirty (30) day and one forty-five (45) day period of keeplock with reduced privileges, but alleges no additional aggravating circumstances present during that confinement. Courts in this Circuit have held that such periods of keeplock, absent additional egregious

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

circumstances, are not "atypical and significant" so as to create a liberty interest and thereby trigger the protections of the Due Process Clause. *See* *Rivera v. Goord,* 2008 WL 5378372, at *2-3 (N.D.N.Y. Dec. 22, 2008) (holding that 40 days of room restriction "did not constitute a constitutionally cognizable liberty deprivation"); *Uzzell v. Scully,* 893 F.Supp. 259, 263 (S.D.N.Y.1995) (45 days of keeplock is not atypical and significant), *Rivera v. Coughlin,* 1996 WL 22342, at *5 (S.D.N.Y. Jan. 22, 1996) (89 days in keeplock does not create a liberty interest). Indeed, courts have roundly rejected the notion that such a short period of confinement, without additional hardships, creates a liberty interest even when that confinement is completely segregated, such as when an inmate is sent to the Special Housing Unit ("SHU"). *See* *Sealey v. Giltner,* 197 F.3d 578, 589-90 (2d Cir.1999) (101 days in normal SHU conditional was not atypical or significant) (cited in *Ochoa v. DeSimone,* 2008 WL 4517806, at *4 (N.D.N.Y. Sept. 30, 2008) (30 days in SHU, without more, did not create a liberty interest)); *Thompson v. LaClair,* 2008 WL 191212, at *3 (N.D.N.Y. Jan. 22, 2008) (30 days in SHU does not create a liberty interest). Therefore, we find that Plaintiff has failed to allege he suffered from an atypical and significant hardship and it is recommended that his due process claims be **dismissed.**

b. *Retaliation*

***8** Plaintiff claims that the disciplinary actions taken against him by DOCS staff members constituted retribution for grievances he filed and that Artus failed to protect him from such reprisals. Compl. at ¶¶ 4 & 8; Pl.'s Aff. at ¶¶ 11 & 19.

The Second Circuit has stated that courts must approach prisoner retaliation claims "with skepticism and particular care," since "virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) & *Franco v. Kelly,* 854 F.2d 584, 590 (2d Cir.1988)), *overruled on other grounds by* *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002).

In order to prevail on a retaliation claim, a plaintiff bears the burden to prove that (1) he engaged in constitutionally protected conduct; (2) prison officials took an adverse action against him; and (3) a causal connection exists between the protected speech and the adverse action. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citations omitted); *see also* *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (citation omitted).

A plaintiff may meet the burden of proving an inappropriate retaliatory motive by presenting circumstantial evidence of a retaliatory motive, such as temporal proximity, thus obviating the need for direct evidence. *Bennett v. Goord,* 343 F.3d at 138-39 (holding that plaintiff met his burden in proving retaliatory motive by presenting circumstantial evidence relating to, *inter alia,* the temporal proximity of allegedly false misbehavior reports and the subsequent reversal of the disciplinary charges on appeal as unfounded). Other factors that can infer an improper or retaliatory motive include the inmate's prior good disciplinary record, vindication at a hearing on the matter, and statements by the defendant regarding his motive for disciplining plaintiff. *McEachin v. Selsky,* 2005 WL 2128851, at *5 (N.D.N.Y. Aug. 30, 2005) (citing *Colon v. Coughlin,* 58 F.3d 865, 872-73 (2d Cir.1995)).

Moreover, "in the prison context [the Second Circuit has] previously defined 'adverse action' *objectively,* as retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d at 381 (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003) (emphasis in original). This objective test will apply even though a particular plaintiff was not himself deterred. *Id.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

If the plaintiff can carry that burden, the defendants will still be entitled to summary judgment if they can show, by a preponderance of the evidence, that they would have taken the same action in the absence of the prisoner's First Amendment activity. *Davidson v. Chestnut,* 193 F.3d 144, 148-49 (2d Cir.1999); *see* *Hynes v. Squillace,* 143 F.3d 653, 657 (2d Cir.1998); *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994).

***9** In this case, Plaintiff alleges that the disciplinary actions taken against him were done in retaliation for grievances he filed. Pl.'s Aff. at ¶ 19. The Supreme Court has noted that the right to petition government for redress of grievances is "among the most precious of the liberties safeguarded by the Bill of Rights." *See* *United Mine Workers of Am., Dist. 12 v. Illinois State Bar Ass'n,* 389 U.S. 217, 222 (1967). The Second Circuit has held that within the prison context, "inmates must be 'permit[ted] free and uninhibited access ... to both *administrative and judicial* forums for the purpose of seeking redress of grievances against state officers.' " *Franco v. Kelly,* 854 F.2d at 589 (quoting *Haymes v. Montanye,* 547 F.2d 188, 191 (2d Cir.1976)) (emphasis and alterations in original). Thus, Plaintiff has met his burden of showing he was engaged in constitutionally protected conduct.

However, the record is clear that all of the disciplinary actions taken against Plaintiff were due to his failure to abide by orders directing his compliance with DOCS' hair policy. *See* Artus Decl ., Exs. B-E, Disciplinary Packets for MR's 1-4. Therefore, even assuming Plaintiff could show that such disciplinary actions were motivated by retaliatory animus (an assumption that finds no basis in the record), Plaintiff's retaliation claims would fail because it is undisputed that his dreadlocks violated DOCS' policy, and thus, the DOCS employees who disciplined Plaintiff can easily show that they would have taken the same disciplinary actions even in the absence of his protected conduct. *See* *Davidson v. Chestnut,* 193 F.3d at 149 ("At the summary judgment stage, if the undisputed facts demonstrate that the challenged action clearly would have been taken on a valid basis alone, defendants should prevail."). Although Plaintiff has challenged DOCS' hair policy in this lawsuit, there is no suggestion that at the time he was disciplined, that policy was not valid. Thus, because there is unrefuted evidence that Plaintiff was disciplined pursuant to a valid DOCS' policy, his retaliation claims must fail.

c. *Cruel and Unusual Punishment*

Although unclear, it appears that Plaintiff asserts an Eighth Amendment claim based on the conditions of his confinement while he served his disciplinary sanctions, which included serving three thirty (30) day and one forty-five (45) day periods in keeplock, loss of phone and commissary privileges, no regular visits, twenty-three (23) hour confinement, and only three showers a week. Compl. at ¶ 6.

In order to state a valid conditions of confinement claim under the Eighth Amendment, a plaintiff must allege: (1) the conditions were so serious that they constituted a denial of the "minimal civilized measure of life's necessities," and (2) the prison officials acted with "deliberate indifference." *Wilson v. Seiter,* 501 U.S. 294, 297-99 (1991) (citation omitted) (cited in *Branham v. Meachum,* 77 F.3d 626, 630-31 (2d Cir.1996)). Here, Plaintiff does not allege that he was denied the "minimal civilized measure of life's necessities," rather, he states that he was placed on keeplock and denied various privileges for three thirty (30) day and one forty-five (45) day periods.[FN7] These conditions are not so severe as to violate the Eighth Amendment's ban on cruel and unusual punishment. *See* *Parker v. Peek-Co,* 2009 WL 211371, at *4 (N.D.N.Y. Jan. 27, 2009) ("It is well established ... that placement in keeplock confinement under the conditions normally associated with that status does not violate an inmate's Eighth Amendment rights.") (citation omitted); *see also* *Jackson v. Johnson,* 15 F.Supp.2d 341, 363 (S.D.N.Y.1998) ("The mere placement in keeplock for 99 days is not sufficiently egregious to constitute cruel and unusual punishment under the Eighth Amendment") (citing cases). Therefore, it is recommended that this claim

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

be **dismissed** as a matter of law.

FN7. Plaintiff also alleges, in conclusory fashion, that he was denied access to the law library during his periods in keeplock confinement. Compl. at ¶ 6. To the extent Plaintiff attempts to raise an access to the courts claim under the First Amendment, any such claim would fail for want of personal involvement and because Plaintiff has not alleged any injury resulting from his alleged denial of access to the law library. *See* *Lewis v. Casey,* 518 U.S. 343, 353 (1996).

**C. RLUIPA and First Amendment Claims**

1. *Merits of Plaintif's Claims*

***10** RLUIPA "protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation of exercise of their religion." [FN8] *Cutter v. Wilkinson,* 544 U.S. 709, 721 (2005). RLUIPA provides that

FN8. RLUIPA was enacted in the wake of the Supreme Court's invalidation of the Religious Freedom Restoration Act of 1993 ("RFRA") in *City of Boerne v. Flores,* 521 U.S. 507 (1997), on the grounds that it exceeded Congress's power under Section 5 of the Fourteenth Amendment. "RLUIPA corrected the constitutional infirmity of RFRA by invoking federal authority under the Spending Clauses to reach any program or activity that receives federal financial assistance, thereby encompassing every state prison." *Fluellen v. Goord,* 2007 WL 4560597, at *5 (W.D.N.Y. Mar. 12, 2007) (citations omitted).

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person-

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a).

Thus, Plaintiff can establish a RLUIPA violation by proving that the prison regulations constitute a "substantial burden" on his religious exercise without promoting a *compelling* governmental interest that is advanced through *the least restrictive means.* As such, RLUIPA places a much higher burden on defendants than does the First Amendment, which, as articulated in the case of *Turner v.. Safely,* requires only that a burden be "reasonably related to legitimate penological interests," not the least restrictive means of protecting compelling governmental interests. 482 U.S. 78, 89 (1987).

The first issue is whether Plaintiff's freedom of religious expression has been substantially burdened. Plaintiff is a registered NOI member. The NOI does not require him to wear dreadlocks, however, Plaintiff asserts that he wears dreadlocks pursuant to his own personal faith and interpretations of the Qu'ran and Bible. Pl.'s Decl. at ¶ 43. As Plaintiff explains, his

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

refusal to cut his hair is rooted in the spiritual understanding that he is *"one"* with the Original Man, Blackman, who is Allah, as Plaintiff is a Blackman thus claiming the Holy Qu'ran and Bible as his blueprint of his lifestyle and hair:

A. Holy Qu'ran provision, surah (Chapter) 2, verse 196: "And accomplish the pilgrimage and the visit for ALLAH. But if you are prevented, send whatever offering is easy to obtain; and shave not your heads until the offering reaches its destination."

B. Holy Bible, Numbers, Chapter 6, verse 5, commonly referred to as the Nazarite Vow 8[:] "All the days of the vow of his Naziriteship no razor should pass over his head; until the days that he should be separated to (Allah) God come to the full, he should prove holy by letting the locks of the hair of his head grow."

*Id.* at ¶ 43 (emphasis in original).

Defendant contends that because Plaintiff's desire to wear dreadlocks is "merely a personal choice and is not based upon NOI tenant or dogma," DOCS' policy does not substantially burden his sincerely held religious beliefs. Dkt. No. 36, Def.'s Mem. of Law at p. 31; *see also* Leonard Decl. at ¶ 65. RLUIPA defines "religious exercise" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S .C. § 2000cc-5(7)(A). Thus, the question of whether Plaintiff's personal religious beliefs are founded in any particular established religion is inapposite. However, RLUIPA "does not preclude inquiry into the sincerity of a prisoner's professed religiosity." *Cutter v. Wilkinson,* 544 U.S. at 725 n. 13. On that subject, the record shows that Plaintiff has been growing dreadlocks for religious reasons since approximately 1993. Dkt. No. 36-3, Pl.'s Dep. at p. 12. In addition, Plaintiff's continued refusal to cut his hair despite the successive punishments he received arguably supports his professed sincerity. Simply put, there is nothing in the record undermining the sincerity of Plaintiff's religious beliefs.

***11** RLUIPA does not define "substantial burden," however, the Second Circuit has assumed that "[s]ince substantial burden is a term of art in the Supreme Court's free exercise jurisprudence ... Congress, by using it, planned to incorporate the cluster of ideas associated with the Court's use of it." *Westchester Day Sch. v. Vill. of Mamaroneck,* 504 F.3d 338, 348 (2d Cir.2007) (citations omitted). The Supreme Court has held that a substantial burden is one that "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thomas v. Review Bd. of Ind. Employment Sec. Div.,* 450 U.S. 707, 717-718 (1981) (cited in *Westchester Day Sch. v. Vill. of Mamaroneck* ). In this case, there can be little doubt that the DOCS' policy in question substantially burdens Plaintiff's religious exercise by forcing him to choose between cutting his hair and being subjected to disciplinary punishment. In *Amaker v. Goord,* 2007 WL 4560596 (W.D.N.Y. Mar. 9, 2007), the Honorable H. Kenneth Schroeder, Jr., United States Magistrate Judge for the Western District of New York, addressed a motion for a preliminary injunction on facts nearly identical to those established here, and concluded that "forcing an individual who sincerely believes that he should wear dreadlocks as part of his religious practice to either forgo his affiliations with the Nation of Islam or face discipline constitutes a substantial burden upon that individual's religious practice." 2007 WL 4560596, at *6; [FN9] *see also Singh v. Goord,* 520 F.Supp.2d 487, 498 (S.D.N.Y.2007) (noting that "demonstrating a substantial burden is not an onerous task for the plaintiff").

FN9. The district court adopted Judge Schroeder's recommendation that the preliminary injunction be granted because the prisoners had shown a likelihood of success on the merits of their claim that DOCS' policy precluding NOI

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

members from wearing dreadlocks violated RLUIPA. *Amaker v. Goord et al.,* 2007 WL 4560595 (W.D.N.Y. Dec. 18, 2007).

Once an RLUIPA plaintiff meets his burden of showing a substantial burden on his exercise of religion, the evidentiary burden shifts to the defendant, who must show that the regulation (1) is in furtherance of a compelling governmental interest and (2) is the least restrictive means of furthering such interest. 42 U.S.C. § 2000cc-2(b). On the first point, Defendant has asserted an interest in maintaining prison security, which he alleges could be undermined if more prisoners are allowed to wear dreadlocks, which can be used to conceal weapons. Def.'s Mem. of Law at pp. 32-33; Dkt. No. 36-8, Lucien J. LeClaire, Jr., Decl., dated Apr. 30, 2009, at ¶¶ 7-21; Leonard Decl. at ¶¶ 48-57 & 68. Without question, DOCS' interest in safety and security is a compelling governmental interest. *See Cutter v. Wilkinson,* 544 U.S. at 725 n. 13.

But, in order to defeat Plaintiff's RLUIPA claim, Defendant must also show that DOCS' policy is the least restrictive means of furthering its compelling interest in security. We believe there are questions of material fact on that issue. Despite the alleged security concerns, DOCS' policy allows inmates of the Rastafarian faith to wear dreadlocks. Leonard Decl. at ¶ 63. Also, Directive # 4914 allows all inmates to grow their hair long, provided they wear it pulled back in a ponytail, and also allows inmates to wear their hair in a "Afro-natural" style. Leonard Decl., Ex. B, DOCS Directive # 4914(III)(B)(2)(a),(d). Thus, DOCS affords a degree of leeway with respect to inmates' hairstyles, but has drawn a line in the sand with respect to dreadlocks worn by non-Rastafarian prisoners. Plaintiff asserts that the least restrictive means of ensuring security is already provided in DOCS Directive # 4914(III)(B)(2)(e), which states that

***12** [a]n inmate may be subjected to a hair search when there is reason to believe that contraband may be discovered by such a search. An inmate may be subjected to such search at any time that a pat frisk, strip search, or strip frisk is being conducted. Consistent with Directive # 4910, during a pat frisk, an inmate will be required to run fingers through [his] hair. During a strip search, an inmate may be subjected to an inspection of his or her hair. During a strip frisk, an inmate will run his or her hands through the hair.

*Id.*

DOCS Deputy Commissioner for Correctional Facility Security Lucien J. LeClaire, Jr., responds to that argument in his Declaration, asserting that "[l]arge, long dreads and the matted hair close to the scalp create a hairstyle that is extremely difficult to visually inspect and nearly impossible for inmates to run their fingers through to allow staff to insure that no contraband is contained therein." LeClaire Decl. at ¶ 18. LeClaire further argues that if an inmate need only declare a personally held religious belief in growing dreadlocks in order to be given permission to do so, DOCS will have no ability to restrict the number of inmates wearing dreadlocks. *Id.* at ¶ 19. The Court does not overlook the weight of these arguments nor the deference courts must accord prison officials when analyzing their policies. However, we question the assumption that permitting dreadlocks to be worn by inmates whose sincerely held religious beliefs require them would open the proverbial floodgates. Under DOCS' current policy, any nefariously motivated inmate need only register himself as a Rastafarian in order to be given permission to wear dreadlocks, and there is no evidence presented to the Court that such policy has resulted in a substantial increase in the Rastafarian/dreadlock-wearing inmate population. Leonard Decl. at ¶ 63; *see also* Artus Decl., Ex. D, Misbehavior Rep., dated Aug. 1, 2007 (stating "[i]nmate Pilgrim was given a direct order on July 1st 2007 to cut his dreadlocks or become a registered Rastafarian") & Leonard Decl., Ex. C, CORC Decision, dated Feb. 9, 2005 (ruling that "staff have correctly directed the grievant to remove his dreadlocks, or change

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

his religious designation"). Moreover, because DOCS has deemed its current policy adequate to protect its safety interests with respect to all of the other permitted hairstyles as well as for Rastafarian inmates with dreadlocks, a material question of fact exists as to why that policy would not also suffice for inmates in Plaintiff's position. *See Amaker v. Goord et al.,* 2007 WL 4560595.

Even under a First Amendment analysis, questions of fact remain. Courts must analyze free exercise claims by evaluating "1) whether the practice asserted is religious in the person's scheme of beliefs, and whether the belief is sincerely held; 2) whether the challenged practice of the prison officials infringes upon the religious belief; and 3) whether the challenged practice of the prison officials furthers some legitimate penological objective." *Farid v. Smith,* 850 F.2d 917, 926 (2d Cir.1988) (citations omitted).

***13** The first two prongs have been met in this case. As discussed above, there is nothing in the record undermining the sincerity of Plaintiff's religious beliefs, nor any suggestion that Plaintiff is personally motivated by fraud or is otherwise attempting to deceive DOCS officials. And, on the second prong, Plaintiff has shown that DOC S' policy substantially burdens his religious beliefs. *See Salahuddin v. Goord,* 467 F.3d 263, 274-75 (2d Cir.2006).[FN10] As to the third prong, the Supreme Court has stated that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley,* 482 U.S. at 89. Courts look to the following four factors in determining the reasonableness of a prison regulation: 1) whether there is a valid and rational relationship between the prison regulation and the legitimate government interests asserted; 2) whether the inmates have alternative means to exercise the right; 3) the impact that accommodation of the right will have on the prison system and resources generally; and 4) whether ready alternatives exist which accommodate the right and satisfy the governmental interest. *Id.* at 89-91 (citations omitted).

FN10. In *Salahuddin,* the Second Circuit left open the question of whether a plaintiff bringing a free exercise claim under the First Amendment must make a threshold showing that his sincerely held religious beliefs have been "substantially burdened." *Salahuddin v. Goord,* 467 F.3d 263, 274-75 n. 5 (2d Cir.2006). *See also Pugh v. Goord,* 571 F.Supp.2d 477, 497 n. 10 (S.D.N.Y.2008) (noting that the Second Circuit has twice declined to answer the question). To the extent that heightened standard applies to all free exercise claims, Plaintiff has met it by showing that DOCS' policy substantially burdens his religious beliefs.

DOCS has a compelling and legitimate penological interest in maintaining prison security. The policy in question, which seeks to limit the number of prisoners who are allowed to wear dreadlocks, which can be used to hide small weapons, is rationally related to that interest. The other remaining three factors, however, weigh against Defendant. On the second *Turner* factor, the Court is not aware of any other means of exercising this particular religious belief other than physically growing dreadlocks. As to the third factor, as previously discussed, questions of fact exist as to what effect the accommodation of Plaintiff's beliefs would have on the entire prison system, especially considering the fact that DOCS' current policy allows any inmate who self-identifies as Rastafarian to wear dreadlocks. For the same reasons, we believe a question of fact exists as to whether there are ready alternatives to DOCS' current policy, including the procedures already applied to those whom DOCS currently allows to wear dreadlocks and other long hair styles. Overall, there are material questions of fact as to the reasonableness of DOCS' policy Plaintiff has challenged. *See Benjamin v. Coughlin,* 905 F.2d 571, 576-77 (2d Cir.), *cert. denied,* 498 U.S. 951 (1990) (affirming district court's finding that DOCS' policy requiring Rastafarian inmates to cut their dreadlocks upon arrival into DOCS' custody was not reasonably related to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

the asserted penological interests when defendants did not demonstrate that the religious accommodation sought by prisoners would have "more than a de minimis effect on valid penological interests"); *see also Francis v. Keane,* 888 F.Supp. 568, 577 (S.D.N.Y.1995) (denying summary judgment where two Rastafarian C.O.'s challenged DOCS' grooming regulation prohibiting dreadlocks for officers); *Amaker v. Goord,* 2007 WL 4560595.

2. *Personal Involvement*

***14** Although neither party addresses the issue in their respective submissions to the Court, there is a question as to whether Plaintiff has sufficiently alleged personal involvement with respect to his RLUIPA claim. Neither the Supreme Court nor the Second Circuit have directly addressed the issue of whether personal involvement is a prerequisite for any valid RLUIPA claim, as it is under § 1983. However, district courts in this Circuit and elsewhere have held that personal involvement is a necessary component of valid RLUIPA claims.[FN11] *See Joseph v. Fischer,* 2009 WL 3321011, at *18 (S.D.N.Y. Oct. 8, 2009) (concluding that the "personal involvement of a defendant in the alleged substantial burden of plaintiff's exercise of religion is a prerequisite to stating a claim under RLUIPA") (citing cases); *Hamilton v. Smith,* 2009 WL 3199520, at *9 (N.D.N.Y. Sept. 30, 2009) (dismissing RLUIPA claim for want of personal involvement on the part of defendants); *Jacobs v. Strickland,* 2009 WL 2940069, at *2 (S.D.Ohio Sept. 9, 2009) (finding no clear error of law in magistrate judge's holding that personal involvement is a necessary element of RLUIPA claims) (citing *Greenberg v. Hill,* 2009 WL 890521, at *3 (S.D.Ohio Mar. 31, 2009); *Alderson v. Burnett,* 2008 WL 4185945, at *3 (W.D.Mich. Sept. 8, 2008)). We are in agreement with that conclusion. RLUIPA provides that "[n]o government" shall substantially burden the religious exercise of confined persons, 42 U.S.C. § 2000cc-1(a), and defines "government" as "(i) a State, county, municipality, or other governmental entity created under the authority of the State; (ii) any branch, department, agency, instrumentality, or official of an entity listed in clause (i); and (iii) any other person acting under color of State law," 42 U.S.C. § 2000cc-5(4)(A). Thus, RLUIPA protects inmates against *actions taken* by a governmental entity or person acting under color of state law; in other words, there must be some personal involvement on the part of an individual defendant or government agency in the alleged RLUIPA violation.

FN11. The Court's research uncovered no ruling that a plaintiff need *not* show personal involvement in order to bring a valid RLUIPA claim.

In this case, the uncontroverted record shows that Artus took no actions relevant to Plaintiff's claims beyond referring Plaintiff's complaints, grievances, and appeals to his subordinates. Artus Decl. at ¶ 13. Moreover, the record does not show, and it is not alleged, that Artus was the creator of the DOCS' policy Plaintiff is challenging. *Id.* at ¶ 8 (noting that the policy is based on DOCS Directive # 4914 and relevant CORC determinations, which have the effect of Directives). Plaintiff has not sued DOCS, nor any DOCS employee responsible for creating and/or enforcing the challenged policy.

However, considering Plaintiff's *pro se* status, the lack of finality in this Circuit on the issue of personal involvement in RLUIPA claims, and judicial economy, the Court recommends that DOCS and DOCS Commissioner Brian Fischer be substituted as proper Defendants to this action solely as to Plaintiff's RLUIPA and First Amendment free exercise claims.[FN12] *See Zuk v. Gonzalez,* 2007 WL 2163186, at *2 (N.D.N.Y. July 26, 2007) (adding a proper defendant, *sua sponte,* in the interest of judicial economy and in light of the plaintiff's *pro se* status); *see also* FED. R. CIV. P. 21 ("Parties may be dropped or added by order of the court on motion of any party or on its own initiative at any stage of the action and on such terms as are just"); *Dockery v. Tucker,* 2006 WL 5893295, at *7 (E.D.N.Y. Sept. 6, 2006) (adding *sua sponte* the United States as a defendant in a FTCA claim

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

brought by a *pro se* plaintiff); *Ciancio v. Gorski,* 1999 WL 222603, at *1 (W.D.N.Y. Apr. 14, 1999) (substituting the proper defendant *sua sponte* "in the interest of eliminating undue complication without affecting the substantial rights of the parties").

FN12. Defendant asserts that Plaintiff's claims are moot because he has been transferred from Clinton Correctional Facility, where Artus is the Superintendent, to Southport Correctional Facility. Def.'s Mem. of Law at p. 38 (quoting *Salahuddin v. Goord* for the proposition that "an inmate's transfer from a prison facility generally renders moot any claims for declaratory judgment and injunctive relief against the officials of that facility."). However, because we recommend that DOCS and Commissioner Fischer be added to the case as Defendants, this mootness argument is without merit.

3. *Monetary Damages under RLUIPA*

***15** Defendant argues that Plaintiff is barred from seeking monetary damages for the alleged RLUIPA violation. Def.'s Mem. of Law at p. 29. RLUIPA allows for "appropriate relief against a government," 42 U.S.C. § 2000cc-2(a), but does not specify what types of relief it makes available. The Second Circuit has not yet ruled on the issue, and there appears to be a divide amongst the other circuit courts that have addressed it. *See Bock v. Gold,* 2008 WL 345890, at *5-7 (D.Vt. Feb. 7, 2008) & *Pugh v. Goord,* 571 F.Supp.2d 477, 506-08 (S.D.N.Y.2008) (both noting the split among circuit and district courts).

However, the district courts in this Circuit have held that monetary damages are not available under RLUIPA against state defendants in either their official or individual capacities.[FN13] Looking to the Eleventh Amendment's protection of the states' sovereign immunity, courts have held that because RLUIPA does not make an unequivocal waiver of sovereign immunity with respect to monetary damages against state defendants in their official capacities, such relief is not available. *See Pugh v. Goord,* 571 F.Supp.2d at 509 (" 'To sustain a claim that the [g]overnment is liable for awards of monetary damages, the waiver of sovereign immunity must extend unambiguously to such monetary claims.' "(quoting *Lane v. Pena,* 518 U.S. 187, 192 (1996)); *see also Bock v. Gold,* 2008 WL 345890, at *6; *El Badrawi v. Dept. of Homeland Sec.,* 579 F.Supp.2d 249, 258-63 (D.Conn.2008). In addition, courts in this Circuit have held that to allow claims against defendants in their individual capacities would raise serious constitutional questions about whether RLUIPA exceeds Congress's powers under the Spending Clause (Article 1, Section 9, Clause 1) of the Constitution.[FN14] *See Pugh v. Goord,* 571 F.Supp.2d at 506-07; *Vega v. Lantz,* 2009 WL 3157586, at *4 (D.Conn. Sept. 25, 2009) (holding that RLUIPA does not allow damages against defendants in their individual capacities and citing cases). Essentially, courts have found that because Congress enacted RLUIPA pursuant to the Spending Clause, not its power to enforce the provisions of the Fourteenth Amendment under Section 5 of the same, there is no constitutional basis for Congress to enforce RLUIPA as to individual defendants, who are not parties to the "contract" between the federal government and the states pursuant to which, as a normal practice, the former provides funding to the latter in exchange for compliance with certain conditions. *See Sossamon v. Lone Star State of Texas,* 560 F.3d 316, 328 (5th Cir.2009) (holding that "individual RLUIPA defendants are not parties to the contract in their individual capacities") (cited in *Vega v. Lantz,* 2009 WL 3157586, at *4); *see also Pugh v. Goord,* 571 F.Supp.2d at 506-07 (citing *Smith v. Allen,* 502 F.3d 1255, 1275 (11th Cir.2007) for the same proposition). Because interpreting RLUIPA to allow suits against individuals would call into question the constitutionality of the statute itself, courts have applied the canon of constitutional avoidance [FN15] in concluding that RLUIPA does not permit such causes of action. *See Bock v. Gold,* 2008 WL 345890, at *6.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN13. Research has not revealed any district court in this Circuit that has concluded otherwise.

FN14. Both the Eleventh and the Fifth Circuits have explicitly held that Congress enacted RLUIPA pursuant to its power under the Spending Clause, not the Commerce Clause. *Sossamon v. Lone Star State of Texas,* 560 F.3d 316, 329 n. 34 (5th Cir.2009); *Smith v. Allen,* 502 F.3d 1255, 1274 n. 9 (11th Cir.2007). We agree with those courts that because "there is no evidence concerning the effect of the substantial burden" on interstate commerce, RLUIPA must necessarily be Spending Clause legislation. *See* *Sossamon v. Lone Star State of Texas,* 560 F.3d at 329 n. 34.

FN15. "The constitutional avoidance canon states that when a statute is susceptible to two possible constructions, and one raises serious constitutional questions, the other construction must be adopted." *Bock v. Gold,* 2008 WL 345890, at *6.

***16** Based on the above reasoning, we agree with the other district courts in this Circuit that RLUIPA does not allow monetary damages against individual defendants in their individual or official capacities. *See* *Pugh v. Goord,* 571 F.Supp.2d at 507 (citing cases); *see also* *Sweeper v. Taylor,* 2009 WL 815911, at *9 (N.D.N .Y. Mar. 27, 2009) (holding that no monetary damages are available under RLUIPA). Therefore, we recommend that Plaintiff's claims for monetary and punitive damages brought pursuant to RLUIPA be **dismissed.** However, because Plaintiff has requested both declaratory and injunctive relief, our finding that RLUIPA does not allow monetary damages does not totally moot his claims.

**D. Qualified Immunity**

Defendant asserts the affirmative defense of qualified immunity. Qualified immunity shields "government officials from liability for civil damages when their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *African Trade & Info. Ctr., Inc. v. Abromaitis,* 294 F.3d 355, 359 (2d Cir.2002) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)); *see also* *Mollica v. Volker,* 229 F.3d 366, 370 (2d Cir.2000). Accordingly, governmental officials sued for damages "are entitled to qualified immunity if 1) their actions did not violate clearly established law, or 2) it was objectively reasonable for them to believe that their actions did not violate such law." *Warren v. Keane,* 196 F.3d 330, 332 (2d Cir.1999) (citation omitted).

Should the district court adopt this Court's recommendations, Plaintiff's RLUIPA and First Amendment religious expression claims against DOCS and Commissioner Fischer are all that will remain in this case. Qualified immunity does not apply to suits against individuals in their official capacities. *See* *Kentucky v. Graham,* 473 U.S. 159, 167 (1985) ("The only immunities that can be claimed in an official-capacity action are forms of sovereign immunity that the entity, *qua* entity, may possess, such as the Eleventh Amendment."). We have already held that, with respect to Plaintiff's RLUIPA claim, monetary damages are not available against defendants in their individual or official capacities. As such, Plaintiff's RLUIPA claims will be limited to injunctive and declaratory relief against DOCS employees in their official capacities. Therefore, qualified immunity has no bearing on Plaintiff's RLUIPA claim. *See, e.g.,* *Rodriguez v. City of New York,* 72 F.3d 1051, 1065 (2d Cir.1995) ( "[T]he defense of qualified immunity protects only individual defendants sued in their individual capacity, not governmental entities ... and it protects only against claims for damages, not against claims for equitable relief."); *see also* *Rodriguez v. Phillips,* 66 F.3d 470, 481 (2d Cir.1995) (noting that qualified immunity does not apply to claims for injunctive and declaratory relief against a defendant in his official capacity).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

***17** Plaintiff's claim for damages under the First Amendment, however, is subject to a qualified immunity analysis. On that issue, we find that it is not clearly established law that DOCS' hair policy, which allows only Rastafarians to wear dreadlocks, violates the Free Exercise Clause of the First Amendment. Although the Second Circuit has previously ruled that *Rastafarians* have a First Amendment right to maintain their dreadlocks absent a valid penological interest that requires their preclusion, *Benjamin v. Coughlin,* 905 F.2d at 576-77, neither the Supreme Court nor the Second Circuit has ruled that other, *non-Rastafarian* inmates are similarly entitled to such protection. *See* *Redd v. Wright,* 597 F.3d 532, 2010 WL 774304, at *4 (2d Cir.2010) (citing cases for the proposition that constitutional rights should be defined with "reasonable specificity" for qualified immunity purposes and granting qualified immunity because a DOCS policy had not been held unconstitutional at the time it was enforced against the plaintiff). As such, under preexisting law a reasonable DOCS official would not have realized that his creation or enforcement of DOCS' hair policy was unlawful. *See* *Dean v. Blumenthal,* 577 F.3d 60, 68 (2d Cir.2009) (citing *Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991)).

Because we find that DOCS' policy did not violate clearly established law, qualified immunity would apply to all those who participated in its creation and enforcement. As such, should the District Court adopt our recommendation that Commissioner Fischer be substituted as a Defendant, Plaintiff's only potential relief against Fischer in his individual capacity could be non-monetary. *See* *Rodriguez v. Phillips,* 66 F.3d at 481. Likewise, the Eleventh Amendment's protection of the States' sovereign immunity would preclude any monetary damages Plaintiff would seek against Fischer in his official capacity. *See* *Farid v. Smith,* 850 F.2d at 921.

As such, should the District Court adopt our recommendations, DOCS and Commissioner Fischer will be substituted as Defendants and Plaintiff will be limited to non-monetary relief against those Defendants under both RLUIPA and § 1983.

**III. CONCLUSION**

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendant's Motion for Summary Judgment (Dkt. No. 36) be **GRANTED in part** and **DENIED in part** in accordance with the above Report-Recommendation; and it is further

**RECOMMENDED,** that DOCS and Commissioner Brian Fischer be substituted as Defendants pursuant to FED. R. CIV. P. 21; and it is further

**RECOMMENDED,** that Defendant Artus be **dismissed** from this action; and it is further

**RECOMMENDED,** that should the District Court adopt our recommendation that DOCS and Commissioner Brian Fischer be substituted as Defendants *sua sponte* by the Court, that the Clerk of the Court shall add the "New York State Department of Correctional Services" and "Commissioner Brian Fischer" as Defendants to the Docket of this action; and it is further

***18 RECOMMENDED,** that should the District Court adopt our recommendation that DOCS and Commissioner Brian Fischer be substituted as Defendants, that the Clerk shall issue Summonses and forward them, along with copies of the Complaint, to the United States Marshal for service upon the substituted Defendants; and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

it is further

**RECOMMENDED,** that should DOCS and Fischer be substituted as Defendants, that those substituted Defendants shall file a response to Plaintiff's Complaint as provided for in the Federal Rules of Civil Procedure after they have been served with process; and it is further

**ORDERED,** that should DOCS and Fischer be substituted as Defendants, that upon the filing of their response to the Complaint, the Clerk shall notify Chambers so that a status conference may be scheduled; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

N.D.N.Y.,2010.

Pilgrim v. Artus

Slip Copy, 2010 WL 3724883 (N.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



H

Only the Westlaw citation is currently available.
**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,

N.D. New York.
Prince PILGRIM, Plaintiff,
v.
Dale ARTUS, Superintendent, Clinton Correctional Facility, Defendant.
No. 9:07-cv-1001 (GLS/GHL).

Sept. 17, 2010.
Prince Pilgrim, Attica, NY, pro se.

Hon. Andrew M. Cuomo, New York State Attorney General, Aaron M. Baldwin, David L. Cochran, Assistant Attorneys General, of Counsel, Albany, NY, for the Defendants.

***MEMORANDUM-DECISION AND ORDER***

GARY L. SHARPE, District Judge.

***1** Pro se plaintiff Prince Pilgrim brings this action under 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act (RLUIPA), [FN1] alleging that while he was an inmate at Clinton Correctional Facility, defendant Dale Artus, Superintendent of Clinton Correctional Facility, violated his constitutional and statutory rights, including the right to freely exercise his religious beliefs. (*See* Compl., Dkt. No. 1.)

FN1. 42 U.S.C. § 2000cc-1, *et seq.*

On April 30, 2009, Artus moved for summary judgment. (Dkt. No. 36.) In a ReportRecommendation and Order (R & R) filed March 17, 2010, Magistrate Judge Randolph F. Treece recommended that all Pilgrim's claims except his religious expression claims be dismissed, that Artus be dismissed from the action, and that the New York State Department of Correctional Services (DOCS) and DOCS Commissioner Brian Fischer be substituted sua sponte as proper defendants. [FN2] (R & R at 18-27, Dkt. No. 50.) Pending are Artus and Pilgrim's objections to the R & R. (Dkt.Nos.55, 56.) For the reasons that follow, the R & R is adopted in its entirety.

FN2. The Clerk is directed to append the R & R to this decision, and familiarity therewith is presumed.

Before entering final judgment, this court routinely reviews all report and recommendation orders in cases it has referred to a magistrate judge. If a party has objected to specific elements of the magistrate judge's findings and recommendations, this court reviews those findings and recommendations de novo. *See Almonte v. N.Y. State Div. of Parole,* No. 04-cv-484, 2006 WL 149049, at *6-7 (N.D.N.Y. Jan. 18, 2006). In those cases where no party has filed an objection, or only a vague or general objection has been filed, this court reviews the findings and recommendations of a magistrate judge for clear error. *See id.*

Here, both parties have filed specific objections to certain of Judge Treece's findings and conclusions. Having reviewed those findings and conclusions de novo and the remainder of the R & R for clear error, the court finds no error, concurs with Judge Treece, and adopts the R & R in its entirety. As to the substitution of parties specifically, the court recognizes the difficulties that the addition of new defendants at this late stage may cause. However, having carefully reviewed Judge Treece's findings, and in line with the reasoning and authority set forth in the R & R, the court does not agree with defendant that permitting the substitution would be an abuse of discretion. *See* FED. R. CIV. P. 21 ("On motion or on its own, the court may at any time, on just terms, add or drop a party.").

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Magistrate Judge Randolph F. Treece's Report-Recommendation and Order (Dkt. No.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

50) is **ADOPTED** in its entirety; and it is further

**ORDERED** that Dale Artus is **DISMISSED** from this action; and it is further

**ORDERED** that the New York State Department of Correctional Services (DOCS) and DOCS Commissioner Brian Fischer be substituted as defendants; and it is further

***2 ORDERED** that the Clerk comply with Judge Treece's directives as to updating the docket, issuing and forwarding summonses with copies of the complaint, and scheduling a status conference between the new defendants and Judge Treece; and it is further

**ORDERED** that, pursuant to the R & R, DOCS and Brian Fischer are to file a response to Pilgrim's complaint as provided in the Federal Rules of Civil Procedure after they have been served with process; and it is further

**ORDERED** that the Clerk provide copies of this Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED.**

N.D.N.Y.,2010.

Pilgrim v. Artus
Slip Copy, 2010 WL 3724881 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



H

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Mortimer EXCELL, Plaintiff,
v.
J.W. BURGE, et al., Defendants.
No. 9:05-CV-1231 (LEK/GJD).

Sept. 25, 2008.
Mortimer Excell, pro se.

Krista A. Rock, Asst. Attorney General, for Defendants.

***DECISION AND ORDER***

LAWRENCE E. KAHN, District Judge.

***1** This matter comes before the Court following a Report-Recommendation filed on September 10, 2008, by the Honorable Gustave J. DiBianco, United States Magistrate Judge, pursuant to 28 U.S.C. § 636(b) and L.R. 72.3(c) of the Northern District of New York. Report-Rec. (Dkt. No. 52).

Within ten days, excluding weekends and holidays, after a party has been served with a copy of a Magistrate Judge's Report-Recommendation, the party "may serve and file specific, written objections to the proposed findings and recommendations," FED. R. CIV. P. 72(b), in compliance with L.R. 72.1. No objections have been raised in the allotted time with respect to Judge DiBianco's Report-Recommendation. Furthermore, after examining the record, the Court has determined that the Report-Recommendation is not subject to attack for plain error or manifest injustice.

Accordingly, it is hereby

**ORDERED,** that the Report-Recommendation (Dkt. No. 52) is **APPROVED** and **ADOPTED** in its **ENTIRETY;** and it is further

**ORDERED,** that Defendants' Motion for summary judgment (Dkt. No. 39) is **GRANTED IN PART,** and that the complaint is **DISMISSED** in its **ENTIRETY** as against Defendants Head and Rourke; and it is further

**ORDERED,** that Plaintiff's First Cause of Action is **DISMISSED** as against Defendants Hess, Devito, Bray, and Sourwine; and it is further

**ORDERED,** that the Defendants' Motion for summary judgment (Dkt. No. 39) is **DENIED** in all other respects; and it is further

**ORDERED,** that the Clerk serve a copy of this Order on all parties.

**IT IS SO ORDERED.**

**REPORT-RECOMMENDATION**

GUSTAVE J. DiBIANCO, United States Magistrate Judge.

This matter has been referred to me for Report and Recommendation by the Honorable Lawrence E. Kahn, United States District Judge, pursuant to 28 U.S.C. § 636(b) and LOCAL RULES N.D.N.Y. 73.3(c).

In this amended civil rights complaint, plaintiff alleges that defendants have violated his First Amendment right to practice his religion and have retaliated against him for exercising his constitutional right to practice his religion. Amended Complaint (AC) (Dkt. No. 7). Plaintiff seeks monetary, declaratory, and injunctive relief. Presently before the court is defendants' motion for summary judgment pursuant to FED. R. CIV. P. 56. (Dkt. No. 39). Plaintiff has responded in opposition to defendants' motion. (Dkt. No. 50). For the following reasons, this court recommends that defendants' motion be granted in part and denied in part.

**DISCUSSION**

**1. *Summary Judgment***

Summary judgment may be granted when the moving

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

party carries its burden of showing the absence of a genuine issue of material fact. FED. R. CIV. P. 56; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citations omitted). "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion." *Id.* However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86 (1986); *see also* *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986).

***2** At that point, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Id. See also* *Burt Rigid Box v. Travelers Prop. Cas. Corp.,* 302 F.3d 83, 91 (2d Cir.2002) (citations omitted). However, only disputes over facts that might affect the outcome of the suit under governing law will properly preclude summary judgment. *Salahuddin v. Coughlin,* 674 F.Supp. 1048, 1052 (S.D.N.Y.1987) (citation omitted).

**2. *Facts***

Plaintiff alleges that, due to plaintiff's religious beliefs and practices, he was the subject of various forms of harassment by the defendants. Plaintiff alleges that on June 12, 2005, he was "acosted [sic]" by defendants Simmons and Labetz, who used a "pat-frisk" procedure as an opportunity to verbally harass plaintiff about his race, his Rastafarian religion, and his religious practice of wearing a "Tsalot-Kob." [FN1] AC ¶¶ 1-8. Plaintiff alleges that, in addition to verbally harassing plaintiff, defendants Simmons and Labetz threw plaintiff's Tsalot-Kob to the ground, stepped on it, and told plaintiff that it would be destroyed. AC ¶¶ 6-7.

FN1. Plaintiff states that the "Tsalot-kob" is religious headgear worn exclusively by Rastafarian inmates. AC ¶ 2. Department of Correctional Services (DOCS) Directive 4202 states that a Tsalot-Kob is a hemispheric head cap, worn by members of the Rastafarian faith, and is also known as a "crown." DOCS Directive 4202(M)(1)(c). Rock Decl. Ex. A.

As a result of this incident, plaintiff states that he was placed in keeplock [FN2] and given a misbehavior report, charging him with refusing a direct order; possession of contraband; harassment; and threats. AC ¶ 9. Plaintiff states that the charges related to his possession of the Tsalot-Kob. *Id.* Plaintiff states that the defendants believed that the Tsalot-Kob was contraband due to its particular color, and that defendants stated in the misbehavior report that plaintiff had previously been told to send the TsalotKob home or destroy it, but he had not done so. *Id.*

FN2. Keeplock is a form of disciplinary confinement where the inmate is confined to his own cell. *Gittens v. LeFevre,* 891 F.2d 38, 39 (2d Cir.1989).

Plaintiff states that he was afforded a disciplinary hearing on June 20, 2005. AC ¶ 10. Plaintiff claims that although he produced a Department of Correctional Services (DOCS) Directive which allowed inmates to wear the multicolored headgear, he was still found guilty of all the charges except harassment and sentenced to thirty (30) days keeplock, with thirty (30) days loss of privileges. AC ¶ 10. Plaintiff states that this determination was affirmed by defendant Burge, and although plaintiff sent a written complaint to Glenn Goord,[FN3] he "ignored" that complaint. AC ¶ 11.

FN3. Glenn Goord, the former Commissioner of DOCS has not been named as a defendant in this case, even though plaintiff sometimes refers to him as "defendant" Goord. *See* AC ¶ 19.

Plaintiff claims that the harassment continued. AC ¶ 12. Plaintiff alleges that on July 20, 2005, he was attending a program, when defendant Hess told plaintiff to remove his Tsalot-Kob, and when plaintiff attempted to explain that he was allowed to wear the headgear, defendant Hess had plaintiff removed from the building and placed in keeplock. *Id.* Plaintiff claims that he was given another misbehavior report, charging him with being "out of place," stating that plaintiff should not have been in the school building because his name was not on the "call-out." AC ¶ 13. Plaintiff states that he was afforded a disciplinary hearing on July 23, 2005, but that all charges

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

were dismissed. AC ¶ 14.

***3** Plaintiff alleges that on July 26, 2005, he was in the mess hall, and defendant Simons began to harass plaintiff by calling him racially derogatory names. AC ¶ 15. Plaintiff states that defendant Simons told plaintiff to remove his Tsalot-Kob. *Id.* Plaintiff states that he asked defendant Simons why he continued to harass plaintiff about this headgear and asked to speak with the mess hall sergeant. *Id.* Plaintiff complained to the mess hall sergeant that defendant Simons was repeatedly harassing plaintiff about his cultural and religious beliefs as a Rastafarian. Plaintiff states that he further explained that defendant Simons had previously "illegally" confiscated the headgear and destroyed it without plaintiff's permission. *Id.*

Plaintiff states that defendant Simons denied harassing plaintiff, and instead informed the mess hall sergeant that plaintiff had filed unfounded complaints against defendant Simons as well as other staff members. AC ¶ 16. Plaintiff claims that the mess hall sergeant then had plaintiff removed from the mess hall, confiscated his Tsalot-Kob, and placed him in keeplock. *Id.* Plaintiff claims that he was issued a third misbehavior report, dated July 27, 2005, charging him with contraband possession, lying, and refusing a direct order. AC ¶ 17.

Plaintiff states that on July 31, 2005, he was afforded a disciplinary hearing on these charges, and the charges were dismissed after plaintiff showed the hearing officer DOCS Directive 4202, authorizing him to have the multicolored headgear. AC ¶ 18. Plaintiff claims that the hearing officer's disposition included an order to return plaintiff's Tsalot-Kob to him because it was not contraband. *Id.* Plaintiff states that he wrote to defendant Burge and Glenn Goord, requesting a transfer out of Auburn Correctional Facility due to all the harassment to which he was being subjected regarding his religious headgear. AC ¶ 19. Plaintiff claims that defendant Burge and Commissioner Goord ignored the request and were "negligent" in their performance. *Id.*

Plaintiff claims that the next incident was on August 4, 2005. AC ¶ 20. Plaintiff alleges that he was attending a Rastafarian religious class, when defendant Devito came into the room to harass plaintiff about his multicolored Tsalot-Kob. *Id.* Defendant Devito also asked plaintiff why he was in the school building when he had previously been told not to return there. *Id.* Plaintiff claims that defendant Devito and "defendant Mcuqueeney" [FN4] began verbally abusing plaintiff and threatening him with death if he filed any complaints against them. *Id.* Plaintiff claims that defendant Devito went into the Rastafarian class and told the members of the class that, if plaintiff's name was not removed from the "call-out," the organization would not be able to operate. *Id.*

FN4. The court notes that although plaintiff refers to this individual as a "defendant" in the amended complaint, this person is not listed in the caption and was never served with process. Thus, this individual is not currently a defendant.

Plaintiff states that he requested to speak with a sergeant, but that rather than comply with plaintiff's request, defendant Devito placed plaintiff in keeplock. AC ¶ 21. Plaintiff states that on August 5, 2005, he was given another misbehavior report, charging him with refusing a direct order. AC ¶ 22. Plaintiff claims that defendant Devito charged plaintiff with being in class with his shirt untucked. *Id.* Plaintiff claims that although the charges were dismissed at the August 9, 2005 disciplinary hearing, the hearing officer refused to give plaintiff a written disposition of dismissal. AC ¶ 23.

***4** Plaintiff alleges that on August 9, 2005, he was in the mess hall, when defendant Sourwine began to harass plaintiff about his Tsalot-Kob. AC ¶ 24. Plaintiff claims that although he attempted to explain that, according to DOCS Directive 4202, he was allowed to wear the multicolored headgear, defendant Sourwine began verbally harassing plaintiff and ordered him to move to another serving line, where defendant Bray began to verbally harass plaintiff. *Id.* Plaintiff states that he was ultimately ordered to leave the mess hall without his meal. AC ¶ 24. Plaintiff states that he complained about defendants Sourwine and Bray to the mess hall sergeant. *Id.* Plaintiff states that the mess hall sergeant reacted by ordering defendant Bray to "remove" plaintiff from the mess hall and place him in keeplock. *Id.*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Plaintiff states that on August 14, 2005 he was given a misbehavior report, charging him with violating a direct order, lying, movement, and violating mess hall serving and seating policies. AC ¶ 25. Plaintiff states that on August 14, 2005, he was afforded a disciplinary hearing. AC ¶ 26. Plaintiff claims that defendant Head, the hearing officer, denied plaintiff his right to due process at the disciplinary hearing when he denied plaintiff the opportunity to submit evidence in his behalf. *Id.* Plaintiff states that defendant Head told plaintiff to "stop bitchin [sic]" and had plaintiff removed from the hearing. *Id.* Plaintiff claims that defendant Head's actions were in retaliation for plaintiff's grievances and complaints. Plaintiff claims that he was found guilty and sentenced to three (3) days keeplock with thirty (30) days loss of privileges. *Id.*

Plaintiff claims that he has been the "continuous victim of racial and religious discrimination" based upon his exercise of the Rastafarian religion and his right to wear his multicolored religious headgear. AC ¶ 27. Plaintiff states that he had "repeatedly" complained to defendants Burge and Rourke as well as to Goord, and "Gummerson" [FN5] to no avail. AC ¶ 28. Plaintiff states that his life has been threatened by "the defendants herein" and "other staff" that plaintiff did not name as defendants. *Id.* Plaintiff also claims that he has "repeatedly" been the victim of false misbehavior reports that will ultimately affect the possibility of parole. *Id.*

> FN5. This individual is also not named as a defendant in this case, even though plaintiff refers to him in a list with other "defendant's [sic]." AC ¶ 28.

Plaintiff states that the inmate grievance procedure has "repeatedly" failed to address his problems of religious discrimination. AC ¶ 29. The last paragraph of the factual portion of plaintiff's complaint purports to make some statements against an individual named G. Steinberg, regarding "six related false misbehavior report[s]," dated August 22, 2005. AC ¶ 30. Plaintiff has ***not*** named this individual as a defendant and states that his appeal of these misbehavior reports is still pending. *Id.* Plaintiff states that he is simply notifying the court of these separate incidents. *Id.*

***5** The amended complaint contains four "Causes of Action." The First Cause of Action is against defendants Simons, Hess, Devito, Labetz, Bray, and Sourwine for violating plaintiff's First Amendment right to practice his religion. AC at p. 13. Plaintiff claims that these defendants improperly confiscated his Tsalot-Kob in violation of DOCS own regulations. *Id.*

Plaintiff's Second Cause of Action is against defendants Simons, Hess, Devito, Labetz, Bray, and Sourwine for violating plaintiff's First Amendment rights by their repeated "religious discriminatory harassment." *Id.*

Plaintiff's Third Cause of Action is against defendants Simons, Devito, Labetz, Bray, Sourwine, and Head for knowingly filing false misbehavior reports against plaintiff in order to deliberately interfere with the practice of his religion. *Id.*

Plaintiff's Fourth Cause of Action is against defendants Burge and Rourke for knowingly disregarding plaintiff's complaints of religious discrimination and permitting "various defendants" from interfering with the exercise of plaintiff's religious rights. *Id* . at p. 14.

**3. *Personal Involvement***

Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and respondeat superior is an inappropriate theory of liability. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citation omitted); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003). In *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability.

A supervisory official is personally involved if that official directly participated in the infraction. *Id.* The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred or

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id. See Iqbal v. Hasty,* 490 F.3d 143, 152-53 (2d Cir.2007) (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)).

In this case, defendants argue that plaintiff has not shown sufficient personal involvement by defendant Rourke in any alleged violations. A review of the amended complaint shows that plaintiff has not alleged that defendant Rourke directly participated in any of the alleged violations. Plaintiff claims only that he "repeatedly complained" to a variety of supervisory officers, including defendant Rourke, "but to no avail." AC ¶ 28. It is not clear from the amended complaint what sort of information, if any, defendant Rourke may have received about plaintiff's problem regarding his Tsalot-kob and his concerns about the other defendants.

***6** Plaintiff has not alleged that defendant Rourke learned about plaintiff's situation through a report or appeal, and plaintiff has not alleged that defendant Rourke "created" any policy under which the constitutional violation was allowed to occur. In fact, it appears from all of the documents submitted by both plaintiff and defendants that there was a misunderstanding regarding the authority of the plaintiff to wear a Tsalot-kob of any color. The court notes that even if plaintiff had written his complaint to defendant Rourke, and he had ignored those complaints, it still would be insufficient to allege personal involvement by this defendant. *See Headly v. Fisher,* 2008 U.S. Dist. LEXIS 37190, * 17-18 (S.D .N.Y. May 8, 2008) (citing *Hernandez v. Goord,* 312 F.Supp.2d 537, 547 (S.D.N.Y.2004)). Plaintiff has not responded to this argument in his opposition to summary judgment. Thus, without more, the amended complaint may be dismissed as against defendant Rourke.

**4. *First Amendment and Retaliation***

In this case, the amended complaint may be read to allege two separate claims regarding plaintiff's religious rights. Plaintiff first alleges that defendants Simons, Hess, Devito, Labetz, Bray, and Sourwine violated his First Amendment right to practice his religion by repeatedly confiscating plaintiff's Tsalot-Kob and harassing him about being Rastafarian in violation of DOCS own directives. AC at p. 13 (First and Second Causes of Action).

Plaintiff also claims that defendants Simons, Hess, Devito, Labetz, Bray, Sourwine, and Head "repeatedly caused the filing of false misbehavior reports" in a deliberate attempt to interfere with plaintiff's religion. This claim can be interpreted as a claim that defendants retaliated against plaintiff for the exercise of his First Amendment rights. *Id.* (Third Cause of Action). Plaintiff's final cause of action merely alleges that the supervisory officers disregarded plaintiff's complaints. AC at p. 14. (Fourth Cause of Action). The court will consider the First Amendment and the retaliation claims separately.

**A. Religion**

It is well-settled that inmates have the right under the First and Fourteenth Amendments to freely exercise a chosen religion. *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) (citing *Pell v. Procunier,* 417 U.S. 817, 822 (1974)). However this right is not limitless, and may be subject to restrictions relating to legitimate penological concerns. *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.), *cert. denied,* 498 U.S. 951 (1990). The analysis of a free exercise claim is governed by the framework set forth in *O'lone v. Estate of Shabazz,* 482 U.S.342 (1987) and *Turner v. Safely,* 482 U.S. 78, 84 (1987). This framework is one of reasonableness and is less restrictive than ordinarily applied to the alleged infringements of fundamental constitutional rights. *Ford,* 352 F.3d at 588.

In *O'Lone,* the Supreme Court held that a regulation that burdens a protected right withstands a constitutional challenge if that regulation is reasonably related to legitimate penological interests. 482 U.S. at 349 (quoting *Turner,* 482 U.S. at 89). An individualized decision to deny an inmate the ability to engage in a religious exercise is analyzed under the same standard. *Salahuddin v. Goord,* 467 F.3d 263, 274 n.4 (2d Cir.2006) (citations omitted). In *Farid v. Smith,* 850 F.2d 917, 926 (2d Cir.1988), the Second Circuit held that to assess a free exercise claim, the court must determine "(1) whether the practice asserted is religious in the person's scheme of beliefs and whether the belief is sincerely held; (2) whether the challenged practice of prison officials infringes upon the religious belief; and (3) whether the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

challenged practice of the prison officials furthers some legitimate penological interest."

***7** Defendants argue that plaintiff does not have a "constitutional right" to wear a Tsalot-kob, and the mere violation of a state rule or regulation does not rise to the level of a constitutional claim. Defendants cite two cases for the statement that there is no constitutional right to wear the plaintiff's religious headgear. Def. Mem. of Law at 15. Defendants argue that in *Benjamin v. Coughlin,* 905 F.2d 571, 576-77 (2d Cir.), *cert denied,* 498 U.S. 951 (1990), the Second Circuit held that there is no First Amendment right to wear crowns while an inmate is in state custody.[FN6]

FN6. A "crown" is another name for the Tsalot-Kob.

The court does ***not*** agree with the defendants' analysis of *Benjamin.* The court in *Benjamin* found no First Amendment or equal protection violation in a challenge to the DOCS regulation restricting the wearing of crowns to designated areas. 905 F.2d at 578-79. The reason for this holding was because defendants in *Benjamin* successfully argued, based on *Turner* and *Shabazz,* that there was a legitimate security interest [FN7] in limiting this form of headgear, and distinguishing the crown from yarmulkes [FN8] and kufis [FN9] worn by inmates of other religions. 905 F.2d at 578-79.

FN7. Yarmulkes and Kufis were smaller than crowns, and DOCS had determined that the larger headgear was more capable of being used to hide contraband. 905 F.2d at 579. The court found this to be a legitimate security concern. *Id.*

FN8. Yarmulkes are worn by Jewish inmates.

FN9. Kufis are worn in the Muslim religion.

Plaintiff is not challenging the directive in this case. In fact, the directive clearly supports plaintiff's ability to where whatever color Tsalot-kob he chooses to wear. DOCS Directive 4202(M)(1)(c) provides that

> Inmates are permitted to wear religious headcoverings in accordance with their religious beliefs and as permissible in a correctional setting. Some examples of approved religious headcoverings are:
>
> ...
>
> c. Tsalot-Kobis approved religious headwear for members of the Rastafarian religious faith. A Tsalot-Kob is a hemispheric head cap that can be made of cloth, knitted or crocheted, and ***may be multicolored or singled colored.*** Only the smallest size is permitted. It measures approximately 12" long at its longest point in order to cover all locks. It must fit as close to the head as the locks permit. Note: This religious headwear is only authorized for members of the Rastafarian faith.....

Rock Decl. Ex. A (emphasis added). It is clear that Directive 4202 was amended on June 7, 2004. Plaintiff's Resp. Ex. C (Revision Notice dtd. June 7, 2004). Prior to the amendment, the color of the Tsalot-Kob was restricted to black. *Id.* Even before the amendment the only issue was the ***color*** of the headgear, not whether it could be worn at all. *Id.*

Thus, it is clear that DOCS has determined that whatever security interest was present in Rastafarian inmates wearing their religious headgear has either been reconsidered or has been satisfied by the restriction on the size of the crown. Additionally, since the directive was amended to allow crowns of all colors, DOCS has made the determination that whatever security concern was present relating to the color of the crown has been satisfied.

Without the issue of a security interest, *Benjamin* is distinguishable from the case that is currently before the court. In *Benjamin,* the court found that the security interest outweighed what may have been a sincerely held religious belief. In this case, there is no dispute that plaintiff is Rastafarian, and there is no dispute that a TsalotKob is a head covering worn by Rastafarian inmates. There is no issue or argument that confiscating or destroying this headgear would not infringe upon plaintiff's sincerely held religious belief. The difference in this case is that defendants are no longer claiming that a

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

security interest outweighs or limits the plaintiff's right to perform the particular religious practice. Thus, *Benjamin* does ***not*** apply to show that there is no First Amendment right to wear a Tsalot-Kob.

***8** In this case, plaintiff had two incidents with defendant Simons regarding the Tsalot-Kob. On June 17, 2008, plaintiff was issued a misbehavior report by defendant Simons, charging plaintiff with various rule violations, including possession of the allegedly contraband Tsalot-Kob. Pl. Mem. in Opp. Ex. A at 11. In the misbehavior report, defendant Simons states that he had told plaintiff on June 16, 2008 that he was not allowed to wear the "hat," and that he would have to "send it home, donate it, [or] destroy it." *Id.* Plaintiff was afforded a disciplinary hearing and was found guilty of all the charges but harassment by Lieutenant Redmond.[FN10] Plaintiff was sentenced to thirty days of keeplock, together with a thirty day loss of privileges. *Id.* at 12. Although plaintiff alleges that the Tsalot-Kob was confiscated on June 17, 2005, it does not appear so from the misbehavior report.

FN10. Lieutenant Redmond is not a defendant in this case.

However, on July 26, 2005, defendant Simons once again gave plaintiff a misbehavior report for wearing the multicolored headgear. *Id.* at 6. The misbehavior report specifically states that the Tsalot-Kob was confiscated at that time and plaintiff was escorted to the package room, where he was told that it would be mailed home. *Id.* The misbehavior report also states that "[p]er directive Tsalot-Kob must be black in color." *Id.*

Plaintiff was afforded a disciplinary hearing on July 31, 2005. *Id.* at 7. Defendant Head was the hearing officer, and found plaintiff ***not guilty*** of all of the charges. The disposition specifically states that plaintiff was ***not*** in violation of Directive 4202, and that the "officer was not aware" of the amendment, but instead had based his decision on the May 12, 2004 directive that ***did require*** all Tsalot-Kobs to be black. *Id.* at 8. Defendant Head further stated that in the future "it is hoped no such occurrences [of] this error will happen again." *Id.* Defendant Head also stated that the Tsalot-Kob "will be returned to you if not already sent home." *Id.*

It is unclear how long plaintiff was without his particular Tsalot-Kob, or whether he had another to wear. Plaintiff alleges that he was wearing a Tsalot-Kob on August 9, 2005, when plaintiff claims that defendant Sourwine told plaintiff to remove the Tsalot-Kob in the mess hall. This court cannot, however, recommend granting summary judgment for defendants based upon the incorrect argument that plaintiff simply does not have a First Amendment right to wear a Tsalot-Kob. The extent of any violation and any injury suffered as a result of that violation are genuine issues of material fact as against defendant Simons, who was involved in the removal and confiscation of the headgear on June 17, 2005 and July 26, 2005, and defendant Labetz, who was involved in the June 17, 2005 incident.

The court notes that plaintiff's first cause of action states that defendants Hess, Devito, Bray, and Sourwine violated plaintiff's First Amendment rights by "repeated" confiscation of plaintiff's head wear. AC at p. 13. There is no indication even in the documents submitted by plaintiff himself that any of these other defendants "confiscated" plaintiff's Tsalot-Kob. At worst, plaintiff alleges that they verbally berated him about the color of his headgear. However, it is well settled that verbal harassment, inexcusable as it may be, does not rise to the level of a constitutional violation. *Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986); *Ramirez v. Holmes,* 921 F.Supp. 204, 210 (S.D.N.Y.1996). Thus, other defendants' questioning plaintiff about his headgear and even verbally harassing him about his religion or his headgear does not rise to the level of a constitutional violation.

***9** Plaintiff claims that on July 20, 2005, defendant Hess told plaintiff to remove his Tsalot-Kob, however, plaintiff does not allege that defendant Hess confiscated the headgear. Plaintiff stated that defendant Hess had plaintiff placed in keeplock, however, the misbehavior report issued to plaintiff on that date states only that he was "out of place" and not on the call-out for the class. Pl. Mem. in Opp. Ex. A at 9. The charge must have been dismissed since no disposition of this misbehavior report appears on plaintiff's disciplinary history. The same is true for the misbehavior report issued by defendant Devito,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

who gave plaintiff a misbehavior report on August 4, 2005 for having his shirt untucked. *Id.* at 10. Plaintiff only claims that defendant Devito and another corrections officer commented on the Tsalot-Kob and threatened to kill plaintiff if he filed any complaint against them. AC ¶ 21.

Finally, defendants Sourwine and Bray are alleged to have verbally harassed plaintiff about the Tsalot-Kob, but plaintiff was placed in keeplock because he did not obey an order regarding the line in which he was supposed to be standing. AC ¶ 24; Head Decl. Ex. A (misbehavior report dated August 9, 2006). There is no reference in the misbehavior report to plaintiff's religion or his headgear.

Thus, to the extent that defendants Hess, Devito, Bray, and Sourwine verbally harassed plaintiff about his religion or his headgear, they did not deprive plaintiff of his First Amendment right to practice his religion, and plaintiff's First Cause of Action may be dismissed as against these defendants. The court will proceed to consider whether plaintiff may maintain a claim for retaliation against any of the defendants.

**B. Retaliation**

Any action taken by defendants in retaliation for the exercise of a constitutional right, even if not unconstitutional in itself, states a viable constitutional claim. *Franco v. Kelly,* 854 F.2d 584, 588-90 (2d Cir.1988). The law is well-settled that an inmate has no right to be free from false accusations or false misbehavior reports, ***unless*** they are made in retaliation for the exercise of a constitutional right. *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (citing *Franco,* 854 F.2d at 588-90).

In order to establish a claim of retaliation for the exercise of a constitutional right, plaintiff must show first, that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for adverse action taken against him by defendants. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citing *Gayle v. Gonyea,* 313 F.3d 677 (2d Cir.2002); *Hendricks v. Coughlin,* 114 F.3d 390 (2d Cir.1997)). The court must keep in mind that claims of retaliation are "easily fabricated" and thus, plaintiffs must set forth non-conclusory allegations. *Id.* (citing *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds, Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506 (2002)).

***10** Although plaintiff in this case does not specifically use the word "retaliation," in his third cause of action, plaintiff claims that defendants Simons, Hess, Devito, Labetz, Bray, Sourwine, and Head "repeatedly" caused the filing of false misbehavior reports to "deliberately interfer [sic] with the practice of plaintiff's religious beliefs ..." AC at p. 13. In his response to defendants' motion for summary judgment, plaintiff does state that he was the "target of harassment and retaliation." Pl. Mem. in Opp. at 3.

To the extent that plaintiff's complaint can be interpreted to allege retaliation, the court must recommend dismissal as to defendant Head. Defendant Head was assigned as the hearing officer after the August 9, 2005 mess hall incident. The misbehavior report had *nothing* to do with plaintiff's religion or headgear, and there is absolutely no indication that defendant Head would have had knowledge of any verbal exchange that plaintiff allegedly had in the mess hall with defendants Sourwine and Bray regarding his Tsalot-Kob. The misbehavior report involved seating policies in the mess hall. Head Decl. Ex. A. A review of the transcript of the disciplinary hearing shows that defendant Head attempted to have plaintiff testify regarding the specific facts of the incident, however, plaintiff wanted only to discuss his complaints of retaliation against the officers. Head Decl. Ex. B at 6-9. Defendant Head ultimately removed plaintiff from the hearing. *Id.* at 8. Any allegation that defendant Head was retaliating against plaintiff for his religion is completely conclusory and may be dismissed.

This finding is supported by the fact that defendant Head presided over the July 31, 2005 disciplinary hearing and found plaintiff ***not guilty of the contraband violation*** charged in defendant Simons's July 26, 2005 misbehavior report. Plaintiff himself has submitted a copy of the misbehavior report and has included defendant Head's disposition. Pl. Mem. in Opp. Ex. A at 8. In that disposition defendant Head finds fault with defendant Simons's handling of the entire situation. *Id.* Defendant

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Head stated in his written decision that it was "hoped that no such occurrence [of] this error will happen again." *Id.* There is absolutely no indication that defendant Head in any way was retaliating or "causing" false misbehavior reports to be filed against plaintiff.

The defendants did not address the issue of alleged retaliation in their motion for summary judgment. In fact, defendants do not include the misbehavior reports from the other dismissed charges. Plaintiff has, however, included these reports. One report stated that on July 20, 2005, plaintiff was "out of place" because he was not on the "call-out" for a particular class. Pl. Mem. in Opp. Ex. A at 9. The report indicates that plaintiff was placed in keeplock as a result, but this incident is not listed on plaintiff's disciplinary history. *See* Head Decl. Ex. H. On August 4, 2005, plaintiff was given a misbehavior report by defendant Devito, charging plaintiff with having his shirt untucked. Pl. Mem. in Opp. Ex. A at 10. Once again, there is no record of this misbehavior report on plaintiff's disciplinary history report. Head Decl. Ex. H.

***11** It has been held that "[o]nly retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Odom v. Dixion,* 04-CV-889, 2008 U.S. Dist. LEXIS 11748, *62-63 (W.D.N.Y. Feb. 15, 2008) (quoting *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003)). In this case, although there was no disciplinary "sentence" relating to these two misbehavior reports, plaintiff does allege that he was placed in keeplock.

In *Dawes v. Walker,* 239 F.3d 489, 492-93 (2d Cir.2001), the Second Circuit recognized that there are situations in which *de minimis* retaliation is "outside the ambit of constitutional protection." *Id.* (citing *Davidson v. Chestnut,* 193 F.3d 144, 150 (2d Cir.1999)). The court in *Dawes* held that ***verbal*** harassment was insufficient to rise to the level of adverse action. *Id.* In *Dawes,* the court stated that prisoners may be required to tolerate more than either public employees or average citizens before a retaliatory action can be considered "adverse." *Dawes,* 239 F.3d at 493 (citing *Thaddeus-X v. Blatter,* 175 F.3d 378, 398 (2d Cir.1999)). The court in Dawes cited *Allah v. Seiverling. Id.* (citing 229 F.3d at 225). In *Allah,* the Third Circuit held that in certain circumstances, "placement in administrative segregation would not deter a prisoner of ordinary firmness from exercising his or her First Amendment rights," however, the court was not prepared to hold that such action could never amount to adverse action. 229 F.3d at 225.

In this case, it is unclear how long plaintiff spent in keeplock as a result of the misbehavior reports that were ultimately dismissed. He spent thirty days in keeplock after being mistakenly found guilty of possession of contraband as a result of defendant Simons's first misbehavior report. It is also true that the two misbehavior reports for which there is no disposition purportedly did not have anything to do with plaintiff's religion, however, if these misbehavior reports were given to plaintiff because he was Rastafarian or because of his religious practice of wearing a crown, plaintiff could state a claim for retaliation.

The court also notes that if defendants would have taken the same action absent the protected conduct, they will have a defense to retaliation. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996). However, it is the defendants' burden to show by a preponderance of the evidence that they would have taken the same action absent the protected conduct. *Id.* Since defendants in this case do not make any argument regarding retaliation, the court will not recommend granting summary judgment on the issue of retaliation as against defendants Simons, Devito, Hess, and Sourwine.

**5. *Due Process***

In order to begin a due process analysis, the court must determine whether plaintiff had a protected liberty interest in remaining free from the confinement that he challenges and then determine whether the defendants deprived plaintiff of that liberty interest without due process. *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001); *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir.1996). In *Sandin v. Conner,* the Supreme Court held that although states may still create liberty interests protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

own force ..., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 483-84 (1995). In *Sandin,* the court rejected a claim that thirty days in segregated confinement was "atypical and significant ." *Id.* at 486.

***12** The Second Circuit has discussed the duration element of the *Sandin* analysis. *Colon v. Howard,* 215 F.3d 227 (2d Cir.2000). In Colon, the court discussed whether it was appropriate to have a "bright line" rule regarding the maximum length of confinement in the Special Housing Unit (SHU) before a liberty interest might be created. *Id.* The court concluded that ***305*** days in SHU would meet the standard. *Id.* at 231. Although Judge Newman believed that the court should articulate a bright line rule, holding that any SHU confinement less than 180 days would not create a liberty interest, the panel disagreed. *Id* . at 234.

It is true that the court must consider conditions as well as duration, however, sentences of 125 to 288 days are "relatively long" and necessitate " 'specific articulation of ... factual findings" before the court could determine whether the "hardship" was atypical and significant. *Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000) (citation omitted). The court in Colon also noted that the longest confinement in SHU that did not meet the atypical requirement was ***101*** days. *Id.* at 231 (citing *Sealey v.. Giltner,* 197 F.3d 578, 589-90(2d Cir.1999)).

Plaintiff does not include a due process claim against defendant Head in his "Causes of Action." Defendant Head is only included in the third cause of action, alleging that he was involved in "repeatedly" causing false misbehavior reports to be written.[FN11] However, in the body of the complaint, plaintiff does appear to claim that defendant Head violated plaintiff's due process rights by excluding him from the disciplinary hearing of August 14, 2005 and by refusing to call certain witnesses. AC ¶ 26.

FN11. This is the retaliation claim discussed above.

In any event, defendants argue that plaintiff cannot establish a due process violation against defendant Head. This court agrees with defendants. Plaintiff received only thirty days in keeplock as a result of the August 9, 2005 mess hall incident. As stated above, keeplock involves an inmate being confined to his own cell, and there is no deprivation of property associated with this form of confinement. *Sandin* was clear in its holding that a thirty day confinement, even in a special housing unit, would not rise to the level of a liberty interest. 515 U.S. at 486. The Second Circuit's decision in *Colon* is consistent with this holding. Thus, plaintiff in this case had no liberty interest in being free from thirty days keeplock, and to the extent that plaintiff may be trying to allege a due process claim as against defendant Head, any such claim may be dismissed.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 39) be **GRANTED IN PART,** and that the complaint be **DISMISSED IN ITS ENTIRETY AS AGAINST DEFENDANTS HEAD and ROURKE,** and it is

**RECOMMENDED,** that plaintiff's First Cause of Action be **DISMISSED AS AGAINST DEFENDANTS HESS, DEVITO, BRAY and SOURWINE,** and it is

***13 RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 39) be **DENIED IN ALL OTHER RESPECTS.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

N.D.N.Y.,2008.

Excell v. Burge
Not Reported in F.Supp.2d, 2008 WL 4426647 (N.D.N.Y.)

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 11

Not Reported in F.Supp.2d, 2008 WL 4426647 (N.D.N.Y.)

(Cite as: 2008 WL 4426647 (N.D.N.Y.))

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Anthony D. AMAKER, Plaintiff,

v.

T. KELLEY, J. Landry, P.T. Justine, O. Mayo, T.G. Egan, D.A. Senkowski, M. Allard, R. Girdich, G.S. Goord, J. Wood, Doctor I. Ellen, J. Mitchell, H. Worley, Doctor L.N. Wright, S. Nye, M. McKinnon, M. Rivers, L. Coryer, A. Pavone, L. Cayea, D. Armitage, J. Carey, P.W. Annetts, R. Rivers, E. Aiken, S.Gideon, R. Lincoln, D. Linsley, C.O. Gordon, J. Reyell, D. Champagne, J. Kelsh, W. Carter, F. Bushey, Cho Phillip, Cho Drom, A.J. Annucci, L.J. Leclair, D. Laclair, T.L. Ricks, A. Boucaud, H. Perry, B. Baniler, R. Lamora, E. Liberty, G. Ronsom, R. Maynard, C. Daggett, D. Selksky, K.M. Lapp, R. Sears, J. Babbie, Sgt. Champagne, Doctor K. Lee, R. Vaughan, and M. Nisoff,[FN1] Defendants.

> FN1. Plaintiff filed an amended complaint purporting to add the New York State Senate and New York State Assembly as Defendants, *see* Dkt. No. 78; however, in its May 13, 2002 Order, the Court, while granting Plaintiff leave to amend, denied Plaintiff leave to add these entities as defendants, *see* Dkt. No. 75.

No. 9:01-CV-877 (FJS/DEP).

Feb. 9, 2009.

Anthony D. Amaker, Wallkill, NY, pro se.

Hon. Andrew M. Cuomo, Office of the Attorney General State of New York, David B. Roberts, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

**ORDER**

SCULLIN, Senior District Judge.

***1** In a Report and Recommendation dated September 9, 2008, Magistrate Judge Peebles recommended that this Court grant Defendants' motion for summary judgment on all claims and that the Court deny Defendant Rivera's motion to dismiss as moot. *See* Dkt. No. 249. Plaintiff filed objections to those recommendations. *See* Dkt. No. 251.

Plaintiff makes two objections that have nothing to do with the merits of his claims,. He objects to the fact that Magistrate Judge Peebles did not attach unpublished cases cited in the Report and Recommendation to it and to the recommendation that the Court dismiss Defendants who have not answered or otherwise opposed the complaint. *See id.* 1-2. Plaintiff also objects, generally, to the application of preclusion and other legal doctrines to his claims. Plaintiff's remaining objections, for the most part, are not actually objections, but consist of further legal argument regarding his claims. *See id.* at 2-6. The Court's review of Magistrate Judge Peebles' Report and Recommendation, in light of Plaintiff's objections, demonstrates that Magistrate Judge Peebles correctly applied the appropriate law and that Plaintiff's objections are without merit.[FN2]

> FN2. The Court notes that, in addition to Magistrate Judge Peebles' reasoning regarding Plaintiff's complaint about Defendants' allegedly retaliatory searches of his cell, cell searches, even if retaliatory, do not offend the Constitution and are not actionable. *See* *Bumpus v. Canfield,* 495 F.Supp.2d 316, 327 (W.D.N.Y.2007) (citing *Hudson v. Palmer,* 468 U.S. 517, 530, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)) (other citation omitted).

Therefore, after carefully considering Magistrate Judge Peebles' Report and Recommendation, Plaintiff's objections thereto, as well as the applicable law, and for the reasons stated herein and in Magistrate Judge Peebles' Report and Recommendation, the Court hereby

**ORDERS** that Magistrate Judge Peebles' September 9, 2008 Report and Recommendation is **ADOPTED** in its

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

entirety; and the Court further

**ORDERS** that Defendants' motion for summary judgment is **GRANTED;** and the Court further

**ORDERS** that Defendant Rivera's motion to dismiss is **DENIED** as moot; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment for Defendants and close this case.

**IT IS SO ORDERED.**

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

Plaintiff Anthony D. Amaker, a New York State prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this action pursuant to 42 U.S.C. § 1983, claiming deprivation of his civil rights. Plaintiff's complaint, as amended, contains an amalgamation of claims based upon a series of events alleged to have occurred at the two correctional facilities in which he was housed during the relevant period, naming in excess of fifty individuals as well as the New York State Senate and Assembly as defendants, and seeking both injunctive and monetary relief.

Currently pending before the court are two motions brought by the defendants. In the first, defendants seek the entry of summary judgment dismissing plaintiff's claims on a variety of grounds, principally on the merits, though additionally urging their entitlement to qualified immunity from suit. One of the named defendants, Rafael Rivera, a corrections officer, has additionally moved requesting dismissal of plaintiff's claims against him for failure to state a claim upon which relief may be granted, arguing that plaintiff's allegations are facially insufficient to support a cognizable claim against him. For the reasons set forth below I recommend that defendants' summary judgment motion be granted, and in light of that recommendation find it unnecessary to address defendant Rivera's separate motion.

I. *BACKGROUND*

***2** Plaintiff is a prison inmate entrusted to the care and custody of the New York State Department of Correctional Services (the "DOCS"). Amended Complaint (Dkt. No. 78) ¶ 3. Plaintiff's incarceration results from a 1989 conviction for murder in the second degree, for which he was sentenced to a period of imprisonment of between twenty-five years and life. Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 229-2) ¶ 1. At the times relevant to his claims plaintiff was designated initially to the Clinton Correctional Facility ("Clinton"), where he was housed beginning in June of 1998, and later the Upstate Correctional Facility ("Upstate"), into which he was transferred on or about October 31, 2001.[FN1] Amended Complaint (Dkt. No. 78) ¶¶ 3, 5, 21.

FN1. Upstate is a maximum security prison comprised exclusively of special housing unit ("SHU") cells in which inmates are confined, generally though not always for disciplinary reasons, for twenty-three hours each day. *See Samuels v. Selsky,* No. 01 CIV. 8235, 2002 WL 31040370, at *4 n. 11 (S.D.N.Y. Sept. 12, 2002).

In his amended complaint plaintiff has interposed a wide range of claims, many of which are unrelated and some of which, as will be seen, were included in a subsequent action brought by the plaintiff in this court, based upon events occurring at Clinton, and later at Upstate, between June, 1998 and January of 2002. One of the more prominent claims now asserted by the plaintiff concerns efforts by DOCS authorities to obtain a Deoxyribonucleic Acid ("DNA") sample from him as authorized under New York's DNA Indexing Statute, N.Y. Executive Law Art. 49-B, as well as disciplinary action taken by prison officials based upon his refusal to comply with that request. Plaintiff also alleges, *inter alia,* that defendants were deliberately indifferent to his serious medical needs, and that he was 1) exposed to inhumane conditions of confinement; 2) denied meaningful access to the law library facilities and deprived of court papers; 3) retaliated against for exercising his right to file grievances and seek other forms of redress; 4) subjected to unlawful racial discrimination and cell searches; and 5) unlawfully required to pay for food and spices required to enjoy meals consonant with his religious beliefs.[FN2]

FN2. The specifics of plaintiff's various causes of action will be discussed in more detail in the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

portions of this report addressing each grouping of claims.

II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on June 1, 2001, Dkt. No. 1, and on June 6, 2002 filed a second amended complaint-the operative pleading currently before the court.[FN3] Dkt. No. 78. In his amended complaint, plaintiff asserts a variety of constitutional and statutory claims against fifty-five named defendants, including the Commissioner of the DOCS and many of the agency's employees.[FN4] *Id.*

FN3. In addition to this action, plaintiff has commenced two other suits in this court. The first, *Anthony D. Amaker v. Glenn S. Goord, et al.,* Civil Action No. 03-CV-1003 (NAM/DRH) (N.D.N.Y., filed 2003) (*"Amaker II"* ), addresses incidents occurring at Upstate as well as subsequent to plaintiff's transfer into the Downstate Correctional Facility, and later to the Great Meadow Correctional Facility. A review of the relevant pleadings from that case reflects significant overlap between the claims asserted in that action and those now before the court. The other action, commenced by plaintiff on March 22, 2006 and encaptioned *Anthony D. Amaker, et al. v. Glenn S. Goord, et al.,* Civil Action No. 06-CV-0369 (GLS/RFT) (N.D.N.Y., filed 2006) (*"Amaker III"* ), was transferred to the Western District of New York on July 6, 2006, pursuant to 28 U.S.C. § 1404(a).

FN4. Also named as defendants in plaintiff's amended complaint were the New York State Senate and the New York State Assembly. *See* Dkt. No. 78. Those entities, which are clearly not parties amenable to suit, have not been formally joined as defendants in the action, however, in light of the issuance of an order on May 13, 2002 denying plaintiff's application for leave to amend to the extent that he sought permission to add them as defendants. *See* Dkt. No. 75.

Since its inception some seven years ago, this case has developed a tortured procedural history which has included the filing of more than one motion for interim injunctive relief and various interlocutory appeals, all of which have been dismissed. Now that discovery has been completed, by motion filed on February 13, 2007 defendants have moved for summary judgment dismissing plaintiff's claims on a variety of grounds. Dkt. No. 229. In addition, Corrections Officer R. Rivera, a named defendant who has yet to answer plaintiff's complaint, has also moved seeking dismissal of plaintiff's claims against him pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief may be granted as against him. Dkt. No. 237. Plaintiff has since responded to defendants' summary judgment motion by the filing on May 25, 2007 of a memorandum, affidavit, and various other materials, Dkt. No. 240, but has not opposed defendant Rivera's dismissal motion.[FN5]

FN5. Among plaintiff's submissions in opposition to the pending motions is a request that the court strike an affirmation submitted by defendants' counsel, Jeffrey P. Mans, Esq., as well as declarations of Dr. Vonda Johnson and James Bell, from the record. Dkt. No. 240-03. Having reviewed the Johnson and Bell declarations, I discern no basis to strike them from the record. Turning to Attorney Mans' declaration, I find that it appears to be offered principally to describe the exhibits being submitted in connection with defendants' motion and to set forth legal argument to supplement their memorandum. While the inclusion of legal argument in such an attorney's affidavit is ordinarily not appropriate, *Donahue v. Uno Restaurants, LLC,* No. 3:06-CV-53, 1006 WL 1373094, at *1 n. 1 (N.D.N.Y. May 16, 2006) (McAvoy, J.), and it is doubtful that defendants' attorney is positioned to include in an affidavit assertions of fact beyond his personal knowledge, *Housing Works, Inc. v. Turner,* No. 00 Civ. 1122, 2003 WL 22096475, at *1 (S.D.N.Y. Sept. 9, 2003), I have chosen not to strike the affidavit, and instead to consider it solely for the limited purpose for which it is being offered.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

***3** Defendants' motions, which are now ripe for determination, have been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed.R.Civ.P. 72(b).

III. *DISCUSSION*

A. *Standards of Review*

1. *Dismissal Motion Standard*

A motion to dismiss a complaint, brought pursuant to Rule 12(b) (6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading, utilizing as a backdrop a pleading standard which is particularly unexacting in its requirements. Rule 8 of the Federal Rules of Civil Procedure requires only that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Absent applicability of a heightened pleading requirement such as that imposed under Rule 9, a plaintiff is not required to plead specific factual allegations to support the claim; rather, "the statement need only 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " *Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 2200 (2007) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1964 (2007) (other quotations omitted)); *cf. Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007) (acknowledging that a plaintiff may properly be required to illuminate a claim with some factual allegations in those contexts where amplification is necessary to establish that the claim is "plausible"). Once the claim has been stated adequately, a plaintiff may present any set of facts consistent with the allegations contained in the complaint to support his or her claim. *Twombly,* 127 S.Ct. at 1969 (observing that the Court's prior decision in *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99 (1957), "described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival").

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true, and draw all inferences in favor of the non-moving party. *Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1722, 1734 (1964); *Miller v. Wolpoff & Abramson, LLP,* 321 F.3d 292, 300 (2d Cir.), *cert. denied,* 540 U.S. 823, 124 S.Ct. 153 (2003); *Burke v. Gregory,* 356 F.Supp.2d 179, 182 (N.D.N.Y.2005) (Kahn, J.). The burden undertaken by a party requesting dismissal of a complaint under Rule 12(b)(6) is substantial; the question presented by such a motion is not whether the plaintiff is likely ultimately to prevail, " 'but whether the claimant is entitled to offer evidence to support the claims.' " *Log On America, Inc. v. Promethean Asset Mgmt. L.L.C.,* 223 F.Supp.2d 435, 441 (S.D.N.Y.2001) (quoting *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995) (other quotations omitted)). Accordingly, a complaint should be dismissed on a motion brought pursuant to Rule 12(b)(6) only where the plaintiff has failed to provide some basis for the allegations that support the elements of his or her claim. *See Twombly,* 127 S.Ct. at 1969, 1974; *see also Patane v. Clark,* 508 F.3d 106, 111-12 (2d Cir.2007) ("In order to withstand a motion to dismiss, a complaint must plead 'enough facts to state a claim for relief that is plausible on its face.' ") (quoting *Twombly* ). "While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.' " *In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (3d Cir.2007) (quoting *Twombly,* 127 S.Ct. at 1974).

***4** When assessing the sufficiency of a complaint against this backdrop, particular deference should be afforded to a *pro se* litigant whose complaint merits a generous construction by the court when determining whether it states a cognizable cause of action. *Erickson,* 127 S.Ct. at 2200 (" '[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.' ") (quoting *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292 (1976) (internal quotations omitted)); *Davis v. Goord,* 320 F.3d 346, 350 (2d Cir.2003) (citation omitted); *Donhauser v. Goord,* 314 F.Supp.2d 119, 121 (N.D.N.Y.2004) (Hurd, J.). In the event of a perceived deficiency in a *pro se* plaintiff's complaint, a court should not dismiss without granting leave to amend at least once if there is any indication that a valid claim might be stated. *Branum v. Clark,* 927 F.2d 698, 704-05 (2d Cir.1991); *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

when justice so requires").

2. *Summary Judgment Standard*

Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When the entry of summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.

***5** When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

B. *DNA Testing*

In or about September of 2001, prison officials at Upstate initiated efforts to obtain a DNA sample from the plaintiff. Amended Complaint (Dkt. No. 78) ¶ ¶ 18-19. Plaintiff's refusal to cooperate with those efforts led to the issuance by Corrections Sergeant Cayea of a misbehavior report charging Amaker with failing to obey an order. *Id.; see also* Mans Aff. (Dkt. No. 229-14) Exh. B. A Tier II hearing was convened to address the charges lodged in the misbehavior report, resulting in a finding of guilt and the imposition of a penalty which included thirty days of keeplock confinement, with a corresponding loss of privileges.[FN6,FN7] *Id.*

FN6. The DOCS conducts three types of inmate disciplinary hearings. Tier I hearings address the least serious infractions, and can result in minor punishments such as the loss of recreation privileges. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the Special Housing Unit (SHU). Tier III hearings concern the most serious violations, and could result in unlimited SHU confinement and the loss of "good time" credits. *See Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246 (1998).

FN7. Keeplock is a form of confinement restricting an inmate to his or her cell, separating the inmate from others, and depriving him or her of participation in normal prison activities. *Gittens v. LeFevre,* 891 F.2d 38, 39 (2d Cir.1989); *Warburton v. Goord,* 14 F.Supp.2d

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

289, 293 (W.D.N.Y.1998) (citing *Gittens* ); *Tinsley v. Greene,* No. 95-CV-1765, 1997 WL 160124, at *2 n. 2 (N .D.N.Y. Mar. 31, 1997) (Pooler, D.J. & Homer, M.J.) (citing, *inter alia, Green v. Bauvi,* 46 F.3d 189, 192 (2d Cir.1995)). Inmate conditions while keeplocked are substantially the same as in the general population. *Lee v. Coughlin,* 26 F.Supp.2d 615, 628 (S.D.N.Y.1998). While on keeplock confinement an inmate is confined to his or her general population cell for twenty-three hours a day, with one hour for exercise. *Id.* Keeplocked inmates can leave their cells for showers, visits, medical exams and counseling, and can have cell study, books and periodicals, *Id.* The primary difference between keeplock and the general population confinement conditions is that keeplocked inmates do not leave their cells for out-of-cell programs, and are usually allowed less time out of their cells on the weekends. *Id.*

On October 10, 2001 plaintiff was again directed to provide a DNA sample, but similarly refused to honor the request. Amended Complaint (Dkt. No. 78) ¶ 20. A second misbehavior report was issued to Amaker as a result of that failure to comply with the directive of prison staff, resulting in a finding of guilt, following a Tier III hearing, and the imposition of a penalty which included six months of disciplinary confinement in a special housing unit ("SHU"), again with a corresponding loss of privileges.[FN8] *Id.; see also* Mans Aff. (Dkt. No. 229-14) Exh. C.

FN8. In New York, SHU cells are utilized for segregating prisoners from general population areas for various reasons including, predominantly, disciplinary purposes. *Lee v. Coughlin,* 26 F.Supp.2d 615, 618 (S.D.N.Y.1998) (citing 7 NYCRR pts. 253, 254, and 301). The conditions typically experienced by inmates confined in an SHU include two showers per week; one hour of outdoor exercise per day; unlimited legal visits; one non-legal visit per week; access to counselors; access to sick call; cell study programs; and access to library books. *Husbands v. McClellan,* 990 F.Supp. 214, 218 (W.D.N.Y.1998) (citing 7 NYCRR pt. 304).

On December 26, 2001 the DOCS Deputy Commissioner for Correctional Facilities, Lucien J. LeClaire, Jr., wrote to the plaintiff to inform him that in the event of an inmate's refusal to provide requested DNA samples corrections officials were authorized to obtain the required sample through the use of reasonable force, and that "appropriate additional disciplinary sanctions" could be imposed, further noting that upon investigation into the matter, apparently based upon a complaint lodged by the plaintiff, it was determined that in the course of their dealings with him corrections staff had "acted appropriately and in accordance with policies and procedures set by the [DOCS] governing DNA testing." Amended Complaint (Dkt. No. 78) Exh. A-5; *see also* Mans Aff. (Dkt. No. 229-14) Exh. D. Despite that letter, Amaker persisted in his refusal to provide the required DNA sample, leading to further disciplinary action against him.[FN9] Amended Complaint (Dkt. No. 78) ¶¶ 23-26.

FN9. The subsequent disciplinary proceedings necessitated by virtue of plaintiff's refusal to provide a DNA sample are chronicled in a report and recommendation issued in another action brought by plaintiff Amaker. *See Amaker II,* Dkt. No. 160, slip op. at pp. 3-4.

Among the claims interposed by the plaintiff in his second amended complaint are those surrounding the requirement that he provide a DNA sample pursuant to New York's Statutory DNA database regime and the imposition of the discipline based upon his repeated refusals to comply with directives to that effect. In asserting those claims plaintiff does not chart a new path, but instead raises claims similar to those which have previously been raised by him and other fellow inmates, and uniformly rejected by the courts.

***6** On the heels of the decision by the New York Court of Appeals in *People v. Wesley,* 83 N.Y.2d 417, 611 N.Y.S.2d 97, 633 N.E.2d 451 (1994) holding, *inter alia,* that DNA evidence is admissible in a criminal trial, the New York Legislature enacted a series of provisions aimed at the creation of a DNA databank. *Zarie v. Beringer,* No. Civ. 9:01-CV-1865, 2003 WL 57918, at *3

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 7

Slip Copy, 2009 WL 385413 (N.D.N.Y.)

(Cite as: 2009 WL 385413 (N.D.N.Y.))

(N.D.N.Y. Jan. 7, 2003) (Sharpe, M.J.). Among those was a statute authorizing the gathering of DNA samples from individuals convicted of certain offenses after January 1, 1996. *See* 1994 N.Y. Laws, ch. 737, §§ 1, 3; *see also* *Nicholas v. Goord,* 430 F.3d 652, 654 n. 1 (2d Cir.2005). In 1999 that provision was amended to apply to any person convicted of certain prescribed offenses, including murder, prior to the statute's effective date, provided that at the time of amendment he or she was still serving a prison sentence imposed in connection with the earlier offense. 1999 N.Y. Laws, ch 560, § 9; *see* *Nicholas,* 430 F.3d at 654 n. 1.

Since its enactment New York's DNA indexing provision, like similar provisions from other jurisdictions, has withstood various challenges, including to its constitutionality. *See, e.g., United States v. Amerson,* 483 F.3d 73, 75 (2d Cir.2007); *Nicholas,* 430 F.3d at 672. In response to one such challenge, the Second Circuit has held that the DNA indexing provision is lawful, concluding that special needs of the state giving rise to enactment of the statute trump the relatively minimal privacy interests and intrusion associated with a DNA sampling requirement. *Nicholas,* 430 F.3d at 671-72; *see also* *Roe v. Marcotte,* 193 F.3d 72, 78-80 (2d Cir.1999) (upholding a Connecticut DNA indexing statute substantially similar to New York's DNA provisions).

The basis for plaintiff's challenge in this case to the constitutionality of the DNA collection requirement is not entirely clear from his amended complaint and motion opposition papers. This uncertainty is of no moment, however, since the validity of New York's DNA indexing statute has been upheld by courts, including in this circuit, "over almost every conceivable constitutional challenge." *Jackson v. Ricks,* No. 9:02-CV-00773, 2006 WL 2023570, at *23 (N.D.N.Y. July 18, 2006) (Sharpe, D.J. and Lowe, M.J .) (collecting cases); *see also* *Doe v. Moore,* 410 F.3d 1337, 1349-50 (11th Cir.2005) (upholding Florida's sex offender DNA collection statute in the face of equal protection and due process challenges).

In challenging New York's DNA enactment plaintiff appears to be crafting an argument which is based upon alleged non-compliance with its statutory empowering provisions, under which the Division of Criminal Justice Services ("DCJS") is tasked with establishing the required notification procedures. That argument, however, appears to present questions of compliance with state law and regulation which are not cognizable under section 1983. *See* *Pollnow v. Glennon,* 757 F.2d 496, 501 (2d Cir.1985).

***7** Regardless of the nature of his challenge to New York's indexing provision, Amaker is now precluded from pursuing that claim by virtue of a prior decision from this court addressing a similar challenge by him. Among the claims which he raised in *Amaker II* were those addressed to the efforts of DOCS employees, including corrections officials at Upstate, to collect a DNA sample from him. Plaintiff's challenge in that action to the constitutionality of New York's DNA indexing provisions was resolved against him based upon the issuance on November 30, 2007 of a report and recommendation by United States Magistrate Judge David R. Homer, and approval of that report, in pertinent part, by Chief Judge Norman A. Mordue on July 10, 2008. *See Amaker II,* Dkt. Nos. 160, 167.

Since the arguments now asserted in connection with the DNA challenge were or could have been raised by Amaker in his prior action, he is precluded from now relitigating those claims. *See* *Akhenaten v. Najee, LLC,* 544 F.Supp.2d 320, 327-28 (S.D.N.Y.2008). Accordingly, the portion of plaintiff's amended complaint which challenges the testing requirements under the DNA identification indexing law lacks merit, and is subject to dismissal.

C. *The Torture Victim Protection Act of 1991*

Among the claims set forth in plaintiff's complaint, as amended, is a cause of action under the Torture Victim Protection Act of 1991, (the "TVPA"), Pub.L. No. 102-256, 106 S. Stat. 73 (1992), based upon defendants' actions toward him. Amended Complaint (Dkt. No. 78) ¶¶ 28, 34, 36. In their motion, defendants also seek summary dismissal of this claim, as a matter of law.

The TVPA provides, in relevant part, that

> [a]n individual who, under actual or apparent authority, or color of law, *of any foreign nation* (1) subjects an individual to torture shall, in a civil action, be liable for

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

damages to that individual; ...

Pub.L. No. 105-256, § 2(a), 106 Stat. at 73 (emphasis added). As can be seen, by its express terms the TVPA applies only to those who act under the authority of a foreign nation. *See In re: Agent Orange Product Liability Litig.,* 373 F.Supp.2d 7, 110-13 (E.D.N.Y.2005); *see also Arar v. Ashcroft,* 414 F.Supp.2d 250, 264 (E.D.N.Y.2006), *aff'd,* 532 F.3d 157 (2d Cir.2008). Since Amaker plainly cannot meet this requirement, his cause of action under the TVPA is deficient as a matter of law, and thus subject to dismissal.

D. *Property Loss*

Although the portion of his complaint in which he summarizes his claims does not reference such a cause of action, elsewhere in that pleading Amaker alleges that certain of his property was withheld by defendants Perry and Baniler, and later destroyed by defendant LaClair.[FN10] Amended Complaint (Dkt. No. 78) ¶ 21. Defendants also seek dismissal of this potential claim as being without merit.

> FN10. To some extent there is overlap between plaintiff's property loss claims and his contention that through confiscation or destruction of documents and other materials related to his ongoing litigation, he has been deprived of access to the courts. The property loss at issue in connection with this claim could also potentially serve as adverse action alleged by the plaintiff in connection with his retaliation claim. Both of these claims are addressed elsewhere in this report. *See* pp. 21-26, and 42-48, *post.*

It is well-settled that no constitutionally cognizable cause of action exists for the destruction or loss of a prison inmate's property, provided that an adequate remedy is afforded by the state courts for such deprivation. *Griffin v. Komenecky,* No. 95-CV-796, 1997 WL 204313, at *2 (N.D.N.Y. Apr. 14, 1997) (Scullin, J.). In this instance, plaintiff was entitled to avail himself of the mechanism prescribed under section nine of the New York Court of Claims Act to redress his loss of property claim. *See id.; see also Brooks v. Chappius,* 450 F.Supp.2d 220, 226-27 (W.D.N.Y.2006). Accordingly, plaintiff's loss of property cause of action is without merit, and subject to dismissal as a matter of law. *See Brooks,* 450 F.Supp.2d at 227.

E. *Eleventh Amendment/Sovereign Immunity*

***8** Plaintiff's claims in this action are brought against the various named defendants, both as individuals and in their official capacities. *See, e.g.,* Amended Complaint (Dkt. No. 78) ¶ 1. Noting that plaintiff's claims against the defendants in their official capacities are tantamount to those against the State, defendants seek their dismissal.

The Eleventh Amendment protects a state against suits brought in federal court by citizens of that state, regardless of the nature of the relief sought. *Alabama v. Pugh,* 438 U.S. 781, 782, 98 S.Ct. 3057, 3057-58 (1978). This absolute immunity which states enjoy under the Eleventh Amendment extends both to state agencies, and in favor of state officials sued for damages in their official capacities when the essence of the claim involved seeks recovery from the state as the real party in interest.[FN11] *Richards v. State of New York Appellate Division, Second Dep't,* 597 F.Supp. 689, 691 (E.D.N.Y.1984) (citing *Pugh* and *Cory v. White,* 457 U.S. 85, 89-91, 102 S.Ct. 2325, 2328-29 (1982)). "To the extent that a state official is sued for damages in his official capacity ... the official is entitled to invoke the Eleventh Amendment immunity belonging to the state." [FN12] *Hafer v. Melo,* 502 U.S. 21, 25, 112 S.Ct. 358, 361 (1991); *Kentucky v. Graham,* 473 U.S. 159, 166-67, 105 S.Ct. 3099, 3105 (1985).

> FN11. In a broader sense, this portion of defendants' motion implicates the sovereign immunity enjoyed by the State. As the Supreme Court has reaffirmed relatively recently, the sovereign immunity enjoyed by the states is deeply rooted, having been recognized in this country even prior to ratification of the Constitution, and is neither dependent upon nor defined by the Eleventh Amendment. *Northern Ins. Co. of New York v. Chatham County,* 547 U.S. 189, 193, 126 S.Ct. 1689, 1693 (2006).

> FN12. By contrast, the Eleventh Amendment does not establish a barrier against suits seeking to impose individual or personal liability on state officials under section 1983. *See Hafer,* 502 U.S.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

at 30-31, 112 S.Ct. at 364-65.

Since plaintiff's damage claims against the named defendants in their official capacities are in reality claims against the State of New York, thus exemplifying those against which the Eleventh Amendment protects, they are subject to dismissal. *Daisernia v. State of New York,* 582 F.Supp. 792, 798-99 (N.D.N.Y.1984) (McCurn, J.). I therefore recommend that this portion of defendants' motion be granted, and that plaintiff's damage claim against the defendants in their capacities as state officials be dismissed.

F. *Plaintiff's Court Access Claims*

Scattered intermittently throughout plaintiff's complaint are allegations that through their actions defendants denied him access to the courts, in violation of his rights under the First Amendment. Plaintiff's court access denial claims are based principally upon his contention that prison law library facilities available to him were inadequate, and additionally that through their actions corrections workers precluded him from accessing those materials. *See* Amended Complaint (Dkt. No. 78) ¶¶ 7, 16, 32. Defendants seek dismissal of those claims based principally upon plaintiff's failure to demonstrate the existence of any injury or prejudice experienced as a result of their actions.

An inmate's constitutional right to “meaningful” access to the courts is well-recognized and firmly established. *Bounds v. Smith,* 430 U.S. 817, 823, 97 S.Ct. 1491, 1495 (1977) (citations and internal quotation marks omitted). Although in *Bounds* the Supreme Court held that this right of access requires prison authorities “to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law[,]” *id.* at 828, 97 S.Ct. at 1498, the Court later clarified that

> ***9** prison law libraries and legal assistance programs are not ends in themselves, but only the means for ensuring a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts. Because *Bounds* did not create an abstract, freestanding right to a law library or legal assistance, an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense.

*Lewis v. Casey,* 518 U.S. 343, 351, 116 S.Ct. 2174, 2180 (1996) (internal quotations and citations omitted). Instead, an inmate “must go one step further and demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim.” *Id.* In other words, to establish a violation of the right of access to the courts, a plaintiff must demonstrate that defendants' interference caused him or her actual injury-that is, that a “nonfrivolous legal claim had been frustrated or was being impeded” as a result of defendants' conduct.[FN13] *Id.* at 353, 116 S.Ct. at 2181.

> FN13. Among the court access arguments asserted by plaintiff is the claim that on one occasion on September 10, 1998 plaintiff gave legal mail of an unspecified nature to Corrections Officer R. Lincoln, who never delivered it. Amended Complaint (Dkt. No. 78) ¶ 7. Since neither plaintiff's complaint nor the record now before the court discloses, however, that plaintiff suffered any prejudice as a result of that failure, this claim lacks merit. *See Govan v. Campbell,* 289 F.Supp.2d 289, 297-98 (N.D.N.Y.2003) (Sharpe, M.J .). Moreover, to the extent that the failure to promptly deliver that mail might be proven to have legal consequences, it is noted that that significance is substantially ameliorated by the prison mailbox rule which provides, in essence, that court papers are deemed filed when delivered by a prison inmate to corrections officials. *See Houston v. Lack,* 487 U.S. 266, 270-72, 108 S.Ct. 2379, 2382-83 (1988); *Mingues v. Nelson,* No. 96 CV 5396, 2004 WL 324898, at *3 (S.D.N.Y. Feb. 20, 2004).

In support of his court access claim plaintiff maintains that he was denied law library access between January 2, 2001 and January 18, 2001, and again from the filing of a second grievance related to library access on February 26, 2001 until March 5, 2001. Amended Complaint (Dkt. No. 78) ¶ 16. Plaintiff contends that this lack of access effectively precluded him from filing a motion to compel-presumably related to discovery-in a pending

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

federal court action.[FN14] *Id.*

> FN14. As defendants note, many of plaintiff's allegations regarding library access denial fail to identify any particular defendant to whom the denial can be fairly attributed. Since personal involvement in a constitutional deprivation is an essential requirement of a civil rights claim under 42 U.S.C. § 1983, *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995), this failure thus provides an additional, independent basis for dismissal of at least portions of plaintiff's court access claims.

Plaintiff's library access claims are addressed in a declaration given by Michael McKinnon, the DOCS employee charged with oversight of the law library at Clinton. *See* McKinnon Decl. (Dkt. No. 229-4) ¶¶ 1-2. In that declaration McKinnon describes the law library facilities and procedures at Clinton, including the established protocol for requesting library access. *Id.* ¶¶ 2-3. McKinnon notes that despite plaintiff's allegations to the contrary, *see* Amended Complaint (Dkt. No. 78) ¶ 7, he never denied library services to the plaintiff or any other inmate when faced with a court imposed deadline. *Id.* ¶ 6. McKinnon also notes that over the four month period during which the plaintiff could have commenced a proceeding under New York Civil Practice Law and Rules Article 78 to challenge the disciplinary action initiated in June of 1998, one of the potential legal proceedings for which he could have requested access to library facilities, he was granted library access on seven occasions during July, eleven times in August, five times in September and on six occasions in October of 1998, and that in the following months he was permitted use of the library facilities on approximately ten days in November of 1998 and nine times in December of that year. *Id.* ¶ 6. According to that declaration, records at Clinton also show that between June of 1999 and September, 2001, plaintiff was scheduled for more than four hundred library call outs, and was granted special access status on February 24, 2001 in light of an impending March 26, 2001 court deadline. *Id.* ¶ 9.

***10** The existence of prejudice is an essential element of a First Amendment court access denial claim. *Lewis,* 518 U.S. at 353, 116 S.Ct. at 2181. It is true that in his amended complaint plaintiff does claim, although in general and conclusory terms, that he was prejudiced by defendants' actions, allegedly having missed a court ordered deadline on more than one occasion, causing adverse consequences in connection with his legal actions. *See, e.g.,* Amended Complaint (Dkt. No. 78) ¶¶ 16, 32. Faced with defendants' motion raising lack of prejudice, however, plaintiff has failed to offer any specifics regarding those claims and to adduce proof from which a reasonable factfinder could conclude that he did indeed experience prejudice by virtue of defendants' failure to provide him with library access, and to mail court documents, leaving instead only his conclusory allegations without underlying evidentiary support.

In sum, the record now before the court neither supports plaintiff's claim that he was denied access to adequate library facilities while at Clinton, nor does it establish the existence of prejudice suffered as a result of any such deprivation, if indeed it did occur. Accordingly, I recommend dismissal of plaintiff's court access claims as a matter of law.

G. *Plaintiff's RICO Cause of Action*

In broad and conclusory terms devoid of specifics, plaintiff alleges that various of the defendants named in the action have violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.* Amended Complaint (Dkt. No. 78) ¶¶ 26, 35. Plaintiff's RICO claim appears to be predicated upon an alleged mail fraud scheme engaged in by corrections workers and "approved by Comm. Goord, Supt. Senkowski" to steal inmate mail, and includes his request that the court refer the matter to the United States Attorney for prosecution. *Id.* at ¶¶ 26, 35, 39. Interpreting plaintiff's complaint as seeking criminal prosecution for the alleged violation, and noting that the prerequisite for establishing a claim under that provision cannot be met in this instance, defendants seek dismissal of plaintiff's RICO claim. Despite his submission of comprehensive materials in opposition to defendants' motion, including a thirty-eight page affidavit and a twenty-one page memorandum of law, plaintiff does not address this portion of defendants' motion.

The substantive prohibitions under RICO are set forth

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

principally in 18 U.S.C. § 1962(a)-(c); subdivision (d) of that provision prohibits parties from conspiring to violate one or more of those substantive provisions. In relevant part, section 1962 provides that

> [i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

***11** 18 U.S.C. § 1962(c); *see* *Salinas v. United States,* 522 U.S. 52, 62, 118 S.Ct. 469, 476 (1997).

In addition to providing for potential criminal prosecution, RICO also affords a civil right of action for violation of its provisions, authorizing recovery of treble damages as well as costs of the action, including reasonable attorneys' fees, in the event of an established violation 18 U.S.C. § 1964(c). *See* *Klehr v. A.O. Smith Corp.,* 521 U.S. 179, 183, 117 S.Ct. 1984, 1987-88 (1997). To plead a cognizable civil RICO claim, a party must allege "(1) conduct, (2) of an enterprise, (3) through a pattern, (4) of racketeering activity," as well as "injury to business or property as a result of the RICO violation." *Anatian v. Coutts Bank (Switzerland) Ltd.,* 193 F.3d 85, 88 (2d Cir.1999).

The pleading of a civil RICO violation is subject to the heightened requirement that its supporting allegations must be pleaded with particularity. *See* Fed.R.Civ.P. 9(b); *see also* *Anatian,* 193 F.3d at 88-89. Additionally, the court's local rules require that when a civil RICO claim is asserted before this court, a RICO statement containing certain specified information must be filed by the party raising the claim. N.D.N.Y.L.R. 9.2. A review of the record in this case reveals that neither of these critical requirements has been met, thereby providing a threshold basis for dismissal of plaintiff's RICO claim. *See* *Spoto v. Herkimer County Trust,* No. 99-CV-1476, 2000 WL 533293, at *3 n. 2 (N.D.N.Y. Apr. 27, 2000) (Munson, J.).

Turning to the merits, it is clear that the record falls considerably short of establishing a basis upon which a reasonable factfinder could conclude that the requisite elements of a RICO claim have been established. While plaintiff alleges in conclusory fashion the existence of mail fraud at the prison facilities in which he was housed, and mail fraud potentially qualifies as racketeering activity, *see Anza v. Ideal Steel Supply Corp.,* 547 U.S. 451, 454, 125 S.Ct. 1991, 1995 (2006), the record fails to disclose the existence of a conspiracy of two or more persons, lacks evidence of two or more acts constituting a pattern of racketeering activity, does not identify the relevant "enterprise", fails to demonstrate how the conspirators, through the pattern of racketeering activity, conducted the enterprise, and alleges no injury to business or property resulting from defendants' actions. *See* Amended Complaint (Dkt. No. 78) ¶¶ 26, 35. Since the record fails to disclose evidence from which a reasonable factfinder in this case could conclude that the requisite elements to sustain a civil RICO claim have been met, I recommend dismissal of that cause of action on the merits.[FN15]

> FN15. In light of this finding I also recommend against referral of this matter to the United States Attorney, a matter which, while within the court's inherent authority in the event of a perceived criminal violation, *see, e.g.,* *ACLI Govn't Sec., Inc. v. Rhoades,* 989 F.Supp. 462, 467 (S.D.N.Y.1997), does not appear to be warranted. This determination, of course, does not preclude the plaintiff from filing a complaint with the United States Attorney or other appropriate federal authorities.

H. *Deliberate Medical Indifference*

One of the central themes presented in plaintiff's prolix, narrative-styled amended complaint is his claim that certain of the defendants have failed to properly treat his various medical conditions, many of which are not specified with any degree of particularity. Defendants contend that based upon the record now before the court they are entitled to dismissal of that claim as a matter of law, arguing that plaintiff neither suffers from a serious medical need, nor were the named defendants subjectively and deliberately indifferent to any such need.

***12** The Eighth Amendment's prohibition of cruel and unusual punishment encompasses punishments that involve the "unnecessary and wanton infliction of pain"

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291 (1976); *see also* *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400 (1981)).

A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement-the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference." *See* *Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (citing *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321 (1991)); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M .J.); *see also, generally,* *Wilson,* 501 U.S. 294, 111 S.Ct. 2321. Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1978; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer* ); *Waldo,* 1998 WL 713809, at *2 (same).

In order to state a medical indifference claim under the Eighth Amendment, a plaintiff must allege a deprivation involving a medical need which is, in objective terms, " 'sufficiently serious' ". *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (citing *Wilson,* 501 U.S. at 298, 111 S.Ct. at 2324), *cert. denied sub nom.,* *Foote v. Hathaway,* 513 U.S. 1154, 115 S.Ct. 1108 (1995). A medical need is serious for constitutional purposes if it presents " 'a condition of urgency' that may result in 'degeneration' or 'extreme pain'." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (citations omitted). A serious medical need can also exist where " 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain' "; since medical conditions vary in severity, a decision to leave a condition untreated may or may not be unconstitutional, depending on the facts. *Harrison v. Barkley,* 219 F.3d 132, 136-37 (2d Cir.2000) (quoting, *inter alia, Chance* ). Relevant factors in making this determination include injury that a " 'reasonable doctor or patient would find important and worthy of comment or treatment' ", a condition that " 'significantly affects' " a prisoner's daily activities, or causes " 'chronic and substantial pain.' " *Chance,* 43 F.3d at 701 (citation omitted); *LaFave v. Clinton County,* No. CIV. 9:00CV774, 2002 WL 31309244, at *2-3 (N.D.N.Y. Apr. 3, 2002) (Sharpe, M.J.).

***13** Deliberate indifference, in a constitutional sense, exists if an official knows of and disregards an excessive risk to inmate health or safety; the official must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer* ); *Waldo,* 1998 WL 713809, at *2 (same). It is well-established, however, that mere disagreement with a prescribed course of treatment, or even a claim that negligence or medical malpractice has occurred, does not provide a basis to find a violation of the Eighth Amendment. *Estelle,* 429 U.S. at 105-06, 97 S.Ct. at 201-02; *Chance,* 143 F.3d at 703; *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.), *cert. denied,* 506 U.S. 1040, 113 S.Ct. 828 (1992). The question of what diagnostic techniques and treatments should be administered to an inmate is a "classic example of a matter for medical judgment"; accordingly, prison medical personnel are vested with broad discretion to determine what method of care and treatment to provide to their patients. *Estelle,* 429 U.S. at 107, 97 S.Ct. at 293; *Chance,* 143 F.3d at 703; *Rosales v. Coughlin,* 10 F.Supp.2d 261, 264 (W.D.N.Y.1998).

Plaintiff's medical indifference claims, while referenced elsewhere, are summarized in paragraph twenty-seven of his amended complaint, and augmented in considerably greater detail in his summary judgment submissions including, notably, his affidavit. Plaintiff's medical concerns appear to center upon disagreement over

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 13

Slip Copy, 2009 WL 385413 (N.D.N.Y.)

(Cite as: 2009 WL 385413 (N.D.N.Y.))

the course of defendants' treatment of his diminished eyesight; chronic back pain, diagnosed as degenerative disc disease; and pain, "clicking and popping" in his knee. Amended Complaint (Dkt. No. 78) ¶¶ 12, 27. Generally speaking, plaintiff's medical indifference claim recites a litany of instances in which plaintiff did not receive desired medication, medical equipment, physical therapy, or treatment for his conditions.[FN16] *See* Amended Complaint (Dkt. No. 78) ¶ 27.

FN16. From a comparison of plaintiff's medical indifference claims in this case with those rejected in *Amaker II,* it appears that there is considerable overlap.

1. *Serious Medical Needs*

In their motion, defendants maintain that none of the conditions upon which plaintiff's medical indifference claims are predicated rise to a level of constitutional significance. In *Amaker II* the court found that plaintiff's claims regarding his vision and delay in eye treatment did not establish the existence of a serious medical need or injury. *See* Report and Recommendation in *Amaker II* (Dkt. No. 160) at pp. 15-16 and Memorandum-Decision and Order (Dkt. No. 167) at pp. 3, 6. Similarly, the *Amaker II* court concluded that in complaining regarding the treatment of his knee, including denial of magnetic resonance imaging ("MRI") testing and knee braces, plaintiff also failed to make the threshold requirement of establishing a serious physical injury or need. *Id* . at 16-17. Likewise, while noting a division among the courts regarding this issue, the court in that case nonetheless concluded that plaintiff's claim of abdominal pain, as drafted, did not successfully present a material issue of fact regarding serious medical need. *Id.* at 17.

***14** Having carefully reviewed the record now presented, like the court in *Amaker II* I doubt plaintiff's ability to establish, at trial, the existence of a serious medical condition of constitutional significance to which the defendants were deliberately indifferent. Because I find that Amaker cannot establish indifference on the part of defendants to any of his medical needs, regardless of whether they were sufficiently serious to trigger protections of the Eighth Amendment, and defendants do not appear to press the issue, I nonetheless find it unnecessary to address the sufficiency of plaintiff's allegations in this regard.

2. *Deliberate Indifference*

Turning to the subjective element of the deliberate indifference inquiry I find, as did the court in *Amaker II,* that rather than disclosing any indifference on the part of prison medical officials to plaintiff's medical needs, the record instead reflects a comprehensive and at times intense pattern of treatment for plaintiff's various medical conditions which, though plainly not to his complete liking, easily fulfills constitutionally mandated minimal requirements.

Plaintiff's medical indifference claim appears to relate to treatment received at both of the correctional facilities at issue in this case, although the vast majority of those allegations relate to his complaints regarding medical attention received while at Clinton. To the extent that plaintiff's claims involve the sufficiency of medical treatment administered at Upstate, similar claims were carefully reviewed by the court in *Amaker II,* resulting in a finding that the defendants were not deliberately indifferent to his serious medical needs during the time of his incarceration at Upstate. *See* Report and Recommendation in *Amaker II* (Dkt. No. 160) at pp. 15-17. That determination is dispositive of the portion of plaintiff's medical indifference claim in this action related to his medical care at Upstate.[FN17] *See Akhenaten,* 544 F.Supp.2d at 327-28.

FN17. Plaintiff's medical indifference claims carry forward to his time at Upstate, following a transfer into that facility on October 31, 2001. In his complaint, as amended, plaintiff asserts that during the course of that transfer he was "made to walk in waist chain hurting his herniated discs in his lower back causing his legs to go numbed [sic] [and that he] never was send [sic] to a medical doctor ...." Amended Complaint (Dkt. No. 78) ¶¶ 21, 24. This claim is contradicted by plaintiff's medical records, however, which reveal that upon his arrival at Upstate he was medically examined, screened and orientated, with no indication of any complaints of pain or numbness at that time; in fact, according to his

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

medical records, plaintiff denied having any injury or current medical complaint when questioned during that process. *See* Mans Aff. (Dkt. No. 229-14) Exh. A, 10/31/08 Entrance Exam Form, Screening and Physical Assessment Form, Inmate Orientation Form, and Incoming Draft Form. Despite plaintiff's further claim that he was not seen by medical officials at Upstate, the records once again reveal otherwise, reflecting that prior to the time of his transfer out of that facility on April 22, 2002, he was seen by medical personnel at Upstate more than forty times, with various complaints being registered by him along the way.

Turning to plaintiff's medical treatment while at Clinton, medical records of plaintiff's care at that facility reflect that between June 8, 1999 and December 1, 1999-the period covered by his complaints regarding medical care at Clinton-he was seen on approximately one hundred occasions regarding complaints concerning his back, knee, and neck pain, chronic headaches, and various other symptoms by an array of health care providers which included prison doctors, outside specialists, physician assistants, therapists and nurses. *See* Mans Aff. (Dkt. No. 229-14) Exh. A (filed under seal); *see also* Johnson Decl. (Dkt. No. 229-3) ¶ 7. During that time plaintiff was provided with medical examinations, consultations, physical therapy, knee braces and supports, and various medications, and additionally was the subject of x-rays and magnetic resonance imaging ("MRI") testing. *Id.*

One of the conditions of which plaintiff complains relates to chronic back pain. Plaintiff's medical records reveal that he has been diagnosed as suffering from degenerative disc disease. Mans Aff. (Dkt. No. 229-14) Exh. A; *see also* Johnson Decl. (Dkt. No. 229-3) ¶ 7. According to Dr. Vonda Johnson, the Medical Director at Clinton, while certain treatment regimens may afford some measure of relief for that condition, depending upon the particular patient, it cannot necessarily be "fixed" through surgery, medication, or physical therapy. Johnson Decl. (Dkt. No. 229-3) ¶ 9. In any event, plaintiff's health records reveal that plaintiff was provided considerable testing and treatment, including physical therapy, in an effort to address that condition. *See generally* Mans Aff. (Dkt. No. 229-14) Exh. A; Johnson Decl. (Dkt. No. 229-3) ¶ 11. Evaluations arranged by prison officials regarding plaintiff's back condition have included MRI testing as well as an EMG study/ nerve conduction study on November 1, 1999, ordered by Dr. Ellen. Johnson Decl. (Dkt. No. 229-3) ¶ 11.

***15** Another of plaintiff's complaints relates to treatment received for his knee. Plaintiff's medical records reveal that a bilateral physical examination of Amaker's knees was conducted on November 15, 1999 by Dr. Ellen. Manns Aff. (Dkt. No. 229-14) Exh. A, 11/1/99, 11/8/99, 11/15/99 Entries; Johnson Decl. (Dkt. No. 229-3) ¶ 11. Neither the results of Dr. Ellen's examination nor anything contained in plaintiff's records was viewed as indicating the need to perform MRI testing on his knees. *Id.*

The specifics of plaintiff's complaints regarding his knee condition include allegations that prison medical personnel failed to provide him with proper knee braces, failed to order MRI testing, and denied his requests to see a specialist to address the pain, clicking and popping being experienced in both knees. Plaintiff's conclusory allegations of not being provided with a knee brace are belied by the record. On April 13, 1999 one neoprene right knee brace was received at the facility for the plaintiff, with an indication that the other was back-ordered. *See* Mans Aff. (Dkt. No. 229-14) Exh. A, 4/13/99 entry. In any event upon receipt of the special neoprene knee braces, they were refused by the plaintiff. *Id.,* 1/6/00 Interdepartmental Communication.

Plaintiff's medical records reflect that medical officials at Clinton were in fact fully cognizant of plaintiff's complaints regarding knee pain, and took measures to address that condition. On November 8, 1999 a neurological examination of plaintiff's lower extremities was conducted, followed by a physical examination of both of plaintiff's knees on November 15, 1999. Johnson Decl. (Dkt. No. 229-3) ¶ 11; Mans Aff. (Dkt. No. 229-14) Exh. A, 11/1/99, 11/8/99, 11/15/99 entries. The results of those examinations by Dr. Ellen revealed nothing to indicate the need for MRI testing. While plaintiff challenges this determination, unsupported by any evidence suggesting that the opinions of Dr. Ellen were not medically appropriate, his claim in this regard

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

represents nothing more than disagreement over a chosen course of treatment, and is insufficient to support a claim of indifference. *Estelle,* 429 U.S. at 105-06, 97 S.Ct. at 201-02; *Chance,* 143 F.3d at 703; *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.3d 296 (2d Cir.), *cert. denied,* 506 U.S. 1040, 113 S.Ct. 828 (1992).

Another of plaintiff's medical complaints stems from the claim that while at Clinton he was denied treatment by Dr. Lee for a period of three months. Amended Complaint (Dkt. No. 78) ¶ 8. Neither plaintiff's complaint nor his motion submission, however, contains specifics regarding the time period involved. Moreover, while there may well have been periods of such a duration over which he was not seen by a doctor, a review of plaintiff's medical records fails to disclose any three month interval during which he was not medically treated by any DOCS medical personnel at Clinton. *See* Mans Aff. (Dkt. No. 229-14) Exh. A. Despite plaintiff's apparent belief to the contrary, the Eighth Amendment does not guarantee a prison inmate unfettered access to a prison physician at his or her insistence. *See Harrison v. Barkley,* 219 F.3d 132, 142 (2d Cir.2000) (" '[S]ociety does not expect that prisoners will have unqualified access to health care ....' ") (quoting *Hudson v. McMillian,* 503 U.S. 1, 9, 112 S.Ct. 995 (1992)).

***16** The vast majority of plaintiff's medical complaints surround the belief that he was not provided with adequate physical therapy, his disagreement over being told that he would have to pay for replacement of his broken eyeglasses, and the denial of appropriate shower and gym passes.[FN18] These complaints fall well short of establishing deliberate medical indifference of constitutional proportions on the part of prison officials at Clinton and Upstate. As the Second Circuit has noted,

> FN18. According to his health records, plaintiff was seen at Clinton by Nurse Rizoff on June 16, 1998, claiming that his eyeglasses were broken and requesting an eye examination and new glasses. *See* Mans Aff. (Dkt. No. 229-14) Exh. A, 6/16/98. Nurse Rizoff inquired as to how the glasses were broken, and advised the plaintiff that pursuant to the DOCS health services policy regarding vision care services he might be held accountable for the cost of any replacement that occurred within two years of his last eye examination and the issuance of glasses. *See id.,* Interdepartmental Communications from Dr. Lee to Plaintiff Regarding DOCS Policy for Eyeglasses, dated February 26, 1999. Plaintiff's records reveal that his eyes were subsequently examined on July 8, 1998, at which time he received a pair of glasses, and that he was retested on April 26, 1999 after complaining of eye pain. *See Id.,* 7/9/98 and 4/26/99 Entries. While there is considerable question as to whether plaintiff's eye condition constitutes a serious medical need for purposes of the Eight Amendment, particularly in view of the lack of allegations that his condition degenerated or he experienced severe pain as a result of the delay in providing him with an eye examination and glasses, *see Koehl v. Dalsheim,* 85 F.3d 86, 88 (2d Cir.1996); *Abdush-Shahid v. Coughlin,* 933 F.Supp. 168, 181 (N.D.N.Y.1996) (Koeltl, J.), it is clear that the defendants were not, as alleged, indifferent to his vision impairment.

> [i]t must be remembered that the State is not constitutionally obligated, much as it may be desired by inmates, to construct a perfect plan for [medical] care that exceeds what the average reasonable person would expect or avail herself of in life outside the prison walls. [A] correctional facility is not a health spa, but a prison in which convicted felons are incarcerated. Common experience indicates that the great majority of ... prisoners would not in freedom or on parole enjoy the excellence in [medical] care which the plaintiffs understandably seek .... We are governed by the principle that the objective is not to impose upon a state prison a model system of [medical] care beyond average needs but to provide the minimum level of [medical] care required by the Constitution. The Constitution does not command that inmates be given the kind of medical attention that judges would wish to have for themselves.... The essential test is one of medical necessity and not one simply of desirability.

*Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986) (internal quotations and citations omitted).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 16

Slip Copy, 2009 WL 385413 (N.D.N.Y.)

(Cite as: 2009 WL 385413 (N.D.N.Y.))

Plaintiff's ambulatory health record, which is both extensive and comprehensive, has been reviewed by Dr. Vonda Johnson, the Medical Director at Clinton. Based upon her professional judgment, Dr. Johnson opines that the plaintiff neither suffered from any acute medical condition requiring immediate medical care and treatment or which resulted in harm to his health or well-being, nor was he denied appropriate treatment by medical and nursing staff both at Clinton and Upstate, as well as by any outside specialists required under the circumstances. Johnson Decl. (Dkt. No. 299-3) ¶¶ 14-15. Having engaged in a careful review of plaintiff's medical records, informed by plaintiff's arguments as well as Dr. Johnson's opinions, I am of the view that no reasonable factfinder could conclude that defendants were deliberately indifferent to any serious medical condition suffered by the plaintiff, and therefore recommend dismissal of plaintiff's deliberate indifference claims as a matter of law.

I. *Retaliation*

In his amended complaint, although with the same degree of indefiniteness that has plagued his submissions in other substantive areas, plaintiff also asserts claims of violation of his First Amendment rights based upon retaliation for having engaged in protected activity, including the filing of grievances. Defendants also seek dismissal of plaintiff's retaliation claim as fatally nebulous and unsupported.

***17** When adverse action is taken by prison officials against an inmate, motivated by the inmate's exercise of a right protected under the Constitution, including the free speech provisions of the First Amendment, a cognizable retaliation claim under 42 U.S.C. § 1983 lies. *See Franco v. Kelly,* 854 F.2d 584, 588-90 (2d Cir.1988). As the Second Circuit has repeatedly cautioned, however, such claims are easily incanted and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus; courts must therefore approach such claims "with skepticism and particular care." *Dawes v. Walker,* 239 F .3d 489, 491 (2d Cir.2001) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002); *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (same).

In order to state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576 (1977); *Dillon v. Morano,* 497 F.3d 247, 251 (2d Cir.2007); *Dawes,* 239 F.3d at 492 (2d Cir.2001). If the plaintiff carries this burden, then to avoid liability the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. If taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

Analysis of retaliation claims thus requires careful consideration of the protected activity in which the inmate plaintiff has engaged, the adverse action taken against him or her, and the evidence tending to link the two. When such claims, which are exceedingly case specific, are alleged in only conclusory fashion, and are not supported by evidence establishing the requisite nexus between any protected activity and the adverse action complained of, a defendant is entitled to the entry of summary judgment dismissing plaintiff's retaliation claims. *Flaherty,* 713 F.2d at 13.

It should also be noted that personal involvement of a named defendant in any alleged constitutional deprivation is a prerequisite to an award of damages against that individual under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

F.2d 260, 263 (2d Cir.1986). As is true of other types of claims, this principle applies to causes of action claiming unlawful retaliation. *See* *Abascal v. Hilton,* No. 04-CV-1401, 2008 WL 268366, at *10 (N.D.N.Y. Jan. 30, 2008) (Kahn, D.J. and Lowe, M.J.).

***18** Analysis of plaintiff's retaliation cause of action is complicated by virtue of his failure in most instances to state, with any modicum of clarity, what specific protected activity triggered the retaliatory response and what the resulting adverse action was, including to articulate the timeframe involved. Among the actions apparently attributed by Amaker to retaliatory animus are searches of his cell, conducted on March 22 and 23, 1999. Amended Complaint (Dkt. No. 78) ¶ 10. Defendants' submissions, however, reveal that the first of those two searches was based upon suspicion that the plaintiff, one of several inmates present in the law library at the time a corrections officer's handcuff key case was discovered missing, could be in possession of that contraband.[FN19] Bell Decl. (Dkt. No. 229-10) ¶ 6. The second of those searches was a routine search performed in accordance with DOCS directives requiring periodic random cell searches. *Id.* ¶¶ 6-8. Since it therefore appears that both of those actions were taken for independent and legitimate reasons, they cannot form the basis of a retaliation claim. *Mount Healthy City Bd. of Ed.,* 429 U.S. at 287, 97 S.Ct. at 576; *see also* *Lowrence v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994).

FN19. It is well-established that as a prison inmate plaintiff has no Fourth Amendment right to privacy which would preclude a search of his cell, accomplished for legitimate reasons. *Hudson v. Palmer,* 468 U.S. 517, 525-26, 104 S.Ct. 3194, 3200 (1984). A cell search motivated out of retaliatory animus, however, could be found to support a claim of unlawful retaliation provided that all of the prerequisites for establishing a First Amendment claim were met. *See* *H'Shaka v. Drown,* No. 9:03-CV-937, 2007 WL 1017275, at *12 (N.D.N.y. Mar. 30, 2007) (Kahn, D.J. and Treece, M.J.).

Although it is far from clear, plaintiff also appears to assert that the requirement imposed by prison officials that he pay for spices and food consumed in connection with his celebration of Ramadan was retaliatory. Amended Complaint (Dkt. No. 78) ¶ 13. It is doubtful that a reasonable factfinder could conclude that this requirement rose to a level sufficient to constitute an adverse action. *Cf.* *Kole v. Lappin,* 551 F.Supp.2d 149, 155 (D.Conn.2008) (dismissing plaintiff's retaliation claim based on her complaint that the prison reduced the number of items sold as kosher-for Passover for inmates in response to her filing a grievance regarding the one hundred dollar spending limit). In any event, more importantly, there is no evidence among any of plaintiff's submissions which would establish the requisite nexus between the imposition of that requirement and plaintiff having engaged in protected activity.

Undeniably, it appears that the plaintiff in this case frequently avails himself of his First Amendment right to complain, by instituting litigation, filing grievances, and pursuing other channels, regarding prison conditions and his treatment as a DOCS inmate. It is also clear that the plaintiff has been subject to disciplinary action by prison officials with some regularity. While these two circumstances could suffice to establish two of the three requisite elements to establish a claim of unlawful retaliation, at least at the summary judgment stage, the record is wholly lacking in evidence from which a reasonable factfinder could conclude that the third and critical element, linking one or more of the adverse actions to plaintiff's protected activity, has been satisfied. Accordingly, I recommend dismissal of plaintiff's retaliation claim as a matter of law.

J. *Equal Protection*

***19** Plaintiff's complaint, as amended, also makes passing reference to the denial by defendants of his right to equal protection. *See, e.g.,* Amended Complaint (Dkt. No. 78) ¶ 28, 33.

The Equal Protection Clause directs state actors to treat similarly situated people alike. *See* *City of Cleburne, Texas v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254 (1985). To prove a violation of the Equal Protection Clause, a plaintiff must demonstrate that he or she was treated differently than others similarly situated as a result of intentional or purposeful discrimination

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

directed at an identifiable or suspect class. *See* Giano v. Senkowski, 54 F.3d 1050, 1057 (2d Cir.1995) (citing, *inter alia,* McCleskey v. Kemp, 481 U.S. 279, 292, 107 S.Ct. 1756, 1767 (1987)). The plaintiff must also show that the disparity in treatment "cannot survive the appropriate level of scrutiny which, in the prison setting, means that he must demonstrate that his treatment was not reasonably related to [any] legitimate penological interests." Phillips v. Girdich, 408 F.3d 124, 129 (2d Cir.2005) (quoting Shaw v. Murphy, 532 U.S. 223, 225, 121 S.Ct. 1475 (2001) (internal quotation marks omitted)).

In this instance neither plaintiff's complaint, as amended, nor the record now before the court provides specifics to flesh out plaintiff's equal protection claim. Presumably, the claim is rooted in the alleged differentiation of prison officials in their treatment of him, based upon his race. To be sure, plaintiff's submissions indicate the use of at least one racial epithet by prison officials. The record, however, is otherwise devoid of evidence from which a reasonable factfinder could conclude that the defendants discriminated as against the plaintiff based upon his race or some other protected criteria. Instead, plaintiff's allegations fall within the category of those observed by the Second Circuit to be insufficient, the court noting that "complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning." Barr v. Abrahams, 810 F.2d 358, 363 (2d Cir.1987). Discerning no basis upon which a reasonable factfinder could conclude that the defendants have violated Amaker's right to equal protection under the Fourteenth Amendment, I similarly recommend dismissal of that claim.

K. *Procedural Due Process*

Plaintiff's amended complaint also asserts, once again in wholly conclusory fashion, that his right to due process was violated by the defendants. Conspicuously absent from plaintiff's submissions, however, is an indication of what cognizable liberty interests are implicated in this cause of action, as well as illumination as to the reasons for his claim that due process was not afforded.

To successfully state a claim under 42 U.S.C. § 1983 for the denial of procedural due process arising out of a disciplinary hearing, a plaintiff must show that he or she 1) possessed an actual liberty interest, and 2) was deprived of that interest without being afforded sufficient process. *See* Tellier v. Fields, 280 F.3d 69, 79-80 (2d Cir.2000) (citations omitted); Hynes, 143 F.3d at 658; Bedoya v. Coughlin, 91 F.3d 349, 351-52 (2d Cir.1996). The procedural safeguards to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest are wellestablished, the contours of the requisite protections having been articulated in Wolff v. McDonnell, 418 U .S. 539, 564-67, 94 S.Ct. 2963, 2978-80 (1974). Under Wolff, the constitutionally mandated due process requirements, include 1) written notice of the charges; 2) the opportunity to appear at a disciplinary hearing and present witnesses and evidence, subject to legitimate safety and penological concerns; 3) a written statement by the hearing officer explaining his or her decision and the reasons for the action being taken; and 4) in some circumstances, the right to assistance in preparing a defense. Wolff, 418 U.S. at 564-67, 94 S.Ct. at 2978-80; *see also* Eng v. Coughlin, 858 F .2d 889, 897-98 (2d Cir.1988). In order to pass muster under the Fourteenth Amendment, hearing officer's disciplinary determination must garner the support of at least "some evidence". Superintendent v. Hill, 472 U.S. 445, 105 S.Ct. 2768 (1985).

***20** Having carefully searched the record now before the court, I am unable to find that Amaker experienced the deprivation of a constitutionally cognizable liberty interest sufficient to trigger the protections afforded under the Fourteenth Amendment. Moreover, even assuming *arguendo* the existence of such a liberty interest, plaintiff's submissions do not disclose any failure to comply with the constitutional mandates of the Fourteenth Amendment, including those articulated by the Supreme Court in *Wolff.* Accordingly, I recommend dismissal of plaintiff's procedural due process cause of action, as a matter of law.

IV. *SUMMARY AND RECOMMENDATION*

Plaintiff's amended complaint, though rambling and consisting of varied and wide-ranging claims based upon acts allegedly occurring at both Clinton and Upstate, when boiled down to its essence asserts claims of medical

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

indifference, constitutional violations based on DNA testing, retaliation, and denial of access to the courts. Having carefully considered the record now before the court I conclude that no factfinder could find in plaintiff's favor on any of these claims, and that defendants are thus entitled to dismissal of all claims against them, as a matter of law.[FN20] Accordingly, it is hereby

FN20. Based upon this finding I have opted not to address the defendants' additional arguments of lack of personal involvement and entitlement to qualified immunity. *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151 (2001). Similarly, I have chosen not to address the motion filed on behalf of defendant R. Rivera seeking dismissal for failure to state a cause of action in light of my recommendation regarding defendants' summary judgment motion.

RECOMMENDED that defendants' motion for summary judgment dismissing plaintiff's complaint (Dkt. No. 229) be GRANTED, and that plaintiff's complaint be DISMISSED in its entirety; and it is further hereby

RECOMMENDED that in light of this disposition the motion of defendant R. Rivera to dismiss plaintiff's claims against him for failure to state a cause of action upon which relief may be granted (Dkt. No. 237) be DENIED as moot.

NOTICE: pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report-recommendation. Any objections shall be filed with the clerk of the court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is further ORDERED that the Clerk of the Court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

N.D.N.Y.,2009.

Amaker v. Kelley
Slip Copy, 2009 WL 385413 (N.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Only the Westlaw citation is currently available.
**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,

W.D. New York.
Anthony D. AMAKER, et al., Plaintiffs,
v.
Commissioner Glenn S. GOORD, et al., Defendants.
No. 06–CV–490.

June 23, 2010.
Anthony D. Amaker, Alden, NY, pro se.

Ruhullah Hizuullah, Comstock, NY, pro se.

George Fluellen, West Coxsackie, NY, pro se.

J. Richard Benitez, NYS Attorney General's Office, Department of Law, Rochester, NY, for Defendants.

ORDER

RICHARD J. ARCARA, District Judge.

***1** This case was referred to Magistrate Judge H. Kenneth Schroeder, Jr. pursuant to 28 U.S.C. § 636(b)(1). On May 1, 2009, defendants filed a motion for summary judgment. On September 4, 2009 plaintiffs filed a motion for summary judgment. On March 25, 2010, Magistrate Judge Schroeder filed a Report and Recommendation, recommending that defendants' motion be granted in part and that plaintiffs' motion be granted in part.

Defendants filed objections to the Report and Recommendation on April 8, 2010 and plaintiffs filed a response thereto.

Pursuant to 28 U.S.C. § 636(b)(1), this Court must make a *de novo* determination of those portions of the Report and Recommendation to which objections have been made. Upon a *de novo* review of the Report and Recommendation, and after reviewing the submissions, the Court adopts the proposed findings of the Report and Recommendation.

Accordingly, for the reasons set forth in Magistrate Judge Schroeder's Report and Recommendation, defendants' motion for summary judgment is granted insofar as defendants seek to dismiss plaintiffs' claims for monetary damages under RLUIPA and otherwise is denied; plaintiffs' motion for summary judgment is granted insofar as plaintiffs seek permanent injunctive relief pursuant to RLUIPA and that defendants are permanently enjoined from punishing plaintiffs for refusing to cut their hair or refusing to change their religious affiliation and from precluding plaintiffs' attendance at Nation of Islam services and classes because of their dreadlocks; and plaintiffs' motion for summary judgment is granted with respect to plaintiffs' cause of action alleging a violation of their free exercise rights pursuant to the First Amendment of the United States Constitution.

The case is referred back to Magistrate Judge Schroeder for further proceedings.

SO ORDERED.

W.D.N.Y.,2010.

Amaker v. Goord
Not Reported in F.Supp.2d, 2010 WL 2572972 (W.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Only the Westlaw citation is currently available.

United States District Court,

S.D. New York.

Jeffrey DICKS, Plaintiff,

v.

BINDING TOGETHER, INC.; Joseph Williams, the Warden of Lincoln Correctional Facility; Members of the Temporary Release Committee; TRC Chairperson Joan Taylor, SCC; P.O Brewington; C.O. Fair; Corrections Counselor Ms. Donna McDonald; Deputy Superintendent Maria Tirone; and State of New York, Defendants.

No. 03 Civ. 7411(HB).

May 18, 2007.

***OPINION & ORDER***

Hon. HAROLD BAER, JR., District Judge.[FN1]

FN1. The Court wishes to thank Chris Fitzgerald of CUNY School of Law for his assistance in researching this Opinion.

***1** *Pro se* Plaintiff Jeffrey Dicks ("Plaintiff" or "Dicks") brings this action against Defendants Superintendent Joseph Williams, Deputy Superintendent Maria Tirone, Corrections Counselor Donna MacDonald, Temporary Release Committee chairperson Joan Taylor, "Corrections Officer Fair," [FN2] and the State of New York (collectively, "Defendants").[FN3] Plaintiff alleges various constitutional claims pursuant to 42 U.S.C. § 1983. Defendants move to dismiss Plaintiff's complaint in its entirety.

FN2. Defendants have not, to date, identified the first name of "Corrections Officer Fair" in their moving papers, prior motions, or prior correspondence with this Court.

FN3. Defendant, in his amended complaint of February 15, 2006, named Janet Chow, the director of the Binding Together work release program, as a Defendant. Pursuant to my Order of April 18, 2006, the Attorney General, in conjunction with the U.S. Marshals, attempted to effectuate service upon Ms. Chow. On May 11, 2006, the Attorney General reported to me that the Marshals were unable to effectuate service upon Ms. Chow, as she resigned from Binding Together in 2003, was believed to have moved out of the area, and her whereabouts were unknown. On September 19, 2006, Plaintiff again named Chow as a Defendant in his Amended Complaint. No service was effectuated (nor, it appears, attempted). On September 29, 2006, Plaintiff, in his now-operative Amended Complaint, did not name Chow as a Defendant. The Clerk of the Court terminated Janet Chow as a Defendant on September 29.

In a letter of July 31, 2006, Defendant requested leave of court to amend his complaint to add Binding Together. Defendant named Binding Together as a Defendant in his now-operative Amended Complaint of September 29, 2006. No service was effectuated (nor, it appears, attempted). Accordingly, I now dismiss Binding Together from this case as a Defendant.

In his amended complaint of February 15, 2006, Defendant also named Parole Officer "R. Carrington." Service was attempted on Carrington by the U.S. Marshals on May 10, 2006, but was returned unexecuted. The Attorney General subsequently informed me that Carrington died on July 5, 2005. Defendant did not name Carrington as a Defendant in subsequent complaints. The Clerk of the Court terminated Carrington as a Defendant on September 19, 2006.

In his amended complaint of February 15, 2006, Defendant also named Parole Officer

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 2

Not Reported in F.Supp.2d, 2007 WL 1462217 (S.D.N.Y.)

(Cite as: 2007 WL 1462217 (S.D.N.Y.))

Mrs. Brewington as a Defendant. Service was attempted on Brewington by the U.S. Marshals on May 10, 2006, but was returned unexecuted. The Attorney General subsequently informed me that Brewington is critically ill and on extended leave from the New York State Division of Parole. Defendant named Brewington in his subsequent Complaints, including his now-operative Amended Complaint of September 29, 2006. No further service was effectuated (nor, it appears, attempted). Accordingly, I now dismiss Brewington from this case as a Defendant.

For the reasons articulated below, Defendants' motion is granted in part and denied in part.

## I. BACKGROUND

The following facts are taken from Plaintiff's complaint (and construed liberally, as Plaintiff is *pro se* ).

A. *Underlying Facts of Plaintiff's Complaint*

Plaintiff was an inmate, it appears, at Wyoming Correctional Facility in 2001. Plaintiff's Amended Motion Brought Under Fed.R.Civ.P. 60(b), September 29, 2006 ("Pl.Compl.") at 4.[FN4] In September 2001, according to Plaintiff, he was transferred to a work release facility, apparently Lincoln Correctional Facility, and approved for the Binding Together vocational training work release program. *See generally* Pl. Compl. ¶ 7-8. Plaintiff was "learning a series of computer programs and document lithographics." *Id.* at 4. Plaintiff began the work release program on October 16, 2001. Pl. Compl. ¶ 7. He alleges he was issued a "continuous contractual agreement to participate" in that program. Pl. Compl. ¶ 10.

FN4. This "Amended Motion" serves as Plaintiff's currently operative complaint.

On October 9, 2001, the Appellate Division, Second Department affirmed Plaintiff's criminal conviction. Pl. Compl. ¶ 9; *see also People v. Dicks,* 287 A.D.2d 517 (N.Y.App.Div.2001). On November 13, 2001, according to Plaintiff, his post-conviction motion was denied by the trial court. Pl. Compl. ¶ 11. Around this time, Plaintiff alleges that he advised his corrections counselor, Donna MacDonald, "that he would need to access facilities that would enable him to properly address his legal concerns." *Id.* at ¶ 12. Specifically, Plaintiff alleges that he "constantly asked for time to research ... and prepare an appeal ... to exhaust the remaining state remedies before the 30-day statutory limit," and gave notice to MacDonald and his parole officer, Brewington, of his concerns.[FN5] *Id.* at ¶¶ 14-15. However, Plaintiff states that about "3 1/2 months after the State Court's denial," [FN6] "the facility" issued him "a pass for Saturdays to attend the New York Public Library in Manhattan.[FN7] *Id.* at ¶ 27.

FN5. Plaintiff refers to the fact that at some point, he filed a motion pursuant to N.Y.Crim. Proc. Law § 440, that was denied in 2001. Pl. Mem. Opp. at 33. It seems, although is not entirely clear, that Plaintiff filed a petition for *habeas corpus* in state court. Plaintiff also suggests that he filed a § 2254 federal habeas corpus petition at some point (apparently, in the Northern District of New York, subsequently transferred to the Eastern District of New York), and that that § 2254 petition was denied for failure to exhaust administrative remedies. Pl. Mem. Opp. at 33; Pl. Compl. ¶ 36.

FN6. It is unclear which denial, exactly, Plaintiff refers to.

FN7. Plaintiff avers, however, that he "did not possess or understand the new technology skills due to a lengthy period of incarceration." Pl. Compl. ¶ 27. Additionally, Plaintiff stated that the hours of 10 a.m. to 4 p.m. was not an "adequate time frame ... to research legal issues and draft up motions," as the law books were "very different compared to the books [Plaintiff] is used to looking at ..." Pl. Compl. ¶ 27.

On March 5, 2002, it appears Plaintiff was terminated from the Binding Together program due, according to Plaintiff, "to being sick." Pl. Compl. ¶ 7. On March 6, 2002, Plaintiff returned to the work release facility. Plaintiff spoke to his counselor, Donna MacDonald, and parole officer, Brewington, and was placed in the Special Housing Unit after MacDonald allegedly became "very

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

unruly." Pl. Compl. ¶¶ 17-18. Plaintiff alleges that he was not allowed access to "pen and paper to challenge anything." *Id* . at ¶ 7.

***2** On March 13, 2002, a hearing was held before the Temporary Release Committee. *Id.* at ¶ 18. MacDonald was not present. *Id.* Plaintiff alleges that he did not receive a "notice of warning, a conference ... or any other ways [sic] that a reasonable person would have to be notified in writing." Pl. Opp. at 9. Plaintiff generally avers that "no one ever inquired about any written documents ... from Binding Together." Pl. Opp. at 13. After the hearing, Plaintiff was placed on 90 days' probation without furloughs. Pl. Compl. ¶¶ 18-19.[FN8]

FN8. It appears, from a Department of Correctional Services computerized summary of that hearing, that Superintendent Joseph Williams gave final approval to the Temporary Release Committee's decision. Defendants' Motion to Dismiss, Ex. A. Plaintiff's arguments are generally consistent with this apparent fact.

It is not clear whether I may judicially notice and consider that computerized summary on a motion to dismiss. Defendants have not asked me to judicially notice it, nor provided argument in support of that proposition. I will accordingly refrain from considering that summary on this motion.

Plaintiff alleges that (apparently) around this time, he returned to the work release facility, and Ms. MacDonald berated him in front of her colleagues. Pl. Compl. ¶ 22. Plaintiff avers that he requested, at this point, "time to get his criminal appeal done." [FN9] *Id.* Plaintiff also avers that he submitted a letter around this time in which he requested to "handle research matters for his legal obligations." [FN10] Pl. Compl. ¶ 24. Plaintiff generally avers that Lincoln Correctional Facility "did not have a law library to help aid in the assistance of pending litigation at [this] time." Pl. Compl. at 15.

FN9. According to Plaintiff, "several months later," a Binding Together counselor did indeed give him permission to "address conducting research in challenging his criminal conviction, as long as [Plaintiff] was able to keep up with the [Binding Together] work ..." Pl. Mem. Opp. at 5.

FN10. Plaintiff avers that at one time, he had a copy of the letter, but "like most of his possessions at Lincoln," it "had been packed away by other people." Pl. Compl. ¶ 23.

Plaintiff also alleges that during their conversation, Ms. MacDonald yelled at him that "no church pass will be given" to Plaintiff. Pl. Compl. ¶ 22. Plaintiff states that he is of the Pentecostal faith. Plaintiff's Opposition to Motion to Dismiss ("Pl.Opp.") at 8. Plaintiff generally states that 25 to 30 individuals at Lincoln were of the Pentecostal faith, but Lincoln did not provide Pentecostal services to those inmates. Pl. Opp. at 23. Plaintiff alleges that previously, he had been allowed to attend worship and counseling services at "Bethel Gospel." Pl. Compl. ¶ 14. "From March [to] April 2002," according to Plaintiff, he "spoke about a various amount of matters," including a "request for a continuous church pass," and specifically alleged that he "asked for a church pass for Sunday Worship Service." *Id.* at ¶ 26, 28. Plaintiff alleges that "[n]o response was given." *Id.* at ¶ 28. Plaintiff states that around this time, there was no [Inmate Grievance Review Committee] "IGRC" box, or "IGRC Office," at Lincoln through which he could file an administrative grievance. *Id.* at ¶ 22.

On April 18, 2002, Plaintiff (according to him) was "suspended from school" (presumably the Binding Together work release program). Pl. Compl. ¶ 29. He claims that "no documents were handed to him ... on this matter." *Id.* When Plaintiff returned to the work release facility, no one was present. *Id.* at ¶ 30. The next day, April 19, Plaintiff went to Binding Together to speak to the director, Janet Chow, who was not present. *Id.* at ¶ 31. Plaintiff was told by another Binding Together counselor to "go home." *Id.* Plaintiff then attended a "loved one's funeral." *Id.*

Subsequently, upon his return to the work release facility, Plaintiff alleges he was placed in the Special Housing Unit "void of any explanation or documentation," because his parole officer, Brewington, had "placed [it] in

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

the computer." Pl. Compl. at ¶ 33.[FN11] The Temporary Release Committee, which according to Plaintiff, consisted of Chairperson Joan Taylor, Parole Officer Carrington, and Special Housing Unit Officer Fair, held a hearing on April 24, 2002 regarding whether Plaintiff was "out of bounds." Pl. Compl. ¶ 34. Plaintiff avers that "no one ever discussed any factors of what led up to the suspension and how long it is supposed to last." Pl. Mem. Opp. at 18. Plaintiff avers that there was "no substantial proof that Plaintiff traveled out of the state ..." Pl. Mem. Opp. at 19.

> FN11. Plaintiff also alleges that when he was placed in the SHU, "his property was packed by someone else ... [m]inus some items." Pl. Compl. at ¶ 33.

***3** After that hearing, which Plaintiff avers was recorded on tape, the committee unanimously voted to remove Plaintiff from work release.[FN12] Pl. Compl. ¶ 34. Plaintiff was subsequently transferred to Riverview Correctional Facility. *Id.* at ¶ 35.

> FN12. A copy of a Department of Correctional Services computerized summary of that hearing is appended to Defendant's Motion to Dismiss as Exhibit B. It appears, from reviewing that summary, that Deputy Superintendent Maria Tirone gave final approval to the Temporary Release Committee's decision. Plaintiff's arguments are generally consistent with this apparent fact.
>
> It is not clear whether I may judicially notice and consider that computerized summary on a motion to dismiss. Defendants have not asked me to judicially notice it, nor provided argument in support of that proposition. I will accordingly refrain from considering that summary on this motion.

Plaintiff avers that he was "supposed to go to his Merit Board" in September 2002, and that he had "all the requirements needed for Merit Board eligibility," but that the Merit Board action "never transpired." Pl. Compl. ¶ 41.

Plaintiff states that while at Riverview Correctional Facility, he did receive access to the law library and filed "several grievances in regards to harassment and unnecessary searches and the damage of property unnecessarily." Pl. Compl. ¶ 13.

B. *Procedural History*

Plaintiff filed his first complaint in this matter on September 22, 2003, before the Honorable Chief Judge Michael Mukasey. Plaintiff subsequently (or concurrently) wrote to the Court to voluntarily dismiss the case. On September 25, 2003, Judge Mukasey granted Plaintiff's request.

On October 20, 2003, Plaintiff appealed the voluntary dismissal to the Second Circuit. On April 19, 2005, the Second Circuit remanded Plaintiff's action to the district court. On May 25, 2005, the district court reopened the action and directed Plaintiff to submit an amended motion pursuant to Fed.R.Civ.P. 60(b). On December 13, 2005, following a request for extension of time, the district court granted Plaintiff's Rule 60(b) motion and directed Plaintiff to submit an amended complaint. On February 15, 2006, Plaintiff submitted an amended complaint. On April 12, 2006, Plaintiff's action was transferred from Judge Mukasey to this Court. On September 19, 2006, Plaintiff amended his complaint again. On September 29, 2006, subsequent to Defendants' motion to dismiss and pursuant to my individual practices, Plaintiff filed the now-operative Amended Complaint. On October 31, 2006, I ordered that Plaintiff be allowed no further amendments.

C. *Plaintiff's Complaint*

Plaintiff alleges three primary causes of action in his Complaint. First, Plaintiff alleges that he was denied substantive and procedural due process at the Temporary Release Committee hearings-both the initial hearing, after which he was placed on 90 days' probation, and the second hearing, after which he was removed from the work release program.

Secondly, Plaintiff alleges that he was denied access to the courts, in that he lost the opportunity to file a N.Y.Crim. Proc. Law § 440 petition (and, although it is unclear, perhaps a 28 U.S.C. § 2254 petition as well)

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

because corrections and work release staff did not grant him authorization to research and prepare the necessary documents to meet his statutory deadline for those petitions.

Third, Plaintiff alleges that he was deprived of his freedom of religion in that corrections staff denied him a pass to attend church services of his particular faith (in Plaintiff's case, the Pentecostal faith).

***4** Plaintiff generally seeks $7 million dollars in actual, punitive, and nominal damages for each of the above alleged constitutional violations against the various defendants.

Regarding his due process claims, Plaintiff also requests to expunge the records of his work release violations. Pl. Compl. at ¶ 14. Plaintiff also requests to be allowed to complete the necessary training program [and] a certificate of some type of acknowledgement for completing the last 60 days of training along with pay." *Id.* Plaintiff additionally requests an order to keep his current job with the City of New York while finishing the necessary training. *Id.*

Regarding his "denial of access" claim, Plaintiff also requests a "written stipulation" agreeing that employees of Lincoln Correctional Facility "hampered the plaintiff from filing timely and necessary appeals to exhaust state remedies in appealing [his] criminal conviction." Pl. Compl. at 15.

Defendants, on October 20, 2006, moved to dismiss Plaintiff's now-operative Amended Complaint.

## II. STANDARD OF REVIEW

When ruling on a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must construe all factual allegations in the complaint in favor of the non-moving party. *See Krimstock v. Kelly,* 306 F.3d 40, 47-48 (2d Cir.2002). A motion to dismiss should not be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Shakur v. Selsky,* 391 F.3d 106, 112 (2d Cir.2004), *quoting Conley v. Gibson,* 355 U.S. 41, 45-46 (1957). Since the plaintiff is the non-movant and proceeding *pro se,* I must construe his papers liberally and "interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (internal citation omitted).

## III. DISCUSSION

Defendants move to dismiss Plaintiff's complaint, in whole and in part, on several grounds. I will address each argument in turn.

### A. *Claims Against State of New York*

Defendants move to dismiss Plaintiff's claims against the State of New York. It is well settled that under the Eleventh Amendment, the doctrine of sovereign immunity bars actions for retroactive damages against a state or one of its agencies in federal court absent the state's consent to such suit or an express statutory waiver of immunity. *See, e.g., Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 97-103 (1984); *Mancuso v. New York State Thruway Auth.,* 86 F.3d 289, 292 (2d Cir.1996); *Santiago v. New York State Dep't of Correctional Services,* 945 F.2d 25 (2d Cir.1991) (civil rights actions against Department of Correctional Services under 42 U.S.C. § 1983 for retroactive damages prohibited by Eleventh Amendment). The State of New York has not so consented to suit in federal court. *Trotman v. Palisades Interstate Park Com.,* 557 F.2d 35, 38-40 (2d Cir.1977). Accordingly, Plaintiff's claims against the State of New York for money damages are dismissed.

***5** Additionally, Plaintiff's claims for money damages against the individual defendants in their official capacities are dismissed. *See Davis v. New York,* 316 F.3d 93, 102 (2d Cir.2002), *citing, e.g., Kentucky v. Graham,* 473 U.S. 159, 169 (1985) (claim for damages against state officials in their official capacity is considered to be a claim against the State and is therefore barred by the Eleventh Amendment).

Plaintiff's claims for prospective injunctive relief are not barred by the Eleventh Amendment-provided, however, that Plaintiff brings those claims against a state official, rather than the state itself. *See Santiago v. New York State Dep't of Correctional Services,* 945 F.2d 25, 32, *citing Ex Parte Young,* 209 U.S. 123 (1908). Plaintiff has named several state officials as Defendants here, and

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

his claims for prospective injunctive relief against those officials are not barred by the Eleventh Amendment.[FN13] Plaintiff's claims for prospective injunctive relief against the named Defendant State of New York are barred by the Eleventh Amendment, and are dismissed. *Cf. Flores v. N.Y. State Dep't of Corr. Servs.,* 2003 U.S. Dist. LEXIS 1680, at *9 (S.D.N.Y.2003) (plaintiff cannot seek an injunction against DOCS directly).

FN13. That said, it should be noted that it is unclear whether the state officials Plaintiff has named here as Defendants have the authority to grant the injunctive relief he seeks.

Thus, the State of New York is dismissed in its entirety as a Defendant in this case.

B. *Personal Involvement of Defendants Williams and Tirone*

Defendants move to dismiss all remaining claims against Superintendent Williams and Deputy Superintendent Tirone (in their personal capacities) for lack of personal involvement in the alleged constitutional violations against Plaintiff.

"It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995), *citing, e.g., Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994); *see also Scott v. Scully,* 1997 U.S. Dist. LEXIS 12966, at *9-10 (S.D.N.Y.1997) (Baer, J.). The personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring. *Id., citing Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986).

Defendants argue that Williams and Tirone were supervisory officials at Lincoln Correctional Facility, and involved in Plaintiff's alleged constitutional violations only to the extent that they approved the findings of the Temporary Release Committee when the Committee placed Plaintiff on probation, and subsequently terminated his work release program. Plaintiff does not directly contradict that statement, but avers that "they have to enter their access codes in order for the decision to be processed." [FN14] Pl. Opp. at 15. Such "involvement" does not constitute "personal involvement" in alleged constitutional violations under any of the five above-mentioned categories articulated by the *Colon* Court. *See Scott v. Scully,* 1997 U.S. Dist. LEXIS 12966, at *11 (where Defendant supervisor only affirmed dismissal of plaintiff's grievance, Court granted motion to dismiss based on lack of personal involvement); *see also Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985) ("plaintiff's claim for monetary damages ... requires a showing of more than ... linkage in the prison chain of command").

FN14. Plaintiff also avers that "final approvals for contracts were subject to Superintendent Joseph Williams and or his designee Deputy Superintendent Maria Tirone ..." Pl. Opp. at 15. To the extent that Plaintiff alleges Williams' or Tirone's involvement in the approval of his contract to begin work release, such participation is irrelevant, as Plaintiff alleges no constitutional violations regarding the approval of his work release contract (as opposed to the Temporary Release Committee's later termination of the contract). To the extent that Plaintiff's opposition could be construed to state that Williams or Tirone exercised final approval over the Temporary Release Committee's decisions, such a statement squares with Defendant's averments that Williams and Tirone were not personally involved in the alleged constitutional violations.

***6** Additionally, Plaintiff makes no factual allegations that Williams or Tirone were personally involved in Plaintiff's alleged violations of "denial of access to the courts" or free exercise of religion.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 7

Not Reported in F.Supp.2d, 2007 WL 1462217 (S.D.N.Y.)

(Cite as: 2007 WL 1462217 (S.D.N.Y.))

Accordingly, all claims against Williams or Tirone are dismissed, and Williams and Tirone are thus dismissed in all capacities as Defendants in this case.

C. *Claims Against Remaining Defendants*

Plaintiff's remaining claims are for money damages and injunctive relief against Corrections Counselor Donna MacDonald, Temporary Release Committee chairperson Joan Taylor, and "Corrections Officer Fair" in their individual capacities.

a. *Due Process Claims*

Plaintiff first alleges that he was denied procedural due process at the Temporary Release Committee hearings that ultimately terminated his participation in the work release program.[FN15]

> FN15. Defendants argue that Corrections Counselor MacDonald should be dismissed for lack of personal involvement as well, as although she issued the initial "out of bounds" charge that led to Plaintiff's first Temporary Release Committee hearing, she was not present at the hearing itself.
>
> It is not clear what role MacDonald played, or was tasked to play, in providing notice to Plaintiff of the charges against him. Additionally, it is unclear what, if any, information (either formal or informal) MacDonald provided to the Temporary Release Committee for its hearings. Construing the *pro se* Plaintiff's allegations liberally, and viewing the facts in the most favorable light, I decline to dismiss the due process claims against MacDonald on this motion to dismiss.

A prisoner has a due process right to a hearing before he may be deprived of a liberty interest. *See Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997). "Prisoners on work release have a liberty interest in continued participation in such programs." *Friedl v. City of New York,* 210 F.3d 79, 84 (2d Cir.2000), *citing Kim v. Hurston,* 182 F.3d 113, 117 (2d Cir.1999); *Tracy v. Salamack,* 572 F.2d 393, 395-96 (2d Cir.1978). An inmate generally must be afforded advance written notice of the charges against him and a written statement of fact findings supporting the disposition and reasons for the disciplinary action taken. *Kalwasinski v. Morse,* 201 F.3d 103, 108 (2d Cir.1999). Subject to legitimate safety and correctional goals of the institution, an inmate should also be permitted to call witnesses and present documentary evidence. *Id., citing Wolff v. McDonnell,* 418 U.S. 539, 563-64 (1974).

Regarding the first hearing, Plaintiff claims that he did not receive "notice," a "conference," or "any other ways [sic] that a reasonable person would have to be notified in writing." Pl. Opp. at 9.[FN16] Plaintiff also claimed that "no one ever inquired about any written documents ... from Binding Together." Pl. Opp. at 13. Regarding the second hearing, Plaintiff claims that he was "suspended from school," with "no documents handed to him," placed in the Special Housing Unit "void of any explanation or documentation," *see* Pl. Compl. ¶¶ 29, 33, and subsequently terminated from work release at a hearing where "no one ever discussed any factors of what led up to the suspension and how long it is supposed to last." Pl. Mem. Opp. at 18.

> FN16. Plaintiff also claimed that he could not adequately defend himself at the hearing because he was denied pen and paper while in the Special Housing Unit. *See* Pl. Compl. ¶ 7.

Construing Plaintiff's *pro se* allegations liberally, Plaintiff has stated claims for violations of procedural due process-namely, defective notice, the lack of opportunity to present evidence, and the lack of a statement of reasons-before both hearings that affected his liberty interest in continuing his work release program.[FN17] Defendants' motion to dismiss those claims is accordingly denied.

> FN17. Defendants also argue that Plaintiff has failed to exhaust his administrative remedies regarding his due process claim. Defendants note that Plaintiff filed an Article 78 petition in state court to challenge his removal from the temporary release program, but failed to obtain

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

personal jurisdiction over defendants due to defective service. *See* Dicks v. Williams, 308 A.D.2d 623 (N.Y.App.Div.2003). Strangely, however, Defendants support their exhaustion argument by citing authority that interprets the statutory procedures for bringing a habeas challenge to a state court conviction. *See* Picard v. Connor, 404 U.S. 270, 275 (1971), *citing* 28 U.S.C. § 2254. At this point in time, I decline to dismiss Plaintiff's due process claim for failure to exhaust administrative remedies.

***7** Plaintiff also appears to allege a claim for violations of substantive due process at the second hearing, which terminated his participation in the work release program. Specifically, Plaintiff alleges there was "no substantial proof that Plaintiff traveled out of the state ..." Pl. Mem. Opp. at 19.

A hearing disposition must be supported by "some evidence." *Kalwasinski v. Morse,* 201 F.3d 103, 108 (2d Cir.1999), *citing* *Superintendent v. Hill,* 472 U.S. 445, 455 (1985). Plaintiff essentially alleges that there was no evidence to support the Committee's decision. Although discovery (most obviously, of the tape of the hearing) and a subsequent motion for summary judgment might have obviated Plaintiff's claim, Plaintiff, on this motion to dismiss, has stated a claim for a violation of substantive due process. Defendants' motion to dismiss Plaintiff's substantive due process claim is accordingly denied.

It is worth noting that discovery, and a subsequent motion for summary judgment, may have shed more light on the merits of Plaintiff's claims. On July 21, 2006, I set a Scheduling Order which provided for discovery by November 15, 2006, and dispositive motions to be filed by January 30, 2007. It appears that neither Plaintiff nor Defendants availed themselves of discovery, or the opportunity to make a motion for summary judgment, before those deadlines.

Should these claims turn out to be true, the state Department of Corrections best rethink their procedures in this area so that what appears at this pleading stage to be a flagrant abuse of constitutional rights is not repeated.

b. *"Denial of Access to Courts" Claim*

Plaintiff also alleges that he was denied access to the courts and thus lost the opportunity to file post-conviction motions, or appeals of those motions, because corrections and work release staff did not grant him authorization to research and prepare the necessary documents to meet his statutory deadlines.

The constitutional right of access to courts entitles prisoners to either "adequate law libraries or adequate assistance from persons trained in the law." *Tellier v. Reish,* 1998 U.S.App. LEXIS 24479, at *7-8 (2d Cir.1998), *citing* *Bounds v. Smith,* 430 U.S. 817, 828 (1977). However, the Supreme Court has recognized that prisoners do not have "an abstract, free-standing right to a law library or legal assistance." *Lewis v. Casey,* 518 U.S. 343, 351 (1996). Instead, "meaningful access to the courts is the touchstone." *Id., quoting* *Bounds,* 430 U.S. at 823. Accordingly, a prisoner must "demonstrate that the alleged shortcomings in the library or legal assistance hindered his efforts to pursue a legal claim." *Id.*

Here, Plaintiff has alleged that the facility he was housed in, Lincoln Correctional, did not have a law library. Plaintiff additionally alleges that he asked on multiple occasions for time to research the legal issues relating to his direct appeal and post-conviction motions, notwithstanding his commitments to the work release program, and was denied such additional time. Construing Plaintiff's allegations in their most favorable light, Plaintiff alleges that he lost the opportunity to file a post-conviction motion, or an appeal of that motion, due to this inability to access legal materials. *See Torres v. Viscomi,* 2006 U.S. Dist. LEXIS 72818, at *9 (D.Conn.2006) ("Inmates must be afforded access to court to file a direct appeal, a petition for writ of habeas corpus or a civil rights action challenging the denial of a basic constitutional right."), *citing* *Lewis v. Casey,* 518 U.S. at 355.

***8** Admittedly, Plaintiffs' allegations are seriously undercut by his statements that he was ultimately given permission to attend the New York Public Library to conduct legal research, and that Binding Together acquiesced to or gave such permission so long as he completed his work release commitments. *See Tellier v. Reish,* 1998 U.S.App. LEXIS 24479, at *7-8 (affirming

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 9

Not Reported in F.Supp.2d, 2007 WL 1462217 (S.D.N.Y.)

(Cite as: 2007 WL 1462217 (S.D.N.Y.))

grant of summary judgment to defendants on "denial of access" claim where plaintiff was allowed access to library for eleven hours a week). The timing of when exactly Plaintiff was given permission to conduct research, as it relates to Plaintiff's statutory deadlines, is unclear. These, however, are genuine issues of material fact, better left for a motion for summary judgment (which Defendants did not bring).

Defendants' motion to dismiss Plaintiff's denial of access claim is accordingly denied.[FN18]

FN18. Defendants also argue that Plaintiff has not exhausted his administrative remedies before he brought his "denial of access" and religious freedom claims, as required by the Prisoner Litigation Reform Act for actions regarding prison conditions. *See* *Neal v. Goord,* 267 F.3d 116, 122 (2d Cir.2001), *citing* 42 U.S.C. § 1997e(a) ("no action shall be brought ... until such administrative remedies as are available are exhausted"). Plaintiff, however, alleges that the Lincoln facility had no Inmate Grievance Review Committee box, through which he could pursue his administrative remedies. *See* Pl. Compl. ¶¶ 21-22. Plaintiff also alleges that he filed grievances while at Riverside, although it is unclear whether he did so, or which violations he alleged at that time. Pl. Compl. ¶ 13.

Accordingly, construing Plaintiff's complaint in the most favorable light, I decline at this time to dismiss Plaintiff's claims for failure to exhaust administrative remedies.

Defendants argue as well that Plaintiff's "denial of access" and religious freedom claims are barred by the statute of limitations. Plaintiff's claims appear to have arisen in March and April of 2002. Plaintiff filed his original complaint in this Court on September 22, 2003, within the three-year statute of limitations for § 1983 claims. *See* *Owens v. Okure,* 488 U.S. 235 (1989). Plaintiff subsequently voluntarily dismissed his original complaint. Rather than refiling his complaint, the *pro se* Plaintiff appealed that voluntary dismissal to the Second Circuit, who remanded Plaintiff's action to this Court on April 19, 2005. In accordance with this Court's orders (and extensions of time), Plaintiff filed his Amended Complaint on February 15, 2006-technically outside the three-year statute of limitations.

"A layman representing himself ... is entitled to a certain liberality with respect to procedural requirements." *Mount v. Book-of-the-Month Club, Inc.,* 555 F.2d 1108, 1112 (2d Cir.1977). Accordingly, I decline to dismiss Plaintiff's claims as barred by the statute of limitations here.

c. *Religious Freedom Claim*

Plaintiff alleges a violation of his constitutional right to free exercise of religion because corrections staff denied him a pass to attend church services of the Pentecostal faith.

"Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003). To state a claim, the prisoner must "show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." *Salahuddin v. Goord,* 467 F.3d 263, 274-75 (2d Cir.2006), *citing* *Ford v. McGinnis,* 352 F.3d at 591. The defendants then bear the "relatively limited" burden of identifying the legitimate penological interests that justify the impinging conduct. *Salahuddin v. Goord,* 467 F.3d at 275, *citing Ford v. McGinnis* at 595. "The burden remains with the prisoner to 'show that these [articulated] concerns were irrational.' " *Id., citing Ford v. McGinnis* at 595; *see also Ford* at 588 (prisoners' free exercise claims are judged under a "reasonableness" test less restrictive than that ordinarily applied to alleged constitutional violations), *citing* *Farid v. Smith,* 850 F.2d 917, 925 (2d Cir.1988); *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349 (1987).

Here, Plaintiff alleges that he was denied the opportunity to attend church services.[FN19] There appears to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

be no reason to question that Plaintiff's professed Pentacostal beliefs are "sincerely held." Plaintiff has alleged a substantial burden upon those beliefs. *See Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir.1989) ("[P]risoners should be afforded every reasonable opportunity to attend religious services, whenever possible.") True, Plaintiff was denied the "church pass" in part, it appears, due to his own disciplinary violation. However, it is "error to assume that prison officials were justified in limiting [plaintiff's] free exercise rights simply because [plaintiff] was in disciplinary confinement." *Id.* at 570.

FN19. Plaintiff also appears to contest the facility's failure to provide services particularly designed for the Pentacostal faith. "[I]f those ... individuals in the facility were Muslim ... or [if] plaintiff had been Muslim, then Lincoln Correctional Facility would have made ... an Imam come for Jumah Services." Pl. Opp. at 23.

***9** It is entirely possible that after an examination of the facts, Defendants may provide a "legitimate penological interest" for Defendants' actions that rebuts Plaintiff's claim. Such a determination, however, is better left to a motion for summary judgment (which Defendants did not bring here). *See Salahuddin v. Goord,* 467 F.3d at 277, *citing Young v. Coughlin,* 866 F.2d at 570 ("the district court should not have dismissed appellant's First Amendment claim without requiring prison officials to establish the basis for the First Amendment restrictions imposed."). Defendants' motion to dismiss Plaintiff's First Amendment claim for violation of free exercise of religion is denied.

Plaintiff also brings a state law claim pursuant to N.Y. Correct. Law. § 610(3), which provides, in part, that inmates "shall be allowed such religious services and spiritual advice and spiritual ministration from some recognized clergyman of the denomination or church which said inmates may respectively prefer ..." [FN20] N .Y. Correct. Law. § 610(3) (2007); *see, e.g., Cancel v. Goord,* 278 A.D.2d 321, 322 (N.Y.App.Div.2000); *see also Salahuddin v. Mead,* 2000 U.S. Dist. LEXIS 3932, at *10-11 (S.D.N.Y.2000) (noting that state free exercise claims are considered in similar manner to federal claims). Defendants' motion to dismiss Plaintiff's state law claim, for the reasons outlined above, is denied as well.[FN21]

FN20. It should be noted that Plaintiff did not bring a claim pursuant to the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), which creates a separate, private right of action for free exercise claims that requires the government to show a "compelling governmental interest." *See Salahuddin v. Goord,* 467 F.3d at 273-74, *citing* 42 U.S.C. § 2000cc-1 *et. seq*. Some courts, even where plaintiff did not specifically allege the statutory RLUIPA claim, have allowed liberal leave to plaintiff to amend his complaint to include it. *See McEachin v. McGuinnis,* 357 F.3d 197, 199 n. 2, 205 (2d Cir.2004) (noting that "the failure in a complaint to cite a statute, or to cite the correct one, in no way affects the merits of a claim," and instructing the district court on remand to consider allowing plaintiff to amend his complaint and consider appointing counsel to plaintiff to address the resultant statutory legal issues). Here, where Plaintiff has now filed three amendments to his complaint in this Court, I decline at this late juncture to grant Plaintiff leave to amend his complaint to add the statutory claim.

FN21. It should be noted, although the parties did not brief the issue, that because Plaintiff's state law claim against DOCS officials must be brought in the New York Court of Claims, it is unclear if I may exercise pendent jurisdiction over Plaintiff's claim. *See Cancel v. Mazzuca,* 205 F.Supp.2d 128, 138 (S.D.N.Y.2002) (declining to exercise pendent jurisdiction over N.Y. Correct. Law § 610 claim), *citing* N.Y. Correct. Law § 24(2) ("Any claim for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties of any officer or employee of [DOCS] shall be brought and maintained in the court of claims as a claim against the state.")

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

D. *Qualified Immunity*

Defendants also move to dismiss Plaintiff's above-mentioned remaining claims against MacDonald, Taylor, and Fair in their individual capacities for alleged violations of a) due process, b) denial of access to the courts, and c) free exercise of religion on the grounds that Defendants are shielded by qualified immunity.

"The doctrine of qualified immunity protects state actors sued in their individual capacity from suits for monetary damages where 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Baskerville v. Blot,* 224 F.Supp.2d 723, 737 (S.D.N.Y.2002), *quoting Harlow v. Fitzgerald,* 457 U.S. 800, 818, 73 L.Ed.2d 396, 102 S.Ct. 2727 (1982); *see generally McKenna v. Wright,* 2004 U.S. Dist. LEXIS 725, at *24-25 (S.D.N.Y.2004) (Baer, J.). "Even where a plaintiff's federal rights are well-established, qualified immunity is still available to an official if it was 'objectively reasonable for the public official to believe that his acts did not violate those rights." *Woods v. Goord,* 2002 U.S. Dist. LEXIS 7157, at *35 (S.D.N.Y.2002), *quoting Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d. Cir.1991). Therefore, state officials are shielded by qualified immunity if either "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 250 (2d Cir.2001), *quoting Salim v. Proulx,* 93 F.3d 86, 89 (2d Cir.1996).

***10** For the same reasons outlined above that support denial of Defendants' motion to dismiss, I decline to find at this time, as a matter of law, that Defendants' actions did not violate "clearly established law." *Cf. McKenna v. Wright,* 2004 U.S. Dist. LEXIS 725, at *26-27. Regarding the "objective reasonableness" of Defendants' actions, while "the use of an 'objective reasonableness' standard permits qualified immunity claims to be decided as a matter of law," *see Cartier v. Lussier,* 955 F.2d 841, 844 (2d Cir.1992), the determination "usually depends on the facts of the case ... making dismissal at the pleading stage inappropriate." *See Woods,* 2002 U.S. Dist. LEXIS 7157, at *35 (citations omitted). Construing the allegations in the *pro se* Plaintiff's complaint in their most favorable light, *see McKenna v.. Wright* at *26, I accordingly decline at this time to dismiss the remaining claims against Defendants on the grounds of qualified immunity.

**IV. CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss Plaintiff's claims is granted in part and denied in part.

Trial of Plaintiff's remaining claims against MacDonald, Taylor, and Fair in their individual capacities for alleged violations of a) due process, b) denial of access to the courts, and c) free exercise of religion will commence on July 16, 2007, in accordance with prior orders of this Court.

The Clerk of the Court is directed to close this motion and remove it from my docket.

**SO ORDERED.**

S.D.N.Y.,2007.

Dicks v. Binding Together, Inc.
Not Reported in F.Supp.2d, 2007 WL 1462217 (S.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.